IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION


JACQUELYN TYREE, et al.,

          Plaintiffs,

v.                                       CIVIL ACTION NO.  2:12-cv-08633

BOSTON SCIENTIFIC CORPORATION,

          Defendant.


**MEMORANDUM OPINION AND ORDER**
(*Motion in Limine No. 9*)

Pending before the court is Boston Scientific Corporation's ("BSC") Motion *in Limine* to Preclude Any Evidence or Argument That Boston Scientific Owed or Breached a Duty to Warn Plaintiffs Directly ("Motion *in Limine* No. 9"). (*See* BSC's Initial Mots. *in Limine* [Docket 374], at ¶ 9). For the reasons set forth below, BSC's Motion *in Limine* No. 9 is **GRANTED**.

    **I.**      **Background**

This consolidated case resides in one of seven MDLs assigned to me by the Judicial Panel on Multidistrict Litigation concerning the use of transvaginal surgical mesh to treat pelvic organ prolapse and stress urinary incontinence. In the seven MDLs, there are over 60,000 cases currently pending, over 13,000 of which are in the Boston Scientific Corporation MDL, MDL 2326. In this particular case, the four consolidated plaintiffs were surgically implanted with the Obtryx Transobturator Mid-Urethral Sling System ("the Obtryx"), a mesh product manufactured

by BSC. (*See* Pretrial Order # 78 [Docket 9], at 1–2).[1] All of the plaintiffs received their surgeries in West Virginia. The plaintiffs claim that as a result of implantation of the Obtryx, they have experienced "erosion, mesh contraction, infection, fistula, inflammation, scar tissue, organ perforation, dyspareunia (pain during sexual intercourse), blood loss, neuropathic and other acute and chronic nerve damage and pain, pudendal nerve damage, pelvic floor damage, and chronic pelvic pain." (*Id.* at 4 (quoting the master complaint)). The plaintiffs allege negligence; strict liability for design defect; strict liability for manufacturing defect; strict liability for failure to warn; breach of express warranty; breach of implied warranty; and punitive damages. (*Id.* at 2). The spouse of one plaintiff (Ms. Tyree) has also alleged loss of consortium. (*Id.*). The claims of strict liability for manufacturing defect, negligent manufacturing, and breach of implied warranty of fitness for a particular purpose have been dismissed. (*See* Mem. Op. & Order (Mot. for Summ. J.) [Dockets 445, 446, 447, 449]).

BSC has submitted twenty-five motions *in limine*, all of which I have ruled on except for the motion at bar. (*See* Mem. Op. & Order (Def.'s Mot. *in* Limine re: MSDS) [Docket 443]; Mem. Op. & Order re: Motions *in Limine* [Docket 464]). In its remaining motion *in limine*, BSC asks the court to preclude evidence that BSC owed or breached a duty to directly warn the plaintiffs about the risks associated with the Obtryx implant. (*See* Def.'s Mem. in Supp. of Its Initial Mots. *in Limine* ("Def.'s Mem.") [Docket 375], at 23).

---

[1] I originally consolidated the cases of eleven plaintiffs implanted with the Obtryx. (*See* Pretrial Order # 78 [Docket 9], at 1 (naming Canterbury, Billings, Sexton, Hendricks, Moore, Tyree, Campbell, Blankenship, Pugh, Workman, and Wilson as consolidated plaintiffs)). Four plaintiffs now remain in this action. (*See* Pretrial Order # 94 [Docket 67], at 1 (removing *Sexton* case from the consolidated West Virginia cases); Stipulation of Dismissal [Docket 104] (dismissing the claims of Donna Billings with prejudice); Order Dismissing Canterbury Plaintiff [Docket 107], at 1 (dismissing the claims of Karen Canterbury with prejudice); Stipulation of Dismissal [Docket 123] (dismissing the claims of Neasha Workman with prejudice); Stipulation of Dismissal With Prejudice[Docket 426] (dismissing with prejudice the claims of Sharon Pugh, et al.); Stipulation of Dismissal With Prejudice [Docket 433] (dismissing plaintiff Tammy Hendricks with prejudice); Stipulation of Dismissal With Prejudice [Docket 427] (dismissing plaintiff Dreama Moore with prejudice)).

BSC asserts two arguments to support its position. First, BSC contends that the plaintiffs did not rely upon warnings provided by BSC, instead depending entirely on the medical judgment of their treating physician when deciding to undergo pelvic implant surgery. Thus, according to BSC, whether BSC owed a duty to directly warn the plaintiffs is "irrelevant to whether they would have undergone the Obtryx procedure." (*Id.* at 23–24). Because the plaintiffs have demonstrated that questions of fact exist regarding information they received prior to implant surgery, as explained in my summary judgment rulings, I am not persuaded by this reasoning. (*See, e.g.*, Mem. Op. & Order re: Campbell [Docket 445], at 6). BSC's second argument, however, requires further consideration.

BSC next claims that its duty to directly warn the plaintiffs is irrelevant because West Virginia courts have not eliminated the learned intermediary doctrine in the context of medical device manufacturers. BSC maintains that while the West Virginia Supreme Court of Appeals rejected the learned intermediary doctrine in *State ex rel. Johnson & Johnson v. Karl*, 647 S.E.2d 899, 914 (W. Va. 2007), the holding narrowly applied to prescription drug manufacturers and manufacturers engaged in direct-to-consumer ("DTC") advertising.[2] As a result, BSC submits that *Karl* does not govern this case and that the learned intermediary doctrine still applies, requiring BSC to warn only the plaintiffs' treating physicians about the Obtryx sling. Thus, in BSC's view, any argument about the information BSC communicated to the plaintiffs should be excluded as irrelevant.

---

[2] DTC advertising is a marketing technique employed by pharmaceutical manufacturers in which "[p]harmaceutical remedies for varied problems such as allergies, nail fungus, hypertension, hair loss, and depression are placed directly before the consumer in magazines, television, and via the Internet." *Perez v. Wyeth Labs., Inc.*, 734 A.2d 1245, 1252 (N.J. 1999) (internal quotations and citations omitted).

## II. Discussion

In reviewing this motion, I face a novel question of West Virginia products liability law. *Karl* unequivocally rejects the learned intermediary doctrine as applied to drug manufacturers, a ruling that departs from the law of forty-eight states by most recent count.[3] In addition, *Karl* expresses concern with applying the learned intermediary doctrine to manufacturers that participate in DTC advertising. But *Karl*'s import beyond this context is not evident. Crucially, given the four separate opinions in *Karl*—one majority opinion, two concurrences, and one joint dissent—I cannot easily ascertain whether the West Virginia Supreme Court of Appeals intended *Karl*'s rationale to apply to a case such as this, where the product at issue is a medical device rather than a prescription drug, and where the defendant engages in minimal, if any, DTC advertising. Determining the scope of *Karl*, therefore, is necessary to address the question prompted by this motion *in limine*: Is the situation at bar distinguishable from *Karl* such that the learned intermediary doctrine should apply, limiting the defendant–manufacturer's duty to warn

---

[3] In 2012, the Texas Supreme Court counted thirty-five states, including the District of Columbia, in which the high court has "adopted some form of the learned intermediary doctrine within the prescription drug products-liability context" or that has at least "cited favorably to its application within this context." *Centocor, Inc. v. Hamilton*, 372 S.W.3d 140, 158 n.17 (Tex. 2012). I have confirmed this number. In addition, state intermediate courts or federal courts of thirteen other states have applied the learned intermediary doctrine or predicted that the highest state court would apply it. *See Piper v. Bear Med. Sys., Inc.*, 883 P.2d 407, 415 (Ariz. Ct. App. 1993); *O'Connell v. Biomet, Inc.*, 250 P.3d 1278, 1281–82 (Colo. App. 2010); *Ortho Pharm. Corp. v. Chapman*, 388 N.E.2d 541, 549 (Ind. Ct. App. 1979); *Petty v. United States*, 740 F.2d 1428, 1440 (8th Cir. 1984) (intimating that the doctrine is part of Iowa's common law); *Mikell v. Hoffman-LaRouche, Inc.*, 649 So. 2d 75, 79–80 (La. Ct. App. 1994); *Violette v. Smith & Nephew Dyonics, Inc.*, 62 F.3d 8, 13 (1st Cir. 1995) (applying the doctrine under Maine law); *Reaves v. Ortho Pharm. Corp.*, 765 F. Supp. 1287, 1291 (E.D. Mich. 1991); *Nelson v. Dalkon Shield Claimants Trust*, No. 84-276-sd, 1994 WL 255392, at *4 (D.N.H. June 8, 1994); *Foyle v. Lederle Labs.*, 674 F. Supp. 530, 535–36 (E.D.N.C. 1987); *Harris v. McNeil Pharm.*, No. 3:98-cv-105, 2000 WL 33339657, at *4 n.4 (D.N.D. Sept. 5, 2000); *In re Zyprexa Prods. Liab. Litig.*, 277 F.R.D. 243, 250 (E.D.N.Y. 2011) (predicting that the Rhode Island Supreme Court would adopt the "general and statutory law in this country"); *McElhaney v. Eli Lilly & Co.*, 575 F. Supp. 228, 231 (D.S.D. 1983); *Lukaszewicz et al. v. Ortho Pharm. Corp.*, 510 F. Supp. 961, 963 (E.D. Wis. 1981).

This brings the total number of states employing some iteration of the learned intermediary doctrine to forty-eight (including D.C.), with the exceptions being Vermont, *see Kellogg v. Wyeth*, 762 F. Supp. 2d 694, 700 (D. Vt. 2010) (asserting that Vermont has neither adopted nor rejected the learned intermediary doctrine), New Mexico, *see Rimbert v. Eli Lilly & Co.*, 577 F. Supp. 2d 1174, 1214–1224 (D. N.M. 2008) (predicting that the Supreme Court of New Mexico would not adopt the learned intermediary doctrine), and, of course, West Virginia.

to the plaintiffs' treating physicians? (*See* Def.'s Mem. [Docket 375], at 24 (arguing that *Karl*'s grounds for rejecting the learned intermediary doctrine do not exist in this case)).

### A. Determining the Scope of *Karl*

In *Karl*, the Supreme Court of Appeals confronted a motion *in limine* very similar to the one in this case. Facing various products liability claims, the defendant drug manufacturer, Janssen Pharmaceutica ("Janssen"), asked the court to exclude evidence or argument by the plaintiff suggesting that Janssen had a duty to provide warnings about its manufactured drug to the plaintiff personally. *Id.* at 901. In other words, relying on the learned intermediary doctrine, Janssen contended that by providing adequate warnings about the drug to the plaintiff's treating physician, Janssen satisfied its duty to warn such that any direct communication with the plaintiff, or lack thereof, was irrelevant. *Id.* The circuit court denied the motion *in limine*, observing that West Virginia's highest court had not yet adopted the learned intermediary doctrine. *Id.*

On petition for writ of prohibition, Janssen asked the Supreme Court of Appeals to join the majority of states and "adopt the learned intermediary doctrine as an exception to the general duty of manufacturers to warn consumers of the dangerous propensities of their products." *Id.* at 900–01. In three separate opinions, a majority of the court denied the writ of prohibition, declining to adopt the learned intermediary doctrine. *See id.* at 901 (majority opinion by Chief Justice Davis); *id.* at 917 (Maynard, J., concurring); *id.* at 918 (Starcher, J., concurring). The two remaining justices dissented to the decision. *See id.* at 914 (Albright, J., dissenting, joined by Benjamin, J.). Left with these four puzzling opinions that have few common aspects, I must discern a concrete principle on which three out of the five justices agreed in order to determine *Karl*'s application in this case.

To facilitate this endeavor, I borrow the United States Supreme Court's approach for instances in which the Justices have entered multiple opinions on various grounds:

> When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of [a majority] of Justices, the holding of the court may be viewed as that position taken by those members who concurred on the narrowest grounds.

*Marks v. United States*, 430 U.S. 188, 193 (1977). Having carefully examined the three opinions that resulted in the rejection of the learned intermediary doctrine, I conclude that the narrowest reading of *Karl* eliminates the protection of the learned intermediary doctrine only for drug manufacturers that engage in DTC advertising. I reach this conclusion by recognizing that notwithstanding the many differences in their opinions, Chief Justice Davis, Justice Maynard, and Justice Starcher uniformly rejected the learned intermediary doctrine specifically for drug manufacturers based, at least partially, on the prevalence of drug advertisements targeted at consumers.

First, Chief Justice Davis's majority opinion directs the following ruling: "[W]e now hold that, under West Virginia products liability law, *manufacturers of prescription drugs* are subject to the same duty to warn consumers about the risks of their products as other manufacturers." *Karl*, 647 S.E.2d at 914 (emphasis added). This holding expressly refers to drug manufacturers and does not speak to *Karl*'s role in other circumstances. Justice Maynard's concurrence also hones in on prescription drug manufacturers, stating that "*drug manufacturers* . . . should not be exempt from the general duty to warn that this State places on manufacturers." *Id.* at 918 (Maynard, J., concurring) (emphasis added). Similarly, Justice Starcher agrees that "the *drug manufacturer* must attempt to fully and understandably instruct the end-consumer." *Id.* at 919–20 (Starcher, J., concurring) (emphasis added). While Justices Starcher and Maynard indicate in their concurrences that they would likely apply the same principle to device manufacturers, *see*

*id.* at 918 (Maynard, J., concurring) and *id.* at 920 (Starcher, J., concurring), Chief Justice Davis's opinion does not express a similar supposition.

Second, while the justices discuss numerous rationales for rejecting the learned intermediary doctrine, their concern with the emergence of DTC advertising stands out among the opinions as the primary justification for *Karl*. Chief Justice Davis provides the most detailed analysis of this matter. She begins by enumerating the "primary justifications" that led to the creation of the learned intermediary doctrine:

> (1) the difficulty manufacturers would encounter in attempting to provide warnings to the ultimate users of prescription drugs; (2) patients' reliance on their treating physicians' judgment in selecting appropriate prescription drugs; (3) the fact that it is physicians who exercise their professional judgment in selecting appropriate drugs; (4) the belief that physicians are in the best position to provide appropriate warnings to their patients; and (5) the concern that direct warnings to ultimate users would interfere with doctor/patient relationships.

*Id.* at 905. Chief Justice Davis then concludes that the "recent initiation and intense proliferation of direct-to-consumer advertising," accompanied by "the development of the internet as a common method of dispensing and obtaining prescription drug information," *id.* at 907, has "obviate[d] each of the premises upon which the [learned intermediary] doctrine rests." *Id.* at 910.

Specifically, the practice of advertising directly to patients "suggests that consumers are active participants in their health care," invalidating the paternalistic role of the physician from the past. *Id.* at 910 (quoting *Perez v. Wyeth Labs., Inc.*, 734 A.2d 1245, 1255 (N.J. 1999)). Additionally, Chief Justice Davis explains that DTC advertising "encroaches" on the physician/patient relationship that the learned intermediary doctrine sought to protect. *Id.* (quoting *Perez*, 734 A.2d at 1256); *id.* at 909 ("Today, doctors still argue that their relationship with patients is undermined by direct-to-consumer advertising [because] patients demand a

particular drug they saw on television, or in a magazine.") (internal quotations and citations omitted). Put simply, Chief Justice Davis's opinion stresses that DTC advertising has eliminated the premises of the learned intermediary doctrine, and as a result, the doctrine has little value. *See id.* at 911 ("When all its premises are absent, [the learned intermediary doctrine] simply drops out of the calculus. . . ." (quoting *Perez*, 734 A.2d at 1256)).[4] Both concurring opinions agree with this rationale. *See id.* at 918 (Maynard, J., concurring) (relying on "the massive amounts" of DTC advertising); *id.* at 919 (Starcher, J., concurring) (worrying that the doctrine allows drug companies to "profit by marketing their drugs directly to consumers" without requiring them to provide adequate warnings).

These two points of agreement result in the narrowed reading of *Karl* set forth above. Other federal district court judges have also assumed this tailored interpretation of *Karl*. In *Roney v. Gencorp*, Chief Judge Chambers stated, "The decision in *Karl* [] was extremely context specific. The reasoning is not applicable to a scenario outside of the prescription pharmaceutical context and the rise of direct-to-consumer advertising." 654 F. Supp. 2d 501, 504 (S.D. W. Va. 2009). Similarly, in *Vagenos v. Alza Corp.*, Judge Copenhaver predicted that the West Virginia Supreme Court of Appeals would not apply the *Karl* decision to a pharmacy, allowing the pharmacy to use the learned intermediary doctrine as a "shield" from liability on a failure to warn claim. No. 1:09-cv-1523, 2010 WL 2944683, at *3–4 (S.D. W. Va. July 23, 2010). As support, Judge Copenhaver points to the *Karl* court's failure to discuss the doctrine in "the context of a pharmacist's duty to warn." *Id.* at *5. This same reasoning applies here—the *Karl*

---

[4] Curiously, in her decision to eliminate the learned intermediary doctrine, Chief Justice Davis relies heavily on the analysis in *Perez v. Wyeth Laboratories, Inc.*, wherein the New Jersey Supreme Court merely created an exception to the learned intermediary doctrine for cases in which the manufacturer participated in DTC advertising. *Perez*, 734 A.2d at 1268 (Pollock, J., dissenting) (explaining that the majority had created an "exception to the learned intermediary doctrine"). The New Jersey Supreme Court adopted the learned intermediary doctrine in 1989, *see Niemiera v. Schneider*, 555 A.2d 1112 (N.J. 1989), and in *Perez*, the New Jersey Supreme Court emphasized that the learned intermediary doctrine would continue to apply "when its predicates are present." *Perez*, 734 A.2d at 1250 (majority opinion).

court did not discuss the doctrine in the context presented in this case either. Admittedly, one of my colleagues has interpreted *Karl* as a broad rejection of the learned intermediary doctrine. *See Muzichuck v. Forest Labs., Inc.*, No. 1:07-cv-16, 2014 WL 3530367 (N.D. W. Va. July 15, 2014) ("In *Karl*, the West Virginia Supreme Court of Appeals did not distinguish between cases that present evidence of direct-to-consumer advertising and those that do not."). Although this interpretation of *Karl* is a rational one, I do not find it persuasive. The court in *Muzichuck* did not employ the U.S. Supreme Court's tool for narrowly construing the holding of a case with multiple underpinnings. *See Marks*, 430 U.S. at 193 (providing the "narrowest grounds" rule). And in any event, the circumstances of *Muzichuck*, which involved a prescription drug manufacturer, fit within this court's narrow reading of *Karl*.[5]

Having exercised *Marks*'s directive and determined *Karl*'s narrow holding—that the learned intermediary doctrine does not protect drug manufacturers who engage in DTC advertising—I now turn to the present matter.

## B. Distinguishing This Case from *Karl*

Based on *Karl*'s majority ruling, I conclude that *Karl* does not govern this case. The learned intermediary doctrine is appropriately applied here because (1) BSC did not directly advertise the Obtryx to the consumer; and (2) the Obtryx is an implanted medical device rather than a consumed prescription drug.

---

[5] The plaintiffs point to this court's previous opinion in *Woodcock v. Mylan, Inc.*, 661 F. Supp. 2d 702 (S.D. W. Va. 2009), to support their argument that the West Virginia Supreme Court of Appeals has entirely rejected the learned intermediary doctrine such that BSC cannot rely on it. (*See* Pls.' Ominus Resp. to BSC's Initial Mots. *in Limine* [Docket 395], at 15). The ruling in *Woodcock* has no effect on this court's analysis of *Karl*.

As an initial matter, *Woodcock* addressed a choice-of-law issue, an entirely different legal subject matter than that presented in the case at bar. *See Woodcock*, 661 F. Supp. 2d at 606 (considering whether West Virginia law or Alabama law would apply to the products liability claims). In addition, *Woodcock* applied *Karl* solely in the context of pharmaceutical drugs—the defendant was a drug manufacturer, and the product at issue was a fentanyl pain reliever patch. *See id.* at 604 (identifying the product at issue as a Schedule II pain reliever manufactured by Mylan Pharmaceuticals). Consequently, the facts of *Woodcock* fit within the confines of this court's current reading of *Karl*.

1. **Absence of DTC Advertising**

DTC advertising, according to the *Karl* court, eliminates the premises underlying the learned intermediary doctrine. BSC, however, did not advertise the Obtryx directly to customers. (*See* Def.'s Mem. [Docket 375], at 24 (asserting that the Obtryx "has never been advertised on television by the manufacturers")). Indeed, the deposition testimony of BSC sales representative Arthur Butcher demonstrates that BSC predominantly, if not entirely, marketed its product to physicians. (*See* Butcher Dep. [Docket 395-8], at 33:2–22 (discussing Butcher's efforts to market BSC products to physicians and the content of Butcher's "sales pitch")).

Without DTC advertising, the premises of the learned intermediary doctrine rematerialize. For example, lacking an advertising forum, BSC, unlike the defendants in *Karl*, cannot easily communicate with end-consumers. *See Karl*, 647 S.E.2d at 910 (explaining that drug manufacturers' advertising campaigns provide "effective means to communicate directly with patients") (quoting *Perez*, 734 A.2d at 1252)). Additionally, if patients can no longer rely on advertisements to make medical decisions, they must again depend on their treating physicians as a "learned intermediary" to help them determine the appropriate treatment. They cannot, as might be the case for advertised products, "demand a particular [device] that they saw on television or in a magazine." *Id.* at 909. Finally, while DTC advertising might put the onus on patients to select a product for treatment, *id.* at 910, physicians necessarily become involved in this decision when only they have access to advertising materials. In the treatment of SUI, for instance, it is almost always the case that the physicians receive the marketing materials and then select the requisite SUI device. (*See, e.g.*, Michael W. Lassere Dep. [Docket 374-18], at 197:1–19 (explaining that the hospital chose a particular SUI device because the physicians wanted to "standardize the materials in the operating room" to make the institution more "uniform"); *see*

*also* Bernard J. Luby Dep. [Docket 374-17, at 37:1–17] (explaining his use of different sling products based on whether or not he "liked the procedure")). This analysis demonstrates that by removing the variable of DTC advertising, the *Karl* court's concerns with the learned intermediary doctrine become less pertinent.

### 2. Implanted Medical Devices

Because *Karl* implicates only drug manufacturers, I am of the opinion that medical device manufacturers may continue to use the learned intermediary doctrine in failure to warn cases. Many courts have allowed medical device manufacturers to use the learned intermediary doctrine against failure to warn claims. *See, e.g.*, *Hurley v. Hart Physicians, P.C.*, 898 A.2d 777, 784 n.10 (Conn. 2006) (listing the courts that have applied the learned intermediary doctrine to prescription medical devices). In fact, one court has stated that "it makes even more sense to apply the doctrine in the context of medical devices." *Beale v. Biomet, Inc.*, 942 F. Supp. 2d 1360, 1368 (S.D. Fla. 2007). The court in *Beale v. Biomet, Inc.* reasoned that a patient cannot access a medical device without the assistance of a learned intermediary—"[w]hile some individuals could conceivably gain access to prescription drugs without their doctor's assistance, it is not reasonably conceivable that an individual could obtain and implant a device that requires a trained surgeon without the intervention of a physician." *Id.* Furthermore, the court opined that the physician plays a larger role in discussing the risks and benefits of implant surgery than he or she might have in discussing a routinely prescribed drug. *Id.* Thus, the physician's opportunity to warn the patient is much greater than that of the device manufacturer.

The Obtryx sling is analogous to the knee replacement device that the *Beale* court considered. Patients cannot obtain the Obtryx sling except through a physician. Additionally, because the patient is under anesthesia during the surgery, the patient and her physician must

thoroughly discuss the potential risks and benefits prior to the implantation. These factors are not present when a physician prescribes a routine drug.

### III. Conclusion

In sum, without the presence of end-consumer advertising, the rationale for rejecting the learned intermediary doctrine is not persuasive. At the same time, when the product involved is a medical device rather than a drug, the rationale for applying the learned intermediary doctrine is compelling. The present case lies at the intersection of this reasoning. BSC, the manufacturer of a medical device and a company that markets to physicians rather than patients, is not subject to the *Karl* ruling, and as a result, the learned intermediary doctrine applies to the plaintiffs' failure to warn claims. Accordingly, BSC only had a duty to warn the plaintiffs' treating physicians of the risks involved with the Obtryx implant. Any evidence or argument that BSC owed or breached a duty to warn the plaintiffs directly is therefore irrelevant.

In reaching the conclusion that the learned intermediary doctrine would apply in West Virginia where a device manufacturer has not participated in DTC advertising, the court was encouraged by the nearly unanimous national recognition of the doctrine's value. Applying the learned intermediary doctrine—as forty-eight states currently do—fosters the uniformity and predictability of law, which has great importance in modern jurisprudence, as evidenced by the increasing reliance on restatements of law and model codes. For the reasons set forth above, I **GRANT** BSC's motion *in limine* on this matter. ([Docket 374, at ¶ 9).

The court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party. The court further **DIRECTS** the Clerk to post a copy of this published opinion on the court's website, www.wvsd.uscourts.gov.

ENTER: October 23, 2014

_____
JOSEPH R. GOODWIN
UNITED STATES DISTRICT JUDGE

13