1

2

3          IN THE UNITED STATES DISTRICT COURT
      FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
                    AT CHARLESTON
                 TRANSCRIPT OF PROCEEDINGS

4

5    _____

6    JACQUELYN TYREE, et al.,          CIVIL ACTION NO.

7           Plaintiffs,               2:12-cv-08633
        v.

8
     BOSTON SCIENTIFIC CORPORATION,

9
            Defendant.

10   _____

11

12                   TRIAL DAY FOUR

13                NOVEMBER 05, 2014

14

15        BEFORE THE HONORABLE IRENE C. BERGER,

16            UNITED STATES DISTRICT JUDGE

17

18
     Court Reporters:        Carol Farrell, CRR, RMR, CCP, RPR
19                           (304)347-3188
                             carol_farrell@wvsd.uscourts.gov
20
                             Lisa A. Cook, RPR, RMR, CRR, FCRR
21                           (304)347-3198
                             lisa_cook@wvsd.uscourts.gov
22

23

24
     Proceedings recorded by machine stenography; transcript
25   produced by computer.

1                    **A P P E A R A N C E S**

2

  **FOR THE PLAINTIFFS:**

3

  **SCOTT A. LOVE, ESQUIRE**
4 CLARK, LOVE & HUTSON
  440 Louisiana, Suite 1600
5 Houston, TX  77002

6 **PAUL THOMAS FARRELL, JR., ESQUIRE**
  GREENE, KETCHUM, BAILEY, WALKER, FARRELL & TWEEL
7 419 11th Street
  Huntington, WV  25701

8
  **AIMEE H. WAGSTAFF, ESQUIRE**
9 ANDRUS WAGSTAFF PC
  1999 Broadway, Suite 4150
10 Denver, CO  80202

11 **DOUGLAS C. MONSOUR, ESQUIRE**
   THE MONSOUR LAW FIRM
12 404 N. Green Street
   Longview, TX  75601

13

14 **FOR THE DEFENDANTS:**

15 **MICHAEL BONASSO, ESQUIRE**
   FLAHERTY, SENSABAUGH & BONASSO, PLLC
16 P.O. Box 3843
   Charleston, WV  25338-3843

17

   **ROBERT T. ADAMS, ESQUIRE**
18 **JON A. STRONGMAN, ESQUIRE**
   **EVA M. WEILER, ESQUIRE**
19 SHOOK, HARDY & BACON
   2555 Grand Boulevard
20 Kansas City, MO  64108

21

22

23

24

25

*United States District Court*
*Southern District of West Virginia*

I  N  D  E  X

PROCEEDINGS                                              PAGE

EXHIBITS MARKED                                          853


                          Direct   Cross   Redirect   Recross
WITNESSES FOR
THE PLAINTIFFS

JIMMY MAYS                 609      633      654

DOREEN RAO                 660      696      708

JACQUELYN TYREE            712      736      793

CHRIS WILSON               798      819      851

Mays - Direct - Monsour

1              PROCEEDINGS had before The Honorable Irene C. Berger,

2    Judge, United States District Court, Southern District of West

3    Virginia, in Charleston, West Virginia, on November 05, 2014,

4    at 9:00 a.m., as follows:

5              (The Jury entered the courtroom at 9:00 a.m.)

6              COURT SERVICES OFFICER:  All rise.

7              THE COURT:  Good morning, everyone.

8              RESPONSE:  Good morning, Your Honor.

9              THE COURT:  Counsel, call your next witness, please.

10             MR. MONSOUR:  Thank you, Your Honor.

11             Your Honor, at this point in time we would call

12   Dr. Jimmy Mays to the stand.

13             THE COURT:  All right.

14             THE DEPUTY CLERK:  Sir, would you please raise your

15   right hand.

16   (**JIMMY MAYS**, HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:)

17             THE WITNESS:  I do.

18             THE DEPUTY CLERK:  Please take the stand.

19             THE COURT:  Counsel, as we go forward, I will simply

20   remind you to refer to any documents by number.  It will help

21   your record and certainly be of some assistance to the clerk

22   if you all will use your exhibit numbers.

23             MR. MONSOUR:  I certainly will, Your Honor.

24             THE COURT:  All right.

25   (DIRECT EXAMINATION OF JIMMY MAYS BY MR. MONSOUR:)

Mays - Direct - Monsour

1   Q.   Are you ready?

2   A.   Yes.

3          MR. MONSOUR:  Counsel?

4          MR. STRONGMAN:  Yes.

5          MR. MONSOUR:  Your Honor?

6          THE COURT:  Yes, sir.

7   BY MR. MONSOUR:

8   Q.   Good morning.

9   A.   Good morning.

10   Q.   Would you please introduce yourself to the ladies and

11   gentlemen of the jury.

12   A.   Yes.  My name is Jimmy Mays.  I'm a Chemical Professor at

13   the University of Tennessee, and also a Distinguished

14   Scientist at Oak Ridge National Laboratory.

15   Q.   Okay.  Dr. Mays, if we could, I've got a brief

16   PowerPoint.  I want to give the jury an idea of your

17   background before we start talking about some of your

18   opinions.

19        Your opinions today are going to be about polypropylene

20   and the MSDS sheet and the scientific validity of the medical

21   applications caution, okay?

22   A.   Okay.

23   Q.   All right.  So let's talk about your background.  It

24   looks like you've got a Ph.D. in polymer science.  Just

25   briefly tell us what is polymer science.

1   A.   Yes.  It's the study of polymers or plastics.

2   Q.   Okay.  And have you written any papers in your career?

3   A.   Yes.  I've published about 350 peer-reviewed papers.

4   Q.   Okay.  We can flip to the next.

5        Have you ever worked in industry?

6   A.   Yes.  Right after graduate school, I spent about five

7   years working at Hercules.  At the time Hercules was one of

8   the largest polypropylene producers in the world.  They not

9   only made the polypropylene but they also made the fibers and

10  films out of it.  I was at the research center in Wilmington,

11  Delaware, but one of my duties for most of the time I was at

12  Hercules was to visit their fibers facility near Atlanta,

13  Georgia, and help them with problems that they had there; see

14  what problems they have, go back to the research center and

15  see what we can do to help them.

16  Q.   Okay.  After you left industry, did you go into

17  education?

18  A.   Yes.

19  Q.   And give us a brief synopsis of your career in education.

20  A.   Yes.  I went to the University of Alabama at Birmingham

21  in 1988, and I was there until the end of 2001.

22        I started as assistant professor, rose through the

23  ranks to full professor, and in -- at the end of 2001, I moved

24  on to my current position at Tennessee, both the University

25  and the National Laboratory near Knoxville.

Mays - Direct - Monsour

1  Q.  Okay.  If we could go to the next slide.

2      I note that you are a Distinguished Professor at the

3  University of Tennessee, and a Distinguished Scientist at the

4  Oak Ridge National Laboratory.  Is that correct?

5  A.  Yes, that's correct.

6  Q.  What is the Oak Ridge National Laboratory?

7  A.  ORNL really got started with the Manhattan Project.  In

8  Oak Ridge, Tennessee, they purified the uranium that was used

9  in the first atomic bomb, and after the war, they maintained

10 that facility there and it became known as Oak Ridge National

11 Laboratory.

12     Nowadays it's really a materials research laboratory.

13 It's not so much weapons out there anymore.

14 Q.  Okay.  So I want to ask you a few questions today.  And

15 the first one I want to ask you -- and I'll write it up here

16 on the board.  Is there a scientific --

17     MR. STRONGMAN:  Objection, Your Honor.  May we

18 approach?

19     THE COURT:  Yes, sir.

20     (The following occurred at sidebar.)

21     THE COURT:  "Is there a scientific?"

22     MR. STRONGMAN:  Mr. Monsour is going to give us the

23 end of that question.  He is going to ask Dr. Mays if there is

24 a scientific basis for the medical application caution

25 statement in the MSDS.  That's where I think you're going.

Mays - Direct - Monsour

1    Right?  And Dr. Mays never offered any opinion with regard to

2    whether or not there was a scientific basis for the medical

3    application caution statement.  There is nothing about that in

4    his report.  And in his deposition, he was specifically

5    asked -- (Indicating.)

6            THE COURT:  Tell me what you want to point me to.

7            MR. STRONGMAN:  He was specifically asked whether or

8    not he was relying on the medical application caution

9    statement for his opinion.  He indicated that he was not.  He

10   indicated that it was not -- I don't have the language right

11   there, but he indicated that it was not needed for his

12   opinion, and so Dr. Mays certainly has not offered either in

13   his report or in his deposition any opinion on the basis of

14   that statement.

15           THE COURT:  Response, Mr. Monsour?

16           MR. MONSOUR:  I don't really understand what his

17   objection is, to be quite frank.  He disclosed his review of

18   the MSDS sheet in his report.  He talks -- he is a polymer

19   chemist.  In his report, he is very clear that he's going to

20   talk about that.  Whether or not he relied upon it, you don't

21   rely, necessarily, upon an MSDS sheet.  He is --I'm asking him

22   to interpret the MSDS sheet, and there is a difference.  Did

23   he look at it?  Yes.  Did he disclose that he looked at it?

24   Yes.  But they're trying to argue a hypertechnical term that

25   he said, "I didn't rely upon it," and I don't know what that

Mays - Direct - Monsour

1    really means.

2            THE COURT:  What's the question going to be,

3    Mr. Monsour?

4            MR. MONSOUR:  Is there a scientific basis for the

5    medical application caution in the MSDS sheet?

6            MR. STRONGMAN:  Obviously, that specific opinion of

7    whether or not there is and what it would be is nowhere in his

8    report or in the deposition, and it's also outdoor the scope.

9            THE COURT:  One moment, counsel, please.

10           MR. STRONGMAN:  Sure.

11           (Pause.)

12           THE COURT:  All right.  The objection to the

13   question, counsel, I'm going to overrule it.  I am looking at

14   his testimony in the deposition on Pages 192 and 193, in

15   which, of course, he indicates that he has reviewed it.  He is

16   asked whether or not --

17           THE COURT REPORTER:  I'm sorry, Your Honor?

18           THE COURT:  And I'm talking down into my robe.

19           He also was asked whether or not it materially

20   contributed to any of his opinions in this case, and he

21   indicates what it told him, and he then is specifically asked

22   in another portion, so that the record is clear, as to whether

23   or not he used it to form any of his opinions or if his

24   opinions are based on it, and he indicated no.

25           So I understand your point, Mr. Strongman, that he

Mays - Direct - Monsour

1  has discussed it, he's reviewed it in relationship to the

2  opinions that he's going to give; and, therefore, this

3  question about whether or not there was a scientific basis I

4  think is a fair question and isn't really giving an opinion as

5  to the contents of the Material Safety Data Sheet.  For all of

6  those reasons, I overrule the objection, preserving the

7  defendant's objection and exception.

8          MR. MONSOUR:  Thank you.

9          MR. STRONGMAN:  Just for the record, Dr. Mays had his

10  opinions ruled on in the *Daubert* order as well, and Judge

11  Goodwin indicated that the opinions left for Dr. Mays to talk

12  about were polypropylene degradation and his review of the

13  literature.  To the extent this opinion falls into that, I

14  assume that's what you're going to argue.  I think it falls

15  outside of that.  But, just for the record, as well on the

16  *Daubert* order.

17          THE COURT:  All right.  He indicates in that

18  deposition that he certainly reviewed it and that it told him

19  that polypropylene was involved, which was important to him,

20  he indicated, and so I believe that it is part and parcel of

21  his talking about the chemicals and the degradation of

22  polypropylene.

23          MR. MONSOUR:  Thank you, Your Honor.

24          MR. STRONGMAN:  Thank you.

25          (Sidebar concluded.)

1  BY MR. MONSOUR:

2  Q.   Okay.  I write slow.

3       So the question, I got halfway out, is:  Is there a

4  scientific basis for the medical application caution in the

5  Marlex MSDS sheet?  That's what we're going to talk about

6  today.

7  A.   Okay.

8  Q.   Okay?

9  A.   Yes.

10  Q.   Now, so let me ask you the question:  Is there a

11  scientific basis for the medical application caution in the

12  Marlex MSDS sheet?

13  A.   Yes, there is.

14  Q.   Okay.  Let's talk about it.  Now, you've seen the Marlex

15  MSDS sheet, correct?

16  A.   Correct.

17  Q.   All right.  If we could pull up exhibit that has already

18  been admitted:  1004.

19          (The document was published to the jury.)

20  BY MR. MONSOUR:

21  Q.   Which is the 2004 Marlex MSDS sheet.  And if you could go

22  down, Evan, to the first paragraph of the medical application

23  caution.  It says -- could you read that for us?

24  A.   Yes.  It says, "Medical application caution:  Do not use

25  this Chevron Phillips Chemical Company LP material in medical

Mays - Direct - Monsour

1   applications involving permanent implantation in the human

2   body or permanent contact with internal body fluids or

3   tissues."

4   Q.   Okay.  Now, is there another portion of the MSDS sheet

5   that actually explains another component of this on a

6   different level?

7   A.   Yes, there is.

8           MR. STRONGMAN:  Objection.

9           THE WITNESS:  I think it's Section 10.

10          MR. STRONGMAN:  Objection, foundation.

11          THE COURT:  Response to the objection regarding

12   foundation, counsel?

13          MR. MONSOUR:  He's already testified that he has

14   reviewed the MSDS sheet, and this is just a different portion

15   of the MSDS sheet.

16          THE COURT:  Mr. Strongman, anything more specific?

17          MR. STRONGMAN:  Yes.  With regard to what portions of

18   the MSDS sheet have any relevance to this statement, Mr. Mays

19   certainly doesn't know what CP Chem was thinking when they put

20   together the MSDS sheet, can't interpret what was in their

21   mind.

22          THE COURT:  All right.  And I did not understand the

23   question to be asking that, and so I overrule it, preserving

24   the defendant's objection and exception.

25          Go ahead, please.

Mays - Direct - Monsour

```
 1  BY MR. MONSOUR:

 2  Q.   Would you tell us what section we could look at to gain

 3  further scientific knowledge on the MSDS sheet?

 4  A.   I believe it's Section 10.

 5  Q.   Okay.  Let's pull up Section 10, if we can.  And if we

 6  look, what is Section 10 called?

 7  A.   Section 10 has to do with stability and reactivity.

 8  Q.   Okay.  And if we look down on the third bolded portion,

 9  it says, "Incompatibility with other materials."  Is that

10  correct?

11  A.   Yes, that's correct.

12  Q.   Now, what is -- let's go to the title first.  What is

13  stability and what is reactivity?

14  A.   Yes.  Stability is how the material will behave over

15  time; will it change with time or will it be stable over time.

16  Reactivity has to do with substances that can react with the

17  polypropylene itself, causing it to change.

18  Q.   Okay.  What does the section entitled "Incompatibility

19  With Other Materials" mean?

20  A.   Yes.  It's basically saying that you should avoid contact

21  of the Marlex polypropylene with these materials.

22  Q.   Okay.  Would you read to us the materials that the Marlex

23  polypropylene should not come in contact with?

24  A.   Yes.  It says may react with oxygen and strong oxidizing

25  agents such as chlorates, nitrates, peroxides, et cetera.
```

Mays - Direct - Monsour

1  Q.  Okay.  Now, what are peroxides?

2  A.  Peroxides are reactive compounds that contain oxygen.

3  Q.  Okay.  Is a peroxide a strong oxidizing agent?

4  A.  Yes, it is.

5  Q.  Can it break down polypropylene?

6  A.  Yes, it can.

7  Q.  Now, would you explain, what happens when strong

8  oxidizing agents such as peroxide attack polypropylene?  What

9  happens?

10  A.  Yes.  It's really a process similar to rusting.  We all

11  know if we take an iron nail and we put it outside,

12  eventually, that iron nail is going to rust.  It does so by

13  reacting with oxygen.  And, eventually, that rusty nail will

14  crumble away.  The same is true of polypropylene.

15  Polypropylene has been known for years to react with

16  oxygen-containing compounds like peroxide, and eventually that

17  polypropylene will undergo a rust-like process and it, too,

18  will crumble and erode away.

19  Q.  Okay.  Can you give us an example that we might see in

20  the real world of polypropylene oxidizing and degrading and

21  breaking down?

22  A.  Yes.  Fishing line is one example.  If you have been out

23  fishing, a lot of fishing line is made of polypropylene, and

24  if you've left your rod and reel, and not used it for awhile

25  and you go out fishing with it, the first time you get the big

Mays - Direct - Monsour

1  one on there, you may lose it because that line can break.

2  Q.   Okay.  The -- your theories are -- or the testimony that

3  you're giving today about polypropylene breaking down and

4  degrading, is that supported in the medical literature?

5  A.   That's supported in the medical literature, but, in

6  particular, it's supported in the chemical literature.

7  Q.   Okay.  And yesterday we went through a whole bunch of

8  studies, and today we're not going to do that.  We're just

9  going to talk.

10       As a teacher who teaches, a distinguished professor and

11  a distinguished scientist, is there any doubt that what you're

12  testifying to today is generally the accepted science in the

13  scientific community about polypropylene?

14  A.   It absolutely is.

15       MR. STRONGMAN:  (Stands.)

16       THE COURT:  Yes, sir.

17       MR. STRONGMAN:  Form, and foundation as well.

18       THE COURT:  Well, I'll let you respond.  Go ahead,

19  please.

20       MR. MONSOUR:  I believe we've already established the

21  foundation, and I believe the form was acceptable in light of

22  the fact that he's an expert witness.

23       THE COURT:  Counsel, I am not convinced that the

24  foundation has been established for that particular question.

25       MR. MONSOUR:  Okay.  Let me --

Mays - Direct - Monsour

```
 1          THE COURT:  For that reason, I'm going to sustain the

 2   objection --

 3          MR. MONSOUR:  Okay.

 4          THE COURT:  -- while I think about his prior

 5   testimony.

 6          MR. MONSOUR:  Okay.

 7   BY MR. MONSOUR:

 8   Q.  Let's talk about the foundational stuff.  I didn't want

 9   to get into too much detail, but let's talk about -- let's

10   talk about polypropylene.

11          Generally speaking, what is it that will cause

12   polypropylene to break down?

13   A.  Polypropylene only degrades by a free-radical-type

14   mechanism and that's common when one uses peroxides.

15   Q.  And how do you know this?

16   A.  I teach Sophomore Organic Chemistry every year, and the

17   simplest organic molecules or alkanes, and polypropylene is

18   just a very large alkane.  And I teach these students and

19   every Organic Chemistry textbook teaches that alkanes undergo

20   degradation by oxidative methods.

21   Q.  Is it established in the scientific community that

22   polypropylene can degrade?

23   A.  Absolutely, yes.

24   Q.  Is it established in the scientific community that

25   polypropylene can degrade as a result of exposure to
```

Mays - Direct - Monsour

1   peroxides?

2   A.   Yes.

3   Q.   And what about strong oxidizing agents?

4   A.   Yes.

5   Q.   Is there -- is it supported, not only in the scientific

6   community, but by the literature?

7   A.   Yes.

8   Q.   Is it supported in the textbooks?

9   A.   Yes.

10  Q.   Is it supported in the literature that is used in

11  industry?

12  A.   Yes.

13  Q.   Are you aware of this from an educational standpoint and

14  an industry standpoint?

15  A.   Yes.  I worked for one of the largest polypropylene

16  producers in the world and we knew about polypropylene's

17  tendency to degrade by an oxidative mechanism back in the

18  '80s.  There is no question.

19  Q.   Is this the type of information that could have been

20  known to a large medical device manufacturer such as Boston

21  Scientific if they had hired the appropriate polymer chemist?

22          MR. STRONGMAN:  Objection.

23          THE WITNESS:  If --

24          MR. STRONGMAN:  Objection, form and, also, outside

25  the scope of permissible opinion.

1          THE COURT:  All right.  Do you have a response to it

2    being outside the scope of permissible opinion?

3          MR. MONSOUR:  I'll rephrase the question, Your Honor.

4          THE COURT:  All right.  It's my understanding,

5    Mr. Strongman, the question is being withdrawn.

6    BY MR. MONSOUR:

7    Q.   Let me ask you this:  Any polymer chemist, whether hired

8    by a large corporation like Boston Scientific, say, in the

9    early '90s or the early 2000s, do you believe that that person

10   would have had this same knowledge base --

11         MR. STRONGMAN:  (Stands.)

12         THE COURT:  All right.  Counsel, I'm going to sustain

13   the earlier objection to that question, and I do so because I

14   believe it runs afoul of a previous ruling regarding

15   knowledge, motive, intent, et cetera.

16         MR. MONSOUR:  I understand, I understand.  Let me

17   rephrase my question.

18   BY MR. MONSOUR:

19   Q.   Whether or not these people were hired, there was a

20   general knowledge in the community, in the scientific

21   community, of the principles that you're talking about today

22   with regard to polypropylene?

23         MR. STRONGMAN:  Same objection.

24         THE COURT:  Come up here, please.

25         (The following occurred at sidebar.)

Mays - Direct - Monsour

 1           THE COURT:  He has now asked a question as to whether

 2  or not this knowledge, as I understand it, was generally

 3  known?

 4           MR. MONSOUR:  Yes.

 5           MR. STRONGMAN:  And my argument is that within the

 6  scope of the *Daubert* order, again, what he's trying to do is

 7  essentially put forward evidence about what Boston Scientific

 8  knew or should have known, which is not what Dr. Mays was

 9  offered on, it's not in what was allowed by Judge Goodwin.  He

10  was mainly allowed to talk about degradation and what the

11  literature says, not what was known or knowable at a certain

12  point in time because that goes to knowledge and intent of

13  what Boston Scientific should have known into the question.

14           THE COURT:  I think as an expert witness, in the

15  fields that he has testified to thus far, he says that he

16  worked for a large polypropylene, I believe, manufacturer;

17  he's also testified to his teaching experience.  I think that

18  he is able to testify to what is generally known about that

19  substance in the industry at a particular time, and I see that

20  as different.  I know that you're saying there is an

21  implication drawn, Mr. Strongman.

22           MR. STRONGMAN:  Right.

23           THE COURT:  But I see that as different from his

24  testifying to, for instance, a review of documents and then

25  testifying to what this defendant knew at a particular time.

```
 1            For that reason, given the phrasing of the question,
 2   I'm going to overrule the objection, preserving the
 3   defendant's objection and exception.
 4            MR. STRONGMAN:  Thank you, Your Honor.
 5            MR. MONSOUR:  Thank you, Your Honor.
 6            (Sidebar concluded.)
 7   BY MR. MONSOUR:
 8   Q.  Let me repeat my question.  It's been generally known in
 9   scientific communities and in industry for a long time that
10   polypropylenes degrade like you're explaining?
11   A.  Yes.  Chemists know this; polymer scientists know this;
12   materials engineers know this.
13   Q.  Now, have you had -- it was stated in opening that -- it
14   was stated in opening that a deponent from Phillips Sumika
15   gave a deposition and there were no scientific documents
16   attached to his deposition.  Have you actually had a chance to
17   review that deposition and the documents that were provided to
18   that witness?
19   A.  Is this Mr. Zakrzewski?
20   Q.  Yes.
21   A.  Yes, I have.
22   Q.  Were there scientific documents that accompanied
23   Mr. Zakrzewski to his deposition?
24   A.  Yes.
25   Q.  And did they talk about the Marlex resin polypropylene?
```

Mays - Direct - Monsour

1  A.   Yes.

2  Q.   Did they talk about whether or not the Marlex resin would

3  degrade?

4  A.   Yes, they did.

5  Q.   Did they talk about whether or not the Marlex would

6  degrade as a result of being exposed to strong oxidizing

7  agents?

8  A.   Yes, they did.

9  Q.   Okay.  Let me hand you -- is this the document you

10  reviewed?

11  A.   Yes, this is it.

12  Q.   Okay.

13       MR. MONSOUR:  Your Honor, at this point in time I

14  would like to offer into evidence what has been previously

15  marked as Exhibit 1110, which is an attachment to the

16  deposition, the 30(b)(6) deposition of Mr. Frank Zakrzewski,

17  the corporate representative of Phillips Sumika as designated

18  by Phillips Sumika.

19       MR. STRONGMAN:  May I just get a copy of it?

20       THE COURT:  Any objection, Mr. Strongman?

21       MR. STRONGMAN:  No objection, Your Honor.

22       MR. MONSOUR:  All right.

23       THE COURT:  Give me the number.  11?

24       MR. MONSOUR:  1110.

25       THE COURT:  Plaintiffs' Exhibit 1110 will be admitted

United States District Court
Southern District of West Virginia

—— Mays - Direct - Monsour ——

1    into evidence without objection.

2    (PLAINTIFFS EXHIBIT 1110 WAS RECEIVED IN EVIDENCE.)

3            MR. MONSOUR:  Okay.  If we could pull up 1110.

4            (The document was published to the jury.)

5    BY MR. MONSOUR:

6    Q.   Now, this document accompanied Mr. Zakrzewski to his

7    deposition, and it says, TSM 308 -- Chemical resistance of

8    Marlex polypropylene.  Do you see that?

9    A.   Yes, I do.

10   Q.   And it comes, at the top, you can see from Phillips

11   Sumika, the manufacturer.

12   A.   Yes.

13   Q.   If we could go down, Evan, to this part right here in the

14   middle, right there.  A little lower.  Yeah, you got it.

15           Would you read what that document says?

16   A.   "Table 2 lists several strong mineral acids, halogens and

17   oxygen which can chemically attack Marlex polypropylene,

18   causing degradation of the resin."

19   Q.   Okay.  Degradation.  We heard about yesterday from

20   Dr. Rosenzweig.

21           What is degradation of polypropylene?  Is it what you

22   talked about before?

23   A.   Degradation is this oxidation which is analogous to

24   rusting.

25   Q.   Okay.  And it talks about Table 2 listing several of the

Mays - Direct - Monsour

1  things that can cause degradation, right?

2  A.   Yes, it does.

3  Q.   Let's go on the next page, Evan, to Table 2.

4       If you will read for us, sir, what the top of Table 2

5  says.

6  A.   "Marlex polypropylene has good chemical resistance to

7  most mineral acids and bases, but, like other polyolefins, can

8  be attacked by some strong mineral acids, halogens and oxygen.

9  The effect of strong oxidizing agents is an attack on the

10 polymer chain resulting in eventual embrittlement of the

11 resin."

12 Q.   Okay.  Would you underline that second sentence for me.

13      Now, we talk about the effect of strong oxidizing

14 agents.  Again, that would be peroxide, correct?

15 A.   That's correct.

16 Q.   Would attack the polypropylene, according to the

17 manufacturer?

18 A.   Yes.

19 Q.   Resulting in embrittlement of the resin.  What is

20 embrittlement?

21 A.   Yes.  The material becomes brittle.  It becomes stiffer

22 and brittle, when it's oxidized.

23 Q.   Does that help with the mechanical properties of the

24 polypropylene?

25 A.   That's not what's desired in the -- in the application.

Mays - Direct - Monsour

1  Q.  What happens to polypropylene when it gets brittle?

2  A.  It can crack, part of it can flake away.  It's just like

3  that rusty nail; the rust will flake off.

4  Q.  Okay.  Now, let me ask you this question.  I think this

5  might come up later in the trial.  Can antioxidants be added

6  to polypropylene to make it last longer?

7  A.  Yes, they can.  In fact, antioxidants are commonly added

8  to polypropylene to try to slow down this degradation process.

9  Q.  Did the Marlex that we've been talking about have

10 antioxidants in it?

11 A.  Yes, it did.

12 Q.  And even with antioxidants, this can happen?

13 A.  Yes, and it's because of how the antioxidants work.  They

14 work by preferentially reacting with the compounds that cause

15 the oxidation.  And every time they react with it, the

16 antioxidant gets used up.  And in the human body, the body

17 generates this peroxide and it keeps generating it.  So,

18 eventually, even though there is antioxidant present, it all

19 gets used up, and then the peroxides attack the polypropylene.

20 Q.  Okay.  Now, if we could go back to the MSDS sheet,

21 Exhibit 1004.  And if we can pull up the first paragraph of

22 the medical application caution.

23      The medical application caution, what does this -- when

24 you look at the fact that there is antioxidants and the

25 medical application caution is still being given in the MSDS

Mays - Direct - Monsour

1   sheet, what does that tell you?

2   A.   It tells me that the people at Chevron Phillips that

3   generated this sheet understand that adding antioxidant will

4   not permanently prevent degradation of the material.  It will

5   only slow it down.  And there also can be issues with the

6   antioxidant itself inside the body.  There can be toxicity

7   issues there, as well.

8   Q.   Are you aware of the antioxidant that is used in the

9   Marlex and in the Obtryx Sling?

10  A.   Yes.

11  Q.   And what is it called?

12  A.   It's called Irganox, and there is a number after that.  I

13  can't remember the exact number.  I think it's 1078 or

14  something.

15  Q.   1076?

16  A.   1076.  Okay.

17  Q.   Okay.  And let me --

18          MR. MONSOUR:  If I can approach, Your Honor?

19          THE COURT:  Yes, sir.

20  BY MR. MONSOUR:

21  Q.   And is this a true and accurate copy of the MSDS sheet

22  for Irganox?

23  A.   Yes, it is.

24  Q.   Okay.  You can hang onto that.

25          Now --

Mays - Direct - Monsour

1          MR. STRONGMAN:  May I have a copy?

2          THE WITNESS:  You can have mine.

3          MR. MONSOUR:  Thank you.

4          At this point in time, Your Honor, I would like to

5   offer the Irganox 1076 MSDS sheet into evidence.

6          THE COURT:  As what numbered exhibit?

7          MR. MONSOUR:  1043.

8          THE COURT:  Mr. Strongman, any objection?

9          MR. STRONGMAN:  I would object on the basis that

10  there is no foundation for this with this witness.  It was not

11  part of the documents that he reviewed in forming his opinions

12  in the case.

13         THE COURT:  All right.  Let me hear your questions

14  with respect to that document with this witness and I will

15  rule, unless you want to respond at this time.

16         MR. MONSOUR:  No, I'll just go ahead and ask the

17  questions.

18         THE COURT:  All right.

19  BY MR. MONSOUR:

20  Q.  Are you familiar, have you reviewed the Irganox MSDS

21  sheet?

22  A.  Yes.  I have been familiar with Irganox for a long time.

23  Q.  Is it a standard antioxidant that's used in

24  polypropylene?

25  A.  Yes, it is.  It's been used for years and years.

Mays - Direct - Monsour

1   Q.   Okay.  Can antioxidants be toxic?

2   A.   Yes.

3   Q.   And can they be toxic to the human body?

4   A.   Yes.

5   Q.   Does the Irganox 1076 MSDS sheet note about whether or

6   not it should be used in the human body?

7   A.   Yes, it does.

8   Q.   And what does it say?

9   A.   It tells you not to.

10  Q.   So polypropylene breaks down in the body, correct?

11  A.   Correct.

12  Q.   As a result of strong oxidizing agents, correct?

13  A.   Correct.

14  Q.   And to slow the process, they add an antioxidant that's

15  not supposed to be implanted in the human body?

16  A.   Correct.

17  Q.   Do you think using Marlex for permanent implantation in

18  the human body is a good idea?

19  A.   No, I don't.

20       MR. MONSOUR:  I'll pass the witness.  Thank you, Your

21  Honor.

22       THE COURT:  Cross-examination, Mr. Strongman.

23       And, counsel, if I can see Plaintiffs' Exhibit 1043,

24  I will make a ruling on your motion for its admissibility.

25       MR. MONSOUR:  Here it is, Your Honor.

1          THE COURT:  Thank you.

2          Mr. Strongman, after hearing the questions asked

3    about this document, do you stand on your objection?

4          MR. STRONGMAN:  I do, Your Honor.  Again, it's beyond

5    the scope of the report.  Not only is the document not in his

6    report, neither is any opinion on it.

7          THE COURT:  I am going to admit Plaintiffs' Exhibit

8    1043.  The witness was asked about his knowledge of this

9    particular document and other questions were asked of him that

10   are within the confines of the opinion that he can give.  I

11   find that simply because he did not refer to this particular

12   document in his report or during his deposition does not

13   preclude his testimony regarding his knowledge of it here, as

14   long as that testimony is within the confines of the opinions

15   that he can give.  For those reasons, I'll overrule the

16   objection, preserving the defendant's objection and exception.

17   (PLAINTIFFS' EXHIBIT 1043 WAS RECEIVED IN EVIDENCE.)

18         MR. STRONGMAN:  Yes, there is a no-foundation

19   objection as well.

20         May I approach the witness, Your Honor?

21         THE COURT:  Yes, sir.

22   (CROSS EXAMINATION OF JIMMY MAYS BY MR. STRONGMAN:)

23   Q.  All right, Dr. Mays, I've got some materials for you that

24   you may need.

25   A.  Thank you.

Mays - Cross - Strongman

1   Q.   Are you ready to proceed, Doctor?

2   A.   Yes.

3   Q.   All right.  My name is Jon Strongman.  I've got a few

4   questions for you.  Okay?

5   A.   Okay.

6   Q.   We have never met before; is that right?

7   A.   That's right.

8   Q.   Okay.  Now, you were asked some questions about the MSDS

9   sheet.  Is that right?

10  A.   Yes.

11  Q.   Okay.  Now, you formed opinions in this case back in,

12  when?  In 2013, is that right?

13  A.   I started working in this case at the end of 2013, that's

14  correct.

15  Q.   Right, before the end of 2013.  And you put together an

16  expert report, correct?

17  A.   Correct.

18  Q.   And in that expert report, you knew that you had to put

19  in all of the information that you were basing your opinions

20  on, correct?

21  A.   Correct.

22  Q.   And in your expert report, you signed your name to it,

23  right?

24  A.   Yes.

25  Q.   Just like under penalty of perjury, right?

Mays - Cross - Strongman

 1   A.   Yes.

 2   Q.   Just like the testimony you're giving here today,

 3   correct?

 4   A.   Correct.

 5   Q.   And in your report, did you take it seriously when you

 6   formed your opinions?  It was a process you took seriously,

 7   correct?

 8   A.   Of course, yes.

 9   Q.   And, in addition to writing a report and formulating your

10   opinions, you also gave a deposition in this case, right?

11   A.   That's right.

12   Q.   And when you were deposed, you were asked about your

13   opinions, what they were based on and what you were relying

14   on, correct?

15   A.   Correct.

16   Q.   And isn't it true that when you formed your report and

17   when you took -- took your deposition and offered opinions in

18   this case, you didn't even know if there was an antioxidant in

19   the Marlex resin used by Boston Scientific, correct?

20   A.   The indication at that point was, from one of the Boston

21   Scientific experts, that there was no antioxidant in it.

22   Q.   Doctor, my question was:  When you formulated your

23   opinion in this case, when you wrote your report, and when you

24   gave a deposition, you did not even know whether or not there

25   was an antioxidant in the Marlex resin, correct?

Mays - Cross - Strongman

```
 1   A.   That's correct.
 2   Q.   You were also asked some questions about a 2000 -- was it
 3   '4 or '7 MSDS sheet, right?
 4   A.   Yes.
 5   Q.   Now, you know that there was an MSDS sheet in 1997,
 6   correct?
 7   A.   Correct.
 8   Q.   Did you review that as well?
 9   A.   Yes, I did.
10   Q.   Now, you know in the 1997 MSDS sheet, there is absolutely
11   no medical application caution statement at all, correct?
12   A.   That's correct.
13   Q.   Now, you pointed to Section 10, Mr. Monsour brought up
14   Section 10.  Do you remember that?
15   A.   Yes.
16   Q.   Now, you know that in the 1997 MSDS sheet, it also talks
17   about oxidants and reaction to oxidants, correct?
18   A.   Correct.
19   Q.   That's not new information, correct?
20   A.   Correct.
21   Q.   So you certainly have no idea, sitting here today, why
22   that medical application caution statement was added because
23   you don't work for CP Chem, correct?
24   A.   Correct.
25   Q.   And, in fact, in your deposition, you were specifically
```

Mays - Cross - Strongman

```
 1  asked whether or not you even were relying on the medical

 2  application caution.  Do you remember that?

 3  A.   Yes, I did.

 4  Q.   And, in fact, you said, "I'm not relying on it at all."

 5  Isn't that correct?

 6  A.   I said I had certainly read it, I was aware of it, but it

 7  wasn't necessary to reach my opinions.

 8  Q.   Doctor, you have your deposition in front of you?

 9  A.   I do.

10  Q.   Can you please turn to Page 192.

11  A.   Yes.

12  Q.   All right.  And I want to point you to Line 16.  Are you

13  with me?

14  A.   Yes.

15  Q.   Okay.  And when you gave your deposition in this case, it

16  was under oath, correct?

17  A.   Yes.

18  Q.   You took that seriously?

19  A.   Yes.

20  Q.   And you tried your best to offer accurate answers to our

21  questions, right?

22  A.   Absolutely.

23  Q.   Okay.  Page 192, Line 16.  Question -- and you understand

24  this was a question about the medical application caution

25  statement, correct?
```

Mays - Cross - Strongman

1   A.   Correct.

2   Q.   Okay.

3        "QUESTION:  Did you rely on that statement for purposes

4   of your opinions in this case?

5        "ANSWER:  I did not rely on that for my opinion.

6        "QUESTION:  Why did you not rely on it?

7        "ANSWER:  Because I didn't feel I needed to.  I didn't

8   see what it really contributed materially to my opinion."

9        Did I read that correctly?

10  A.   You did, and that's what I said just a moment ago.  Yeah.

11  Q.   Did I read that correctly?

12  A.   Yes.

13  Q.   And, in fact, you were asked another question later, and

14  you said you figured they put it in for legal reasons, right?

15  A.   Well --

16  Q.   That's what you said in your deposition, correct?

17  A.   Correct.

18  Q.   It's not what you said to Mr. Monsour in court today,

19  correct?

20       MR. MONSOUR:  Objection.  That's not the question

21  that I asked him.

22       THE COURT:  That objection is sustained.

23  BY MR. STRONGMAN:

24  Q.   Now, Doctor, you are here today as a paid expert, right?

25  A.   Yes.

Mays - Cross - Strongman

1   Q.   And just because you are a paid expert doesn't mean that

2   you should set aside your scientific principles, right?

3   A.   That's right.

4   Q.   You're a scientist first, correct?

5   A.   Yes.

6   Q.   And when you're a scientist, it's important to consider

7   all information that's relevant, correct?

8   A.   Correct.

9   Q.   You can't cherry-pick data, correct?

10  A.   Correct.

11  Q.   It's important to be informed, as well, as a scientist,

12  correct?

13  A.   Correct.

14  Q.   Now, in this case, when you formed your opinions, you had

15  no idea what the names of the plaintiffs were in any of the

16  cases, correct?

17  A.   Correct.

18  Q.   Do you even know today the names of the plaintiffs in the

19  case that we are here about?

20  A.   I've seen some names but I couldn't --

21  Q.   You couldn't name them?

22  A.   That's correct.

23  Q.   And, in fact, you didn't even know what jurisdictions, if

24  any, that your opinions have been disclosed in, correct?

25  A.   Correct.

Mays - Cross - Strongman

```
 1  Q.  And when you formed your opinions in this case, you
 2  certainly didn't review any information on any particular
 3  plaintiff, correct?
 4  A.   Correct.
 5  Q.  And I want it to be clear.  You're not offering any
 6  opinions today that any of these -- well, let me strike that.
 7         You're not offering any opinions today specifically
 8  about any one of the plaintiffs in this case, correct?
 9         MR. MONSOUR:  Your Honor, objection.  Dr. Mays is a
10  general causation expert.  He's been designated as general
11  causation.  He gave general opinions, and this is well beyond
12  anything that I asked and questioned him on.
13         THE COURT:  Well, as I understand the question, he's
14  asked whether or not he's giving any opinions that are
15  specific to any particular plaintiff, and I think that that's
16  an appropriate question for the jury's understanding of the
17  parameters of his opinions.
18         MR. MONSOUR:  Okay.
19         THE COURT:  I overrule the objection.  Go ahead,
20  please.
21         THE WITNESS:  Okay.  Could you repeat that?  I'm
22  sorry.
23  BY MR. STRONGMAN:
24  Q.  You're not here today offering any opinions specifically
25  about any of the four plaintiffs that we're here to talk
```

Mays - Cross - Strongman

1   about, correct?

2   A.   Correct.

3   Q.   Now, I want to talk about two points in time.  Okay?  I

4   want to talk about before you got hired in litigation and I

5   want to talk about after you got hired in litigation.  Okay?

6   Are you with me?

7   A.   Yes.

8   Q.   Do you remember when you were hired?

9   A.   In this particular case?

10  Q.   Correct.

11  A.   It was sometime late last year.  I'm thinking maybe

12  August or some -- sometime like that.

13  Q.   You got a call from plaintiffs' lawyers asking you to

14  offer some opinions, right?

15  A.   Correct.

16  Q.   Now, Doctor, before you were hired in this litigation,

17  you didn't even know that the Obtryx device existed, correct?

18  A.   That's true, yes.  I knew in general that these types of

19  devices were out there but I was not familiar with the name

20  "Obtryx."

21  Q.   And with regard to the Obtryx specifically, you didn't

22  even know when it came on the market when you formed your

23  opinions in this case, correct?

24  A.   That's correct.

25  Q.   Now, when you were deposed, you also indicated that

Mays - Cross - Strongman

1  before you got involved in litigation, you had never even seen

2  a mesh product used to treat stress urinary incontinence,

3  correct?

4  A.  Correct.

5  Q.  And besides the work that you did for litigation, you've

6  done no research on the precise polypropylene that's used in

7  the Obtryx, correct?

8  A.  You mean the Marlex itself?

9  Q.  Correct.  Outside of what you've done in litigation,

10  before you were hired by lawyers, you had never done any

11  specific research on the specific polypropylene used in the

12  Obtryx?

13  A.  I don't believe I had.

14  Q.  And before you were hired, you had certainly never

15  published an article about polypropylene mesh, correct?

16  A.  Not about polypropylene mesh.

17  Q.  And you certainly had never given a presentation on

18  polypropylene mesh before --

19  A.  Not polypropylene mesh.

20  Q.  -- you were hired?

21      And, in fact, before you were hired by plaintiffs'

22  lawyers in this case, you had never even conducted any

23  research on the degradation of polypropylene mesh, correct?

24  A.  Correct.

25  Q.  On top of that, you had also not conducted any research

Mays - Cross - Strongman

1  involving the use of polypropylene mesh in the body before you

2  were hired, correct?

3  A.   Correct.

4  Q.   I apologize for my handwriting, not the best.

5       Another topic I want to talk about, Doctor, with you,

6  you talked during your direct examination about degradation of

7  polypropylene, correct?

8  A.   Correct.

9  Q.   And you understand that the allegations in this case

10  relate to clinical performance of polypropylene mesh, correct?

11  A.   Correct.

12  Q.   And you would agree, certainly, that evidence and data

13  about clinical performance of polypropylene mesh is relevant

14  to your opinions, right?

15  A.   It's relevant, yes.

16  Q.   But the reality is you cannot cite any literature that

17  states there is an effect on the patient caused by

18  polypropylene degradation, correct?

19  A.   The degradation of the material causes it to stiffen, and

20  the stiffening of the polypropylene is a source of a lot of

21  the pain these women are having.

22       MR. STRONGMAN:  Objection, nonresponsive.

23       THE COURT:  Repeat your question, please,

24  Mr. Strongman.  And, Doctor, listen to it carefully and then

25  respond.

Mays - Cross - Strongman

```
 1           THE WITNESS:  Okay.

 2  BY MR. STRONGMAN:

 3  Q.   Doctor, you cannot cite any literature that states there

 4  is an effect on the patient caused by polypropylene

 5  degradation, correct?

 6  A.   I can go to Clavé, and Clavé looked at a hundred

 7  explanted pelvic meshes, and these pelvic meshes were not

 8  removed from these women for no reason.

 9  Q.   Do you have your deposition in front of you, Doctor?

10  A.   Yes.

11  Q.   Could you turn to Page 261 for me, Line 15.  Do you see

12  it?

13  A.   Yes.

14  Q.   And you were asked this question:

15           "Can you cite for me any literature that states there

16  is a clinical effect, an effect on the patient, to

17  polypropylene degradation?

18           "ANSWER:  I'm not a clinician, and I don't regularly

19  read the clinical literature, so no."

20           Did I read that correctly?

21  A.   You read that correctly.  However --

22  Q.   Thank you.

23  A.   -- just up above --

24  Q.   Did I read that correctly?

25           MR. MONSOUR:  Objection, Your Honor.  He's not
```

Mays - Cross - Strongman

1   letting him finish his answer.

2          THE COURT:  Doctor, you started to give an

3   explanation, further explanation of your answer.  I'm going to

4   permit it.

5          And we can stop these objections, gentlemen, I think

6   it's clear that I'm going to let a witness answer a question

7   and then give an explanation if he or she feels that that's

8   required to give a complete answer.  So let's proceed in that

9   fashion.

10          Go ahead, please.

11          THE WITNESS:  Thank you.

12          Just above that question that you pointed to in my

13   deposition, you had asked me, basically, the same thing again.

14          "Can you cite for me any literature that purports to

15   state that there is a clinical effect due to polypropylene

16   degradation?"

17          And I said, "Well, I see all of these materials being

18   explanted, so there was some clinical problem with some of it.

19   I have to -- I think it's very unrealistic to assume that none

20   of these women had clinical problems.  In every one of these

21   materials we look at, we see degradation.  The material that

22   composes the mesh which was put -- which was put in as a

23   permanent implant is falling apart."

24   Q.   Doctor, the bottom line is, the question I put to you and

25   that you answered in this deposition was that you're not a

Mays - Cross - Strongman

1   clinician, correct?

2   A.   I'm not a clinician, correct.

3   Q.   You can't point to any clinical literature, based on the

4   answer that you gave in your deposition, correct?

5   A.   Correct.

6   Q.   You were also asked in your deposition about patient

7   experience, right?  Do you remember that?  Patient experience?

8   A.   I really don't at this point remember.

9   Q.   Well, you were asked if you were interested in what the

10  patient experience had been with polypropylene.  Right?

11  A.   Yes, I recall that.

12  Q.   And you said you were very interested in the patient's

13  experience, right?

14  A.   Yes.  Yes.

15  Q.   The bottom line is, wouldn't it be safe to say that you

16  did not consider patient experience with the Obtryx when you

17  formed your opinions in this case?

18  A.   My opinions are based on the material.  I'm a chemist.

19  My question is what happens to the polypropylene in the body.

20  Q.   Doctor, could you turn to 287 in your deposition, Line

21  13.  Are you with me?

22  A.   Yes.

23  Q.   "QUESTION:  Fair enough.  Would it be safe to say that

24  you did not consider patient experience with the Obtryx in

25  reaching the opinions in your expert report?

Mays - Cross - Strongman

1           "ANSWER:  I think that's fair to say."

2           Did I read that correctly?

3    A.   Yes, you did.

4    Q.   Now I want to make it also clear, Doctor, you're not a

5    medical doctor; is that right?

6    A.   That's right.

7    Q.   You're not a clinician, you don't treat patients in any

8    fashion; is that right?

9    A.   No, I don't.  That's correct.

10   Q.   And you're certainly not an expert in stress urinary

11   incontinence surgery, right?

12   A.   I'm not.

13   Q.   And, in fact, you didn't even really know about the

14   products used to treat stress urinary incontinence before

15   litigation, correct?

16   A.   I knew there were products out there but I had no idea of

17   the specific products.

18   Q.   And you're not really an expert in the biological

19   response to foreign bodies, correct?

20   A.   Well, I'm a chemist and I understand some of the chemical

21   processes that happen, but, yeah, I would generally agree with

22   what you said.

23   Q.   Okay.  Now, one of the things that I was asking you some

24   questions earlier about, when you formed your opinions, it's

25   important to be fair, right?

Mays - Cross - Strongman

1   A.   Yes.

2   Q.   And would you agree with me that when you form your

3   opinions, you have an obligation to be fair and balanced?

4   A.   Yes.

5   Q.   Now, when you wrote your expert report, you actually had

6   a partner writing your expert report with you, correct?

7   A.   Correct.

8   Q.   And that was a fellow by the name of Dr. Gido, correct?

9   A.   Correct.

10  Q.   So you were co-authors?

11          MR. MONSOUR:  Your Honor, objection.  Can I approach?

12          THE COURT:  Yes, sir.

13          (The following occurred at sidebar.)

14          MR. MONSOUR:  I have no idea where he's going but I

15  think it's running afoul of our proffer, it's running afoul of

16  our direct, and Dr. Gido's testimony was struck.  So I -- I

17  don't know where he's going.

18          MR. STRONGMAN:  Specifically, he was the co-author on

19  the report and Dr. Gido said -- in his deposition said that he

20  had no obligation to be fair and balanced.

21          THE COURT:  I'm sorry?

22          MR. STRONGMAN:  Dr. Gido was a co-author on the

23  expert report, and Dr. Gido in his deposition said that he has

24  no obligation -- "we" is his word -- have no obligation to be

25  fair and balanced.

Mays - Cross - Strongman

1           THE COURT:  All right.  Well, if that's where you

2      want to go, I sustain the objection.

3           It's not appropriate to try to impeach this witness

4      or to detract from his credibility with the testimony of

5      another witness.  I preserve the defendant's objection and

6      exception.

7           MR. MONSOUR:  Thank you, Your Honor.

8           (Sidebar concluded.)

9      BY MR. STRONGMAN:

10     Q.   Now, Doctor, with regard to your expert report, so, as I

11     was saying, you wrote your expert report in a fair and

12     balanced fashion, and you wrote it with another scientist,

13     correct?

14     A.   Correct.

15     Q.   And in your report, you list out a bunch of materials

16     that you reviewed.  Is that right?

17     A.   That's right.

18     Q.   And if you went through and you tallied up all of the

19     materials that are listed in your report, it's thousands and

20     thousands of pages, correct?

21     A.   It would be a lot of pages.

22     Q.   And yet you spent four hours reviewing those thousands

23     and thousands of pages, correct?

24     A.   That's not true.  All those references I spent hours and

25     hours with preparing the report.

Mays - Cross - Strongman

1   Q.   Do you have your deposition with you, Doctor?  Can you

2   turn to Page 73, running over onto Page 74?  Do you see it?

3   A.   Yes.

4   Q.   Okay.  And in your deposition, you were asked questions

5   about what kind of documents you reviewed.  Is that right?

6   A.   That's correct.

7   Q.   Okay.  And you specifically were asked about how much

8   time you spent reviewing the documents.  Is that right?

9   A.   That's correct.

10  Q.   And you actually went to your billing records to try to

11  figure it out, correct?

12  A.   Correct.

13  Q.   And if you looked at Page -- Page 74, Line 14, do you see

14  that?

15  A.   I do.

16  Q.   And it says, "I would estimate that I probably spent

17  three hours looking at Boston Scientific -- or, I'm sorry --

18  four hours, including this urinary incontinence and pelvic

19  prolapse," correct?

20  A.   Correct.

21  Q.   You also in your report talk about -- a little bit about

22  the fact that polypropylene has been used in the body for a

23  long time.  Is that right?

24  A.   That's right.

25  Q.   And you would certainly agree with me that polypropylene

Mays - Cross - Strongman

1  has been used in the body for decades, right?

2  A.   That's right.

3  Q.   And I think during your direct testimony, you said that

4  oxidation, issues like that, were known for decades as well.

5  Is that right?

6  A.   That's right.

7  Q.   And you're aware that today, doctors are implanting

8  polypropylene mesh in patients every day, right?  You know

9  that.

10  A.   I know that, yes.

11  Q.   And do you believe that physicians should not be able to

12  use polypropylene mesh in their patients?

13  A.   I think polypropylene vaginal mesh is a very bad idea,

14  yes.  But I'm not condemning polypropylene broadly for

15  biomaterials application.  It depends on the application and

16  it depends on the polypropylene.

17  Q.   And when you formed your opinions in this case, you never

18  picked up the phone and talked to a medical doctor about the

19  use of polypropylene mesh, correct?

20  A.   That's correct.

21  Q.   And you're at the University of Tennessee, right?

22  A.   That's right.

23  Q.   And you know the University of Tennessee has medical

24  doctors, right?

25  A.   Yes.

Mays - Cross - Strongman

1   Q.   And when you formed your opinions in this case, you never

2   picked up the phone, called the medical doctors at the

3   University of Tennessee, and said, "I think you should stop

4   using mesh," did you?

5   A.   I did not.

6   Q.   In fact, you know that doctors at the University of

7   Tennessee use polypropylene mesh in patients, correct?

8   A.   I believe that to be the case, yes.

9   Q.   And still to this day, you've never walked down to the

10  medical school and said, "Don't put this in patients."  You've

11  never done that to this day, correct?

12  A.   I have not done that.

13  Q.   And you certainly don't know anything about the clinical

14  experience of the doctors that used polypropylene mesh for

15  these four plaintiffs, correct?

16  A.   Correct.

17  Q.   Don't you think it would have been important to know

18  before you walked in here today what the practices were for

19  the treating physicians for these plaintiffs?

20  A.   It's really not relevant to what I was asked to opine on

21  in this case.  I was asked what happens to polypropylene

22  inside the body.  Doctors are a relatively poor source of

23  information on the chemical behavior of polypropylene.

24  Q.   So you think you're more informed and smarter than

25  medical doctors with respect to what types of implants to use

Mays - Cross - Strongman

1   in surgery with their patients; is that what you're telling

2   the jury?

3   A.   In terms of the chemical properties of polypropylene, I

4   know a lot more than any doctor does.

5   Q.   Okay.  And being that you feel like you know more than

6   any doctor in the world about polypropylene, you still have

7   never walked down to the University of Tennessee, you've never

8   called the physicians in this case, you've never went to one

9   single medical doctor and said, "I know more than you do;

10  don't use polypropylene in people."  You've never done that,

11  correct?

12          MR. MONSOUR:  Your Honor, I'm going to object to the

13  form of the question.  It's abusive.

14          THE COURT:  If you are objecting to the question

15  being argumentative, counsel, I sustain the objection.

16          MR. MONSOUR:  Thank you.

17  BY MR. STRONGMAN:

18  Q.   Doctor, have you ever told a medical doctor that you

19  believe you understand polypropylene better than they do?

20  A.   I have not.

21  Q.   And, certainly, you would agree with me that part of what

22  you build your opinions on in this case is your own experience

23  in your profession.  Is that right?

24  A.   That's correct.

25  Q.   And, certainly, it's fair for a doctor who treats

Mays - Redirect - Monsour

```
 1   patients to form opinions and to use products based on their

 2   experience, correct?

 3   A.   Correct.

 4         MR. STRONGMAN:  I don't have any further questions of

 5   this witness.

 6         THE COURT:  Is there redirect?

 7   (REDIRECT EXAMINATION OF JIMMY MAYS BY MR. MONSOUR:)

 8   Q.   You were asked some questions about your experience with

 9   polypropylene vaginal mesh.

10   A.   Yes.

11   Q.   And you responded, "I hadn't spoken or published on

12   polypropylene mesh."  Let me ask the question a different way.

13         Have you published on polypropylene?

14   A.   Yes.

15   Q.   How many times?

16   A.   Many times.

17   Q.   Have you spoken or lectured about polypropylene?

18   A.   Yes, I have.  And I've even taught biomedical engineers

19   about polypropylene and other polymeric materials.  I have

20   served on their dissertations.  I was invited by people in the

21   University of Tennessee Medical School to go over and tell

22   them about some of the new polymers we're developing.  So the

23   doctors came to me, asking my advice on polymers.

24   Q.   Okay.  You've done research on polypropylene?

25   A.   Yes, I have.
```

Mays - Redirect - Monsour

1  Q.  To give the jury some perspective, how many people know

2  as much about polypropylene as you?

3       MR. STRONGMAN:  Objection, foundation.

4       THE COURT:  Well, it's directly, Mr. Strongman,

5  unfortunately, in response to a question that you asked, and

6  I'm going to permit it.

7       MR. STRONGMAN:  Fair enough.  Thank you.

8       THE WITNESS:  I'm one of the top international

9  experts on polymers in the world.

10 BY MR. MONSOUR:

11 Q.  Okay.  But give me an idea.  You say "one of the top."

12 Of the 8 billion people on the planet, how many people know as

13 much about polymers as you?

14 A.  I would say there's maybe a hundred of us that you could

15 put in a room and we'd have a good time talking about

16 polymers.

17       (Laughter.)

18       THE WITNESS:  It would bore the rest of you all to

19 death, I'm afraid.

20 BY MR. MONSOUR:

21 Q.  I'll be out breaking degraded fishing line when you're

22 doing that.

23      Let me ask you this:  Chemistry is chemistry is

24 chemistry.  Is that a fair statement?

25 A.  That's fair.

Mays - Redirect - Monsour

```
 1   Q.   So from the time we hired you, did the laws of chemistry
 2   change from before and after?
 3   A.   No.
 4   Q.   Okay.  So if I were to ask you if you put water in a
 5   freezer, what's going to happen to it?
 6   A.   It's going to freeze.
 7   Q.   Okay.  Now, if -- if Mr. Strongman rounds up some doctors
 8   and they say that water -- that water's not going to freeze
 9   but we still put that water in the freezer, what's gonna
10   happen to it?
11   A.   It's gonna freeze.
12   Q.   Even though --
13            MR. STRONGMAN:  Objection.
14            MR. MONSOUR:  -- the doctors --
15            THE COURT:  Just a second.
16            MR. STRONGMAN:  Argumentative, leading.
17            THE COURT:  The objection to argumentative as to the
18   prior question is sustained.
19            MR. MONSOUR:  Okay.
20   BY MR. MONSOUR:
21   Q.   If you put water in a freezer, is it going to freeze?
22   A.   Yes.
23   Q.   If physicians come forward and say, "My experience shows
24   that water put in a freezer doesn't freeze," would you put
25   much stock in those opinions?
```

Mays - Redirect - Monsour

1  A.  No, I would not.  In fact, in the medical community,

2  there's been a sort of myth since the 1960s that polypropylene

3  was inert inside the body.  And the reason they believe that

4  is something I said earlier that I teach these Sophomore

5  Organic Chemistry kids every year --

6          MR. STRONGMAN:  Objection, foundation to this answer.

7          THE COURT:  Response?

8          MR. MONSOUR:  He's explaining the answer to my

9  question.

10          MR. STRONGMAN:  He's talking about myths in the

11  medical community.  There is no foundation to offer that.

12          THE COURT:  I'm going to sustain the objection to

13  that portion of the answer that goes to the myth in the

14  medical profession.  That answer is coming, I believe, as a

15  direct result to your question about freezing and the

16  implication of that, and so I think we're getting somewhere

17  afield of where we need to be, counsel.

18          MR. MONSOUR:  Okay.

19  BY MR. MONSOUR:

20  Q.  Let me ask you a question a little different way.

21          Is it -- is it understood in the scientific community,

22  not the medical community but the scientific community, that

23  what you've talked about with regard to polypropylene is true?

24  A.  Absolutely the case.

25  Q.  Is it taking the doctors a little longer to catch on?

Mays - Redirect - Monsour

1   A.   That is correct.

2           MR. STRONGMAN:  Objection, foundation.

3           THE COURT:  I'm going to sustain the objection to it

4   taking the doctors a little longer to catch on.  Ladies and

5   gentlemen, you're not to give consideration to that portion of

6   the answer.

7           MR. MONSOUR:  Okay.

8   BY MR. MONSOUR:

9   Q.   Let me ask it this way then.  I'll rephrase the question.

10          Does it appear that the medical community is a little

11  slower to recognize the --

12          MR. STRONGMAN:  Objection.

13          THE COURT:  Same question, counsel.

14          MR. MONSOUR:  Okay.

15  BY MR. MONSOUR:

16  Q.   The last question I want to touch on is you were talking

17  about clinical articles, articles that show degradation, and

18  you had mentioned the Clavé article.  Briefly, in the Clavé

19  article, what were they looking at?

20  A.   They were looking at vaginal mesh which had been

21  explanted from a hundred patients.

22  Q.   Okay.  And it was explanted for what reason?

23  A.   Because the patients were having problems with it.

24          MR. MONSOUR:  That's all I have.  Thank you, Your

25  Honor.

Mays - Redirect - Monsour

```
1            THE COURT:  You can step down, sir.

2            THE WITNESS:  Thank you.

3            (The witness left the stand.)

4            THE COURT:  Call your next witness.

5            MR. LOVE:  Your Honor, our next witness will be

6    Doreen Rao.

7            May I make a request at this time?  I had a lot of

8    coffee this morning.

9            THE COURT:  Yes, sir.

10           Ladies and gentlemen, I'll give Mr. Love a recess.

11   While you're out, do not discuss this case among yourselves or

12   permit anyone to discuss it with you or in your presence.

13   Please be in your jury lounge at 10:30.

14           We will stand in recess.

15           COURT SERVICES OFFICER:  All rise.

16           (The Jury left the courtroom at 10:11 a.m.)

17           (A recess was taken from 10:11 a.m. to 10:30 a.m.)

18           (The jury returned into the courtroom at

19   10:30 a.m.)

20           THE COURT:  Call your next witness, counsel.

21           MR. LOVE:  Your Honor, at this time we would call

22   Doreen Rao adversely.

23           THE COURT:  All right.

24           MR. LOVE:  May I proceed, Your Honor?

25           THE COURT:  Yes, sir.
```

Rao - Direct - Love

```
 1              (DOREEN RAO, HAVING BEEN DULY SWORN, TESTIFIED AS

 2    FOLLOWS:)

 3    (DIRECT EXAMINATION OF DOREEN RAO BY MR. LOVE:)

 4    Q.   Good morning, ladies and gentlemen of the jury.

 5         Good morning.

 6    A.   Good morning.

 7    Q.   You and I haven't officially ever met.  My name is Scott

 8    Love.  How are you today?

 9    A.   I'm well, thank you.

10    Q.   Good, good.

11              MR. LOVE:  May I approach the witness, Your Honor?

12              THE COURT:  Yes, sir.

13    BY MR. LOVE:

14    Q.   You may or may not need these, but I've got some of

15    your prior testimony.  And to the extent that we need to

16    reference it, I made a copy for you so it would be easy

17    for you to reference.

18    A.   Thank you.

19    Q.   I've got about two or three topics for you today.  It

20    should take maybe 30 minutes or so.  But let's just give the

21    jury, I guess, a little background on you.  You joined Boston

22    Scientific as a senior engineer in 1999; correct?

23    A.   Yes.

24    Q.   Okay.  And you're still employed with Boston Scientific

25    today.  True?
```

Rao - Direct - Love

```
 1   A.   Yes.
 2   Q.   Okay, great.  I believe the first department you worked
 3   on was the Research and Development Department.  Is that fair?
 4   A.   I've always been in the Research and Development
 5   Department, yes.
 6   Q.   Perfect.  And you understand that we have a case here
 7   today and we're here to talk about Obtryx slings?
 8   A.   Yes.
 9   Q.   Okay.  I understand that not long after you started at
10   Boston Scientific you joined what was called the Advantage
11   project that was previously called the Pinnacle sling project.
12   Is that fair?
13   A.   Yes.
14   Q.   And that was right around 2000 or so?
15   A.   Yes.
16   Q.   Okay.  And the Obtryx sling is a sling product that
17   utilizes the Advantage mesh today.  Is that fair?
18   A.   Yes.
19   Q.   And that's the polypropylene mesh that the jury's heard
20   about through the course of the first two or three days of
21   this trial.  Fair?
22   A.   Yes.
23   Q.   Okay.  Now, as I understand it, you purchase this mesh
24   from a supplier and you integrate it into your products and it
25   becomes, for instance, the Obtryx sling.
```

Rao - Direct - Love

1  A.   Yes.

2  Q.   Okay.  And I guess the goal of the project that you were

3  on was to attempt to copy the TVT that was made by Ethicon.

4  Is that fair?

5  A.   We wanted to get a product like it if not better.

6  Q.   Okay.  And the idea, I would hope, would be to make it

7  better than the TVT product; right?

8  A.   Correct.

9  Q.   You weren't just copying the TVT product.  It wasn't

10 going to be the same product.  You were hoping to make a

11 different, improved product.  Fair?

12 A.   That was the goal, yes.

13 Q.   Okay, fair enough.  Now, at the time of this project, you

14 weren't aware of any testing that Boston Scientific had done

15 to determine if mesh degraded once it was implanted in the

16 human body.  Fair?

17 A.   Fair, yeah.

18 Q.   Okay.  Now, you agree -- I think we can agree that Boston

19 Scientific has an obligation to make safe products for women.

20 A.   Yes.

21 Q.   Okay.  And I think we'll probably agree on this as well,

22 that you agree that the best way to establish that a product

23 is safe for permanent human implantation before you sell it is

24 through human clinical trials.  Is that fair?

25 A.   Not necessarily.  There's different standards that you

—— Rao - Direct - Love ——

1   follow that are -- help you to tell what kind of testing you

2   need to do.

3   Q.   Okay, fair enough.  Now, you've given testimony on this

4   very question and I thought you had given the answer that,

5   yes, that's a very good way to establish that a product is

6   safe for humans.

7   A.   It's one way, yes.

8   Q.   Okay.  Are randomized controlled trials considered the

9   gold standard?

10  A.   I don't know.  I'm not a clinical person.

11  Q.   Oh, you're not a clinical person?

12  A.   No.

13  Q.   You're not sure if they're considered tier one evidence?

14  A.   I'm not familiar with that terminology.  I'm sorry.

15  Q.   Okay, fair enough.  Let's go back to the Advantage

16  project if we could.  And let's talk about the changes that

17  you were hoping to make to make this product better than the

18  TVT Ethicon product.  I -- the way I understand it is that you

19  actually did make some design changes to the TVT product to

20  make it your own.  Is that fair?

21  A.   We didn't necessarily have access to the design dossier

22  for the TVT, but we analyzed their product and made a product

23  similar to it, and then had some features that we added to it

24  that we felt would make it a better product, yes.

25  Q.   Fair enough.  You had access to TVTs and you made some

—— Rao - Direct - Love ——

1   changes in the hopes that it would be better than the TVT.

2   Fair?

3   A.   Yes.

4   Q.   Okay.  And the change I understood you made, and the

5   jury's heard about this, is that you detanged the middle

6   portion that went underneath the urethra.  Is that fair?

7   A.   Yes.

8   Q.   All right.  And the idea behind this, as I understand it,

9   is that by detanging the mesh when it's underneath the

10  urethra, because the edges were detanged, hopefully it would

11  be smoother and not saw into the urethra.  Was that the idea

12  behind the change?

13  A.   The idea was to make it a smoother surface, and also to

14  stabilize that area so that it wouldn't elongate and deform.

15  Q.   Smoother surface to make it safer.  Fair?

16  A.   Those are your words.

17  Q.   Well, I'm asking.  I mean, the idea was to make it -- the

18  idea behind smoothing it out was that it would be safer.

19  A.   Sure.

20  Q.   Okay.  Now, in fairness, at the point in time that you're

21  making these changes to the TVT, it was only a theory, the

22  idea behind the detanging, because you hadn't tested it in

23  humans.  Fair?

24  A.   Yes.

25  Q.   Okay.  There was no guarantee that the changes were going

1  to improve the product, but that's what you hoped for?

2  A.   It was an engineering judgment, yes.

3  Q.   All right, fair enough.  Let's talk about the studies

4  that were performed on this design change and this product so

5  that you could ensure, that your company could ensure that it

6  was safe.

7        And I've got a little chart up here.  We're going to go

8  to it.  And I think you've got a TV monitor here.  "Studies

9  conducted by Boston Scientific to ensure safety."

10       Now, at the time of the Advantage product, did Boston

11  Scientific have any long-term data on how polypropylene would

12  react in a woman's body?

13  A.   There was clinical data based on the TVT product that had

14  already been on the market for some years.  And there was data

15  on hernia mesh and other products that Boston Scientific sold

16  that were made from the same material.

17  Q.   Let me ask my question again.  And go ahead and put it up

18  for Ms. Rao so she can see it.

19            MR. STRONGMAN:  Do you have a copy of your slide?

20            MR. LOVE:  No, we don't because it's not necessarily

21  a slide.  I do not.

22  BY MR. LOVE:

23  Q.   Has BSC -- no, that's not the first one, is it?

24  You're right.  It is.  Go ahead.  Has Boston Scientific

25  ever conducted any long-term studies regarding the

Rao - Direct - Love

```
 1   effects of polypropylene within the female body as you

 2   were preparing the design changes for the TVT, for the

 3   TVT?

 4           MR. STRONGMAN:  May we approach briefly?

 5           THE COURT:  Yes, sir.

 6           (The following occurred at sidebar.)

 7           MR. STRONGMAN:  It was just my understanding that we

 8   would get a copy of anything that was going to be put up on

 9   the screen.  I'd just like a copy of it.

10           MR. LOVE:  These are verbal questions that we're just

11   putting up.  I don't know what her answer is going to be, so I

12   can't give him a copy of something that I don't know the

13   answer to.  This is cross-examination.

14           THE COURT:  Well, my concern about it is that it

15   really isn't a document for the jury to view.  There are no --

16   you don't have answers.  I don't know what's admissible.  You

17   can put a question up there and an answer if she answers

18   before I'm able to rule if there is an objection, but going in

19   this fashion it's really not a document for the jury to view.

20           MR. STRONGMAN:  I agree.

21           MR. LOVE:  It's no different than these guys writing,

22   just writing a question.  Either she's going to answer it --

23           THE COURT:  It's going to end up being a document for

24   the jury to view.

25           MR. LOVE:  It's no different than those guys that
```

─── Rao - Direct - Love ───

1   have been writing the whole trial.

2            THE COURT:  Well, if you had an objection to that,

3   Mr. Love, I would rule on it one way or the other.  But my

4   concern here is that there are questions that are going up

5   before the jury.  There are answers.  If there's an objection,

6   it's, it's more like a document that's being placed up before

7   the Court has the opportunity to rule on its admissibility.

8            MR. LOVE:  So, to the extent that I ask a question

9   and get an answer, may we put them up after she answers?

10            THE COURT:  You can do that.

11            MR. LOVE:  Perfect, Your Honor.

12            MR. STRONGMAN:  Thank you, Your Honor.

13            (Sidebar concluded.)

14   BY MR. LOVE:

15   Q.   Okay.  Let me see if we can do this one at a time.

16   At the time of the Advantage project, did Boston

17   Scientific have any long-term data on how polypropylene

18   would react in a woman's body?

19   A.   Only the data that we got from the TVT that was already

20   on the market.

21   Q.   Okay.  Let's go -- because that exact question was asked

22   of you in a prior testimony and you said, "No."  So, if we

23   could, let's go to her transcript, Page 166/24.  And that

24   would be the big white book that you have -- the black one.

25   I'm sorry.

Rao - Direct - Love

 1   A.   Yes, sir.  What page was that please?

 2   Q.   It's 166, line 24.

 3        MR. STRONGMAN:  Your Honor, I object to putting the

 4   transcript up on the screen.

 5        THE WITNESS:  This starts at Page 665.

 6   BY MR. LOVE:

 7   Q.   Which one do you have?  I'm sorry.  It's Page 166.

 8   A.   My book starts at Page 665.

 9   Q.   Let me see.  I'm sorry, my apologies.  I may be directing

10   you to the wrong one.

11        THE COURT:  Mr. Strongman, your objection to

12   deposition testimony being placed up on the screen is

13   sustained.

14        MR. LOVE:  Okay.  Fair enough.  I just thought it

15   might be convenient for the jury to read along with us, but we

16   can certainly do it without it.

17   BY MR. LOVE:

18   Q.   It's -- if you go to the smaller book -- my

19   apologies.  All right.  If you go to Page 166, now, just

20   so the jury's aware, I'll read the question that I asked

21   you prior to that.

22        My question:  "Did Boston Scientific have any long-term

23   data on how polypropylene would react in a woman's body?"

24        And your answer was:  "Only what we had from Johnson &

25   Johnson and others."

Rao - Direct - Love

1          And the question from your testimony was:  "Has Boston

2     Scientific ever conducted one of those long-term studies

3     regarding the effects of polypropylene within a female's

4     body?"

5          And would you read your answer, ma'am.

6          MR. STRONGMAN:  Objection, improper impeachment.

7     It's not the same question.

8          THE COURT:  I'm sorry?

9          MR. STRONGMAN:  It's not the same question.

10         MR. LOVE:  It is identical.  It's the identical

11    question.

12         THE COURT:  Let me see it.  I don't have it.  If you

13    all can't agree on what's in black and while, I'll need to

14    look at it.

15         (The following occurred at sidebar.)

16         THE COURT:  All right.  Go ahead.

17         MR. LOVE:  If you'll look at -- if you compare the

18    question here highlighted in yellow to the question on number

19    one on my outline --

20         MR. STRONGMAN:  What line?

21         MR. LOVE:  166/15.

22         MR. STRONGMAN:  Okay.

23         THE COURT:  All right.  Your objection?

24         MR. STRONGMAN:  What he asked her was:  "You didn't

25    consider any long-term data."

Rao - Direct - Love

1          MR. LOVE:  No, I didn't.  I said, "Did Boston

2     Scientific ever conduct."

3          MR. STRONGMAN:  My memory is you didn't ask the

4     question that's in the deposition.

5          THE COURT:  Well, I can certainly look it up here on

6     the screen, but you all know that if you're going to make an

7     attempt to impeach a witness, the question needs to be the

8     same as what she answered in the deposition.  I don't need to

9     tell you all that.

10          Let's begin again.  And if it is, I'm going to permit

11     impeachment.  But I will say for purposes of the record

12     there's been what was appeared to be an attempt to impeach

13     earlier today which was not inconsistent with the witness's

14     testimony.  If there is some inconsistency, it's appropriate

15     to impeach her with the same question if it was asked.

16          MR. LOVE:  Thank you, Your Honor.

17          MR. STRONGMAN:  Thank you, Your Honor.

18          (Sidebar concluded.)

19     BY MR. LOVE:

20     Q.  All right.  Let's start back at the beginning.

21     Let's kind of reorganize where we're at.  And I wanted

22     to talk to you about the studies that Boston Scientific

23     had conducted on the design change it was making to the

24     TVT.

25          And my question to you is this:  At the time of the

Rao - Direct - Love

 1  Advantage project, had Boston Scientific ever conducted one of

 2  those long-term studies regarding the effects of polypropylene

 3  within a human, female's body?

 4  A.   No.

 5  Q.   Okay.  Now, as I understand it, there was not even any

 6  discussion at the Advantage team meetings about conducting

 7  clinical trials on the product that you recall.  Correct?

 8  A.   Not that I recall.

 9  Q.   Okay, fair enough.  Now, you did do what's called

10  elongation testing, did you not?

11  A.   That's one of the routine tests we do on the mesh, yes.

12  Q.   Perfect.  As I understand your previous testimony,

13  elongation testing is how much a material will stretch under a

14  given force.

15  A.   Correct.

16  Q.   All right.  And that makes sense when you're dealing with

17  polypropylene; right?  The mesh is going to be inserted in the

18  human body; correct?

19  A.   Yes, it's meant to be inserted in a tension-free manner.

20  So, it shouldn't have any forces on it when it's inserted in

21  the body.

22  Q.   Okay.  Women different sizes?

23  A.   Uh-huh.

24  Q.   Different makes and models; right?  Good idea to test the

25  tension prior to evaluating --

Rao - Direct - Love

```
 1   A.   It's a standard quality control test that we do on all

 2   the mesh.

 3   Q.   All right.  That testing failed, did it not, ma'am?

 4   A.   No.

 5   Q.   It didn't.

 6   A.   No.  There's different -- it's tested in different

 7   manners.  When you --

 8   Q.   Okay.

 9   A.   When you knit the mesh, it's knit in a very wide piece of

10   material.  And the standards that we use are an ASTM, the

11   American Society for Testing Materials.  And they recommend

12   that you use a two-inch wide piece of mesh, which you can only

13   use on the mesh that has come from the manufacturer.  But the

14   devices themselves are only one and a half centimeters wide.

15        So, you get a difference in the, in the testing between

16   what we would call the bulk mesh, the two-inch wide piece and

17   the strip.  And they behave differently.

18   Q.   I apologize for interrupting you.  I just simply asked,

19   the elongation testing failed, did it not?

20   A.   It, it didn't fail.  It was being compared to the wrong

21   acceptance criteria.  So, we tested a thin strip and compared

22   it to the value we would expect to see for a two-inch wide

23   strip.

24   Q.   Okay.  I have a document here that says all of the

25   testing met the acceptance criteria with the exception of the
```

—— Rao - Direct - Love ——

 1  elongation testing.

 2  A.   And could I see that document so I can put it in context?

 3  Because it, it did fail if you look at the 1.1 centimeter

 4  strip being compared to a two-inch wide sample.  We just

 5  evaluated against the wrong acceptance criteria.

 6  Q.   I heard you say it failed, though; right?

 7  A.   It didn't meet the acceptance criteria for the two-inch

 8  wide strip.  I wouldn't say it failed because it met the

 9  acceptance criteria for the narrow strip which is what the

10  mesh is, a one-and-a-half-centimeter strip as opposed to a

11  two-inch wide strip.

12  Q.   My apologies again.  I thought your previous answer was

13  it failed.  Your next answer was it didn't fail.  Did it fail?

14  A.   It looks like it failed because it was being compared to

15  the wrong benchmark.  It would be like running the 50-yard

16  dash and expecting you to run the 100-yard dash in the same

17  amount of time that would typically be used for a 50-yard

18  dash.

19  Q.   Okay, okay.  We'll let the jury figure it out.  It either

20  failed or it didn't fail and they'll get to figure out which

21  answer they believe.  Let's go to pore size.

22          MR. STRONGMAN:  Objection.  It's argumentative.

23          THE COURT:  Well, the objection to the statement is

24  sustained.

25          Ladies and gentlemen, you all have been instructed

Rao - Direct - Love

```
 1   that statements of counsel are not to be considered as

 2   evidence.  So, do not give any consideration to Mr. Love's

 3   statement in your deliberations.  The objection is sustained.

 4            MR. LOVE:  My apologies, Your Honor.

 5   BY MR. LOVE:

 6   Q.   Pore size.  You're familiar with pore size.  Mesh

 7   has pores, does it not?

 8   A.   It does.

 9   Q.   Why are, why are pore size -- why are pores important

10   when implanting a mesh permanently in the human body?

11   A.   Pores are important because you want your mesh size and

12   the pores to be more than 75 microns.  75 microns is

13   considered the optimal, the minimal pore size for good tissue

14   in-growth.

15   Q.   Okay.  The idea behind pore size is that you want it to

16   be large enough to facilitate tissue in-growth?

17   A.   I believe that's what I said, yes, sir.

18   Q.   Okay.  I just said it dumbed down because I'm not a very

19   smart guy.  I was just trying to make sure we were on the same

20   page.

21        Can pore size affect the product's function once in the

22   human body?

23   A.   Pore size will affect the product's function.  But,

24   again, the product is put in the body.  It's supposed to be

25   tension-free.  So, it shouldn't be seeing any forces.
```

*United States District Court*
*Southern District of West Virginia*

──────── Rao - Direct - Love ────────

1   Q.   I wasn't talking about forces, just pore size.  If you've

2   got -- you said 75 microns?

3   A.   Or greater.

4   Q.   Or greater.  So, if it's 25 microns, could pore size

5   affect the function of the product in the body?

6   A.   Yes.

7   Q.   Perfect.  Okay.  Did you or your team do any testing

8   regarding how elongation affects pore size?

9   A.   Not specifically, no.

10  Q.   Okay.  Did you or your team do any testing regarding how

11  much tension the mesh endures after it's implanted in the

12  human body?

13  A.   No.  But, again, it shouldn't see any tension because

14  it's a tension-free device.

15  Q.   Okay.  And that was "no"?  No?

16  A.   The question is --

17  Q.   You didn't do that testing?

18  A.   No.

19  Q.   Okay.  Did you ever study in any way the tension that the

20  mesh would be under in a human body?

21  A.   We did some testing and some work with physicians to try

22  to determine what kind of tension the mesh would see while it

23  was being implanted in the body.

24  Q.   Okay.  Let me ask the question again.  Did you ever study

25  in any way the tension the mesh would be under in the human

1  body prior to making this product available for sale to

2  humans?

3  A.   No, not that I'm aware.

4  Q.   Okay, fair enough.  Was there ever any studies done that

5  measured the pore size or pore area after the mesh was put

6  under pressure that you're aware of?

7  A.   I'm sorry.  Put under pressure.  Could you explain that,

8  please?

9  Q.   Yeah.  You were asked this exact question in a prior

10  deposition.  I'll read it again and see if you can understand

11  it here.  Was there ever any studies done that measured the

12  pore size or pore area after the mesh was put under pressure

13  that you're aware of?

14  A.   No.

15  Q.   Okay.  So, you make these changes to the TVT product.

16  You detang it.  And that was the section that goes under the

17  urethra.  And that's the primary design change for the Obtryx

18  sling.  Fair?

19  A.   Yes.

20  Q.   Okay.  Was there ever any clinical studies conducted on

21  what the effects of removal of the tangs had on the human body

22  prior to making the Obtryx available for sale to humans?

23  A.   We did a rabbit study just to see if the removal of the

24  tangs affected the tissue in-growth and biocompatibility.

25  Q.   Okay.  Let me ask my question again.  Was there ever any

Rao - Direct - Love

```
 1   clinical studies conducted on what the effects of removal of
 2   the tangs had on the human body prior to making the Obtryx
 3   available for sale to humans?
 4   A.   No.
 5   Q.   Okay.  And I don't think -- I think I know what your
 6   answer to this question is.  But you're not aware of any
 7   clinical trials that Boston Scientific performed regarding the
 8   detanging since the product was made available for sale to
 9   humans; correct?
10   A.   I don't know of any trials that were specifically geared
11   toward looking at the detanging, but I believe there have been
12   some trials done since it was launched.
13   Q.   I'm talking about that design change that you guys --
14   A.   No.
15   Q.   Okay.  Fair enough.  Let's talk about Directions for Use.
16   I understand you previously testified that you actually sat in
17   on some meetings that dealt with putting the Directions for
18   Use together.
19   A.   Yes, I did.
20   Q.   Okay, fair enough.  And you've obviously seen the Obtryx
21   Directions for Use; correct?
22   A.   I saw -- in an Obtryx, possibly "no" because I didn't
23   work on that whole project.  I really worked on the sling.  I
24   have probably seen it in passing, but I wasn't on that
25   particular project.
```

—— Rao - Direct - Love ——

1  Q.   You actually have been deposed and testified about the

2  specific Obtryx DFU that's involved in this case and gone

3  through it, have you not?

4  A.   I think so, yeah.

5  Q.   Okay.  So, you have seen it before?

6  A.   Yes.

7       MR. LOVE:  Your Honor, at this time I'd like to

8  publish Exhibit 1131, the Obtryx Halo system DFU.

9       MR. STRONGMAN:  No objection.

10       THE COURT:  Has it previously been admitted into

11  evidence or are -- if you're not moving it, that's fine.

12       MR. LOVE:  I am moving for its admission, yes, ma'am.

13       THE COURT:  And it's 1131?

14       MR. LOVE:  That's correct, yes, ma'am.

15       THE COURT:  Plaintiffs' Exhibit 1131 will be admitted

16  into evidence without objection and can be published.

17       (PLAINTIFFS' EXHIBIT 1131 WAS RECEIVED IN EVIDENCE.)

18       MR. LOVE:  May I approach the witness, Your Honor?

19       THE COURT:  Yes, sir.

20  BY MR. LOVE:

21  Q.   I'm going to hand you a copy.  You're probably

22  familiar with it.  You've testified about it in the last

23  couple months.

24  A.   Thank you.

25  Q.   Okay.  So, this is the Directions for Use for the Obtryx

—— Rao - Direct - Love ——

1   sling; correct?

2   A.   Yes.

3   Q.   All right.  Now, you have -- the jury's heard about the

4   Directions for Use and what they're for.  But just so we can

5   kind of orient for this next line of questioning, these

6   accompany the product that gets shipped to the hospitals;

7   correct?

8   A.   Yes, sir.

9   Q.   All right.  And, so, when you open the package, you get

10  actually one of these so that the doctor can review it,

11  familiarize himself with how to use the product and the risks

12  attendant to the product.  Fair?

13  A.   Uh-huh, yes.

14  Q.   Okay.  I want to talk to you about -- and I want you to

15  point out for the jury where some of these things appear in

16  the DFU about statements that appear in the DFU.  And if you

17  could just point to them in the Directions for Use and then we

18  can talk about them.

19       The first statement is, "Polypropylene is not intended

20  to be permanently implanted in the human body."  Where does

21  that appear in the Directions for Use for the Obtryx sling?

22       MR. STRONGMAN:  Objection, argumentative.

23       THE COURT:  Counsel, is there any response to the

24  objection?

25       MR. LOVE:  I'm simply asking the witness to identify

—— Rao - Direct - Love ——

 1  for the jury where information regarding the risks attendant

 2  to the product appear in the DFU.

 3          THE COURT:  I'm going to allow the question, Mr.

 4  Strongman.  I overrule the objection.  Go ahead.

 5          THE WITNESS:  I don't believe that it is in the DFU.

 6  I don't believe that particular warning is in here, but I

 7  haven't memorized this.

 8  Q.  Okay, fair enough.  I don't think that it's in there

 9  either.  Now, --

10          THE COURT:  Counsel, I'm going to instruct you not to

11  make statements so that I don't have to keep instructing the

12  jury.  When you say, "I don't think it's in there either,"

13  that's akin to your testifying.  So, I don't want to have to

14  keep instructing the jury about that.  That should not be part

15  of the questioning.

16          MR. LOVE:  Fair enough, Your Honor.

17  BY MR. LOVE:

18  Q.  What I'd like to do at this point in time is pull

19  up the 2004 MSDS that's been admitted into evidence, and

20  that's Exhibit 1004.  Now, you've actually seen this

21  before, have you not, ma'am?

22  A.  I have.

23  Q.  Okay.  And you've actually testified about this

24  particular document before, have you not?

25  A.  I have.

Rao - Direct - Love

1  Q.   Okay.  Now, this particular MSDS -- we're not going to go

2  through it again.  Everybody knows what's in it.  But this

3  MSDS is dated January 28th, 2004, it looks like.  Do you see

4  that?

5  A.   I do.

6  Q.   I understand that the Obtryx sling was made available for

7  sale to humans in August, or thereabouts, of 2004.  Is that

8  fair?

9  A.   Sounds about right.

10  Q.   Okay.  Now, so this is approximately six or seven months

11  before Boston Scientific begins to sell the Obtryx sling.

12  Fair?

13  A.   Yes.

14  Q.   Okay, all right.  And is this the first time -- you know

15  the Medical Application Caution.  You've seen that, obviously.

16  Yes?

17  A.   I have.

18  Q.   Okay.  Is, is this the first time that you had ever seen

19  or your company had ever seen this Medical Application Caution

20  in an MSDS for polypropylene that you're aware of?

21  A.   I think so.

22  Q.   Okay.  So, at this time, were you aware of the scientific

23  basis that established that polypropylene was safe for

24  permanent implantation in the pelvic area?

25  A.   I'm sorry.  What's the question?

Rao - Direct - Love

1   Q.   Yeah.  In 2004 or thereabouts had you ever seen any

2   scientific literature that established that polypropylene was

3   safe for permanent implantation in the pelvic area of a woman?

4   A.   Only through the successful use of the TVT product and

5   our Advantage device.

6   Q.   Okay.  But -- okay.  With respect to the Obtryx -- now,

7   what study --

8   A.   The same mesh.

9   Q.   I'm sorry.  The polypropylene?

10  A.   Yeah.

11  Q.   Okay.  So, you believe that there were studies that

12  established that polypropylene was safe for permanent

13  implantation in the human body?

14  A.   I believe there was clinical data showing good outcomes.

15  Q.   What study is that you're referring to?

16  A.   I haven't memorized all the literature, but I know there

17  is a bunch of literature on the TVT product.

18  Q.   Okay.  We're talking about the Obtryx sling.  I'm talking

19  about the Obtryx sling.

20  A.   The sling's the same.  It's the same polypropylene.  It's

21  a polypropylene material.  And our Advantage is also a

22  polypropylene material.

23  Q.   Okay.  But you changed the design; right?  It wasn't the

24  same as the TVT; right?

25  A.   It's the same material.  And when you're looking at the

Rao - Direct - Love

```
 1  MSDS, you're talking material specific to the resin that we

 2  used.

 3  Q.  And what was that study called again that you said?  You

 4  said a whole bunch of them.

 5          MR. STRONGMAN:  Argumentative.

 6          THE COURT:  That objection is overruled.  I consider

 7  it, Mr. Strongman, to be not argumentative either in its

 8  substance or its tone, but follow-up to a statement that the

 9  witness gave in response to a question a moment ago.  Go

10  ahead, please.

11          THE WITNESS:  I can't cite a specific study, but I

12  know that there are clinical people in our organization that

13  are much more familiar with all the studies that have been

14  done.

15  BY MR. LOVE:

16  Q.  Okay.  And you're sure that that TVT had the Marlex

17  polypropylene provided by Chevron Phillips?

18  A.  No, I'm not sure.

19  Q.  Okay.

20  A.  But I'm sure it was a polypropylene.  And when you

21  analyze it by FTIR, which is an analytical test that sort of

22  looks at the chemical footprint, that it was exactly the same.

23  Q.  Okay.  So, you're not sure if it was the Marlex provided

24  by Chevron Phillips; correct?

25  A.  Correct, but --
```

Rao - Direct - Love

1  Q.   And you're not --

2  A.   -- I'm sure that it's polypropylene.

3  Q.   And you're not sure of any specific study that you can

4  identify for this jury; correct?

5  A.   You'd have to speak to our clinical people to get the

6  exact studies, but I know there were studies done.

7  Q.   Okay, fair enough.  And can these MSDSs contain warnings

8  about things the product might be inappropriate for?

9  A.   Yes.

10 Q.   All right.  And would such information be reliable?

11 A.   It can be reliable.  This particular medical application

12 warning was something that we called the company and asked

13 them about.  And we asked why they suddenly put it on the MSDS

14 when previous versions did not have it.

15      And we were told that the reason they put it there was

16 purely a business decision.  And when we pressed them to ask

17 if anything had changed in the formulation, the materials, the

18 suppliers, we were told, "No," and that there were no safety

19 risks.  It was just a business decision.

20 Q.   Okay, okay.  Well, I just simply asked can this

21 information be reliable, and then you just gave me that

22 explanation.  I'm not sure where you were going.  Can the

23 information in an MSDS like this be reliable?

24 A.   Yes.

25 Q.   Okay.  And, now, did you hire at this time polypropylene

— Rao - Direct - Love —

```
 1  experts to examine the Marlex polypropylene to ensure that it
 2  was safe for human implantation at this time in 2004?
 3  A.   We didn't hire anybody, but it was no different than the
 4  Marlex that we had been implanting with our Trelex mesh since
 5  1990.
 6  Q.   Okay.  Well, it's not the same as Trelex mesh.  This is
 7  from Chevron Phillips Marlex polypropylene.  It was a
 8  different supplier; right?
 9  A.   The Trelex mesh is a Boston Scientific hernia mesh that
10  had been on the market since the 1990s.  One of the reasons
11  that we chose this particular grade of Marlex is that we had
12  good experience with that for about a decade.
13  Q.   We're not talking about hernias.  We're talking about
14  Chevron Phillips Marlex polypropylene that goes permanently
15  transvaginally in a woman.
16  A.   Well, this document is just talking about the resin.  And
17  the resin in the Marlex do have good historical use.  If you
18  want to extrapolate it to a specific application, then we did
19  not -- I mean, ask a different question that has to do
20  specifically with women.  But the Marlex itself and this MSDS
21  are sound and we've been using it for many years with good
22  luck.
23  Q.   You have?
24  A.   Yes, we have.
25  Q.   Okay.  Now, when it's used in a woman's pelvic region,
```

Rao - Direct - Love

```
 1   it's different from the abdomen region; right?
 2   A.   That's correct.
 3   Q.   There are certain oxidizing agents in the pelvic region;
 4   right?
 5   A.   I don't believe that.
 6   Q.   You don't?
 7   A.   No, I don't.  I've testified about that before.
 8   Q.   You don't believe that it has any oxidizing agents?
 9   A.   I don't believe there are strong oxidizers within the
10   body that would cause polypropylene to degrade.
11   Q.   All right.  Got this in 2004.  Right?  January.  What was
12   the name of the randomized controlled trial that Boston
13   Scientific initiated after receiving this from Chevron
14   Phillips?
15   A.   I don't believe there was a randomized controlled trial.
16   We called the company and realized that there was absolutely
17   nothing different about the material.
18   Q.   Didn't they actually say they were going to refuse to
19   sell it to you anymore for liability reasons at this time?
20   A.   That was their business decision.  And they did
21   ultimately sell us more material after knowing exactly how it
22   was going to be used.
23   Q.   Okay, okay.  We'll figure that out in a few minutes.
24   Next statement.  "The safety and effectiveness --" this is for
25   the Directions for Use.  We're going to go back to the
```

─── Rao - Direct - Love ───

1    Directions for Use.

2         If you could, the following statement, "The safety and

3    effectiveness of the Obtryx sling system compared to

4    conventional surgical repair for stress urinary incontinence

5    has not been demonstrated in a randomized controlled trial."

6         Where does that statement appear in the Directions for

7    Use for the Obtryx sling?

8    A.   I'm not sure if it's in here.

9    Q.   Okay, fair enough.  Now, that statement is factually

10   accurate as of August, 2004, is it not?

11   A.   Yes.

12   Q.   Okay.  Now, you -- your company used -- made other

13   products that contained this polypropylene stuff; right?  You

14   had the Advantage.

15   A.   The Advantage and also the Trelex mesh, yes.

16   Q.   Ultimately, you had a Pinnacle product that was on that

17   used a polypropylene too, the same type?

18   A.   Yes.

19   Q.   And that polypropylene that was used in the Pinnacle

20   product was the same as the polypropylene that's used in the

21   Obtryx sling; right?

22   A.   Yes.

23   Q.   All right.  Now, your company didn't do any human

24   clinical trials on the Pinnacle products before selling them

25   to humans either, did they?

Rao - Direct - Love

1          MR. STRONGMAN:  Objection.  May we approach?

2          THE COURT:  Yes, sir.

3          (The following occurred at sidebar.)

4          MR. STRONGMAN:  My objection is he's now getting

5   into, obviously, the Pinnacle product which is for pelvic

6   organ prolapse and that shouldn't be in evidence.

7          And with regard to the language that Mr. Love's

8   talking about that, I believe he's going to show it was the

9   Pinnacle Directions for Use, not in the Obtryx Directions for

10  Use, and is inherently wrapped up in the FDA process.

11          The conversations that Boston Scientific had with the

12  FDA regarding 522 orders and various FDA procedures regarded

13  only pelvic organ prolapse.  And, in fact, what the FDA said

14  was you need no further studies on SUI products.  That's why

15  there's a difference in the DFUs.

16          So, to the extent that Mr. Love gets into why some

17  things were in the Pinnacle DFU but not in the Obtryx DFU,

18  he's opening the door to the conversations of the FDA's

19  conclusions on those issues.

20          THE COURT:  All right.

21          MR. LOVE:  The "why" is irrelevant to me, Your Honor.

22  The fact of the matter is that this is a polypropylene product

23  just like the Obtryx.  They didn't do human clinical trials in

24  either product.

25          The difference for this case is that in the DFU for

——————— Rao - Direct - Love ———————

 1  Pinnacle they included a warning that they hadn't studied it

 2  in humans and said it was safe.  So, the issue -- it's

 3  relevant because it goes to notice.  This company knew how to

 4  warn properly and chose not to with respect to Obtryx.  And it

 5  goes to the company, and the company had the ability to put it

 6  in the Obtryx and chose not to.

 7          THE COURT:  Anything further?

 8          MR. STRONGMAN:  Yes.  He has already established --

 9  he asked her, "Where is that language in the Obtryx DFU?"  She

10  said, "It's not."  And that's as far as he should go.

11          And, again, the "why," the reason why it's in the

12  Pinnacle DFU is critical because it's directly tied to the FDA

13  issues regarding the safety and efficacy that they made with

14  regard to the SUI products versus the POP products.

15          MR. LOVE:  And they didn't go -- it says, "We didn't

16  do studies."  It has nothing to do with the efficacy of the

17  product, Your Honor.  It goes to notice.  This company knew

18  how to warn and chose not to.

19          THE COURT:  All right.  The "why," as you indicate,

20  is not of importance to you.  In order to be fair so that the

21  jury gets a full view, if they go into differences in the DFU,

22  the defense fairly would be able to explore why not.

23          He is claiming, and he will note, this is not the

24  case; that the reason it's not in there is because it was not

25  required by the FDA.

Rao - Direct - Love

1              And, so, the Court has precluded that.  And in order

2     to ensure that both of you are able to get to the merits of

3     your case, I'm going to preclude that.

4              However, Mr. Love, she has made statements here

5     during the course of her testimony that there was no testing

6     because it was the same as the polypropylene used in the prior

7     sling.  I think that you should be able to inquire about that.

8              MR. LOVE:  Uh-huh.

9              THE COURT:  But as to the information, the

10    differences in the DFU, if the differences are based on what

11    was required by the FDA, I'm not going to permit you to go

12    into those.

13             MR. LOVE:  If I could, just one more, you allowed

14    them to go into substantial equivalence without mentioning the

15    FDA.  This is no different.  They got to put in the

16    substantial equivalence when they know, we know, and you know

17    that substantial equivalence doesn't equal safety.

18             And we should be able to say, "Listen, they knew how

19    to warn," it doesn't matter why, without mentioning the FDA.

20    It's tit for tat.  They opened the door and the "why" isn't

21    relevant.  He's just selling that because it's the FDA.  The

22    fact is they knew how to warn and they chose not to.

23             THE COURT:  And you can ask her about warnings

24    without getting into the differences in testing.  I preserve

25    the plaintiffs' objection and exception to this ruling.

——— Rao - Direct - Love ———

1           MR. LOVE:  Thank you, Your Honor.

2           (Sidebar concluded.)

3    BY MR. LOVE:

4    Q.   Okay.  Let's back up just a touch.  No randomized

5    clinical -- let's just back up.  No randomized

6    controlled trials on the Obtryx sling prior to this

7    product being made available for sale; correct?

8    A.   Yes.

9    Q.   All right.  Actually, no human clinical trials at all,

10   randomized or otherwise, in the Obtryx sling prior to making

11   it available for sale to humans; correct?

12   A.   Not for Obtryx, correct.

13   Q.   Correct, all right.  Neither one of those statements

14   appears in the Directions for Use that I'd like you to pull

15   back up.  Correct?

16   A.   I don't believe so.

17   Q.   Okay.  So, if a doctor is looking at this particular

18   Directions for Use, they're not going to know that Boston

19   Scientific hasn't established that the product is safe and

20   effective through randomized controlled trials.  True?

21   A.   True.

22   Q.   Okay, next statement.  Let's see if we can find out where

23   it is in the DFU.  "Boston Scientific Corporation never tested

24   the Obtryx sling system in humans prior to making it available

25   for sale."  I think we just agreed that's not in there either;

─── Rao - Direct - Love ───

1  right?

2  A.   Correct.

3  Q.   Okay, last statement.  "Boston Scientific made design

4  changes to the TVT sling system but never tested these changes

5  in humans to ensure that the Obtryx sling system was safe and

6  effective."  Where does that appear in the Directions for Use

7  for the Obtryx sling?

8  A.   It doesn't.

9  Q.   Okay.  They heard words like "shrinkage."  Where does the

10  warning that this product may shrink once inside the body,

11  where does that appear in the DFU?

12  A.   I'm not sure if it does.

13  Q.   Okay.  Degradation.  The jury's heard that polypropylene

14  can degrade once in the human body.  Where does that warring

15  appear in the DFU?

16  A.   I'm not sure if it appears.

17  Q.   Okay.  Chronic foreign body reaction, that you can have a

18  long-term permanent foreign body reaction.  Where does that

19  warning appear in the DFU for the Obtryx sling?

20  A.   I'm not sure that appears in those words.

21  Q.   Okay.  Now, the, the jury has heard about the Cholhan

22  study that talks about periurethral banding and dyspareunia.

23  Where does the warning about periurethral banding appear in

24  the Directions for Use for the Obtryx sling?

25  A.   I don't believe it does.

Rao - Direct - Love

1   Q.   Okay.  And it's fair -- I think we're on the same page

2   and I think the jury understands this.  But the first

3   randomized controlled trial ever conducted by Boston

4   Scientific, I believe, was the Ross study.  Is that fair?

5   A.   I honestly don't know.  I don't follow all the clinical

6   literature and I don't follow our clinical studies.

7   Q.   Okay.  You don't keep up with your company's own studies?

8   A.   No.

9   Q.   Okay.

10  A.   Not as a matter of my, my regular course of work I don't.

11  I hear about them from time to time, but I'm not very familiar

12  with them.

13  Q.   Fair enough.  Well, let's just kind of wrap this thing

14  up.  So, if a doctor is looking at the DFU for the Obtryx

15  sling in 2009, 2010, 2011 and considering whether to choose

16  the Obtryx sling versus maybe the TVT or something else, none

17  of the things that we just went through would appear in the

18  Directions for Use to educate him about potential problems

19  associated with this product.  Fair?

20  A.   I'm not clear if this is the same DFU that we currently

21  send out with our product.  I know the DFUs do change over

22  time.

23  Q.   Okay.

24  A.   So, some of those things could potentially be on a more

25  up-to-date DFU.  This one doesn't have a date on it.

Rao - Direct - Love

1  Q.   This is the DFU that was in place when my clients had

2  this product implanted in them.  Okay?  Just assume that for

3  purposes of this question.

4  A.   Okay.

5  Q.   All right.  So, if that's true, my clients' doctors who

6  were looking at this DFU don't have shrinkage.  True?

7  A.   True.

8  Q.   Don't have periurethral banding.  True?

9  A.   True.

10 Q.   Are not told that the product had never been established

11 to be safe and effective through human clinical trials.  True?

12 A.   True.

13 Q.   Are not told that the product could degrade once inside

14 their body.  True?

15 A.   They haven't been told about that potential, no.

16 Q.   Okay.  So, can you look the jury in the eye and tell them

17 that the Obtryx DFU told physicians the whole truth and

18 everything that Boston Scientific knew in 2009 and 2010?

19         MR. STRONGMAN:  Objection, form, foundation.

20         THE COURT:  I'm sorry?

21         MR. STRONGMAN:  Objection to the form of the

22 question, argument, and foundation as well.

23         THE COURT:  I will sustain it as to being

24 argumentative.  Go ahead, counsel.

25 BY MR. LOVE:

─────── Rao - Direct - Love ───────

1   Q.  If Ms. Blankenship's doctor, April, 2009, when she

2   had her first surgery, was looking at this DFU, is he

3   being told the whole truth about the risks known to

4   Boston Scientific and what they had done or not done at

5   that time?

6          MR. STRONGMAN:  Same objection on foundation with

7   this witness.

8          THE COURT:  I overrule it.  Go ahead, please.

9          THE WITNESS:  Could you repeat that, please?

10  BY MR. LOVE:

11  Q.  Sure.  Ms. Blankenship had this product implanted

12  in her in 2009.  If her doctor is looking at this DFU,

13  is he being told the whole truth about what this product

14  could do and what Boston Scientific had done or not done

15  with this product?

16         MR. STRONGMAN:  Objection.  She's not a clinical

17  witness.  She's not familiar with what the doctors knew or

18  didn't know.

19         THE COURT:  I overrule the objection.  Go ahead,

20  please.

21         THE WITNESS:  This DFU does not state all of those

22  things.

23  BY MR. LOVE:

24  Q.  So, he wouldn't have been told the whole truth by

25  Boston Scientific.  Fair?

Rao - Cross - Strongman

1   A.   The DFU would not tell all of those details, no.

2   Q.   Thank you.  I appreciate your time.

3        THE COURT:  Cross, counsel?  Mr. Strongman.

4        MR. STRONGMAN:  Thank you.  May I proceed, Your

5   Honor?

6        THE COURT:  Yes, sir.

7   (CROSS EXAMINATION OF DOREEN RAO BY MR. STRONGMAN:)

8   Q.   Good morning, Ms. Rao.  How are you?

9   A.   Good, thanks.

10  Q.   You were asked some questions just a moment ago by

11  Mr. Love about the Directions for Use.  Is that right?

12  A.   Yes.

13  Q.   Now, could you explain the cross-functional approach that

14  Boston Scientific takes with regard to how it develops its

15  products and how the DFU is developed?  Is it by your

16  department?  Another department?  Could you elaborate on that?

17  A.   Just about all of the, the deliverables or documents that

18  we need to prepare for our products are created by

19  cross-functional teams.  And depending on what the document

20  is, different people might be involved.

21       So, for instance, the DFU would require that we have

22  someone from our quality group there, our clinical group,

23  medical sciences group, and obviously someone from like a

24  labeling group, someone who's actually going to figure out how

25  to format it so it fits on the page.

Rao - Cross - Strongman

1  Q.  And could you just tell the jury a little bit about what

2  your job is and what you do at Boston Scientific specifically?

3  A.  So, I'm a Research and Development engineer.  And early

4  on for this project -- well, actually for the Advantage

5  project that designed the mesh, my job was to do the technical

6  work to figure out what the TVT mesh was and to make a mesh

7  similar, if not better, than it.

8       And then a little later in my job, I was a team leader,

9  which didn't mean I did all the work.  It just meant that I

10  made sure they had all the right people in the room, that we

11  were following all of our appropriate operating procedures and

12  making sure that all of the steps were done to assure that we

13  had safe and effective products on the market.

14  Q.  And, Ms. Rao, were you responsible for the Directions for

15  Use for the Obtryx?

16  A.  No, I was not.

17  Q.  Was another department within Boston Scientific

18  responsible for that?

19  A.  There was a whole another project team that was

20  responsible for that.  And, again, they would have had a

21  quality person, a medical person, a regulatory -- I didn't

22  mention that before -- was also involved in drafting this.

23  Medical, clinical, quality, and regulatory were probably the

24  key players.  But other people need to approve it as well.

25       We have an electronic document approval system.  And

Rao - Cross - Strongman

1   something like a DFU gets very broad approval.  And it won't

2   get published until everybody's agreed to the content.

3   Q.   And, Ms. Rao, you were asked some questions about medical

4   literature as well.  Is there a department within Boston

5   Scientific that analyzes medical literature?

6   A.   We have a clinical group, and it's their -- their job is

7   to follow all of the studies that are going on, as well as

8   conduct studies that we might be doing internally.

9        We also have a medical sciences group.  And their job

10   would also be to keep abreast of the literature and to deal

11   with any physicians because we routinely get physician input

12   as we're designing products to make sure that we are designing

13   products that are going to work well.

14   Q.   And with regard to the clinical group, who's in charge of

15   the clinical group with respect to urology?

16   A.   I believe Janice Connor does most of the clinical work

17   for urology and women's health.

18   Q.   Now, you were also asked some questions about what was

19   and was not in the DFU.  Do you remember those?

20   A.   Yes.

21   Q.   And, specifically, Mr. Love asked you some questions

22   about the MSDS.  Right?

23   A.   Yes.

24   Q.   And could you tell me specifically what you personally

25   did with regard to the Medical Application Caution when you

Rao - Cross - Strongman

1   read it.

2   A.   When we became aware of the Medical Application Caution,

3   we noticed that it had been added to a DFU on a, for a resin

4   that had been used for many years.  So, I called the vendor.

5   It was either Chevron Phillips or Sumika.  They kept changing

6   ownership.  And I asked them if there was anything different

7   about the product that prompted them to put that warning on

8   there.

9        And I asked them if there were any new materials, if

10  the materials were coming from different suppliers, if they

11  had changed any of their formulations.  And I was assured that

12  it's exactly the same product, but they had made a business

13  decision that they wanted to stay away from medical.

14  Q.   Now, did Phillips at any time express any safety concerns

15  to you?

16  A.   No, not at all.

17  Q.   And that was a conversation you had personally; correct?

18  A.   I did.

19  Q.   And at any time did Chevron Phillips tell you that there

20  was some sort of risk with using their polypropylene in

21  transvaginal mesh?

22  A.   No.

23  Q.   You mentioned a little bit ago that there was testing

24  that Boston Scientific did to make sure that the polypropylene

25  that was being used in our product was just like other

*United States District Court*
*Southern District of West Virginia*

Rao - Cross - Strongman

1   polypropylene.  I think you called it FTIR testing.  Do you

2   remember that?

3   A.   That's one of the tests we did, yeah.

4   Q.   And can you explain what that test did and why it showed

5   that the polypropylene compound that we use in the Obtryx is

6   just like the polypropylene compound used in other devices?

7   A.   So, it's -- FTIR is a Fourier Transform Infrared and it's

8   an analytical technique where you use some equipment and it's

9   called a chemical fingerprint and it shows different peaks and

10  valleys within the material showing what it's made of.

11         And what we did early on was we took an FTIR of the TVT

12  material and an FTIR of the material that we had proposed, the

13  Marlex, and we overlaid them on top of each other.  And the

14  peaks were indistinguishable, meaning that the material, the

15  base material was the same.

16  Q.   And Boston Scientific also did biocompatibility testing

17  on the polypropylene material; correct?

18  A.   Yes.

19  Q.   And I think it was mentioned there was not

20  biocompatibility testing done on the mesh used in the Obtryx.

21  I think Dr. Pence said that.  Is that accurate?

22  A.   No, we did a full battery of biocompatibility testing.

23  The testing -- there's recognized standards, ISO standards

24  that you need to test to depending on how the product is being

25  used and what part of the body it's going to be in and how

Rao - Cross - Strongman

 1  long it's going to be implanted in the body.  And we did all

 2  those tests and we passed all those tests.

 3       We have a biocompatibility group that's solely

 4  responsible for determining which tests need to be done and

 5  sending them out to be done and analyzing the reports and

 6  filling out the proper documentation in our system.

 7            MR. STRONGMAN:  Your Honor, may I approach?

 8            THE COURT:  Yes, sir.

 9            THE WITNESS:  Thank you.

10  BY MR. STRONGMAN:

11  Q.  Ms. Rao, can you identify the document that I just

12  handed you?

13  A.  It's an ISO standard.  It's 10993-1.  And it says,

14  "Biological evaluation of medical devices, Part 1, evaluation

15  and testing."

16            MR. STRONGMAN:  And, Your Honor, at this time Boston

17  Scientific would move Defendant's Exhibit 1059, which is ISO

18  10993, into evidence.

19            THE COURT:  Is there an objection, Mr. Love?

20            MR. LOVE:  No objection, Your Honor.

21            THE COURT:  Plaintiffs' -- or Defendant's Exhibit

22  1059 will be admitted into evidence without objection.

23            (DEFENDANT'S EXHIBIT 1059 WAS RECEIVED IN EVIDENCE.)

24  BY MR. STRONGMAN:

25  Q.  And there's been some discussion by Dr. Pence

Rao - Cross - Strongman

1  earlier about whether or not biocompatibility testing

2  has to do with the protection of humans.  And I want to

3  look at what the ISO has to say.  Okay?  Let me just

4  back up.  ISO, that stands for international standards.

5  Is that right?

6  A.   It's an international organization for standardization.

7  Q.   And this is an industry standard, an international

8  standard.  It's not something that Boston Scientific came up

9  with.  Is that right?

10 A.   Correct.

11 Q.   And if you could look -- there's a Forward in ISO 10993.

12 It is Page IV.  At the very top there it sets out what the ISO

13 is.  Do you see that?

14 A.   I do.

15 Q.   And it says that the ISO is a worldwide federation of

16 national standards bodies, ISO member bodies, and that work

17 preparing international standards is normally carried out

18 through ISO technical committees.  Do you see that?

19 A.   I do.

20 Q.   And, again, these are not Boston Scientific specific

21 committees.  These are worldwide committees of experts.  Is

22 that right?

23 A.   Correct.

24 Q.   And if you could turn the page to the Introduction about

25 three pages later.  And specifically at the bottom of the

Rao - Cross - Strongman

1  first paragraph under the Introduction it states that the

2  ISO -- states that, "The ISO 10993 is intended to be the

3  overall guidance document for the selection of tests enabling

4  evaluation of biological responses relevant to the safety of

5  medical devices and materials."  Is that right?

6  A.   Yes.

7  Q.   And it specifically says down two paragraphs, "The

8  protection of humans is the primary goal of ISO 10993."  Is

9  that right?

10  A.   Yes.

11  Q.   And did Boston Scientific do ISO 10993 testing?

12  A.   Yes.

13  Q.   Did the mesh used in the Obtryx device pass --

14  A.   Yes.

15  Q.   -- the ISO 10993 testing?

16  A.   Yes, it did.

17  Q.   You were also asked some questions by Mr. Love about

18  similarities and differences with the Ethicon TVT

19  polypropylene.  Is that right?

20  A.   Yes.

21  Q.   And he talked about the fact that there were similarities

22  and differences, and he pointed out the detanged edge.  Do you

23  remember that?

24  A.   Yes.

25  Q.   Now, with regard to your work, did you actually run a

Rao - Cross - Strongman

1  battery of tests to make sure that the mesh that we were

2  using, Boston Scientific was using was, in fact, similar to

3  the TVT mesh in terms of its composition, its pore size, its

4  knit?

5  A.  Yes.

6          MR. STRONGMAN:  May I approach, Your Honor?

7          THE COURT:  Yes, sir.

8  BY MR. STRONGMAN:

9  Q.  I'm going to hand you this, Ms. Rao.  The sticker's

10  falling off there.

11  A.  Thank you.

12  Q.  And if you could, could you just tell me what number is

13  on that sticker?

14  A.  1503.

15  Q.  And, Ms. Rao, can you identify what I've handed you

16  that's been marked as 1503?

17  A.  Yes.  It's some pictures of the TVT mesh compared to the

18  Advantage mesh at different magnifications.

19  Q.  Okay.  And is this a picture that you took yourself?

20  A.  It is.

21  Q.  And is this picture a fair and accurate representation of

22  a magnification looking at the mesh that's in the Obtryx and

23  looking at the mesh that's in the TVT?

24  A.  Yes.

25          MR. STRONGMAN:  Your Honor, I would move to admit

Rao - Cross - Strongman

 1    Defense Exhibit 1503.

 2            THE COURT:  Any objection, counsel?

 3            MR. LOVE:  No objection, Your Honor.

 4            THE COURT:  Defendant's Exhibit 1053 [sic] will be

 5    admitted into evidence without objection.

 6            (DEFENDANT'S EXHIBIT 1503 WAS RECEIVED IN EVIDENCE.)

 7    BY MR. STRONGMAN:

 8    Q.   And just for the jury's benefit now that they can

 9    see it, can you just describe what we're looking at

10    here?

11    A.   So, the two photos on the left are the Advantage mesh,

12    obviously at different magnifications.  And then the photos on

13    the right are the TVT mesh.  And the picture was just taken to

14    show that structurally they're the same.

15    Q.   So, not only structurally are they the same, but did you

16    also do tests to make sure they're chemically the same?

17    A.   We did.  That would be the FTIR.  And we did a few other

18    analytical tests.

19    Q.   Now, you were asked some questions also about elongation.

20    Do you remember that?

21    A.   I do.

22    Q.   Did Boston Scientific do testing according to standards

23    with regard to elongation and the mesh that's in the Obtryx

24    device?

25    A.   We did.  We did testing according to an ASTM standard,

Rao - Cross - Strongman

1  but we weren't able to test according to the ASTM standard on

2  an actual device because the device didn't give us a sample

3  wide enough.

4  Q.  Can you describe for the jury the product development

5  process briefly?  There's different phases of the process;

6  right?  Can you describe that for the jury?

7  A.  So, at the time that this product was designed and

8  developed, we had a five-phase process.  And you started with

9  a proposal phase where you came up with an idea.  The

10  marketing people might have seen something that they want us

11  to make.  Then you just evaluate whether it makes good

12  business sense to move forward with the project.

13      And then you go into a definition phase which is where

14  you start defining what the product is going to look like.

15  And this phase tends to be very iterative.  You might start

16  with an idea and do some testing and evaluation and modify the

17  idea a little bit until you have something that you think you

18  want to move forward with.

19      And when you get to that point, you move to what we

20  call the development phase where you have this concept or idea

21  and you march forward towards developing the product that

22  ultimately you want to sell.

23      Once you have that done, there's a verification and

24  validation phase.  And that's where we do all the testing to

25  make sure that the product meets all the specifications that

Rao - Cross - Strongman

1  we've set out for it, but also that it meets the user needs.

2  So, we have users evaluate it.  It's a combination of bench

3  testing and user evaluation.

4       And then the last phase would be a commercialization

5  phase when we're satisfied that we've met all the requirements

6  and we're ready to start selling the product.

7  Q.  And with regard to the definition phase, that's early on

8  in the process; right?

9  A.  It's very early on.

10 Q.  Part of what you're trying to do in the definition phase

11 is figure out what the specs should be, what the parameters

12 should be for your potential product; right?

13 A.  Right.

14 Q.  And, certainly, any bench testing or mechanical testing

15 that's done as part of the definition phase isn't, by

16 definition, a fail or pass, is it?

17 A.  No.  It's just all part of the evolution of figuring out

18 what the product needs to look like.  You have to take into

19 account the product that you're making, the competitive

20 products that you're looking at, and also the clinical

21 relevance of some of the specifications.

22 Q.  And before a product would be commercialized, Boston

23 Scientific's own processes require that it meet every standard

24 and every test through the verification and validation stage?

25 A.  Absolutely.

Rao - Redirect - Love

1  Q.  And with regard to elongation testing, did Boston

2  Scientific meet the required standards that we set in the

3  verification stage before it ever is commercializes?

4  A.  Yes.

5  Q.  The last thing I want to ask you, Mr. Love ended by

6  asking you some questions about what a doctor would or

7  wouldn't know based on looking at the DFU.  Do you remember

8  that?

9  A.  I do.

10  Q.  Assuming that Mr. Love's representations about certain

11  things were true about degradation or shrinkage and those

12  sorts of things, and assuming those are in clinical literature

13  out there, doctors can read the clinical literature; correct?

14  A.  Yes.

15       MR. STRONGMAN:  I don't have any further questions at

16  this time, Your Honor.

17       THE COURT:  Redirect, Mr. Love?

18  (REDIRECT EXAMINATION OF DOREEN RAO BY MR. LOVE:)

19  Q.  Just a few questions.  I got this ISO testing.  And

20  it said -- I think Jon read -- "The protection of humans

21  is the primary goal of ISO."  And that's certainly a

22  goal that you would hope to achieve as a medical device

23  company; right?

24  A.  Yes.

25  Q.  You do testing to protect humans; right?

—Rao - Redirect - Love—

1    A.   Yes.

2    Q.   Human testing can do the same thing; right?

3    A.   Yes.

4    Q.   Okay.  This Advantage TV -- let's go back to this just

5    one second.  Now, were you aware of the ProteGen sling product

6    that your company made at one time in the late '90s?

7              MR. STRONGMAN:  Objection, outside the scope.

8              MR. LOVE:  I'll tie it back in if you just give me a

9    chance.

10             THE COURT:  Let me see you all here at the bench.

11             (The following occurred at sidebar.)

12             THE COURT:  Mr. Love.

13             MR. LOVE:  During the examination from Mr. Strongman

14   she testified that all the ISO testing was done and it's done

15   to protect humans.  What I want to explore with her is that

16   her company had internally made a decision that for any future

17   materials we need to do ISO materials and human testing.

18             THE COURT:  Anything further?

19             MR. STRONGMAN:  Actually, it's beyond the scope.

20             THE COURT:  Given the explanation, I disagree and I'm

21   going to overrule the objection.  I preserve the defendant's

22   objection and exception.

23             MR. LOVE:  Thank you.

24             (Sidebar concluded.)

25   BY MR. LOVE:

Rao - Redirect - Love

1   Q.   I don't remember what my exact question was, but

2   I'll ask it again to the extent that I'm able to.   Are

3   you familiar with the ProteGen sling your company made

4   in the late '90s?

5   A.   Vaguely.

6   Q.   Vaguely, okay.  So, you're familiar with it.  It's just

7   not --

8   A.   I didn't work at the company at the time, but I've heard

9   about it and it's very different from this material.

10  Q.   Perfect.  It is very different.  But you know your

11  company after this product was recalled said, "For any future

12  sling materials, we've got to do human testing."  Right?

13          MR. STRONGMAN:  Objection, misstates the evidence.

14          MR. LOVE:  I can show her the key points memo if you

15  like.  Can we bring up Exhibit 759?

16          THE COURT:  Mr. Strongman, are you saying that it

17  misstates the evidence or misstates what's in the document?

18          MR. STRONGMAN:  Misstates what's in the document.

19          THE COURT:  All right.  Go ahead and show it to her,

20  please, if you would.

21          MR. LOVE:  Exhibit 759, please.  Go ahead and bring

22  up the last bullet point.

23  BY MR. LOVE:

24  Q.   I guess the point I was trying to make was very

25  simple.  ISO testing is good, is it not, ma'am?

———Rao - Redirect - Love———

 1  A.   It is good, yes.

 2  Q.   Okay.  Go ahead and read that bullet point for the jury.

 3  A.   "In connection with any future sling materials Boston

 4  Scientific will gather clinical data to assess product

 5  performance in a broad spectrum of clinical situations."

 6  Q.   Okay.  And look at the date there at the top.  What is

 7  that date there?

 8  A.   April 22, 1999.

 9  Q.   Okay.  Obtryx is a sling product.  It's a sling material.

10  Right?

11  A.   Yes.

12  Q.   Okay.  And Boston Scientific will gather clinical data.

13  That's what it says.  Right?

14  A.   That was one of the key points.

15  Q.   Okay.  And none, none was done with respect to the Obtryx

16  sling.  Fair?

17  A.   Not prior to launch.

18  Q.   Perfect, perfect.  Okay.  One last thing.  This

19  Advantage -- you showed this little picture that showed that

20  they are very similar.  Right?

21  A.   Yes.

22         THE COURT:  What document number?

23         MR. LOVE:  I'm sorry.  This is document, Exhibit

24  Number 1503.

25  BY MR. LOVE:

Tyree - Direct - Wagstaff

 1  Q.   TVT is not Marlex polypropylene, is it?

 2  A.   I don't know for sure.  I know it's polypropylene.

 3  Q.   Okay.  This, this actually says "Advantage."  This

 4  polypropylene used by Boston Scientific was heat-melted or

 5  detanged; right?

 6  A.   Not in this picture, but the edges under the urethra were

 7  detanged.

 8  Q.   Perfect, perfect.  And no human testing was done on the

 9  detanging to make sure it worked the way that your company

10  wanted it to work; correct?

11  A.   Correct.

12  Q.   Okay.  Thank you.

13          THE COURT:  You can step down, ma'am.

14          THE WITNESS:  Thank you.

15          THE COURT:  Call your next witness.

16          MS. WAGSTAFF:  Your Honor, our next witness is

17  plaintiff Jacquelyn Tyree.

18          THE COURT:  Ms. Tyree, will you come up and take an

19  oath or affirmation.

20          (**JACQUELYN TYREE**, HAVING BEEN DULY SWORN, TESTIFIED

21  AS FOLLOWS:)

22  (DIRECT EXAMINATION OF JACQUELYN TYREE BY MS. WAGSTAFF:)

23  Q.   Good afternoon, Ms. Tyree.

24  A.   Good afternoon.

25  Q.   I want to introduce myself to the ladies and gentlemen of

Tyree - Direct - Wagstaff

1  the gentlemen.  My name is Aimee Wagstaff and I've yet to

2  speak in front of you today.  So, I just wanted to introduce

3  myself.

4       And, Ms. Tyree, you've been here the entire trial, have

5  you not?

6  A.   Yes.

7  Q.   Okay.  And you've heard a lot of testimony in this trial

8  about stress urinary incontinence and the Obtryx sling; right?

9  A.   Right.

10 Q.   All right.  So, it's time to let the jury meet one of the

11 plaintiffs and introduce them to you all.  So, why don't you

12 take a moment and introduce yourself to the jury.

13 A.   I'm Jackie Tyree.

14 Q.   Okay.  And where do you live?

15 A.   In St. Albans, West Virginia.

16 Q.   Are you nervous?

17 A.   Very.

18 Q.   How long have you lived in St. Albans?

19 A.   I have lived there for about 10 years.  I've been in this

20 area all my life, though.

21 Q.   So, you're born and raised in West Virginia?

22 A.   Yes.

23 Q.   Okay.  And your husband is actually here with you today,

24 is he not?

25 A.   Yes, he is.

Tyree - Direct - Wagstaff

1   Q.   And he's been here with you every day; right?

2   A.   Yes.

3   Q.   And your mom is actually here today as well?

4   A.   Yes, she is.

5   Q.   As well as your best friend too; right?

6   A.   Yes.

7   Q.   You have your support system here with you.

8   A.   Right.

9   Q.   And you're -- how long have you been married to Robert?

10  A.   March will be 13 years.

11  Q.   Okay.  But you actually have known him since you were in

12  high school; correct?

13  A.   Right, longer than that.

14  Q.   So, you've known him for 30 --

15  A.   A long time.

16  Q.   -- plus years?  Okay.  And you have some children; right?

17  A.   Right.

18  Q.   Why don't you tell the jury a little bit about your

19  children.

20  A.   I have two children.  Joey is my oldest.  He is 34.  He

21  will be at the end of the month.  And Jamika.  She is 28.

22  Q.   Okay.  And Joey is a senior at Marshall University;

23  right?

24  A.   Right.

25  Q.   And where does Jamika live?

Tyree - Direct - Wagstaff

```
 1  A.   She married military, so she is in Hawaii.

 2  Q.   Okay.  But she just recently moved there; right?

 3  A.   Just moved there in, last July.

 4  Q.   You're pretty close with your kids?

 5  A.   Very.

 6  Q.   Very close.  And you're retired; right?

 7  A.   Yes.

 8  Q.   Okay.  And are you receiving retirement monies?

 9  A.   Yes, I am.

10  Q.   Okay.  Why don't you tell us how that came about.

11  A.   I worked at magistrate court for 24 years.  So, my age

12  and my time allowed me to retire.

13  Q.   So, once your age and how many years of service you've

14  put in equaled 80 years, you were able to retire; is that

15  right?

16  A.   Right.

17  Q.   So, you must have worked there a long time.

18  A.   Yes, 24 years.

19  Q.   Okay.  And you mentioned you had two kids.  Were those

20  vaginal births?

21  A.   Yes.

22  Q.   Okay.  And how big were each of those children if you can

23  remember?

24  A.   Joey was six pounds nine ounces.  Jamika was seven pounds

25  one and a half ounces.
```

Tyree - Direct - Wagstaff

1  Q.   Okay.  And was there anything abnormal about those

2  deliveries?

3  A.   No.

4  Q.   No?  All right.  Now, you've heard a lot of testimony

5  over the last few days about stress urinary incontinence;

6  right?

7  A.   Yes.

8  Q.   And at some point in your life you experienced some

9  stress urinary incontinence; right?

10 A.   Right.

11 Q.   Do you remember when that began roughly?

12 A.   No, I really don't.

13 Q.   Was it around 2009, '10 sound familiar?  Is that fair?

14 A.   Yes.

15 Q.   Okay.  So, I'd like you to tell the ladies and gentlemen

16 of the jury a little bit about your stress urinary

17 incontinence back in 2009, 2010 in terms of if it was severe

18 or what caused your stress urinary incontinence and that type

19 of stuff.

20 A.   Well, I had just like light leaking.  I would just have

21 to wear a panty liner.  I would have to wear one every day.

22 But it was just light leaking if I would sneeze or cough or

23 like any stress, stretching, anything like that would cause

24 it.

25 Q.   And you just had to wear a thin panty liner; is that

Tyree - Direct - Wagstaff

1  right?

2  A.   Yes.

3  Q.   And would you say that that had a negative impact on your

4  life, your stress urinary incontinence back in 2009, 2010?

5  A.   No, just besides like hygiene issues.  Of course, I

6  didn't like that.

7  Q.   Yeah.  A negative experience, but it wasn't having a

8  negative impact on your life; right?

9  A.   Right.

10  Q.   And did you ultimately seek the advice of a doctor to

11  treat your stress urinary incontinence?

12  A.   Yes, I did.

13  Q.   Okay.  Why don't you tell us who you reached out to.

14  A.   Dr. Luby.

15  Q.   Okay.  And what did you -- how did that come about?  How

16  did you end up with Dr. Luby?

17  A.   I just heard that he was a good doctor and, so, that's

18  just who I chose to go see.

19  Q.   And Dr. Luby is what kind of a doctor, if you know?

20  A.   I don't really know.  At the time, I believe that he was

21  an OB/GYN.

22  Q.   Okay.  And he's here in Charleston; right?

23  A.   In South Charleston.

24  Q.   Okay, South Charleston.  What hospital?

25  A.   He's not at a hospital.

Tyree - Direct - Wagstaff

1   Q.   Okay.

2   A.   He has his own office.

3   Q.   Okay.  And what did Dr. Luby recommend for you with

4   respect to your stress urinary incontinence?

5   A.   He recommended the sling.

6   Q.   Okay.  Do you know which sling?

7   A.   The --

8   Q.   Was it the Obtryx?

9   A.   Yes.

10  Q.   Okay.  And what was your understanding of what the Obtryx

11  was meant to fix for you?

12  A.   Just to, to stop the leaking, that it would stop the

13  leaking.

14  Q.   Okay.  Now, you were here during opening statement on

15  Monday morning; right?

16  A.   Yes.

17  Q.   And you heard Mr. Adams tell the jury that all of you all

18  needed the sling implanted in you to correct severe stress

19  urinary incontinence.  Did you hear that?

20  A.   Yes.

21  Q.   And do you believe that in 2009, 2010 that your stress

22  urinary incontinence was a severe condition?

23  A.   No, I don't think it was severe.

24  Q.   Okay.  So, you actually had the Obtryx implanted in

25  December of 2010.  Does that sound correct?

Tyree - Direct - Wagstaff

1   A.   Yes.

2   Q.   Just after Christmas?

3   A.   Right, December 27th.

4   Q.   Okay.  And Dr. Luby implanted that --

5   A.   Yes.

6   Q.   -- in you?  And at the time of the implant, you didn't

7   know it was the Obtryx sling, but you have since learned it

8   was the Obtryx; right?

9   A.   Right.

10  Q.   And how did the surgery go?

11  A.   It went well.

12  Q.   It went well.  Any complications during the surgery?

13  A.   No.

14  Q.   Did you have any criticisms of Dr. Luby's treatment of

15  you with respect to the implantation of the Obtryx?

16  A.   No.

17  Q.   No.  And were you given any restrictions as part of your

18  recovery?

19  A.   Well, I had to wait a certain amount of time before I

20  could have intercourse.  And then I couldn't do any lifting,

21  you know, or pushing or pulling for, I believe it was six

22  weeks.

23  Q.   Okay.  And did you comply with that restriction?

24  A.   Yes, I did.

25  Q.   And prior to the implant were you and your husband,

Tyree - Direct - Wagstaff

1  Robert, engaging in sexual intercourse?

2  A.  Yes.

3  Q.  How, how frequently?

4  A.  I would say maybe once a week.

5  Q.  I know this is difficult to talk about.  Okay.  So, you

6  complied with the six-week restriction that the doctor gave

7  you; right?

8  A.  Yes.

9  Q.  Any other restrictions that he gave besides lifting and

10  to not engage in sexual activity?

11  A.  No.

12  Q.  Okay.  At some point did you try to engage in sexual

13  intercourse again with your husband?

14  A.  Yes.

15  Q.  Okay.  And why don't you tell us how that felt.

16  A.  I could not.  Just, just to attempt I could not.

17  Q.  What do you mean you could not?

18  A.  It was just too painful just even to attempt.  I just

19  could not at all.

20  Q.  But you tried?

21  A.  Yes.

22  Q.  And did you have other -- so, did you have other pain?

23  A.  Yes.

24  Q.  And where was that pain?

25  A.  I would have -- like just sharp shooting pains would

Tyree - Direct - Wagstaff

1    shoot up through me.  I would have --

2            MS. WAGSTAFF:  May I approach and give her some

3    water?  Would you like some water?

4            THE WITNESS:  I'm all right.  Like if you would put

5    a, a cell phone beside you and the way it vibrates, I would

6    have those feelings inside me.  And I would do that like --

7    daily I would do that.  So, it was just like -- and then I

8    feel like -- all the time I feel like I have, I've had like

9    rough, like rough sex all the time.  That's how I feel sore

10   like that all the time.

11   BY MS. WAGSTAFF:

12   Q.   And you felt that way even though you weren't able

13   to have sex?

14   A.   Right.

15   Q.   And, so, after your surgery and after you waited that

16   six, six weeks to engage in sexual intercourse, these are the

17   feelings that came about when you tried?

18   A.   Right.

19   Q.   And you continued your treatment and care with Dr. Luby

20   for a period of time after your surgery; correct?

21   A.   Right.

22   Q.   And I've reviewed your medical records and it looks like

23   you went to him more than five, less than ten times.  Is that

24   fair?

25   A.   Yes.

Tyree - Direct - Wagstaff

1  Q.  Okay.  And did you ever tell Dr. Luby about these pains?

2  A.  Yes.

3  Q.  You're sure you told him about those pains?

4  A.  Yes.

5  Q.  Okay.  And if, if that documentation is not in your

6  medical records, do you have any reason to suspect why that

7  wouldn't be in your medical records?

8  A.  No.

9  Q.  Okay.  Did Dr. Luby spend a lot of time with you when you

10  would come in for these follow-up visits?

11  A.  No.

12  Q.  Did it seem like he was rushed a lot of the time?

13  A.  Yes.  He would just always tell me, "Well, you're not

14  leaking, are you?"  And just -- that's it.  He seemed

15  unconcerned about any of my other problems.  He would just

16  always say to me, "Well, you're not leaking."

17       And then I took my husband with me one time because I

18  thought, well, maybe if I take him with me, he would get the

19  point, you know, that I'm having other problems.

20       And, so, when Robert went with me, it was the same

21  thing, you know.  "Well, you're not leaking, are you?"  No, I

22  was not leaking, but I had the other problems.

23       And at that point, I got very aggravated and I, I never

24  went back after that.

25  Q.  So, your husband went with you to your last visit to

Tyree - Direct - Wagstaff

```
 1   offer you support to let the doctor know you were in pain; is
 2   that correct?
 3   A.   Yes.
 4   Q.   Okay.  And then that was your last visit to Dr. Luby?
 5   A.   Yes.
 6   Q.   And then did you go seek a second opinion somewhere else?
 7   A.   Yes, I did.
 8   Q.   Okay.  And why don't you tell the jury about that?
 9   A.   I went to Dr. Patton at that point.  And when he examined
10   me then, he immediately knew that something was wrong.  And he
11   said that he wasn't really in that area, you know, he didn't
12   deal with that.  So, he referred --
13         MR. BONASSO:  Your Honor, we object.  We believe what
14   the doctor was saying is hearsay and that testimony -- I think
15   they can offer his testimony.
16         THE COURT:  Response to the objection?
17         MS. WAGSTAFF:  Okay.  I can withdraw the question.
18         THE COURT:  All right, the question is withdrawn.
19   BY MS. WAGSTAFF:
20   Q.   Ms. Tyree, what did you understand Dr., Dr. Patton
21   to explain was going on with you?
22         THE COURT:  I think that's the same.
23         MS. WAGSTAFF:  What was your understanding of what he
24   said?
25         THE COURT:  It's the same issue, counsel.  I've
```

Tyree - Direct - Wagstaff

1    sustained an objection.

2    BY MS. WAGSTAFF:

3    Q.   Okay.  Did Dr. Patton perform a pelvic exam on you?

4    A.   Yes, he did.

5    Q.   Okay.  And did Dr. Patton refer you to another doctor?

6    A.   Yes, he did.

7    Q.   And who did Dr. Patton refer you to?

8    A.   To Dr. Fitzwater and Lohri's office.  I think there are

9    other doctors there too, but those are the two that I saw from

10   that office.

11   Q.   And Dr. Patton is a doctor here in the Charleston area;

12   correct?

13   A.   Yes.

14   Q.   And, so, it was Dr. Fitzwater and Dr. Lohri?  They're

15   doctors here in the Charleston area?

16   A.   Yes.

17   Q.   Okay.  And were you still suffering from pain while you

18   were visiting Dr. Patton?

19   A.   Yes.

20   Q.   And did you tell Dr. Patton you were in pain?

21   A.   Yes.

22   Q.   And then did you go visit Dr. Fitzwater next?

23   A.   Yes.

24   Q.   And did Dr. Fitzwater perform a pelvic exam on you?

25   A.   Yes, he did.

Tyree - Direct - Wagstaff

1   Q.   Okay.  And how many times did you visit Dr. Fitzwater?

2   A.   I think that I just saw him one time I believe.

3   Q.   Okay.

4   A.   And he had Dr. Lohri take over from there.

5   Q.   Okay.  And do you know why you only saw Dr. Fitzwater one

6   time?

7   A.   He, he told me that Dr. Lohri specialized in those type

8   things.  So -- as far as the slings and all were concerned.

9   Q.   So, at this point were these doctors telling you that

10  there may be complications associated with the sling?

11  A.   Yes.  And Dr. Lohri had decided that -- well, he spoke

12  with Dr. Patton also.  That was my understanding.  He said he

13  had spoken with Dr. --

14          MR. BONASSO:  Your Honor, I believe this is hearsay.

15          THE COURT:  The objection is sustained.

16          MS. WAGSTAFF:  Okay.

17  BY MS. WAGSTAFF:

18  Q.   So, you eventually end up with Dr. Lohri; correct?

19  A.   Correct.

20  Q.   He's a doctor here in Charleston?

21  A.   Right.

22  Q.   And Dr. Lohri also performed a pelvic exam of you;

23  correct?

24  A.   Correct.

25  Q.   And did Dr. Lohri recommend that the mesh should be

Tyree - Direct - Wagstaff

1   removed?

2   A.   Correct.

3   Q.   And did he tell you why the mesh should be removed?

4           MR. BONASSO:   Same objection, Your Honor.

5           THE COURT:   The objection is sustained, counsel.

6           MS. WAGSTAFF:   All right.

7   BY MS. WAGSTAFF:

8   Q.   So, eventually you end up going to Dr. Lohri to

9   have the mesh removed; correct?

10  A.   Correct.

11  Q.   And that was in July of 2013?

12  A.   Right.

13  Q.   So, about 15 months ago; is that right?

14  A.   Yes.

15  Q.   Okay.  And how did that surgery go?

16  A.   It went, it went well.

17  Q.   Okay.  Were you under general anesthesia?

18  A.   Yes.

19  Q.   Okay.  Did you also have a cytoscopy done where they put

20  the camera inside your urethra, if you know?

21  A.   I, I seem to think that I did.

22  Q.   Okay.  Do you know if you still have mesh inside of you?

23  A.   Yes, I do.

24          MR. BONASSO:   Objection, foundation, Your Honor.

25  BY MS. WAGSTAFF:

Tyree - Direct - Wagstaff

1    Q.  Has any doctor ever told you --

2            THE COURT:  Just a -- I'm sorry.  Were you

3    withdrawing that question, Ms. Wagstaff?

4            MS. WAGSTAFF:  Yes, Your Honor.

5            THE COURT:  The question -- the first question

6    apparently is withdrawn.

7    BY MS. WAGSTAFF:

8    Q.  Has any medical provider ever told you that you

9    still have mesh inside of you?

10           MR. BONASSO:  Same objection, Your Honor.  Well,

11   different objection.  This is hearsay.

12           THE COURT:  Do you have a response you want to give

13   to that, Ms. Wagstaff?

14           MS. WAGSTAFF:  I think that they can follow up on

15   cross.  And me asking her if she has -- if anyone has ever

16   told her that she has mesh inside of her is an appropriate

17   question for direct.

18           THE COURT:  So, you think it's not hearsay?

19           MS. WAGSTAFF:  Correct.

20           THE COURT:  I sustain the objection, counsel.

21   BY MS. WAGSTAFF:

22   Q.  Okay.  Let's talk about your complications now.

23   Why don't you tell us how you're doing today.

24   A.  I have all of my same problems except they have worsened.

25           MS. WAGSTAFF:  Your Honor, I would like to submit to

Tyree - Direct - Wagstaff

1    the Court that the, my prior questions are an exception to the

2    hearsay rule under Federal Rule of Evidence 803(4) which is a

3    statement made for medical diagnosis or treatment.

4         THE COURT:  Those are statements made to the doctor

5    for that purpose.  That exception does not cover statements

6    made by the doctor, counsel, to the patient.

7         In other words, if I give a doctor my medical history

8    or statements, those are included in medical records to, for

9    the purpose of a diagnosis, that's not hearsay or it is an

10   exception.  But I do not believe or find that the doctor's

11   statement to the patient, which is what's been asked for here,

12   falls under that particular exception.

13        MS. WAGSTAFF:  Okay, fair enough.

14   BY MS. WAGSTAFF:

15   Q.  So, let's go back to your complications now.  You

16   have -- are you able to have sex today?

17   A.  No, I'm not.

18   Q.  Okay.  Have you tried -- when was the last time you tried

19   engaging in sexual intercourse?

20   A.  I don't even know.  Since I had it put in in 2010,

21   probably only about 10 times did I attempt since 2010.

22   Q.  And was it painful every time?

23   A.  Yes.

24   Q.  On a scale of one to ten, could you, could you tell the

25   ladies and gentlemen of the jury what level of pain you

Tyree - Direct - Wagstaff

1    experienced when you tried to have sex those ten times?

2    A.    I would tell you probably 12.

3    Q.    And after you, your second surgery, did your stress

4    urinary incontinence return?

5    A.    Yes.

6    Q.    So, as we sit here today, you suffer from stress urinary

7    incontinence?

8    A.    Yes, and it is worse also.

9    Q.    So, now that the stress urinary incontinence increased,

10   did you ever undergo any sort of injection to try to help

11   that?

12   A.    Yes.

13   Q.    And that was another surgery and you were under general

14   anesthesia; is that correct?

15   A.    Yes.

16   Q.    And when was that surgery, if you can recall, roughly?

17   A.    It was in 2013, I believe, but I'm not sure when.

18   Q.    Okay.  Would you disagree if the record said it was in

19   January of 2014?  Does that sound right?

20   A.    Oh, no, yes, it was.  It was.

21   Q.    Okay.

22   A.    It was.

23   Q.    And did that help your stress urinary incontinence?

24   A.    No, it did not, not at all.

25   Q.    Okay.  So, prior to your surgery with Dr. Luby when he

Tyree - Direct - Wagstaff

1    implanted the Obtryx, do you recall any discussion of risks

2    and benefits with him?  He must have said something to you to

3    recommend the Obtryx; right?

4    A.  Yes.

5    Q.  Okay.  And, in fact, you signed -- you were here during

6    opening.  You saw the slide that showed that you signed a

7    consent form; right?

8    A.  Yes.

9    Q.  And, in fact, you signed nine consent forms; right?

10   A.  Several, yes.

11   Q.  And since you've signed those nine consent forms, between

12   that time and today, have you had a chance to review those

13   consent forms?

14   A.  Yes.

15   Q.  Yeah.  And in your review of those consent forms, are all

16   of them related -- are all of the consent forms related to the

17   Obtryx sling?

18   A.  Yes.

19   Q.  Okay.  Are some of those consent forms blank?

20   A.  Yes.

21   Q.  When you underwent the surgery with Dr. Luby back in

22   2010, did you -- I'm going to -- did you understand that a

23   risk of the surgery was that you would have life-altering

24   damages?

25   A.  I didn't understand that I was going to have permanent

Tyree - Direct - Wagstaff

damages by no means.

Q.   Okay.  Did you understand that you would never -- that a risk of the surgery was that you would never be able to have sexual relations with your husband again?

A.   Never, never did I think -- never, no.

Q.   Did you understand that it was a risk of the surgery that it may be impossible to fully remove the Obtryx sling?

A.   No.  I was never told that, no.

Q.   Did you understand that it was a risk of the surgery that the Obtryx sling may shrink inside of the body?

A.   No.

Q.   Did you understand it was a risk of the surgery that the Obtryx sling may degrade inside your body?

A.   No.

Q.   Did you, did you know when you agreed to have the Obtryx sling placed inside of you for the rest of your life did you know that that Obtryx sling had never been tested in humans?

A.   No.

Q.   When you agreed to have the Obtryx sling placed inside of you, did you know that Boston Scientific had received a warning saying that it should not be placed inside humans?

A.   No.

Q.   If you had known any of those, would you have agreed to have the Obtryx sling placed inside of you?

A.   No.

Tyree - Direct - Wagstaff

1    Q.   Now, you heard in opening statement as well that Boston

2    Scientific's lawyer said that a lot of the pain that you're

3    suffering today you were suffering prior to the implant.  Do

4    you remember that slide?

5    A.   Yes.

6    Q.   Okay.  I'd like to talk a little bit about that right now

7    if we can.  You had a hysterectomy; correct?

8    A.   Yes.

9    Q.   How years ago roughly?

10   A.   Over 20 years ago.

11   Q.   A long time ago?

12   A.   Yes.

13   Q.   Twenty years ago?

14   A.   Yes.

15   Q.   And in that hysterectomy were your ovaries removed?

16   A.   No.

17   Q.   Okay.  Now, in May of 2010 there's a medical record that

18   claims that you are having pain with sex.  Do you remember --

19   A.   Yes.

20   Q.   -- reviewing that medical record?

21   A.   Yes.

22   Q.   Can you explain -- did you ever -- do you have an

23   appreciation of why that was happening?

24   A.   Yes.

25   Q.   Okay.  And why do you think that you were having pain

Tyree - Direct - Wagstaff

 1  with sex in May of 2010?

 2  A.   I went to Dr. Luby then also and he told me that my

 3  ovaries were stuck to the walls of my vagina.  And then when I

 4  would have sex that it would bump into that when I would

 5  actually have intercourse.

 6  Q.   Okay.  So, -- okay.  So, did you then have your ovaries

 7  removed?

 8  A.   Yes, I did.

 9  Q.   Okay.  And was that causing severe pain?

10  A.   Yes.

11  Q.   Okay.  So, having your ovaries stuck to the side of your

12  wall was causing you severe pain with sex; is that correct?

13  A.   Right.

14  Q.   Okay.  Once you got your ovaries removed did you -- was

15  that around May of 2010?

16  A.   Yes.

17  Q.   Okay.  Did that resolve the painful sex that you were

18  having prior to May of 2010?

19  A.   Yes.

20  Q.   And how do you, how do you know that?  It may seem

21  obvious, but why don't you tell the jury how you know that.

22  A.   Because I had no problems having intercourse after that.

23  Q.   Okay.  So, there is a period of time between May of 2010

24  and December of 2010 when you had the Obtryx implanted where

25  you were engaging in sexual intercourse with your husband;

Tyree - Direct - Wagstaff

1  right?

2  A.   Yes.

3  Q.   And that wasn't painful to you?

4  A.   Right.

5  Q.   And is the pain that you were having with sex in May of

6  2010 different than the pain that you're having today?

7  A.   Yes.

8  Q.   Are you sure about that?

9  A.   Yes, because I'm not -- because now I'm not having

10  intercourse at all.

11  Q.   So, if I understand you correctly, before you could have

12  intercourse and it hurt?

13  A.   Right.

14  Q.   And today it's more?

15  A.   I am not having it.  It's painful just to attempt.  I'm

16  not having -- there is no penetration at all.

17  Q.   Okay.  And you've had urinary tract infections in the

18  past; right?

19  A.   Yes, I have.

20  Q.   And that's probably painful while you have the urinary

21  tract infection; correct?

22  A.   Yes.

23  Q.   And that's different than the pain you're experiencing

24  today?

25  A.   Yes.

Tyree - Direct - Wagstaff

1  Q.   Okay.  And you're not making a claim for lost wages;

2  right?

3  A.   No.

4  Q.   Okay.  And how are you doing today?  How are you dealing

5  with what you've been through?

6  A.   I don't feel well.  I kind of just stay in a shell when

7  it comes to that part.  I'm rather withdrawn and I just kind

8  of try to act as though it doesn't exist pretty much.

9  Q.   Why do you --

10  A.   I don't even know if Robert remembers, but he asked me

11  not long ago, he said do I think about how this affects him.

12  And I said, "Do you want my honest answer?"  And he said,

13  "Yes."  And I said, "No, I don't."  And he said -- and, you

14  know, I said, "I'll tell you why."  I said, "Because I don't

15  know how to deal with my issues because I don't know how to go

16  on with a permanent problem, a forever, a forever problem that

17  I have."

18        Is it fair to him?  No, it's not fair that I don't

19  think about his side of it, not at all.  But I don't know how

20  to accept this.  So, I try to act like it hasn't happened

21  because I don't know how to figure out how to go on from here.

22  As far as this goes, I don't know how to deal with it.  So,

23  how do I handle it?  I try not to I guess.  I don't know.

24  Q.   Okay.

25        MS. WAGSTAFF:  I pass the witness.

Tyree - Cross - Bonasso

 1          THE COURT:  Cross-examination, counsel.

 2   (CROSS EXAMINATION OF JACQUELYN TYREE BY MR. BONASSO:)

 3   Q.   Good morning, Mrs. Tyree.

 4   A.   Good morning.

 5   Q.   My name is Mike Bonasso.  I've not been up in the

 6   courtroom yet.  We haven't met before, have we?

 7   A.   No.

 8   Q.   Well, before I start, I want to tell you that I

 9   understand this is a difficult topic and a difficult subject.

10   I really don't understand it all, but I do believe it's

11   difficult.  It's difficult to talk man and woman in an open

12   place.  So, I understand you're nervous this morning, but I'll

13   try to take that into account when I ask questions.  And if

14   you need to gather yourself, you do so.  Okay?

15   A.   Uh-huh.

16   Q.   A little bit about your background.  I think you said

17   that you worked for, you worked for the magistrate court

18   system for 24 years?

19   A.   Yes.

20   Q.   And you were a clerk or an assistant over here at the

21   Kanawha County Courthouse for those years?

22   A.   Yes.

23   Q.   And what did you do in that job?

24   A.   I was an assistant to the magistrate.  We did all the

25   small claims things, did the warrants and civil claims and

Tyree - Cross - Bonasso

 1  those type things.

 2  Q.   So, you would, you would have to process warrants

 3  sometimes.  You would get civil complaints where people file

 4  small claims.  You'd address what those were and how they need

 5  to be handled and processed.  If somebody filed an answer,

 6  you'd, you also helped process that through the system?

 7  A.   Yes.

 8  Q.   So, you were involved with legal documents somewhat in

 9  making sure things were filed properly?

10  A.   Yes.

11  Q.   Okay.  And then I think the person that, for whom you

12  worked, the magistrate, passed away?

13  A.   Yes.

14  Q.   And then somebody else came in and you went to another

15  job?

16  A.   Yes.

17  Q.   And you went to work at West Virginia State College, now

18  West Virginia State University I believe.

19  A.   Yes.

20  Q.   And you worked over there for 10 or 12 years?

21  A.   Yes, eleven and a half.

22  Q.   Eleven and a half, okay.  Thank you.  And then I

23  understand that in about -- was it last year, 2013, they had

24  some budget cutbacks?

25  A.   Right.

Tyree - Cross - Bonasso

1    Q.   And that affected you that you might actually be, and

2    were going to be terminated because their budget was

3    shrinking.   They had to let some people go?

4    A.   Right.

5    Q.   And, so, you were let go?

6    A.   Right.

7    Q.   It wasn't because of job performance or anything you were

8    doing or weren't doing.   It was just because there wasn't

9    enough money to pay for all the people and they had to make

10   some tough calls?

11   A.   Right.

12   Q.   And you considered yourself a good employee?

13   A.   Yes.

14   Q.   Competent employee, productive employee?

15   A.   Yes.

16   Q.   And, so, then, as I understand it, because you had worked

17   at the magistrate court for 24 years, you had retirement

18   building up over those years; correct?   That's the way it

19   works with the public system.

20   A.   Yes.

21   Q.   And, so, when you reach a certain age, you have a certain

22   number of years, you can just go ahead and take retirement.

23   A.   Yes.

24   Q.   And that's how it worked for you having been with the

25   magistrate court and that system over there for 24 years.

Tyree - Cross - Bonasso

```
 1   When you add that to whatever the age was, you had enough
 2   points to qualify for retirement?
 3   A.   Yes.
 4   Q.   And that's how you did it?
 5   A.   Yes.
 6   Q.   Now, I understand you have some claims and injuries here
 7   and I'm not -- there are some I think that are in and some
 8   that I think are not in.  As I understand, you take some
 9   medications now; correct?
10   A.   Yes.
11   Q.   You take Wellbutrin --
12   A.   Yes.
13   Q.   -- for depression?
14   A.   Well, I --
15   Q.   That's a depression medicine, isn't it?
16   A.   Yes, it is.
17   Q.   And you were taking that medicine before you had your
18   sling implanted.  Am I right?
19   A.   Yes.
20   Q.   And that was related to another series of event that
21   don't have anything to do with the mesh?
22   A.   Yes.
23   Q.   Your depression and the medicine you take you're taking
24   for the event that happened some years ago.  Am I right?
25   A.   Yes.
```

Tyree - Cross - Bonasso

```
 1  Q.   And you're not blaming -- you're not telling us today

 2  that you're taking Wellbutrin because of the Obtryx, are you?

 3  A.   No, I'm not.

 4  Q.   And I think from looking at your medical records, you've

 5  had a long history of urinary tract infections over the years?

 6  A.   I have had some off and on, yes.

 7  Q.   And you had them before the Obtryx?

 8  A.   Pardon me?

 9  Q.   You've had urinary tract infections before you had the

10  Obtryx in?

11  A.   Yes, I have.

12  Q.   And you're not blaming your urinary tract infections on

13  the Obtryx, are you?

14  A.   No, I'm not.

15  Q.   And you also take some Topamax?

16  A.   Yes.

17  Q.   What is that medicine for?

18  A.   I have migraines.

19  Q.   You've had migraines for a number of years?

20  A.   Yes, I have.

21  Q.   And, so, you try to control that pain with the medication

22  the doctors give you?

23  A.   Yes.

24  Q.   Topamax; right?

25  A.   Yes.
```

Tyree - Cross - Bonasso

1   Q.   So, you're not saying that the migraines that you have or

2   have had, they're not connected to this at all, are they?

3   A.   No.

4   Q.   I'd like to, if we could, discuss a little bit about some

5   of your history.  Your lawyer asked you some questions about

6   some of your history and I'd like to ask you a few more

7   questions.

8        First of all, when you go to your doctors -- and you've

9   been to Dr. Upton some, Dr. Fitzwater.  You had your

10  hysterectomy.  You've been to doctors over the years for

11  different things like many people have; right?

12  A.   Yes.

13  Q.   And when you go to the doctors and you have complaints,

14  you tell them, you tell them what's going on and you answer

15  their questions.  You try to be open and candid and honest

16  with them.  Right?

17  A.   Yes.

18  Q.   Because if you hold stuff back from the doctor that he's

19  asking you about or she's asking about, they may not know

20  everything they need to know to give you the right care they

21  need to give you; right?

22  A.   Yes.

23  Q.   So, when you go to the doctor, you kind of open up to

24  them.  Is that fair?

25  A.   Yes.

Tyree - Cross - Bonasso

1  Q.   Okay.  Now, you had your hysterectomy when?  Back in the

2  '90s sometime?

3  A.   Over 20 years ago, a long time ago.

4  Q.   And then in about 2001 you -- I'd ask if we could bring

5  up Document Number 1.

6          MR. BONASSO:  Your Honor, this is part of Exhibit 66.

7          THE COURT:  It's part of the medical records that

8  have previously been admitted, Mr. Bonasso?

9          MR. BONASSO:  Yes.

10  BY MR. BONASSO:

11  Q.   I'm going to try to hit through most of these

12  pretty quickly.

13      Now, this is a record dated January 9, 2001.  You have

14  a monitor there; is that right?

15  A.   Yes.

16  Q.   Your chief complaint then was left pelvic pain.  Do you

17  see that?

18  A.   Yes.

19  Q.   And then the actual history of the illness and the reason

20  you were there -- in that first paragraph it says, "A 45 --"

21  the name is Ms. Bryan here.  That was your maiden name; right?

22  A.   Yes.

23  Q.   Okay.  "Ms. Bryan is a 45-year-old black female who

24  presents with a history of pain in the lower quadrant of her

25  abdomen with pressure in the perineal area."

Tyree - Cross - Bonasso

1          Did I read that right?

2    A.   Yes.

3    Q.   You had an abscess of the periurethral for about a year

4    and a half which prolapsed on Friday.  Do you see that?

5    A.   Yes.

6    Q.   Now, do you remember in January of 2001 that you had some

7    pelvic problems and pressure?

8    A.   Yes.

9    Q.   And that you had had that condition for a couple of -- a

10   year and a half this says.  And you went and you were

11   scheduled to have surgery on January 9?

12   A.   Yes.

13   Q.   Okay.  Do you recall that event?

14   A.   Yes.

15   Q.   And then later on in that year in August we have a

16   history and physical that's dated August 15 in the upper

17   right, 2001.  This is about seven, eight months later; right?

18   A.   Yes.

19   Q.   And then for the chief complaint and the history we see

20   that you have what's called a urethral diverticulum.  Do you

21   see that?

22   A.   Yes.

23   Q.   Do you know what that is?

24   A.   No, I don't.

25   Q.   Okay, okay.  Do you understand that a urethral

Tyree - Cross - Bonasso

1   diverticulum -- first of all, it's on the urethra.  It relates

2   to the urethra.  Do you understand that?

3   A.   Yes.

4   Q.   And the urethra is the tube that goes from the bladder

5   and allows us to urinate; right?

6   A.   Uh-huh.

7   Q.   And the sling in this case was actually placed under the

8   urethra as the, as the people have told us about in the case;

9   correct?

10  A.   Yes.

11  Q.   So, it says here that you presented to Thomas Memorial,

12  Dr. John Hannah, that you're going to return on August 15th.

13  Actually, this document, I think, is dated a week earlier.

14  It's the pre-admission clearance.  "Was found to have --"

15  well, it says that the patient states that she started having

16  symptoms of urinary burning with pressure feeling in the groin

17  area any time she had to void.  She was found to have frequent

18  urinary tract infections which usually responded well to

19  antibiotic therapy but that would reoccur.

20       Is that as you recall back in the day in 2001?  You may

21  not recall it specifically.

22  A.   No.

23  Q.   I read that correctly; right?

24  A.   Yes, you read it correctly.

25  Q.   Then it goes on to say, "Was seen by Dr. Hannah and Mani

Tyree - Cross - Bonasso

1    and Dean and they advised she had a urethral diverticulum that

2    should be excised."

3         Do you see that?

4    A.   Yes, I see that.

5    Q.   And then you had that surgery the next week where they

6    actually operated on your urethra; right?

7    A.   I don't know.  I see that, though.

8    Q.   Pardon me?

9    A.   I said I see what you're reading, but I don't remember

10   that.

11   Q.   Let me show you the operative report real quick just to

12   tie it down.  Now, this document is the actual procedure date

13   of August 15, 2001; right?

14   A.   Yes.

15   Q.   And then down here it says in the Indications -- excuse

16   me.  So, under Procedure up above there -- it says "excision

17   of urethral diverticulum."  That was the operation they were

18   going to perform.  Do you see that?

19   A.   Yes.

20   Q.   Okay.  And then, so, the operation was actually performed

21   in August, 2001; correct?

22   A.   Yes.

23   Q.   So, then do you recall also that you had a surgery in

24   2006 for your gallbladder --

25   A.   Yes.

Tyree - Cross - Bonasso

1  Q.  -- removal?  Okay.  So, we can quickly go through this.

2  The date is April -- I'm sorry, January 1st, 2006.  It

3  happened on New Year's, didn't it?

4  A.  Yes.

5  Q.  Okay.  And then the diagnosis here was acute

6  cholecystitis, which I think is gallbladder attack.  And you

7  had an acutely inflamed gallbladder and they removed your

8  gallbladder in that surgery, did they not?

9  A.  Yes, they did.

10  Q.  How long did that event occur?

11  A.  Pardon me?

12  Q.  How long did that occur, that pain with that gallbladder?

13  A.  It actually just hit me that night.  I was rushed in

14  then.

15  Q.  Okay.  So, that was 2006.  I want to jump ahead now and

16  move to 2010.  Now, now, this is a record from Dr. Luby which

17  is part of Exhibit 64, Your Honor, that's been admitted.

18        THE COURT:  Thank you.

19  BY MR. BONASSO:

20  Q.  And this was when you went to Dr. Luby in February

21  of 2010.  And at that time, your complaints that were

22  listed at the top there were frequent urinary tract

23  infections, vaginal itching, discharge with odor, severe

24  back pains and abdominal pains, sometimes complaining of

25  leakage.  Do you see that?

Tyree - Cross - Bonasso

```
 1  A.   Yes, I see that.
 2  Q.   So, back in the 2009, 2010 time frame, as your lawyer
 3  mentioned earlier, that's when the leakage started with you;
 4  right?
 5  A.   Uh-huh, yes.
 6  Q.   Now, if you just look at this document in total, you see
 7  that at the top of the page there's some notes.  We just went
 8  over them; right?
 9  A.   Yes.
10  Q.   And then if you look at the bottom, it looks like there's
11  a bunch of chicken scratch.  Do you see that?
12  A.   Yes.
13  Q.   And I really can't read all of that, but the point is
14  there's two different kinds of handwriting on this report, are
15  there not, on this doctor's note; correct?
16  A.   Yes.
17  Q.   And, so, it wasn't the case -- it was the case that when
18  you went to the doctor, you first went to one of their staff
19  people and kind of told them what was going on.  And then they
20  would also get a little bit of history from you and they would
21  find out how your medicines were doing, et cetera, and weigh
22  you and that sort of thing.  And then after they met with you,
23  you would then meet with the doctor; correct?
24  A.   Yes, that's usually how it works.
25  Q.   That's how it works with all the doctors pretty much,
```

*United States District Court*
*Southern District of West Virginia*

Tyree - Cross - Bonasso

1  isn't it?  You go to the doctor.  The first thing you do, you

2  meet with some --

3  A.   Right.

4  Q.   -- nurse or technician or maybe a PA and they'll ask you

5  what's going on.  You tell them.  You have some discussions.

6       And then a little bit later, the doctor will come in

7  having looked at those notes and say, "Okay.  How are we doing

8  today?"  And you have a second discussion with the doctor.  Am

9  I right?

10 A.   Right.

11 Q.   And, so, on this occasion in February, 2010, you told him

12 about your problems that you were having then; right?

13 A.   I would say.

14 Q.   Okay.  And then do you recall that he did some testing on

15 you at that time?

16 A.   I don't know.

17 Q.   Let me ask it this way.  Do you recall that he did some

18 testing on you over the next few weeks and found that he

19 thought you had some ovary issues?  I think you testified

20 about that a few minutes ago.

21 A.   Okay.

22 Q.   He said he thought you had adhesions; that your ovary was

23 sticking against the vagina or something else and that you had

24 adhesions in your pelvic area.  That was one of the things he

25 told you he thought?

Tyree - Cross - Bonasso

1  A.   He told me that my ovaries were stuck to the walls of my

2  vagina, yes.

3  Q.   Right.  And then he also addressed the leakage as well

4  and did some testing for the leakage in those, either on that

5  day or on the following days to see what was going on with

6  your, your incontinence; right?

7  A.   Right, in the following days, yes.

8  Q.   Right.  And, so, then he decided -- and you all discussed

9  this -- that the better thing to do would be to deal with the

10 pelvic pain first.  That would be the ovary evaluation to see

11 if the ovaries need to be taken out, do that first and then

12 reevaluate and, if necessary, treat the stress urinary

13 incontinence.  He didn't want to deal with both of those in

14 the same surgery.

15 A.   Right.

16 Q.   Do you recall --

17 A.   He didn't want to do them both at the same time.

18 Q.   He didn't want to?

19 A.   No.

20 Q.   So, the plan was that he was going to run the tests,

21 which he did.  And once he figured out what he thought was

22 going on -- he said, "Let's do this in May," whenever you did

23 it, and you did it in May.  "Then we'll see where we are, do

24 some more testing, and then do a surgery if necessary or some

25 other treatment after we take care of the ovary situation."

Tyree - Cross - Bonasso

1   Is that right?

2   A.   I don't know if that was his plan or not, but that's what

3   he did.

4   Q.   But you all discussed that.  I mean, you knew that was

5   the way it was going to work?

6   A.   No, he didn't say that we was going to do this first and

7   then we was going to do that second.

8   Q.   Okay, okay.  You knew that he wasn't going to -- even

9   though he tested you for the stress urinary incontinence, you

10  knew that the first operation was really just going to be

11  about that?

12  A.   Correct, because he didn't do those tests until after.

13  Q.   Oh, really?  Okay, okay, okay.  So, then, in May of that

14  year, that's when you had the surgery?

15  A.   Yes.

16          THE COURT:  Mr. Bonasso, --

17          MR. BONASSO:  Yes, ma'am.

18          THE COURT:  -- find a good stopping point please.

19          MR. BONASSO:  You know, Judge, we're getting to the

20  operation.  This would actually be a good place.

21          THE COURT:  All right.  Thank you.

22          Ladies and gentlemen of the jury, I'm going to give

23  you your luncheon recess.  While you're out, do not discuss

24  this case or permit anyone to discuss it with you or in your

25  presence.

Tyree - Cross - Bonasso

1          I have another unrelated matter scheduled for hearing

2    at 12:30 and, so, I will make every effort to be ready for you

3    at 2:00.  Be in your jury lounge at 2:00 this afternoon.

4    We'll stand in recess.

5          MS. WAGSTAFF:  Your Honor, can we leave our

6    materials?

7          THE COURT:  Yes.

8          (Jury retired from the courtroom at 12:24 p.m.)

9          THE COURT:  We'll stand in recess for your purposes

10   until 2:00.

11         (A luncheon recess was taken from 12:24 to 1:59 p.m.)

12         (The Jury entered the courtroom at 1:59 p.m.)

13         COURT SERVICES OFFICER:  All rise.

14         THE COURT:  Mr. Bonasso.

15         MR. BONASSO:  Thank you, Your Honor.

16   BY MR. BONASSO:

17   Q.  Ready, Ms. Tyree?

18   A.  Yes.

19   Q.  So I'd like to talk about your May surgery.  If we could

20   go to Number 7, please.  The May surgery, where your ovaries

21   were removed, this is a -- this document is part of Exhibit 64

22   from Dr. Luby's records.  This is a history and physical which

23   is presurgery clearance, and so the date is May the 3rd, 2010.

24   And then the chief complaint in the history it says, "Pelvic

25   pain.  Ms. Tyree presents for preadmission testing with

Tyree - Cross - Bonasso

1  history of pelvic pain, intermittent, approximately one year."

2  That's as you recall, right?

3  A.  Yes.

4  Q.  It states --

5         MS. WAGSTAFF:  Can I have a copy of that?

6         MR. BONASSO:  Oh, I'm sorry.

7  BY MR. BONASSO:

8  Q.  It states that pain occurs in both the left and right

9  lower abdominal quadrants.  I mentioned that earlier.  Also

10  low-back pain and pain with intercourse.

11        And then she was seen by Dr. Luby who recommended the

12  patient for laparoscopic -- laparoscopy with bilateral

13  salpingo-oophorectomy.  That means taking out your ovaries and

14  your tubes, right?

15  A.  Yes.

16  Q.  And then perhaps -- possible exploratory with the

17  bilateral salpingo-oophorectomy, et cetera.

18        So this is when you went in to do your presurgery

19  clearance, and then the next document, also part of the same

20  exhibit, Number 64 from Dr. Luby's records, this is the

21  operative report.  And that's part of the same document, part

22  of the same group, perhaps.  And so just to take a look at the

23  diagnoses and the procedure.

24        MR. BONASSO:  If you'll come back up, Jen, if you

25  could get all three of the preoperative diagnoses to -- there

Tyree - Cross - Bonasso

1  you go.  Thank you.

2  BY MR. BONASSO:

3  Q.   So they had a preoperative diagnosis, which -- of chronic

4  pelvic pain, and the residual ovary syndrome, and you remember

5  that because that was why you thought you were there, right?

6  A.   Yes.

7  Q.   And then the postoperative diagnosis, after he did the

8  operation, he lists the first two again but also then adds

9  extensive pelvic adhesions, correct?

10  A.   Yes.

11  Q.   Do you see that?

12  A.   That's what's there.

13  Q.   And then the procedure -- there were four or five things

14  listed:  The diagnostic laparoscopy, the laparoscopic lysis of

15  adhesions, laparoscopic enterolysis, laparoscopic bilateral

16  ureterolysis, and the laparoscopic bilateral

17  salpingo-oophorectomy and cystoscopy.

18       Now, these lysis procedures, that's what you understood

19  where he was separating the tissue that he told you he was

20  going to do when he went in there; is that right?  Ma'am, did

21  you understand that at the time?

22  A.   Yes, I knew that's what he was doing.

23  Q.   Okay.  Thank you.

24       Okay.  So then you moved from there, and at that point,

25  did you consult with Dr. Luby about getting tested further for

Tyree - Cross - Bonasso

1   your stress incontinence?

2   A.   Yes.

3   Q.   Do you recall that you were also tested before that, for

4   the stress incontinence, between February and May?

5   A.   I don't remember him doing the testing.

6   Q.   Okay.  You don't remember the testing?

7   A.   I don't remember him doing the testing before that.  He

8   may have.  I'm just saying that I don't remember that.

9   Q.   If he says he did it before, you wouldn't dispute that.

10  If he says no, she's right, it was just afterwards, then you

11  wouldn't -- you wouldn't dispute that, either; am I right?

12  A.   I'm just saying that I don't remember when he started

13  doing the tests.

14  Q.   Okay.

15  A.   The tests.

16  Q.   Okay.  Now, Ms. Wagstaff asked you some questions about

17  some consents, and I think you said you signed nine different

18  consents.

19  A.   I signed several, yes.

20  Q.   Okay.  And you said that as you were -- as you were,

21  later on, perhaps getting ready for trial, or as the case was

22  going, you went back and looked at those consents.  Do you

23  remember that testimony this morning?

24  A.   Yes.

25  Q.   Now, you were given consents after the May surgery, as

Tyree - Cross - Bonasso

1   you moved toward doing the SUI surgery; is that right?

2   A.   To have that done?  Yes.

3   Q.   You were given the consents?

4   A.   Yes.

5   Q.   Okay.  And your surgery where he implanted the Obtryx was

6   December of 2010?

7   A.   Yes.

8   Q.   And the other surgery for the ovaries and the adhesions

9   was May of 2010, right?

10  A.   Yes.

11  Q.   Okay.  And in between time, you got some consents and you

12  met with the doctor and his staff to go and get the consents

13  signed, right?

14  A.   Yes.

15  Q.   Okay.  Let's -- if we could put them up.  I'm not going

16  to go through every word of all of them.  There's a lot.  But

17  if you'll just start with the first one and we'll go just

18  through quickly.  This first one is a general consent form for

19  surgery.

20       MR. BONASSO:  Really, Jen, I think you can -- okay.

21  Thank you.

22  BY MR. BONASSO:

23  Q.   It refers to you and it refers to the TOT with

24  cystoscopy.  You understood that with the procedure there was

25  going to be a cystoscopy done as well, right?

Tyree - Cross - Bonasso

1  A.   Yes.

2  Q.   And that was where they put the tube up and looked

3  through the urethra and up into the bladder as part of the

4  procedure?  You may or may not know that.

5  A.   I don't really know what all of the procedures are.

6  Q.   Okay.  I'll just review the rest of the form.  It's got

7  general risks, and then anesthesia risks and unforeseen risks,

8  and then there's a date of May -- of July 8, 2010.  And that's

9  your signature, correct?

10 A.   Yes.

11 Q.   And then it's also signed by someone, who I think's name

12 is Cheryl Wilson, and so you had someone witness that when you

13 went through the process?

14 A.   Yes.

15 Q.   And then the next one is an informed consent and request

16 for surgery.

17      MR. BONASSO:  And, Your Honor, for clarification,

18 this is part of Exhibit 60 -- 64, which are Dr. Luby's

19 records.

20 BY MR. BONASSO:

21 Q.   Here's another one signed by you.  It actually has the

22 same procedure listed, it's also got the same date, and you

23 signed it and it looks like the same person, perhaps Cheryl

24 Wilson signed it, correct?

25 A.   Yes.

Tyree - Cross - Bonasso

1   Q.   And then the next one is a consent for trans -- the next

2   one is an informed consent -- let's see, consent for

3   transobturator mid-urethral sling, TOT, correct?

4   A.   Yes.

5   Q.   And in the middle paragraph -- no, in the bottom

6   paragraph, it starts with "I understand."

7        "I understand that no guarantee has been made that the

8   procedure will improve the condition, and the procedure may

9   make my condition worse.

10        "On the basis of the above statements, I request to

11  have the procedure."

12        Did I read that right?

13  A.   Yes.

14  Q.   Yes, ma'am.  And at the bottom, you signed it, also July

15  8, 2010, and it looks like the same person signed -- witnessed

16  it.  Is that right?

17  A.   Yes.

18  Q.   So the next one is a consent for cystoscopy.  It's all

19  part of that same exhibit.  And this is another document.

20  It's another consent, containing statements and issues and

21  risks.  And you also signed that document and dated it on July

22  8 and Ms. Wilson apparently witnessed it.  Am I right?

23  A.   Yes.

24  Q.   Okay.  The next one is a request for repair of

25  relaxation -- it says, "Request for repair of relaxation of

Tyree - Cross - Bonasso

1  pelvic organs and/or correction of urinary incontinence."

2       And you understood you were there for the second one,

3  correct, the urinary incontinence; is that right?

4  A.  Yes.

5  Q.  Okay.  And that's your name on that line?

6  A.  Yes.

7  Q.  Okay.  And then down below, where there's a list of risks

8  and complications, maybe the whole thing, all of that, all the

9  way down.  Thank you.

10       They have general risks of surgery, infection, allergic

11  reaction, disfiguring scar, severe loss of blood, loss of

12  function, paralysis, paraplegia, quadriplegia, brain damage,

13  death.  They list a bunch of general risks.

14       Then they list some other ones below, do they not?

15  They say, "These risks and/or complications may include but

16  are not limited to" -- "but are not limited to such

17  complications as," and then it lists them, correct?

18  A.  Yes.

19  Q.  And then I don't need to read all of them, but it does --

20  I won't read it entirely.  It refers to injury to the bowel

21  and bladder and the ureter, maybe some fistula formation, et

22  cetera.  Then it says, "Reoccurrence of my loss of control of

23  urine."  Do you see that as one of the risks and

24  complications?

25  A.  Yes.

Tyree - Cross - Bonasso

1   Q.   Okay.  And that "There may be no improvement in my

2   control of" union -- "of urine."  Do you see that as a risk

3   and complication?

4   A.   Yes, I do.

5   Q.   And "A prolonged need for a catheter to drain my

6   bladder."  Do you see that as a risk?

7   A.   Yes.

8   Q.   And the last one is discomfort with intercourse.  Do you

9   see that?

10  A.   Yes.

11  Q.   That's also one of the specific risks that were

12  mentioned, correct?

13  A.   Yes.

14  Q.   And on the second page of that document, it says, "By

15  signing the form, I acknowledge that I have read -- I have

16  read or had this form read to me or explained to me."  Now,

17  you read these forms, did you not?

18  A.   Yes.

19  Q.   Because you worked in the court system, and you knew that

20  you needed to review documents that might have -- be of

21  importance to you, right?

22  A.   Yes.

23  Q.   Okay.  Now, the next paragraph which I don't think is

24  highlighted -- let me see.  It says, I have -- yes.  "I have

25  been given ample opportunity to ask questions, and any

Tyree - Cross - Bonasso

1   questions I have asked have been answered or explained in a

2   satisfactory manner."

3        This kind of language appears on several of these

4   consents, doesn't it?  Have you had an opportunity to ask

5   questions and your questions were answered?

6   A.   Correct.

7   Q.   And that actually is a true statement, you did have an

8   opportunity to ask questions, and you got them answered.

9   A.   Yes.

10  Q.   Okay.  Now, the next consent is a consent for synthetic

11  sling.  Now, you understood this was a synthetic sling that

12  was going to be implanted in you, correct?

13  A.   Yes, that is what it says.

14  Q.   You knew that from talking to the doctor --

15          A JUROR:  (Sneezes.)

16          MR. BONASSO:  God bless you.

17          A JUROR:  Thank you.

18  BY MR. BONASSO:

19  Q.   You knew that there was going to be a synthetic sling

20  based on your discussions with the doctor, correct?

21  A.   Yes, that's what it says.

22  Q.   And then that's got your name on it.  Then it lists

23  some -- it lists some risks of the surgery.  Well, wait a

24  minute.  Yes, it's got some alternatives there.  And you

25  saw -- you read through what the alternatives were,

Tyree - Cross - Bonasso

1  observation, Kegel exercises, biofeedback, urinary control

2  insert, medication, or bulking agents.  You understand all

3  those were alternatives that you -- at least you saw it here

4  and you understood they were at least something to be

5  considered?

6  A.   I read those, yes.

7  Q.   Okay.  And if you had any questions about them, I presume

8  you were able to ask the doctor and he answered those

9  questions for you, correct?

10 A.   If I had them, yes.

11 Q.   Okay.  Then it talks about the risks of surgery.  There's

12 bleeding and infection.  One of them is persistent urinary

13 incontinence, meaning that you could still have urinary

14 incontinence, right?

15 A.   Yes.

16 Q.   So you understood that?

17 A.   Um-hum.

18 Q.   Is that right?

19 A.   Yes.

20 Q.   Okay.  And then there could be punctures or lacerations

21 of vessels or nerves, et cetera, something that was similar to

22 one of the other consents we just saw a minute ago, right?

23 A.   Yes.

24 Q.   And then there was also some language about extrusion or

25 erosion of the mesh, that that could occur, right?

Tyree - Cross - Bonasso

1  A.   Yes.  I see that there.

2  Q.   And that there could also be some infection.  As with all

3  foreign bodies, Prolene mesh may potentiate an existing

4  infection.

5           THE COURT REPORTER:  I'm sorry.  What was that?

6  BY MR. BONASSO:

7  Q.   As with all foreign bodies, Prolene mesh may potentiate

8  an existing infection.

9        Okay.  The good news is I only have one more.  There

10  are a few more, but I'm only doing this group now.

11        So this is another consent for some -- I think it's

12  consent for the transobturator, but there it is.  Okay.  This

13  is consent for transobturator mid-urethral sling.  You have

14  signed it at the bottom and dated it the same day as the

15  others.  Is that right?

16  A.   Yes.

17  Q.   So let's go up to the paragraph, the second paragraph

18  that says "most patients," and it says, "Most patients have

19  surgery with little difficulty, but problems can happen

20  ranging from minor to fatal."  So it could be something small

21  or something very, very serious, and you understood that, did

22  you not?

23  A.   I did.

24  Q.   Okay.  And then a little -- maybe that whole paragraph.

25        It also lists here that -- I'm reading in the third

Tyree - Cross - Bonasso

1    line, nerve damage causing weakness or numbness or pain in the

2    thighs, legs -- legs and feet, blood clots, et cetera,

3    shortening of the vagina, depression or even loss of libido.

4    And then it talks about reactions to drugs or anesthesia, and

5    injury -- it says, "Unintended injury may occur to other

6    pelvic or abdominal structures such as the bladder, ureter,"

7    et cetera.  Do you see that?

8    A.   Yes.

9    Q.   Okay.  And right at the top of this section right here,

10   about the risks, it says, "These may include nausea, vomiting,

11   pain," et cetera, and then it says formation of adhesions.  Do

12   you see that?

13   A.   Yes, I do.

14   Q.   So you understood you could have more adhesions, even

15   after the surgery.  Am I right?

16   A.   Yes, I see that.

17   Q.   And you were aware, you had some adhesions even before

18   the surgery, right?

19   A.   Yes.

20        MR. BONASSO:  Okay.  If we can go down to the bottom

21   of that paragraph, and it starts with -- in the middle of the

22   line, recurrence or reoccurrence, you're about right there,

23   Jen.

24   BY MR. BONASSO:

25   Q.   "Reoccurrence of urinary incontinence or other symptoms

Tyree - Cross - Bonasso

 1  can occur that may result in the need of further treatment

 2  with drugs or surgery."

 3      And then the next -- on this next paragraph, says,

 4  "Finally, I understand it is impossible to list every possible

 5  undesirable effect that the surgery may have."

 6      And so you had the opportunity to speak with the doctor

 7  about it, ask him your questions and get those questions

 8  answered.  Is that right?

 9  A.  Yes.

10  Q.  And you did so, right?  You asked him if you had

11  questions, he answered them for you?

12  A.  Yes, if I had questions, he did.

13  Q.  All right.  Now, then let's go to Number 9.  I'm going to

14  move down to November.  For whatever reason, your surgery in

15  May, then the consents were in July, but there was some delays

16  that the procedure didn't -- the operation did not happen

17  until December.  Do you remember that?

18  A.  Yes.

19  Q.  And so this is the -- another presurgery clearance that

20  you had to go through before you had the surgery.  And this is

21  a document dated November 29, 2010, right?

22  A.  Yes.

23  Q.  And it's -- that was about a month, four weeks, actually,

24  before you actually had the surgery, right?

25  A.  Yes.

Tyree - Cross - Bonasso

1   Q.   Then under "History of the Present Illness," it says you

2   present to preadmission testing for history of urinary

3   incontinence for several years.  Do you see that?

4   A.   Yes.

5   Q.   You understand the history that's given in a form like

6   this is a history from the patient, right?  The person walks

7   in and they tell them why they are there for the operation?

8   A.   Yes.

9   Q.   Okay.  So you told them, you are 55-year-old female, you

10  were presenting for preadmission testing, you have a history

11  of incontinence for several years, right?

12  A.   Yes.

13  Q.   Then you reported urgency of urination, and nocturia, two

14  to three episodes nightly.  Do you see that?  Nocturia means

15  you've got to get up and go to the bathroom during the night.

16  A.   Yes.

17  Q.   You reported that to them as well?

18  A.   Yes.

19  Q.   And that you say the incontinence occurs when laughing,

20  coughing or lifting.

21  A.   Yes.

22  Q.   Did I read that right?

23  A.   Yes.

24  Q.   And, in fact, it was -- it was pretty much every time,

25  wasn't it?  If you coughed or laughed or you lifted something

Tyree - Cross - Bonasso

1  or sneezed, pretty much every time, you would have some

2  leakage?

3  A.   Yes.

4  Q.   Okay.  You didn't -- earlier you said you didn't think it

5  was severe.  You didn't think you had severe SUI?  Do you

6  recall saying that?

7  A.   Yes.

8  Q.   Were you aware from your discussions with the doctor, as

9  part of the decision to have the procedure, that he said it

10  was severe?

11  A.   I don't recall.

12        MR. BONASSO:  Okay.  I'm going to show what's part of

13  Exhibit 64 which are Dr. Luby's records.

14        (The document was published to the jury.)

15  BY MR. BONASSO:

16  Q.   And if we could -- well, let me move this.  This says the

17  date is December 1 of 2010.  This is your name, Jacquelyn

18  Tyree, and it is Dr. Luby's record at the top.  Do you see

19  that?

20  A.   Yes.

21  Q.   And then down below, before -- before we said -- or you

22  told us that you met with someone and you gave them general

23  background information, and then you met with the doctor and

24  he would also review information with you and meet with you,

25  right?

Tyree - Cross - Bonasso

1    A.   Yes.

2    Q.   And so I'm going to point you to -- I don't know if you

3    can enlarge it.

4    A.   I see.

5    Q.   Okay.  Do you see it where it says "severe SUI"?

6    A.   Yes, I do.

7    Q.   Okay.  And I'm going to hand you another one, or show you

8    another one, dated December 8, where, again, it's chicken

9    scratch, I guess, but it's the same as the other words,

10   "severe SUI."  Do you see that?

11   A.   Yes, I see that.

12   Q.   So do you have an understanding that your SUI was

13   considered by your doctor to be severe?

14   A.   I see that that's on there, but I don't -- I don't write

15   that.  So if he puts "severe" on there, I understand that -- I

16   see that he has written that, but I don't know that it's --

17   it's severe.  I mean, if he says it's severe, then --

18   Q.   I understand.

19   A.   Okay.

20   Q.   I wasn't trying to put the words in your mouth that way.

21   A.   Okay.

22   Q.   But I was asking you, was -- were you aware from your

23   discussions with him and making your decisions that he

24   considered it to be severe?

25   A.   No.

Tyree - Cross - Bonasso

1    Q.   Okay.  Then I want to briefly look at the surgery record

2    which is Number 10.  This is from the surgery of --

3            (The document was published to the jury.)

4            MR. BONASSO:  May we approach?  Okay.  Okay.  Thank

5    you.

6    BY MR. BONASSO:

7    Q.   So you had the surgery on December 22nd.  Am I right?

8    A.   Yes.

9    Q.   And do you recall when you -- do you recall that when you

10   received your information about your procedure, do you recall

11   filling out a questionnaire in this case called a fact sheet?

12   Plaintiff fact sheet, do you recall filling that out?

13   A.   No, I don't.

14   Q.   I will bring you a copy of it in a moment.

15   A.   Okay.

16           MR. BONASSO:  Your Honor, may I approach?

17           THE COURT:  Yes, sir.

18   BY MR. BONASSO:

19   Q.   I'm going to give you a notebook, Ms. Tyree.  This has

20   your deposition in there and it's got a plaintiff fact sheet

21   behind Tab 2.  Okay?

22   A.   Okay.

23   Q.   And it was a questionnaire you filled out for the law

24   case, was it not?

25   A.   Yes.

Tyree - Cross - Bonasso

1  Q.   And you were asked to provide dates when you received

2  written or verbal information or instructions, and do you

3  recall putting down that you received verbal instructions in

4  December of 2010?  And I will turn you -- direct you to Page

5  5, Number 3A.  Do you see that?

6  A.   Yes.

7  Q.   And it says, "Provide the date you received the written

8  or verbal instruction or information or instructions," and you

9  said December -- verbal information, in December, 2010,

10 correct?  Do you see that?

11 A.   And this was for what?

12 Q.   It was your plaintiff fact sheet that you signed.

13 A.   Oh, yes, yes.

14 Q.   Okay.  And you signed it, that's your signature on the

15 very last page?

16 A.   Yes.

17        MR. BONASSO:  I don't intend to move this at this

18 moment, Your Honor.  That's why I'm not publishing it.

19        THE COURT:  All right.

20 BY MR. BONASSO:

21 Q.   Do you see down there, Number 3, the date you received

22 the written and/or verbal information, you said verbal

23 information, in December, 2010, right?

24 A.   Yes.

25 Q.   And then it asks the person, and you said Dr. Bernard

Tyree - Cross - Bonasso

1   Luby, right?

2   A.   Yes.

3   Q.   And then it asks what information, and you said

4   Dr. Luby -- Dr. Bernard Luby described the mesh sling and the

5   surgical procedure regarding the implantation of the sling?

6   A.   Yes.

7   Q.   Okay.  So next we will go to the actual operative report.

8   And the date is December 27th, 2010, and you are the patient

9   and Dr. Luby is the surgeon.  And then if we could go to the

10  paragraph under "indications."

11       Now, this says that -- and I'm going to read through

12  some of this and cut off some of the words, but it relates to

13  you, a white -- this says white female.  That's incorrect,

14  isn't it?

15  A.   A little bit.

16  Q.   Who presents with stress urinary incontinence with a

17  hypermobile urethra.  That part was correct, right?

18  A.   Yes.

19  Q.   It was confirmed on both physical examination and

20  urodynamic testing, so did you understand that from the

21  doctor's procedures with you, that it was confirmed?

22  A.   No.

23  Q.   You didn't understand he had confirmed that you had

24  stress incontinence?

25  A.   Yes, yes, yes.  I'm sorry.

Tyree - Cross - Bonasso

1  Q.   Okay.  And then it says, Patient wants to proceed with

2  the transobturator mid-urethral sling and a procedure called a

3  cystourethroscopy for treatment of her stress incontinence.

4  And you did want to proceed with it at that time, did you not?

5  A.   Yes.

6  Q.   Then it says, "The procedures, risks, complications and

7  benefits as well as alternative management of surgery were

8  thoroughly discussed with the patient."  Do you see that?

9  A.   Yes.

10  Q.   And then it goes on to say, "Potential complications

11  discussed include infection, bleeding, injury to bowel or

12  bladder, recurrence of stress urinary incontinence, urge

13  incontinence, vaginal scarring, mesh erosion, infected mesh,

14  urinary frequency, dyspareunia," et cetera.  Do you see that?

15  A.   Yes.

16  Q.   And then the next sentence says, "The patient is full

17  aware of all the potential risks and complications of the

18  surgery and wants to proceed with surgery.  All of her

19  questions have been satisfactorily answered."

20        Now, is that what you're referring to when you said you

21  had your discussion with Dr. Luby in December before the

22  surgery when he explained things to you?

23  A.   I signed the consent forms when they were given to me to

24  have the surgery done.

25  Q.   Right.  Well, the other document we just read, your fact

Tyree - Cross - Bonasso

1   sheet, said you had a verbal discussion with Dr. Luby as well

2   in December, where he discussed the procedures and risks.  And

3   this says that he did it on the day of the operation.  And

4   does that seem correct to you?

5   A.   He didn't go into detail about all of this, but he did

6   tell me about some of the risks.

7   Q.   Okay.  So this record --

8   A.   Before the -- before the surgery, as they always do.

9   Q.   Okay.  So this record is somewhat incorrect?  Is that

10  what you're telling us?  The doctor's record is not entirely

11  accurate?

12  A.   I am saying that he did not go into all of this full

13  detail before the surgery.

14  Q.   Okay.  If he says he did go through those, then you would

15  say he is incorrect?

16  A.   Then I would say he's incorrect.

17  Q.   Okay.  All right.  So you had the surgery, and you went

18  home and you had some period of time for recovery, I guess, a

19  couple weeks, whatever it was.  Correct?

20  A.   Yes.

21  Q.   And then you went back to the doctor on a few occasions

22  for follow-ups.  Am I right?

23  A.   Yes.

24  Q.   And before I go through each one of them, I think you

25  said this before, but just to be sure, between the December

Tyree - Cross - Bonasso

```
 1  2010 surgery when you had the mesh put in and July of 2013

 2  when you had it removed, your stress urinary incontinence was

 3  gone, right?

 4  A.   Yes.

 5  Q.   Okay.  And so your first follow-up -- this isn't your

 6  first follow-up visit.  I skipped the first couple because

 7  they were right afterwards, but you came back on January

 8  18th -- this is Number 11, Jen -- January 18th.

 9          (The document was published to the jury.)

10  BY MR. BONASSO:

11  Q.   January 18 of 2011, and that's your name, correct?

12  A.   Yes.

13  Q.   That's your -- is that your birth date?

14  A.   Yes.

15  Q.   So that's accurate.  And the date was January 11 --

16  January 18, 2011.

17          And then the next section lists a number of questions.

18  And it says, "Do you experience any of the following?"  And

19  there's a bunch of them on there, but one of them is sexual

20  difficulty -- well, they are all circled "no," correct?

21  A.   Correct, they are all circled.

22  Q.   One says sexual difficulty, another one says abdominal or

23  pelvic pain, another one says leakage or dribbling.  Those are

24  all "no."  Correct?

25  A.   They are all circled "no."
```

Tyree - Cross - Bonasso

1  Q.   And then down below, it says, SP TOT.  Do you understand

2  that means status post TOT surgery?

3  A.   Um-hum.

4  Q.   And then it says, "Denies C/O."  Do you see that?

5  A.   Yes, I see that.

6  Q.   Did you understand that's shorthand in medical offices

7  for complaints, denies complaints of?  Do you see that?

8  A.   Yes, I see that.

9  Q.   And is that correct or incorrect?

10 A.   That is incorrect.

11 Q.   Ms. Tyree, we had an opportunity to -- it wasn't I.  I

12 didn't meet with you, but you gave a deposition in the case,

13 did you not?

14 A.   Yes, I did.

15 Q.   And I'm going to ask you to go ahead, and you have it

16 there in front of you in your notebook there, behind the first

17 tab.  So are you telling -- let me back up for a minute.

18      Earlier when you talked about your situation, and I

19 empathize with you, so you don't hear me saying it's not real

20 or true, but you were pretty emotional about it.  When you

21 talk about this and consider it, it is -- it comes to the top

22 for you, doesn't it, comes to the surface?

23 A.   Yes.

24 Q.   Now, when you went to the doctor's office in January, on

25 January 18th, 2011, I think you said earlier that in all of

Tyree - Cross - Bonasso

```
 1   your appointments, you told them that you were having these
 2   problems, not the stress incontinence, but you had the other
 3   problems.  Is that right?
 4   A.   Yes.
 5   Q.   And were you -- were you -- it was an important issue to
 6   you at the time about the pain with the sex and also just the
 7   general pain; am I right?
 8   A.   Yes.
 9   Q.   Okay.  So when you met with the staff, you told them, and
10   they didn't write it down, is that what you're saying?
11   A.   I don't -- I don't know what they wrote down because I
12   don't see what they write down.
13   Q.   I mean, that's a good point.
14        Let me ask it this way.  When you told them, they
15   didn't record that on this document, did they, the one we're
16   looking at?
17   A.   I guess that they didn't, since they have all those
18   circled.  I don't see that.
19   Q.   Okay.  And then after you met with the staff, you then
20   met with the doctor, and you told him as well?
21   A.   Yes.
22   Q.   Okay.  And I can't read all of that writing down there.
23   He'll tell us what it says later.  But if he says you didn't
24   complain, then he also would be incorrect, if that's what he
25   wrote?
```

Tyree - Cross - Bonasso

1   A.   He would absolutely be incorrect.

2   Q.   So you made the complaints in January -- on January 18 of

3   20 -- 2011.  Is that right?

4   A.   Yes, I complained each time I went.

5   Q.   Okay.  So will you open your deposition to Page 126,

6   please.

7   A.   Page what?

8   Q.   126.  They're four to the page, so they're kind of small.

9   And I think it's two-sided pages, too.  So, can you find Page

10  126?

11  A.   Yes.

12  Q.   Okay.  At the top it refers to this date.  It says, "You

13  were there on January 18, 2011.  Does that sound about right?"

14  You said, "Yes."  Correct?

15  A.   Yes.

16  Q.   Okay.  So a little bit lower down, it says on Line 20,

17  "Did you make any complaints of pain or anything to your

18  memory in the January time period of '11?

19       "No, I probably did not."

20       Next question:  "So this record in January of '11 is

21  accurate?

22       "Answer:  Yes."

23       So are you saying that the testimony is incorrect that

24  you gave at the deposition in April of this year?

25  A.   Well, that's what that says, and I complained, I can tell

Tyree - Cross - Bonasso

1    you that I complained.  Yes, that is what that says.

2    Q.   Okay.  So that's what you said in the deposition,

3    correct?

4    A.   Yes.

5    Q.   And -- but it says you didn't complain in the deposition,

6    right?

7    A.   Yes.

8    Q.   And the medical record also says you didn't complain.

9    That's what the record says, right?  The one we have up on the

10   screen?

11   A.   Yes.

12   Q.   And if the doctors didn't put any complaints down there,

13   then it's wrong as well.  Is that right?

14   A.   (No response.)

15   Q.   Okay.  Let's go next to a doctor's visit of February 15,

16   2011.  This record looks like the same form, right?  It's got

17   your name, your birth date, your age, and the date.  Those are

18   all correct, aren't they?

19   A.   Yes.

20   Q.   And, also, down below, in between the writing that you

21   can read and then down below it, in the middle, it's got your

22   weight and that sort of stuff.  Do you see that?  So your

23   previous weight was 152, I think it was.  Does that sound

24   about right as to what your weight was?

25   A.   Probably.

Tyree - Cross - Bonasso

1   Q.   Probably?

2   A.   Probably about that.

3   Q.   Okay.  So let's go to see what it says here, blow up the

4   top half of the page.  The same questions as before, and,

5   again, several "nos," correct?

6   A.   That's what it says.

7   Q.   Okay.  And then down below that, the med tech or the

8   nurse wrote, "Voiding well, no leakage, denies complaint."

9   Did I read that right?

10   A.   Yes.

11   Q.   And is that incorrect?  Is that -- the way it's written,

12   is that wrong?

13   A.   I had no leaking.

14   Q.   So part of it's right.  You were voiding well; is that

15   correct?

16   A.   Yes.

17   Q.   And part of it's right that there is no leakage, right?

18   A.   Right.

19   Q.   But the other part about denying complaints is wrong --

20   A.   I complained.

21   Q.   -- because you complained to them.

22   A.   Yes.

23   Q.   Okay.  Now, if you will go back to your deposition,

24   please, to Page 128, which is kind of where we were at a

25   minute ago.  And on Page 127, you were asked about the

Tyree - Cross - Bonasso

1    February 15, 2011, visit, and it goes down one page and up

2    onto the next.  And then in the middle of the page, about Line

3    6, do you see that on Page 128?

4    A.   Yes.

5    Q.   Okay.  It says, and then -- and then I'm reading this.

6    It sounds like I took this deposition.  "Then in the middle,

7    in the writing, it says, 'Voiding well, no leakage, denies

8    complaints, or denies C/O.'"

9            And your answer was:  "Correct."

10           Do you see that?

11   A.   Yes.

12   Q.   And that says, "If I said -- if I suggested to you that

13   C/O meant complaints in medical records, would that be --

14   would that be accurate in this regard, that you deny having

15   any complaints?"

16           And then you said, "Correct."

17           Do you see that?

18   A.   Yes.

19   Q.   Okay.  So in your deposition in April, you indicated, did

20   you not, that this is an accurate record?  Do you see your

21   question and answer there?  "Would that be accurate in this

22   regard, that you denied having any complaints on this date,

23   correct?"  Do you see that?  That's what it says, does it not?

24   A.   Yes.  That's what it says.

25   Q.   If I can next take you to -- now, the people at

Tyree - Cross - Bonasso

1  Dr. Abbott's -- the people at Dr. Luby's office were not

2  all -- I did it again.  I'm sorry.

3       The people at Dr. Luby's office, you say were not

4  accurate when you gave them -- they didn't write it down

5  correctly, according to these records, right?  You told them

6  you had complaints and you don't see any complaints written in

7  the records.

8  A.  Correct.

9  Q.  Was Dr. Upton's office -- was he your regular treater?

10 A.  Yes.

11 Q.  He is the one you went to for your general --

12 A.  Right.

13 Q.  -- stuff?

14      How long did you treat with him?

15 A.  It's been years.  I don't know how long.

16 Q.  Long time?

17 A.  Yes.

18 Q.  You have a relationship built up with him over the years?

19 A.  Yes.

20 Q.  Okay.  So when you tell Dr. Upton's people -- you also

21 meet with, like, technical people or like a technician or a

22 nurse or a PA or somebody before you meet with Dr. Upton,

23 generally?

24 A.  Yes.

25 Q.  Okay.  And so I'd like to put up Number 12, please.  You

Tyree - Cross - Bonasso

1  saw the last record was February of 2011 and the one before

2  that was January, 2011.  Do you remember that?  This one is

3  March 14th of 2011.  Do you see that?  And it says Dr. -- the

4  provider is Matthew B. Upton, M.D., and he's with Dunbar

5  Medical Associates, right?

6  A.   Yes.

7  Q.   And the very first thing under "History of Present

8  Illness" tells why you're there, and it says, "Patient is

9  55-year-old African American female who presents for a routine

10 follow-up."

11      So this went from some prior -- one of your prior

12 appointments with him, right, a follow-up of some sort,

13 correct?

14 A.   Yes.

15 Q.   Okay.  And then the third line says, "She is doing well

16 and has no current complaints."  Do you see that?

17 A.   Yes.

18 Q.   If you come down a little bit lower -- I think probably

19 it's down below.  It's under "Checkup."  Under "Checkup," it

20 says, "Bladder sling working well."

21      Did you consider that the bladder sling was working

22 well when you had the pain and you couldn't have relations

23 with your husband and you were hurting all the time?

24 A.   The sling always worked as far as the leaking.  I was not

25 leaking.

Tyree - Cross - Bonasso

1  Q.  So when he asked you about how you're doing, I don't see

2  anywhere in here where you say, "Yeah, the bladder sling is

3  working well, but I have pain, I have dyspareunia or painful

4  sex.  I'm in pain all the time.  I can't -- I feel like I'm in

5  a shell, that I can't go out with my family."  Did you give

6  him any of that information --

7  A.  I never said that I couldn't go out with my family.  I've

8  never said anything like that, that I was in a shell that way.

9  Q.  I misunderstood you because I thought you did.

10  A.  Yes, you did.

11  Q.  I thought you made a comment earlier about feeling like

12  you were in a shell, that you didn't want to go out.

13  A.  As far as my relationship with my husband.

14  Q.  Okay, okay, okay.  So when you talk about being in a

15  shell, you meant with regard to Mr. Tyree?

16  A.  Correct.

17  Q.  I misheard that, and I'm sorry.

18  A.  Okay.

19  Q.  Okay.  So, given the opportunity to talk to Dr. Upton,

20  did you mention it to him or not?

21  A.  No, I did not.

22  Q.  Okay.  And you had gone to him for years, you said?

23  A.  Yes.

24  Q.  You considered him a doctor that you trusted?

25  A.  Yes.

Tyree - Cross - Bonasso

1   Q.   So many times you would go to Dr. Upton and he would

2   refer you even to other doctors for -- if it was a specialist

3   issue?  Like Dr. Luby, did he refer you to Luby?

4   A.   No, he did not.

5   Q.   Okay.  Did he ever refer you to any other doctors for any

6   treatment?

7   A.   He probably has.  I don't remember right off.

8   Q.   Okay.  So next is Number 13.

9        (The document was published to the jury.)

10  BY MR. BONASSO:

11  Q.   This is April 13, 2011, it says, "Denies complaints."

12  This form looks like the other one, doesn't it?

13  A.   Yes.

14  Q.   And if they said you denied complaints in April of '11,

15  the records would be wrong?

16  A.   Yes.

17  Q.   Okay.  If you please go to your deposition, Page 129, if

18  you would go to Line 9.  If you go just above it, it will tell

19  you what he's talking about.  He's talking about that exhibit,

20  is April of '11.  Do you see Line 9 there?

21  A.   Yes.

22  Q.   And it says, "And it states in writing on the document,"

23  this document here, "by CC," which means chief complaint,

24  "routine, denies C/O.  Is that correct?

25        "Yes.

Tyree - Cross - Bonasso

1        "Would that have been consistent with your memory of

2   what was going on in April of '11, that you didn't have

3   complaints?

4        "Answer:  Yes."

5        Did you not give that answer to that -- those questions

6   about six months ago?

7   A.   That is what it says here.

8   Q.   Okay.  And the record is wrong, also?

9   A.   That is what it says here.

10  Q.   But the record here.  The medical record is also

11  incorrect?  April, '11?

12  A.   (No response.)

13  Q.   Okay.  Let's go on to a couple more.  December -- I'm

14  sorry.  October 26, which is the next page.

15        (The document was published to the jury.)

16  BY MR. BONASSO:

17  Q.   The record looks similar to the others, does it not?  All

18  the "nos" are circled; am I right?

19  A.   Yes.

20  Q.   And then it's dated October 26, almost ten months, about

21  ten months after the operation, correct?

22  A.   Yes.

23  Q.   It actually refers to status post TOT, December 27, 2010.

24  Right?

25  A.   Yes.

Tyree - Cross - Bonasso

1  Q.  And then it says, "Denies C/O," denies complaints.  Is

2  that what that says?

3  A.  Yes.

4  Q.  Are you saying that you told them you had problems with

5  pain and problems with sexual pain on October 26, 2011?

6  A.  Yes.

7  Q.  If you would go, please, to your deposition, Page 131,

8  and on Line 14, it says, "And, again, under the written part,

9  it says, 'Denies C/O,' correct?"

10         And your answer was, "Correct."

11         Next question:  "Nothing has changed, correct?

12         "Answer:  Yes.  Nothing has changed.

13         "Question:  Do you have any reason to believe that this

14  record is not accurate?"

15         And your answer was:  "No, I do not have any reason."

16         Now, do you today have a reason to believe that this

17  record is incorrect?

18  A.  Yes.

19  Q.  So the answer that you gave under oath in April is

20  different than the answer today?

21  A.  I always complained.

22  Q.  And then one more.  February 22 of 2012.  It's very

23  similar to the others, "no" to all the questions.

24         (The document was published to the jury.)

25  BY MR. BONASSO:

Tyree - Cross - Bonasso

1   Q.   The date, and then when you were asked about complaints

2   for the TOT, again, denies complaints and you're saying that

3   is incorrect.  Do I have that right?

4   A.   Yes.

5   Q.   Okay.  Let's go next to September 29, 2012.

6        (The document was published to the jury.)

7   BY MR. BONASSO:

8   Q.   Okay.  Here is one dated September 29, 2012, so we went,

9   in 2011 -- so the surgery was in December and you go January,

10  February, April, October, February.  And you say all those

11  records are wrong because you told them and they never wrote

12  it down, right?

13  A.   I'm saying that I always complained.

14  Q.   Right.  And when they say you didn't complain, then the

15  records are wrong; that's what you're telling the jury, right?

16  A.   I'm saying that I always complained.

17  Q.   Okay.  So, now, let's go to -- this form looks a little

18  different here, but let's go to the CC here.

19       Now, this is September of 2012.  Getting kind of all

20  the way through 2011, and now we're getting to the end of

21  2012, right?  You're there for a routine visit.  Do you see

22  that?

23  A.   Yes.

24  Q.   And then it says, "Patient denies complaints."  And it's

25  scratched out.  Do you see that?

Tyree - Cross - Bonasso

1   A.   Yes.

2   Q.   So somebody wrote it and then there must have been

3   further discussion because they struck it out and then they

4   wrote, "Patient has sling and is concerned about pain during

5   intercourse."  Do you see that?

6   A.   Yes.

7   Q.   And you're saying you told them that every time?

8   A.   Yes.

9   Q.   And on this occasion, they wrote it down but on the other

10  occasions, they did not write it down.  Correct?

11  A.   Well, that is the way it appears, yes.

12  Q.   Okay.  Well, I mean, that's what the paper says on -- or

13  some of them say it and some don't, right?  Or one says it and

14  the others don't.  Right?

15  A.   That's the way it appears, yes.

16  Q.   Now, do you recall you went to Dr. Luby in September of

17  2012 and you complained about having painful intercourse, that

18  he said he thought you had a urinary tract infection, and he

19  did a urinalysis for you; do you recall that?

20  A.   No, I don't recall it.

21  Q.   And then about a week later, he -- or whenever he got the

22  prescription -- or the culture back, he called in a

23  prescription for Cipro because you had a UTI; do you recall

24  that happening at this visit with Dr. Luby?

25  A.   No, I don't remember it.

788

Tyree - Cross - Bonasso

1   Q.   Now, this -- as the other lawyer said, it's a good sign

2   when people are turning pages.  We have covered a lot of this

3   stuff.

4        Now, at some point, you saw some ads on television

5   about mesh?

6   A.   Yes.

7   Q.   Do you remember telling us about that in your deposition?

8   A.   Yes.

9   Q.   Or you didn't tell me, but you told the lawyer asking you

10  the questions.  And you saw the ad sometime between your two

11  surgeries, right?

12  A.   Yes.

13  Q.   And I think you said you saw the ads sometime in 20 --

14  maybe 2012.  Does that sound right?

15  A.   I don't remember when it was.

16  Q.   Okay.  Do you recall that you talked to one of your

17  friends at the courthouse about getting a lawyer, and they

18  gave you a recommendation, and you followed up on the TV ads,

19  because you went to see one of your friends in the court

20  system, and that was sometime in late 2012.  Do you recall

21  that time frame?

22  A.   I remember doing that.  I don't remember the exact date.

23  Q.   Okay.  Why don't you go to Page 18 of your deposition.

24  A.   Page what?

25  Q.   18.  Now, this is really more kind of a refresher because

Tyree - Cross - Bonasso

1   you said you couldn't remember, but you knew you did it, so

2   this might help you.

3   A.   Oh, no, I know it.  I just said I don't remember when.

4   Q.   That's what I'm saying, this might help you on the date.

5   Okay?

6   A.   Okay.

7   Q.   Page 4, it says, "When did you follow up" -- this is, I'm

8   sorry, Page 18, Line 4.  Are you with me?  Have you found it?

9   A.   Yes.

10  Q.   "When did you follow up on seeing that ad by talking to

11  someone, I believe you said in the court system?

12          "Late 2012, I would say late 2012."

13          Does that help refresh your recollection?

14  A.   Yes, it --

15  Q.   Okay.  So you went to Dr. Luby in September of '12 and

16  said you had pain, and he -- you don't recall whether he

17  diagnosed a urinary tract infection and gave you medication

18  for it, but you did go see him on -- in September, right?

19  A.   If that's what that says.  I don't remember that, but if

20  that's what the records show, then that's what I did.

21  Q.   Let me start over.  That was a bad question.

22          You went to him in September of 2012?

23  A.   Okay.

24  Q.   You complained of pain.  What you said earlier, you don't

25  really remember whether he diagnosed a UTI and called in a

Tyree - Cross - Bonasso

1  Cipro prescription for you.  That part you don't recall.

2  A.   Right.

3  Q.   I think that's what you said, right?

4  A.   Um-hum.

5  Q.   So was that the last time you went to see him?

6  A.   I don't know the date of the last time I went.

7  Q.   Well, it was this date or afterwards, right?  It had to

8  be this date or later, correct?

9  A.   Well, I would think so.

10  Q.   Okay.  So sometime in late 2012, you change your mind and

11  leave Dr. Luby, and then you went to another doctor.

12  A.   Correct.

13  Q.   You went to Fitzwater?

14  A.   Patton, Dr. Patton.

15  Q.   Had you treated with Dr. Patton before?

16  A.   No, I had not.

17  Q.   And you went to see Dr. Patton in when?  April of 2013?

18  A.   No.  I believe it was in January, if I'm not mistaken.

19  Q.   Oh, it was?  Okay.  Okay.  So you went to Dr. Patton in

20  January of 2012 -- 2013, 2013.  Right?  Is that what you told

21  me?  I thought it was later but I'll take -- I mean, I don't

22  know.  I'll take your word for it.  I'm just trying to make

23  sure I get my timeline straight.  You went to Luby in late

24  2012, right, September or later?

25  A.   You have me so confused with dates now that --

Tyree - Cross - Bonasso

1  Q.   You know what?  I'm sorry.  I talk fast sometimes.  I

2  apologize.

3       I think you told me that looking at that record, you

4  went -- at least went to Dr. Luby on late September?

5  A.   The last time I went to him, okay.

6  Q.   Okay.  So you don't know if that was the last time or

7  maybe there was another time after that?  Isn't that what you

8  said a few minutes ago?

9  A.   Yes.

10  Q.   Okay.  And then you saw the ads on TV, and you talked to

11  your friend at the courthouse in late 2012, and then you went

12  to Dr. Patton in early 2013.  Is that what you just told me?

13  A.   Yes.

14  Q.   Okay.  And then I think you -- you actually made a

15  decision to file your lawsuit in that time frame, right, in

16  April 2013?  The first quarter or the first three months of

17  2013?

18  A.   I think it might have been in April.

19  Q.   Okay.  Now, I do want to ask about one more record, then

20  I'm going to be that close to being finished.  (Indicating.)

21       MR. BONASSO:  If we could put up Number 14.

22       (The document was published to the jury.)

23  BY MR. BONASSO:

24  Q.   Okay.  This is a record of October 21, 2013, with

25  Dr. Upton.  Right?  Do you see that?

Tyree - Cross - Bonasso

1    A.   Yeah.

2    Q.   Down below -- so this is -- this is -- down below, he's

3    got a report in here about -- it's highlighted.  This says,

4    "See note of 10-18-13, patient having syncope episodes."  Do

5    you know what "syncope" means?

6    A.   No.

7    Q.   Fainting, passing out.

8         "Washing dishes" -- I'm reading.  "Washing dishes,

9    dizzy, went to bathroom then vomited, lost control of bowels

10   and bladder, felt faint, went to her couch, but passed out

11   before getting there, awoke on the floor next to her couch,

12   had a headache for two weeks after the episode, but no further

13   episodes."  And then it says, "Severe, intermittent headaches

14   in those two weeks."  Do you see that?

15   A.   Yes.

16   Q.   Is that -- was that a migraine attack?

17   A.   I just did that one time.

18   Q.   Okay.  That would be more in the migraine headache world,

19   right?

20   A.   Right, migraines.

21   Q.   Now, Dr. -- so getting back to your visits before you had

22   your surgery in 2013, you went to see Dr. Fitzwater?

23   A.   Yes.

24   Q.   Okay.  Did you understand that he found something called

25   a Grade 2 cystocele?

Tyree - Redirect - Wagstaff

1    A.   No.

2    Q.   And then you went to see Dr. Margolis as part of the law

3    case, right?

4    A.   Yes.

5    Q.   He examined you, and he also found you had a cystocele.

6    Are you aware of that or did he tell you that?

7    A.   If he did, I don't know.

8    Q.   A cystocele is where the bladder drops.  Do you know that

9    word means that, where the bladder drops some?

10   A.   No, I don't know.

11   Q.   Okay.  And then you went to see Dr. Green.  We asked

12   Dr. Green to evaluate you and examine you.  You went to see

13   him, right?

14   A.   Yes.

15   Q.   And are you aware that he also found a cystocele?

16   A.   I don't know.

17   Q.   No?  Have any of them told you that cystoceles can cause

18   pain with sex?

19   A.   That would be fine, but I cannot have sex, so you would

20   have to be able to have sex to have pain with it.  So --

21            MR. BONASSO:  Thank you, Ms. Tyree.  That's all I

22   have.

23            THE COURT:  Redirect of this witness?

24   (REDIRECT EXAMINATION OF JACQUELYN TYREE BY MS. WAGSTAFF:)

25   Q.   Are you doing okay?

Tyree - Redirect - Wagstaff

```
 1  A.   Yes.
 2  Q.   Okay.  I just have a few follow-up questions.  I
 3  shouldn't be more than just a few minutes.
 4       Mr. Bonasso touched a little bit on the consent forms.
 5  Do you remember that?
 6  A.   Yes.
 7  Q.   And he hand picked three or four to sort of walk through,
 8  and I wanted to ask you some questions on those.
 9       Was it your understanding that you needed the Obtryx
10  Sling?
11  A.   Yes.
12  Q.   Was it your understanding that you needed to sign the
13  consents to get the Obtryx Sling?
14  A.   Yes.
15  Q.   Did any of those nine consents that you signed include a
16  statement that the dyspareunia would be severe and permanent?
17       MR. BONASSO:  Your Honor, I object.  I think the
18  statements, those eight or nine documents, speak for
19  themselves, and to ask people about the words that aren't in
20  there, I think it's improper.
21       THE COURT:  I will overrule the objection, counsel,
22  preserving the defendant's objection and exception.
23       Go ahead, counsel.
24  BY MS. WAGSTAFF:
25  Q.   All right.  Did any of those nine consent forms contain a
```

Tyree - Redirect - Wagstaff

1   statement that the Obtryx had not been proven safe by Boston

2   Scientific?

3   A.   No.

4   Q.   Did any of those nine consent forms include a statement

5   that Boston Scientific had not tested the Obtryx in human

6   beings?

7   A.   No.

8   Q.   Did any of those nine consent forms state that the Obtryx

9   could shrink or degrade inside of your body?

10  A.   No.

11  Q.   And, again, if those consent forms had stated that or if

12  you had been aware of those risks, would you have agreed to

13  the surgery?

14  A.   No.

15  Q.   Okay.  Now, we went through a lot of medical records and

16  a lot of dates.  Easy to get dates confused, is it not?

17  A.   Right.

18  Q.   And we started with medical records about a month after

19  the surgery, I think it was January of 2011, where the circles

20  were no pain.

21  A.   Um-hum.

22  Q.   Is it fair to say that because there is a period of time

23  when you weren't having sex, because of doctor's orders, that

24  you weren't having painful sex?  Is that fair?

25  A.   Yes.

Tyree - Redirect - Wagstaff

1   Q.   And January and February of 2011 would fall into that

2   time period, correct?

3   A.   Yes.

4   Q.   Okay.  And one medical record that was not brought out

5   that I would like to put on the ELMO is a medical record from

6   March -- March 12th of 2013.

7           (The document was published to the jury.)

8   BY MS. WAGSTAFF:

9   Q.   Do you see this?

10  A.   Yes.

11  Q.   Is this big enough?  Sorry, I don't really know how to

12  use it that well.

13      Okay.  March 12th of 2013, and that's you, Jacquelyn

14  Tyree.

15  A.   Yes.

16  Q.   Right?

17  A.   Yes.

18  Q.   And this says, "The patient states that over the past

19  year and a half to two years, she has been suffering a lot of

20  dyspareunia as well as also she has been having a lot of what

21  she feels is bladder pain at times when she voids and some

22  occasional frequency and urgency."

23      Did I read that correctly?

24  A.   Yes.

25  Q.   And is that consistent with your memory, without going

Tyree - Redirect - Wagstaff

1    into specific dates, that around -- this would suggest that

2    around March or April of 2011, you began having dyspareunia?

3    A.   Yes.

4    Q.   That's painful sex.

5    A.   Yes.

6    Q.   Yes?  So this statement is consistent with your

7    recollection of what happens.

8        "She states that" -- it goes on to say, "She states

9    that mainly her discomfort is with sexual relations and that

10   the pain that she has is more with sexual relations and more

11   generalized in nature and there is not one specific area that

12   bothers her the most."

13       Did I read that correctly?

14   A.   Yes.

15   Q.   All right.  So, consistent with your recollection, this

16   medical record indicates that your dyspareunia and documented

17   pain began in March or April of 2011, correct?

18   A.   Yes.

19           MS. WAGSTAFF:  I have no further questions.

20           THE COURT:  You can step down.

21           MR. BONASSO:  Your Honor, just one quick one.

22           THE COURT:  No, sir.  We are stopping at redirect.

23   You can step down.

24           Call your next witness.

25           (The witness left the stand.)

Wilson - Direct - Monsour

1          THE COURT:  Mr. Bonasso, you may not have noticed, we

2   are doing that with all of the witnesses.

3          MR. BONASSO:  I'm sorry, Judge, I didn't.

4          THE COURT:  That's okay.

5          MR. BONASSO:  I didn't realize that was your rule.

6   I'm sorry.

7          MR. MONSOUR:  Your Honor, we are going to call

8   plaintiff, Chris Wilson, to the stand.

9          THE COURT:  All right.

10          (The witness took the stand.)

11   (**CHRIS WILSON**, HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:)

12          THE WITNESS:  Yes, I do.

13          MR. MONSOUR:  Your Honor, if it pleases the Court?

14          THE COURT:  Yes, sir.

15          MR. MONSOUR:  Counsel.

16   (DIRECT EXAMINATION OF CHRIS WILSON BY MR. MONSOUR:)

17   Q.   Good afternoon.

18   A.   Good afternoon.

19   Q.   It's Wednesday, it's 3:00.  The judge typically gives us

20   an afternoon break, which means you might be the last witness

21   of the week.  Okay?

22   A.   Okay.

23   Q.   All right.  Would you please introduce yourself to the

24   jury.

25   A.   My name is Chris Wilson.  I'm 47 years old, and I'm from

Wilson - Direct - Monsour

1   Pratt, West Virginia.

2   Q.   Okay.  Now, let me ask you this, Ms. Wilson:  You've been

3   here watching the entire trial, haven't you?

4   A.   Yes, sir.

5   Q.   Okay.  A little nervous up there?

6   A.   It's a better chair.

7   Q.   Okay.  I think you've got your brother here with you?

8   A.   Yes, I do.

9   Q.   Okay.  What I'd like to do is I want to get a little bit

10  of background.  I don't want to necessarily belabor the

11  points.  It's been a long week, so let's try and move through

12  it.  But I want to get a little idea of who you are, where

13  you're from, how far you got in school, some of those kind of

14  things.

15  A.   Okay.  I am the legal guardian of a 24-year-old --

16  year-old Downs Syndrome child.  His name is Mark.  And I have

17  been in his life, been privileged to raise him since he was

18  about two-and-a-half.  I do a lot of volunteering for

19  fostering of animals.  We have collage, even down to a horse

20  in the yard.  There is not many animals I haven't done, except

21  snakes and spiders.  Those are not allowed.

22         But I volunteer for Special Olympics, to help -- Mark's

23  a swimmer.  I went to school at Alderson Broaddus College to

24  be a physician assistant and try to double into sports

25  medicine.  And I got about two-and-a-half years into that

1   program and my father passed away, so I came back home,

2   financially not able to return, plus I wanted to help my mom

3   with my little brother.  And three years later, my mother

4   passed away, so I got to finish the job with my little

5   brother.

6   Q.   Okay.  If you could, I just -- and I don't want to go too

7   far into it, but we've a got a few pictures of you with -- the

8   young man, the 24-year-old man that you take care of, you

9   consider him your son?

10  A.   I do.

11  Q.   Okay.  And if you could, I think we've got just a couple

12  of pictures to show you.  This is a picture of you with -- who

13  are these people?

14  A.   This is the swim team this most recent year, 2014 swim

15  team for Special Olympics, Kanawha County.

16  Q.   You're one of the swim coaches for the Special Olympics

17  team?

18  A.   Yes, I am.

19  Q.   And we've got another picture.  And this is your son,

20  Mark, with some of the trophies that he's won?

21  A.   Yes, that's his accomplishments wall.  That has pictures

22  of him swimming, doing track and field, basketball and all the

23  little medals.

24  Q.   Okay.  And I think we've got one more picture.  And this

25  is a picture of what?

Wilson - Direct - Monsour

A.   This is our son, Mark, and the rescue horse that is now a

permanent fixture at the home.  His name is Rocky and Mark

wanted to be a cowboy.

Q.   Okay.  All right.  Is it a fair statement to say that

when raising a 23-year-old special-needs child, that that

keeps you a pretty busy mom?

A.   It keeps you a pretty busy neighborhood.

Q.   Okay.  Is -- I'd like to talk a little bit about some of

your -- some of your background, some of your medical

background.  And I don't really want to go into all of it.

     But before you had your stress urinary incontinence

surgery, in the past before, you had had a surgery for

trigeminal neuralgia?

A.   Yes, I did.

Q.   And I want you to explain it in your own terms because I

suspect it will be talked about significantly on cross.  So I

would like to just ask you a few questions.

     Could you kind of give us an idea of what the

trigeminal neuralgia was and the treatment that you had for it

and how your life has improved since you had that treatment?

A.   Well, originally, I was not diagnosed with trigeminal

neuralgia.  I was diagnosed as bipolar.

Q.   And when was this?  Give the jury a little bit of a time

frame.

A.   That would be in the '90s.  And because I did not know

Wilson - Direct - Monsour

 1    what was going on and they could not figure out what was going

 2    on, they just assumed that it was in my head.

 3          And, eventually, literally, yes, it was in my head.

 4    They did get an affirmative diagnosis in 2002, and it is a

 5    condition that affects the fifth cranial nerve in your brain.

 6    Different people have different triggers.  Mine happened to be

 7    stress and cold weather, which -- thankful we didn't have

 8    court Saturday because that was just a nice combination, the

 9    perfect storm.

10          So when I have this condition -- when they first

11    diagnosed it, I was having upwards of 20 attacks a day.  These

12    attacks can last anywhere from 10 to 15 minutes, two minutes,

13    sometimes even into the 20s.  And so before the diagnosis, I

14    really thought I was going crazy.  I would have a pain, and it

15    would be so bad in my head, in my jaw, and then it would

16    disappear, then it would be back.  It was very hard for my

17    doctors to diagnose.  But once they did, in 2002, they were

18    able to give me a proper medication, and it's not typical

19    medication, it's not a pain medication.  It's an antiseizure

20    medication.  And it actually works as Tylenol would work for

21    you for a headache.  This antiseizure medication actually

22    works on the cranial nerves like Tylenol.  And eventual -- I

23    began taking it daily.  And it got everything under control.

24    And I had a reaction, after having so much Tegretol in my

25    system, but it seemed to be the best drug of choice for what

—— Wilson - Direct - Monsour ——

 1   was going on.  So over the years, I was able to change up the

 2   medication.

 3        But, now, when they diagnosed me in 2002, they offered

 4   me a surgery.  And I did consider the surgery and talked with

 5   many doctors from Morgantown and around, and there was just

 6   too many complications, and one of which would be that I would

 7   lose the feeling in the side of my face, maybe even the

 8   functions in the side of my face, but they would place, take a

 9   needle going in and shoot alcohol on the nerve and kill it, so

10   that the pain would go away.

11        Well, I just felt like that was going to make me lose

12   too much of myself and everything else, so I didn't do that

13   surgery.  I continued with the medication, continued following

14   up with the doctors.

15        And in -- right before February of 2004, they had come

16   up with a new surgery.  And they had said a doctor from Duke

17   would fly in, and he did brain surgery in Morgantown certain

18   days a week, and was I interested in that.

19        So I talked with my doctors, and the benefits

20   definitely outweighed the risks on this procedure.  It was

21   not -- the complications were not as limiting.  And I was

22   willing to take the risk at this point.

23        So I had the surgery, where they went in and they went

24   into the back of my head -- I have a small scar back here --

25   and they wrapped the nerve to try to protect it from being

Wilson - Direct - Monsour

agitated by any other sources.  Some people can't even drink

cold water.  I'm lucky, I can drink cold water.  My stresses,

like I said before, are change in the barometric pressure and

a lot of stress.

        And it was successful.  It was very successful.  My

life became normal after that.  It -- I took the medication

when I knew the weather was going to change, I would put it in

my system, and it takes three days for the medicine to start

working.  So if I know the weather is going to change on

Saturday, I usually take a half a pill on Wednesday and

continue that.  So that if it does flare up, it's easier for

me to -- to medicate and get it under control.  But, you know,

from 2004 up, it's -- it's -- it's not really be a major,

major factor because it was so well controlled.  That's my

best explanation.

Q.   Okay.  So how has your life improved since this surgery

in 2004?

A.   I was not on the couch all day.  I could live pretty

much -- in a controlling fashion, I could live a normal life.

Q.   Okay.  And you had told me last week that your trigeminal

neuralgia used to bother you every day --

A.   Yes.

Q.   -- before 2004, and now you have flare-ups how often?

A.   Maybe three times a year, I have -- when the weather is

really -- fall and spring are really bad and allergy season,

Wilson - Direct - Monsour

1  and then if there's a major stressful event, but usually, I

2  have not had more than two or three flare-ups, being able to

3  self-medicate, and I know my body, so --

4  Q.   Okay.  Let's move on to your issues of stress urinary

5  incontinence, and I'm not going to go through a bunch of

6  medical records.  I just want to talk to you and let's hear

7  your story from you.

8       When did you start having problems with the stress

9  urinary incontinence and how long did you have those problems,

10  how severe were they, and who did you go see for them?

11  A.   Okay.  I noticed that I was starting to spray a little

12  bit when I coughed, and I also felt like I was not emptying my

13  bladder fully when I would go to the bathroom.  But the

14  spraying a little bit when you cough occasionally, you stick a

15  panty liner on.  So I thought I would mention it to my general

16  practitioner, and I did, Dr. Jagannath.  And he said, "Well,

17  let's go ahead and let you go see a urologist and see what he

18  says, because I'm not a urologist.  I'm just your family

19  practitioner," and I said okay.

20       So he referred me to Dr. Bhanot, and that would be in

21  2010.  And I saw Dr. Bhanot, I went to my appointment, he

22  said -- well, he talked to me maybe --

23            MS. WEILER:  Objection, Your Honor, hearsay.

24            THE COURT:  The objection as to what the doctor told

25  her is sustained.

Wilson - Direct - Monsour

 1  BY MR. MONSOUR:

 2  Q.   Okay.  Let me ask you this:  When you went to go see

 3  Dr. Bhanot, did you meet with him?

 4  A.   I met with him, and after I met with him, it was my

 5  understanding that I needed to take a few tests, and after the

 6  tests, I would meet with him again.

 7  Q.   Okay.  Did you have those tests performed?

 8  A.   I did have those tests performed, and I did meet with

 9  Dr. Bhanot again, and it was my understanding at this time

10  that I needed surgery.

11  Q.   Now, what was your understanding of the complications of

12  this surgery, how long it would take, and what the results

13  would be?

14  A.   My understanding was that it was pretty much a quick

15  procedure.  I'd be 20 minutes in and out.  I would be able to

16  go home the same day.  It would not affect me, it would make

17  my life as good as new, and that the only thing I would

18  experience as far as complications should be maybe some pain

19  in my legs.

20  Q.   And how long were those pains supposed to last?

21  A.   Maybe a week, week and a half.

22  Q.   Okay.  Now, when you went to go see Dr. Bhanot, were you

23  given a bunch of options for the incontinence?

24  A.   No, sir.

25  Q.   Okay.  What was the general gist of what you were

Wilson - Direct - Monsour

1   offered?

2   A.   I was offered surgery, sir.

3   Q.   Okay.  Good as new?

4   A.   Good as new.

5   Q.   Okay.

6   A.   Quick and easy.

7   Q.   And this was for stress urinary incontinence that had

8   been bothering you for how many months?

9   A.   Three to four months.

10  Q.   And it was a mild, moderate or severe case?

11  A.   It was a nuisance.

12  Q.   Okay.  Now, you had the surgery?

13  A.   Yes, sir.

14  Q.   Following the surgery, did you meet with your physician?

15  A.   Which physician?

16  Q.   Dr. Bhanot.

17  A.   Yes.

18  Q.   Okay.  Were you given any instructions from Dr. Bhanot,

19  giving you restrictions as to things you should or should not

20  do following the surgery?

21  A.   No.

22  Q.   Okay.  Was there any mention of not having any sex?

23  A.   No.

24  Q.   Was there any mention of not lifting any heavy objects?

25  A.   No.

Wilson - Direct - Monsour

1          MS. WEILER:  Objection, Your Honor, hearsay.

2          THE COURT:  That is sustained, counsel, as I

3    understand when you ask whether there was any mention, you're

4    talking about whether her doctor told her that.  So I sustain

5    the objection.

6          MR. MONSOUR:  I will move on, Your Honor.

7    BY MR. MONSOUR:

8    Q.   Now, let's keep going down the path of your stress

9    urinary incontinence sling surgery.  Did the procedure work

10   for awhile?

11   A.   Yes, it did.

12   Q.   Did it start to fail at some point in time?

13   A.   Yes.

14   Q.   And how long did that take?

15   A.   Well, I began having pain that I did not at the time

16   associate with the urinary area.  But other than that, the

17   urinary -- actual urinary symptoms that made me return to the

18   doctor happened in 2012, I think.

19   Q.   So how long after the surgery was that?

20   A.   About a year and a half.

21   Q.   Now, when these problems arose, what were the problems

22   that arose?  What were the problems that you first started

23   noticing where you started having -- I think you told me at

24   one point in time you were good as new for around 10 to 12

25   months?

Wilson - Direct - Monsour

1   A.   Well, I was good as new for about 10 to 12 months, and

2   then I had experienced this pain.  And this pain was in my

3   lower abdomen, in my vaginal area, pelvic area, that shot back

4   towards my left side and my back.

5        I at the time maybe thought it might have been

6   appendicitis or something, so I went to the ER.  I did not

7   think at the time that this was related.  I -- my

8   understanding when I left the hospital, the ER that day, it

9   was not the appendix, it was not the back, but it may be a

10  gynecological issue.

11  Q.   Okay.  Following this ER visit, did you then follow up

12  with a gynecologist?

13  A.   Yes, I did.

14  Q.   And what was your understanding after being examined by

15  the gynecologist?

16  A.   It was my understanding that I had bilateral cysts in my

17  ovaries and that I had fibroids in my uterus but that this was

18  not what was causing my problems and it was not of a

19  significant nature.

20  Q.   At that point in time, did you then return to your

21  regular doctor?

22  A.   Yes, I did.

23  Q.   And what is his name again?

24  A.   Dr. Jagannath.

25  Q.   Okay.  Dr. Jagannath.  Now, what did Dr. Jagannath do for

810

Wilson - Direct - Monsour

 1  you for this pain that you were having?

 2  A.   He prescribed me some pain medication and he told me that

 3  if it increased --

 4          MS. WEILER:  Objection, Your Honor.

 5          THE COURT:  The objection to that portion of the

 6  response, which indicated "he told me," I sustain the

 7  objection and I'll order stricken from the record.

 8          Go ahead, please.

 9  BY MR. MONSOUR:

10  Q.   He did prescribe you some pain pills?

11  A.   Yes, he did.

12  Q.   Okay.  Did you take those for awhile?

13  A.   Yes, I did.

14  Q.   All right.  Did the pain pills make you better?

15  A.   They did relieve some of the symptoms, but as time went

16  on, the pain increased in the back -- in the front going

17  towards the back, and then I had a pain that was -- started to

18  develop in the front, and it was becoming very painful.

19  Q.   And you said "the front."  I know what you mean, but the

20  jurors might not know what you mean.

21  A.   The front of my pelvic area, in my abdomen, it felt like

22  I really had to pee but I couldn't.  And along with that came

23  a few instances of going to the bathroom and not being able to

24  pee.  Then I would go down the hall, it would pee.  And I was

25  not prepared for that.

Wilson - Direct - Monsour

1          So once I informed my regular practitioner that these
2  urinary things were happening, along with the pain that was
3  shooting through like a spear that just -- just stabbed
4  straight through, now I'm having this pain and now I'm not
5  able to pee, he decided it's time for me to go back to the
6  urologist.
7  Q.   All right.  Did you follow up with your urologist?
8  A.   Yes, I did.  Dr. Bhanot.
9  Q.   Okay.  Same doctor that put the sling in?
10  A.   Yes, sir.
11  Q.   Okay.  When you went to Dr. Bhanot, what was your
12  understanding of the cause of your problems?
13  A.   When I first returned to Dr. Bhanot, it was my
14  understanding when I left there that he didn't feel like I had
15  a problem.  He was going to run some tests.  He felt like I
16  had maybe seen something on TV and was just showing up there.
17  So he was going to run some tests and then he would see me
18  again.
19  Q.   Okay.  Were those tests run?
20  A.   Yes, sir.
21  Q.   And what did those tests show?
22  A.   When I returned back to Dr. Bhanot, I was informed, and
23  it was my understanding, that the tape that I had placed in me
24  had gotten tight, it was pushing up, it had shrunk, in no
25  uncertain terms, but it was pushing up -- it was like --

—— Wilson - Direct - Monsour ——

1    Q.   Hold on real quick.  Hold on real quick.

2    A.   Yes, sir.

3    Q.   Was it your --

4              MS. WEILER:  Your Honor --

5              THE COURT:  Yes, ma'am.

6              MS. WEILER:  Objection.  All this testimony is based

7    on hearsay.

8              THE COURT:  You all can come to the bench and maybe I

9    can give you a ruling broad enough to give you some guidance.

10             (The following occurred at sidebar.)

11             THE COURT:  When she testifies to, of course, what

12   the doctor told her, I've sustained those objections.  She's

13   also testified to, she was informed.  That, again, is based on

14   hearsay, as to what the doctors told her.  And she has, most

15   recently and prior to this, testified as to her understanding

16   of it.  Again, it's based on what the doctor told her, and so,

17   again, I find that it's based on hearsay.

18             You started to say something.  Go ahead, Mr. Monsour.

19             MR. MONSOUR:  The only thing I was going to say, Your

20   Honor, is I've always understood that a patient was able to

21   testify as to what they understood their medical conditions to

22   be.  And if the patient is wrong, the other lawyer can point

23   out and say, no, you're wrong, and look at the medicals.  But

24   I always thought that they were allowed to give at least their

25   understanding of what the issue was to be disproven on cross.

Wilson - Direct - Monsour

1          THE COURT:  There is no problem with her generally

2   testifying to her understanding of what her medical condition

3   is, but she is testifying over and over again about going to

4   the doctor and when she left, her understanding, and

5   Ms. Weiler is correct, it's based on hearsay, and it's based

6   on the information she -- her conversations with her doctor.

7   And so the response is no different than if you ask her, "What

8   did the doctor tell you?"  So that is her point, as I

9   understand it, when she makes the objection, that it's based

10  on hearsay.

11          Is there something you want to place on the record,

12  Ms. Weiler?

13          MS. WEILER:  No, just --

14          THE COURT:  And if I misunderstood you, I apologize.

15  I'm old and I try to rush things along.  You can object for

16  the record if you want.

17          MS. WEILER:  No.  Thank you.

18          THE COURT:  All right.

19          (Sidebar concluded.)

20  BY MR. MONSOUR:

21  Q.   Now, after -- after you went to see Dr. Bhanot for these

22  issues, did you -- did he recommend -- or did you have to have

23  a surgery as a result of his examination and testing of you?

24  A.   Yes, I did.

25          THE COURT:  Great question, Mr. Monsour.

Wilson - Direct - Monsour

1           MS. WEILER:  Excuse me, Your Honor.  Could I move

2    that board?  I can no longer see the witness.

3           MR. MONSOUR:  Oh, I'm sorry.

4           MS. WEILER:  Thank you.

5           THE COURT:  I was about to call you and Ms. Weiler

6    back to the bench to give you exactly what you've just done,

7    so I think that is the appropriate way to ask the question.

8           MR. MONSOUR:  Okay.  Thank you.

9           THE COURT:  Yes, sir.

10   BY MR. MONSOUR:

11   Q.   The surgery that you had, without talking about what your

12   doctor said, but you are aware of the area of where the

13   surgery took place, correct?

14   A.   Yes.

15   Q.   And was that in the same spot as where your tape had been

16   placed?

17   A.   It was in the vagina, in the same area.

18   Q.   Was the tape operated on?

19   A.   Yes.

20   Q.   Okay.  Now, if -- did the surgery that was performed, the

21   second surgery that was performed -- the first one was the

22   tape going in.  The second one was the treatment of it.

23   Correct?

24   A.   Correct.

25   Q.   Following the second surgery, did your pain go away?

Wilson - Direct - Monsour

1  A.   The pain in my front abdomen did go away.  The feeling of

2  having to pee and not being able to went away.  But the pain

3  that had started a long time ago, that started in my lower

4  pelvic area that felt like a spear that goes through and you

5  can feel it from both ends, all the way through, it remained.

6  And over the next few months, I developed another pain in the

7  vaginal area, which was like a twisting or weird feeling like

8  a tampon being stuck or twisted and you just can't get it out,

9  it's just twisted.

10  Q.   Okay.  Let me ask you this:  Did you then follow up with

11  any physicians to let them know that your pain was still

12  there?

13  A.   I informed Dr. Bhanot.

14  Q.   And did Dr. Bhanot refer you anywhere for treatment?

15  A.   I was referred because of a paper that came from

16  Dr. Bhanot to my regular doctor.  My regular doctor has to

17  refer me.

18  Q.   Okay.  And did your regular doctor refer you somewhere?

19  A.   Yes.  He referred me to a back and spine specialist.

20  Q.   Okay.  And is that because the pain was going to your

21  back?

22  A.   Yes.

23  Q.   Did the back doctors examine you and run tests?

24  A.   Yes, they did.

25  Q.   At the end of their examination and testing, did they

Wilson - Direct - Monsour

1   perform any back procedures?

2   A.   No.  When I left there, I did not have to return.  I did

3   not have a back issue.

4   Q.   Okay.  Did you go back to Dr. Jagannath?

5   A.   Yes, I did.

6   Q.   Where did Dr. Jagannath send you then?

7   A.   He told me to keep my appointment --

8        MS. WEILER:  Objection, Your Honor, hearsay.

9   BY MR. MONSOUR:

10  Q.   Don't say he told you.

11  A.   Okay.

12       THE COURT:  Just a second, you all.  Just for the

13  record, I know that you lawyers and even Ms. Wilson knows

14  where this is going, but this record needs to be clear.

15       I sustain the objection and strike any portion of the

16  answer that refers to, "he told me."  Now, let's move forward.

17       MR. MONSOUR:  Okay.

18       THE WITNESS:  I went back to Dr. Bhanot.

19  BY MR. MONSOUR:

20  Q.   Okay.  That's where you went.  Okay.

21  A.   Yes.

22  Q.   So when you go back to Dr. Bhanot, did he perform an

23  examination of you?

24  A.   Yes.

25  Q.   How long did -- was it an examination of your vaginal

Wilson - Direct - Monsour

 1  area?

 2  A.   Yes.  He stuck his fingers in and out in a matter of

 3  three seconds.

 4  Q.   Okay.  Were you referred anywhere by Dr. Bhanot?

 5  A.   No.

 6  Q.   Were -- did he order any certain type of procedure to

 7  evaluate your condition?

 8  A.   It was felt that I may need a colonoscopy at this point.

 9  Q.   So what you're telling me is he referred you for a

10  colonoscopy?

11  A.   My doctor, Jagannath, yes.

12  Q.   Okay.  Now, did you go get the colonoscopy?

13  A.   No, I did not.

14  Q.   And why did you not go get the colonoscopy?

15  A.   I did not feel that I needed it, nor did my practicing

16  physician.

17  Q.   Now, let's talk about the pain that you have in your

18  vaginal area.  You described it before as what?

19  A.   It is like a spear.  If you can just picture a spear that

20  goes in and it goes all the way back and touches your back,

21  you can feel it back there, you can feel it in the middle, you

22  can feel it in the front.  It's like you're walking around

23  literally with a spear in your bottom.

24  Q.   Does it -- how often does it bother you?  Is it constant,

25  is it intermittent, is it three times a year?  How often do

Wilson - Direct - Monsour

1  you have this problem?

2  A.   I feel this every day.  I mean, it is every day, every

3  minute of the day, 24/7.

4  Q.   Did it -- does it affect your relationship with your son?

5  A.   It changes how I'm able to function on a daily basis.

6  Q.   And why is that?

7  A.   One of Mark's favorite activities is riding a double

8  bike.  Well, I can't sit on a bike seat anymore.  I can't ride

9  with him on a double bike.

10       We used to do a thing called the Polar Plunge together.

11  That was -- it's an activity that you jump in ice cold water

12  in the middle of February, here in Charleston at the Power

13  Park.  And it raises money for Special Olympics, and he's the

14  only Special Olympian that jumps.  And he wanted to do it, so

15  I said okay.  And we did it.  We did it three years in a row.

16  And after that, I couldn't do it.  And last year -- he was so

17  disappointed, the year before, that I asked a friend of mine

18  if her son would mind jumping with Mark so that he could still

19  participate.  But it's something that was taken away from me

20  that I enjoyed to be doing with him.

21  Q.   Do you -- well, let me ask this.  I'll ask you some of

22  the same questions that Ms. Wagstaff asked Ms. Tyree.

23       You've seen the evidence, you've been watching it in

24  the courtroom, correct?

25  A.   Yes, sir.

Wilson - Cross - Weiler

1  Q.  If you had been advised that the MSDS sheet for the

2  polypropylene said "not for permanent implant in a human

3  body," would you have ever agreed to have this procedure done?

4  A.  No, sir.

5  Q.  If you had known that this mesh could shrink up inside

6  your body and be borderline impossible to get out, would you

7  have had this procedure?

8  A.  No, sir.

9  Q.  What is your biggest fear with regard to the mesh that

10  remains in your body?

11  A.  I fear that I need more surgery.  I fear that I'll end up

12  in more pain than I am now or in the same pain for the rest of

13  my life.  But what really scares me to death is that they'll

14  never, ever be able to get it all out, and I'll never be okay.

15  That's my biggest fear.

16       MR. MONSOUR:  All right.  I'll pass the witness.

17  Thank you.

18       THE COURT:  Cross-examination, Ms. Weiler.

19  (CROSS-EXAMINATION OF CHRIS WILSON BY MS. WEILER:)

20  Q.  Afternoon, Ms. Wilson.

21  A.  Afternoon.

22  Q.  I haven't had the opportunity to talk yet, so I'm Eva

23  Weiler, and we have actually met before, haven't we?

24  A.  Yes, ma'am.

25  Q.  Spent a few hours together, actually, here in Charleston?

Wilson - Cross - Weiler

1   A.   Quite a few.

2   Q.   That's right.

3        I would like to ask you a few more questions today as

4   well.  All right?

5   A.   Yes, ma'am.

6   Q.   The Obtryx, you had that placed in May, 2010, right?

7   A.   Correct.

8   Q.   And that's because you were suffering from stress urinary

9   incontinence, right?

10  A.   Yes.

11  Q.   And that began when you started having urinary leakage

12  back in about 2009; is that right?

13  A.   It would be the beginning of 2010.  I would -- I could

14  say the end of 2009, towards the beginning of 2010.

15  Q.   Okay.  All right.  And when we talked, I believe you

16  described it to me as spraying; is that right?

17  A.   I consider it like a spritz.

18  Q.   And you were spraying urine when you were coughing,

19  right?

20  A.   Yes, ma'am.

21  Q.   And also when you were sneezing?

22  A.   That did happen, too.

23  Q.   And lifting things?

24  A.   Didn't notice it as much, but I'm sure that it was

25  possible.

—— Wilson - Cross - Weiler ——

1  Q.  When it first started happening, can you tell me the

2  quantity that you were spraying when you would cough or sneeze

3  or lift?

4  A.  Breath spray size, basically, and panty liners could

5  handle it.

6  Q.  When you first started doing it, wasn't it about a

7  capful, right?

8  A.  That would be what would be on the panty liner, that

9  might have been more than one spritz.

10 Q.  And over time your incontinence got worse, right?

11 A.  Actually, not until later.

12 Q.  But over time, it did worsen, correct?

13 A.  After I had the surgery, yes.

14 Q.  So it never exceeded more than a capful before the

15 surgery, is that what you're saying?

16 A.  No, I had only had this experience before surgery three

17 to four months.  I mean, it went from spritzing to maybe a

18 capful.  That would be my best recollection.

19 Q.  So it's your testimony that it did not worsen over time

20 before you had the Obtryx; is that right?

21 A.  Well, I would consider that worsening, going from a

22 spritz to a capful.

23 Q.  Okay.

24 A.  So --

25 Q.  Am I also correct that you had spraying of urine during

Wilson - Cross - Weiler

1   certain sexual acts as well?

2   A.   With an orgasm, the pressure.

3   Q.   That happened every time?

4   A.   Not generally, but if I had urine in my bladder, it

5   would.

6   Q.   And am I correct that prior to having the Obtryx, the

7   number of times that you were engaging in sexually intimate

8   acts were diminished because of that spraying?

9   A.   Yes.

10  Q.   And you also stopped engaging in certain types of sexual

11  contact and intimacy because you were spraying during orgasm;

12  is that right, Ms. Wilson?

13  A.   Yes.

14  Q.   And, eventually, am I correct that you were actually

15  spraying enough urine to fill about the size of a test tube?

16  A.   Before surgery?

17  Q.   Correct.

18  A.   I'm -- the best of my recollection, it's a capful, and

19  depending on the size of the test tube you're referring to, I

20  can better accurately describe that.

21  Q.   Sure.   A test tube, about as wide as your thumb and about

22  as tall as your finger.

23  A.   As wide as my thumb, as tall as which finger?  I have

24  long fingers, I'm sorry.

25  Q.   Your thumb.

*United States District Court*
*Southern District of West Virginia*

Wilson - Cross - Weiler

1   A.   As tall -- oh, this size.  I may have been getting to the

2   point that if I sprayed -- it depended on how much urine I had

3   in my bladder at the time, as to how much would squirt out.

4   Q.   But on occasion, you were spraying a quantity of urine

5   consistent with about the size of your thumb?

6   A.   I -- I'm sure it could have happened, yes.

7   Q.   And that was happening with coughing?

8   A.   Not so much with coughing, but more violent things like

9   sneezing.  Coughing wasn't as violent as sneezing.  Sneezing,

10  you can't stop.  Coughing, you could kind of prepare -- you

11  know, cross your legs and less comes out.

12  Q.   And did you have that quantity of urine come out when you

13  were engaging in certain sexual acts as well?

14  A.   If I had an orgasm, I would say that some of that -- the

15  same amount probably did come out, still, depending on how

16  much was in there.

17  Q.   That was rough on you to deal with that leakage, wasn't

18  it?

19  A.   Not really.  It was a nuisance.  It was something I was

20  aware of.

21  Q.   There were occasions where you had to change your clothes

22  because of the quantity of urine that you leaked, right?

23  A.   Not before the surgery, no, ma'am.

24        MS. WEILER:  May I approach, Your Honor?

25        THE COURT:  Yes, ma'am.

Wilson - Cross - Weiler

```
 1   BY MS. WEILER:
 2   Q.   Just turn to Tab 1 for me.  And you recall, as we
 3   mentioned earlier, that you and I spent some hours together
 4   taking your deposition, right?
 5   A.   Quite a few hours, yes.
 6   Q.   And you knew that your testimony was under oath at that
 7   time, right?
 8   A.   Yes.
 9   Q.   If you could, turn to Page 147 of your deposition
10   testimony, please.
11   A.   Of my deposition testimony?
12   Q.   Um-hum.  That's Tab 1.
13   A.   I should have brought my glasses.  Okay.
14   Q.   Are you there?
15   A.   Yes.
16   Q.   So bottom of Page 147, I asked you:  "Did you ever have
17   to change your clothes as a result of urine loss?
18        "ANSWER:  I did."
19        Did I read that correctly?
20   A.   Yes, ma'am.
21   Q.   At the same time before the Obtryx --
22   A.   Could I clarify?  When you say change of clothes, before
23   my surgery, I'm not talking about a complete outfit.  I had to
24   change underwear.
25   Q.   I asked you, "Did you ever have to change your clothes as
```

Wilson - Cross - Weiler

1  a result of your urine loss?"  And you answered, "I did."  Is

2  that correct, that's how you answered the question?

3  A.   That's how I answered it.  Okay.

4  Q.   At the same time, you also had some urge incontinence and

5  nocturia at the same time.  Do you know what that is,

6  nocturia?

7  A.   Getting up through the night to urinate.

8  Q.   And before the Obtryx, you were experiencing some of that

9  too, right?

10  A.   Yes.  I was under the impression that at nighttime,

11  everyone tends to urinate more because when you lay down, the

12  fluid that collects in your legs, your kidneys are more

13  readily available to get rid of it.  So you -- a lot of people

14  pee at night, so I wasn't extremely concerned.  But the answer

15  is yes, I did have to get up to pee at night.

16  Q.   These circumstances prompted you to go and seek medical

17  treatment, right?

18  A.   Yes.

19  Q.   And at a certain point you decided that you couldn't do

20  it anymore, you couldn't handle the circumstances?

21  A.   No, ma'am, that's not what I decided.

22  Q.   If you turn to Page 148, the same deposition, should be

23  on the same page.

24  A.   Okay.

25  Q.   Question is:  "What prompted you to seek medical help for

Wilson - Cross - Weiler

1   it?

2        "ANSWER:  I just decided I couldn't do that anymore and

3   I thought I needed to talk to Dr. J about it and so I told him

4   I was having some problems with my urine."

5        Did I read that correctly?

6   A.   Yes, you did, ma'am.

7   Q.   And when we talked, your deposition was on May 19th,

8   2014, right?

9   A.   I'm not sure.  I know it was in May.

10  Q.   If you look at the front page of that, Tab 1.

11  A.   Okay.  I'll take your word for it.

12  Q.   Sure, sure.  It says there, video deposition of Chris

13  Rene Wilson.  Do you see that?

14  A.   Yes.

15  Q.   And it says on the 19th day of May, 2014.  Did I read

16  that correctly?

17  A.   Yes, ma'am.

18  Q.   Now, beyond the urinary symptoms we've already talked

19  about a little bit, you were also having symptoms of

20  difficulty emptying your bladder; is that right?

21  A.   I felt like I had some.

22  Q.   And isn't it true that you would sit on the toilet and

23  have to let your bladder kind of dribble out, to finish

24  urinating sometimes?

25  A.   At times I had to, yes.

Wilson - Cross - Weiler

1  Q.   And along with these urinary symptoms, before you ever

2  had the Obtryx, you were already coping with some other

3  significant medical history.  Is that fair?

4  A.   I wouldn't say significant.  But I had medical history.

5  Q.   And just first off, am I correct that you've been on

6  disability since the late 1990s?  Is that right?

7  A.   I assume you're correct, yes.

8  Q.   And when you first went on -- first diagnosed for

9  purposes of disability, that was based on bipolar disorder; is

10 that right?

11 A.   Yes, ma'am.

12 Q.   And your bipolar disorder causes you to have extreme

13 social anxieties, correct?

14 A.   This is true.

15 Q.   And you have to take medication to balance out those

16 anxieties; is that right?

17 A.   I do take Prozac for that, yes, ma'am.

18 Q.   And you have also had doctors tell you that you suffer

19 from anxiety issues, right?

20 A.   At the time that I was diagnosed with those, I was

21 suffering severe anxiety.  No one could figure out what was

22 going on inside my head.  And they all wanted me to think I

23 was crazy.  So yes, ma'am.

24 Q.   So doctors have told you over the course of your life

25 that you suffer from anxiety?

Wilson - Cross - Weiler

1   A.   Yes, ma'am.  Early in the '90s.

2   Q.   And they told you that before the Obtryx surgery, right?

3   A.   Yes, ma'am.

4   Q.   And am I also correct that you've gone through periods of

5   depression prior to ever having the Obtryx surgery?

6   A.   I have, yes, ma'am.  I went through a severe period when

7   I lost my parents.

8   Q.   Now, we talked a little bit, you did with your counsel,

9   about trigeminal neuralgia; is that right?

10  A.   Yes, ma'am.

11  Q.   And you described it as a very painful condition; is that

12  right?

13  A.   Yes, ma'am.

14  Q.   And the -- you would have those waves of pain 15 to 20

15  times per day before your surgery; is that right?

16  A.   This is true.

17  Q.   And you suffered through that type of pain for seven

18  years; is that right?

19  A.   Yes, ma'am.

20  Q.   And the pain was so severe for you that you actually

21  spent a lot of time at home on your couch; is that right?

22  A.   Yes, ma'am.

23  Q.   And it affected your ability to do pretty much anything,

24  right?

25  A.   It affected my ability to go out of the house, yes.

Wilson - Cross - Weiler

```
 1  Q.   And ultimately in 2004, you underwent a brain surgery; is
 2  that right?
 3  A.   Yes, ma'am.
 4  Q.   And that involved cutting a hole in the back of your
 5  head, right?
 6  A.   Yes, ma'am.
 7  Q.   And you were offered an alternative with regard to an
 8  injection; is that right?
 9  A.   Yes, ma'am.
10  Q.   But you opted not to do that, correct?
11  A.   Correct.  The injection was going to kill the nerve.
12  This, the second operation, was only going to wrap it.  It
13  would not interfere with the way the nerve worked.
14  Q.   And in that surgery, where they had to cut into the back
15  of your head, they placed a titanium mesh; is that right?
16  A.   Correct.
17  Q.   And before you went through that procedure, you
18  understood that that surgery involved risk, right?
19  A.   Yes, ma'am.
20  Q.   And you understood that it required the risk of actually
21  cutting into the back of your head, right?
22  A.   Yes, ma'am.
23  Q.   And it also involved the placement of a mesh, right?
24  A.   Yes, ma'am.
25  Q.   And am I correct that you still experience pain as a
```

Wilson - Cross - Weiler

1  result of this trigeminal neuralgia?

2  A.   I do, yes, ma'am.

3  Q.   And you mentioned earlier that there was a perfect storm

4  this Saturday.

5  A.   Yes, ma'am.

6  Q.   And can you tell me what the perfect storm is?

7  A.   A very sudden weather change, and although I had started

8  taking Tegretol to get some in my system, with that compounded

9  by -- I'm just under a little bit of stress here, not a lot

10 but a little bit of stress, those two things together, I

11 really was not functioning correctly on Saturday.

12      When it comes, it comes.  It always starts the same.

13 It starts here and then it spreads out over one side of my

14 face, and it affects the eye and the ear, and then when it

15 relieves itself, it actually goes back the same exact way.

16 It's always this side of my face, and it's always near here.

17 (Indicating.)

18 Q.   And the extreme change in weather you're talking about,

19 was it cold on Saturday?

20 A.   The temperature dropped dramatically, yes.

21 Q.   The medicine that you take, you don't take it all the

22 time, right?

23 A.   No, I do not.

24 Q.   You take it when you're afraid that this pain is going to

25 come back, right?

Wilson - Cross - Weiler

1    A.   Yes.  I'm at that point now.  Originally, I did take it

2    every day, but I'm at the point now that I can, when I feel

3    it, I know I'm going to suffer for two days if I didn't see it

4    coming, but then the medicine kicks in, and works just like

5    Tylenol.

6    Q.   And you expect this trigeminal neuralgia to affect you

7    for the rest of your life, correct?

8    A.   I do.

9    Q.   Now, I understand that you studied to be a physician's

10   assistant, right?

11   A.   Well, I was in that program.  Your first two years of

12   college are basic, you know, just English, math, that kind of

13   thing.  But I did have some, you know, a few courses that

14   would point me in that direction, like anatomy, physiology.

15   Q.   Then you went on to actually work at a doctor's office

16   for a couple of years, too, right?

17   A.   Yes, I did.

18   Q.   And that actually crossed over in time with working at

19   the practice of one of your doctors, right, correct?

20   A.   Actually, I worked the summers in between going to

21   college at the doctor that -- the doctor's office that the

22   doctor that is now working there has.

23   Q.   You worked at the office of Dr. Jagannath, correct?

24   A.   Well, doctor -- it was Dr. Agrawal at the time.

25   Q.   And Dr. Jagannath took over his practice, correct?

Wilson - Cross - Weiler

1    A.   He took over his practice, yes.

2    Q.   Now, prior to the Obtryx being placed, am I correct you

3    didn't do any research about the procedure, right?

4    A.   No, ma'am, I did not.

5    Q.   And, but you did understand that a mesh was going to be

6    placed in your body, right?

7    A.   No, I did not.  I didn't understand it was mesh.  The

8    first time I realized it was mesh was when I was going to have

9    the second surgery, and it was -- I learned that the tape was

10   not tape, it's actually mesh, and that any foreign body in my

11   body is probably not a good idea.

12   Q.   You knew, though, that, as you have referred to, when the

13   tape was placed, it was going to be permanent, right?

14   A.   Yes, ma'am.  And I was going to be good as new.

15   Q.   And you -- you relied on Dr. Bhanot's medical judgment

16   and decided to go forward with that procedure, right?

17   A.   Yes, ma'am.

18   Q.   And, actually, when you had initially presented with your

19   urinary symptoms, Dr. Jagannath is the one that referred you

20   to Dr. Bhanot, right?

21   A.   Yes, ma'am.

22   Q.   And Dr. Bhanot ultimately performed that surgery on you,

23   right?

24   A.   Yes, ma'am.

25   Q.   Did you seek a second opinion before you had that surgery

Wilson - Cross - Weiler

1  performed?

2  A.   No.   I sought a second opinion after my visit with

3  Dr. Bhanot in -- in 20 -- I think it's two thousand and --

4  actually, February of this year, I think, is when I sought a

5  second opinion.

6  Q.   When you went in to have the Obtryx surgery, you

7  understood that it was going to be surgery that went in

8  through your vagina, right?

9  A.   Yes, ma'am.

10 Q.   And you understood that it was going to involve a small

11 incision and then hook out to your legs; is that right?

12 A.   No, ma'am.

13 Q.   So you didn't understand it would -- the doctor would

14 make a small incision and then use a hook, and he would take

15 the thing and hook it into my legs and it would support my

16 bladder?   You didn't understand that?

17 A.   I don't know if I can truly -- but what I understood was

18 that it was going to be a piece of tape, a tape, a strap that

19 was going to go under my urethra and hook to my legs.   Now,

20 how it got there, no, I didn't really research that.   And had

21 I seen your film earlier, I probably would not have done that.

22 Q.   Now, before you had the procedure, Dr. Bhanot -- strike

23 that.

24       Before you had the Obtryx, you knew about that there

25 would be regular surgical complications associated with the

1  procedure, didn't you?

2  A.   Regular surgical complications possible, yes.

3  Q.   And you also knew about risks of anesthesia before you

4  went into it, right?

5  A.   Yes, ma'am.

6  Q.   And that includes the risk of not waking up, right?

7  A.   Yes, ma'am.  I also asked every anesthesiologist that I

8  talked to to please not put me under very far, that I didn't

9  do drugs and I didn't want to not wake up.

10  Q.   And you also knew that there was a risk of being

11  uncomfortable or sore with your legs after surgery, right?

12  A.   Yes.  That was truly understated.

13  Q.   And you also knew that there was a potential for some

14  bleeding after surgery, too, right?

15  A.   Yes, ma'am.

16       MS. WEILER:  Could we put up Exhibit 91, Page 17,

17  please.  You can blow up the whole thing, Jen.

18       (The document was published to the jury.)

19  BY MS. WEILER:

20  Q.   Your surgery was May 20th, 2010; is that correct?

21  A.   Yes, ma'am.

22  Q.   And this is dated April 27, 2010.  This is a medical

23  record from Dr. Bhanot.

24       MS. WEILER:  Actually, Jen, can you open up the

25  blown-up portion just a little bit more, please.

Wilson - Cross - Weiler

1   BY MS. WEILER:

2   Q.   S.C. Bhanot, M.D.  Did I read that correctly at the

3   bottom, do you see that?

4   A.   Yes, ma'am.

5   Q.   And that's Dr. Bhanot that implanted the Obtryx; is that

6   right?

7   A.   Yes, ma'am.

8   Q.   And this says, "The patient had cysto CMG done as an

9   outpatient at Saint Francis Hospital, based on what she's

10  recommended to have a transobturator tape."  Did I read that

11  correctly?

12  A.   Yes, ma'am.

13  Q.   And that's the tape that you were referring to, right?

14  A.   Yes, ma'am.

15  Q.   And then it says, "The procedure, its complications and

16  the treatment of complications, success rates, rates of

17  retention, treatment with need for intermittent

18  self-catheterization was discussed with the patient in

19  detail."  Did I read that correctly?

20  A.   You did read that correctly.

21  Q.   Were you aware of the rates of retention before having

22  the Obtryx, Ms. Wilson?

23  A.   No.

24  Q.   So it's your testimony that this record is incorrect?

25  A.   Yes, ma'am.

Wilson - Cross - Weiler

1   Q.   So you don't recall talking with Dr. Bhanot about these

2   things, correct?

3   A.   Not all these things, no, ma'am.

4   Q.   So while you don't recall him going into the detail of

5   each of these additional items, am I correct that you can't

6   say that he didn't say it, can you?

7   A.   He did not discuss all these things in detail with me.  I

8   feel that I would remember, and but, you know, anything is a

9   possibility.  So that is just my answer.

10  Q.   You just don't recall?

11  A.   Well, I don't recall that -- it's not like Memorex, and I

12  can't push a button, so I don't recall specifically everything

13  that he said to me at that time.

14  Q.   You also signed a consent form prior to undergoing the

15  surgery, right?

16  A.   You have to sign a consent form -- form to have surgery,

17  yes.

18  Q.   So after you talked with Dr. Bhanot on April 27th, 2010,

19  you later signed a consent form for the surgery that you're

20  talking about, right?

21  A.   Yes, ma'am.

22        MS. WEILER:  And let's pull that up.  That's Exhibit

23  101, Page 52, if you blow up just at the bottom.

24        (The document was published to the jury.)

25  BY MS. WEILER:

—— Wilson - Cross - Weiler ——

1  Q.  Ms. Wilson, is this your signature down here at the

2  bottom?

3  A.  It would appear to be, yes, ma'am.

4      MS. WEILER:  And up at the top, if you could

5  rehighlight, Jen.

6  BY MS. WEILER:

7  Q.  It says, "Transobturator tape."  Do you see that as well?

8  A.  Yes, ma'am.

9  Q.  You understood that that was the procedure that

10  Dr. Bhanot talked to you about?

11  A.  I understood he was -- yeah, I understood that was the

12  tape.  I could not pronounce the word, so, yes.

13      MS. WEILER:  Down below, can you highlight down by

14  the signature again, Jen, please?

15  BY MS. WEILER:

16  Q.  It says here, "If your request for additional information

17  has not been met, do not sign this form."

18      Did you ask Dr. Bhanot for -- regarding any questions

19  about this procedure?

20  A.  No.  At the time I believe they had already given me my

21  preop medication, and I'm surprised I got my name on the line.

22  Q.  You trusted Dr. Bhanot's medical opinion that the

23  procedure was appropriate for you?

24  A.  Yes, ma'am.

25  Q.  And you relied on him to choose what he believed to be

Wilson - Cross - Weiler

1   the most suitable option for you?

2   A.   Yes, ma'am.

3   Q.   Now, you were implanted with the Obtryx on May 20th,

4   2010, correct?

5   A.   Yes, ma'am.

6   Q.   And you followed up with Dr. Bhanot five days after that

7   surgery; is that right?

8   A.   Yes, ma'am.

9   Q.   And Dr. Bhanot noted that you had excellent results; is

10   that right?

11   A.   I'm sure he noted I had excellent results when I was able

12   to urinate.

13   Q.   You didn't have incontinence after the --

14   postoperatively, did you?

15   A.   No, ma'am.

16   Q.   And now you also saw Dr. Jagannath, he is your

17   primary-care physician, right?

18   A.   Yes, ma'am.

19   Q.   You saw him in August, about three months after the

20   surgery, right?

21   A.   Do you have the record?  I'm sure I did.

22   Q.   Sure.

23        MS. WEILER:  Could we pull up Exhibit 95, please,

24   Page 24.

25        (The document was published to the jury.)

Wilson - Cross - Weiler

 1  BY MS. WEILER:

 2  Q.   This is August 17th, 2010.  Do you see that?

 3  A.   Yes, ma'am.

 4  Q.   And then down below, it says, in handwriting, "Has been

 5  doing good."  Did I read that correctly?

 6  A.   Yes, ma'am.

 7  Q.   Now, about a year after the Obtryx surgery in March,

 8  2011, you went to the Emergency Room; is that right?

 9  A.   I'm sorry?  I didn't hear.  I was still reading that.

10  Sorry.

11  Q.   Sure.

12       About a year after you had the Obtryx, in about March,

13  2011, you went to the Emergency Room; is that right?

14  A.   Yes, ma'am.

15  Q.   And you did so for right flank pain; is that right?

16  A.   I believe it was left.

17          MS. WEILER:  Can you put up Exhibit 95 -- 98, please.

18          (The document was published to the jury.)

19  BY MS. WEILER:

20  Q.   And we are looking at Page 70 -- well, this will work as

21  well.  Right here, look down here under "Reason for visit:

22  Pain, right flank, 24 hours, blood in urine."  Did I read that

23  correctly?

24  A.   Yes, you read it correctly.

25  Q.   If you could go to Page 70 within that exhibit, as well.

Wilson - Cross - Weiler

1   And down here, under "clinical impression."

2         Blow that part up there, please.

3         It says, "Right flank pain, enlarged uterus."  Did I

4   read that correctly?

5   A.   Yes, ma'am.

6   Q.   And that was the clinical impression of the doctor that

7   you saw there, correct?

8   A.   I would assume so, yes.

9   Q.   And after the Emergency Room visit, you followed up with

10  Dr. Jagannath, right?

11  A.   I would assume I saw him before I saw the gynecologist

12  because, like I said, I have to be referred.

13        MS. WEILER:  Can you pull up Exhibit 95, please, 18.

14        (The document was published to the jury.)

15  BY MS. WEILER:

16  Q.   Now, when you saw Dr. Jagannath just later that month, he

17  indicated fibroid uterus and ovarian cyst, correct?

18  A.   Yes, ma'am.  I believe I said that's what they told me

19  after they did an ultrasound.

20  Q.   You're aware that both those conditions cause pain,

21  correct?

22  A.   Yes, ma'am, I am.

23  Q.   Also on that date, do you see just below here,

24  Dr. Jagannath prescribed you with estrogen, correct?

25  A.   Yes, ma'am.

Wilson - Cross - Weiler

1  Q.  Did you ever take that estrogen?

2  A.  No, I did not.  I took the -- I took the SoyCares, which

3  is a homeopathic estrogen instead.

4  Q.  But you didn't take the prescription that he had

5  prescribed you?

6  A.  No, I did not.

7  Q.  And then after that, you went back to see Dr. Bhanot,

8  right?

9  A.  What date is that?

10  Q.  It's not that record, but I'm asking you, did you go back

11  to see Dr. Bhanot after that?

12  A.  Yes, ma'am.

13  Q.  And that was in approximately May of 2013?

14  A.  I would assume so, yes.

15  Q.  And that's -- that was the first time that you'd been

16  back to see him since your surgery, right?

17  A.  Well, since my last follow-up from surgery, yes.

18  Q.  And that was about two years after seeing Dr. Jagannath

19  back in March, 2011; the next time you saw Dr. Bhanot is in

20  May of 2013.  Is that right?

21  A.  Correct.

22  Q.  And Dr. Jagannath had sent you back to see Dr. Bhanot; is

23  that right?

24  A.  Yes, ma'am.

25          MS. WEILER:  And if you could pull up Exhibit --

Wilson - Cross - Weiler

```
 1            THE COURT:  Counsel, while you're doing that, let me
 2   give the jury a recess.  They've been in the box two hours.
 3            Ladies and gentlemen, while you're out, do not
 4   discuss this case among yourselves or permit anyone to discuss
 5   it with you or in your presence.  We'll stand in recess until
 6   25 minutes after the hour.
 7            (The Jury left the courtroom at 4:04 p.m.)
 8            (A recess was taken from 4:04 p.m. to 4:25 p.m.)
 9            THE COURT:  Ms. Weiler.
10            MS. WEILER:  Thank you, Your Honor.
11   BY MS. WEILER:
12   Q.  The next time you went back to see Dr. Bhanot was
13   in May of 2013; right?
14   A.  Yes, ma'am.
15   Q.  And if you could highlight, zoom in just below that,
16   please, underneath the next highlighted section.  And when you
17   went to see him, you went for consultation of suprapubic pain
18   and urinary hesitancy and frequency.  Do you see that?
19   A.  Yes.
20   Q.  And just down below it says, "She has had no problems
21   post-operatively for three years."  Did I read that correctly?
22   A.  You read it correctly, but it's incorrect.
23   Q.  "And she has come back to the office only one time in the
24   immediate post-op."  Did I read that correctly?
25   A.  That's correct.
```

Wilson - Cross - Weiler

1   Q.   "And now she complains of abdominal pain to the back and

2   the middle of the spine."  Did I read that correctly?

3   A.   Yes, ma'am.

4   Q.   Now, this is before you had another surgical procedure;

5   is that right?

6   A.   That was my referral back, yes.

7   Q.   And then you subsequently went and had a surgery on

8   August 28, 2013?

9   A.   Yes, ma'am.

10  Q.   And before that visit -- let's pull up Exhibit 96,

11  please.  Your procedure was on the 28th and this -- the date

12  of this record, history and physical, August 27th, 2013.  Do

13  you see that?

14  A.   Yes, ma'am.

15  Q.   And if you go back up to the top paragraph, please.

16  Again, it says, "She has done well for three years but for the

17  last few months."  Did I read that correctly?

18  A.   You read that correctly.

19  Q.   "Patient has been having difficulty emptying the

20  bladder."  Is that right?

21  A.   Yes.

22  Q.   And then go down a little bit further if you could in the

23  physical examination section here.  And under "pelvic," "The

24  patient has tenderness on the left side, no cystocele, no

25  rectocele, no stress incontinence."  Do you see that?

1    A.   Yes, ma'am.

2    Q.   I read that correctly; right?

3    A.   Yes.

4    Q.   Now, just down below under "plan and recommendations" --

5    can you expand that just a little bit more, please, Jen?

6    Thank you.  "The patient based on post-void residual as well

7    as symptoms.  She is advised to have urethrolysis with the

8    understanding that she may not have control of her urine after

9    the surgery."  Did I read that correctly?

10   A.   You did read that correctly.

11   Q.   And you understood the procedure that you were going to

12   undergo might result in you having incontinence again; right?

13   A.   No.

14   Q.   You didn't understand that?

15   A.   That's what he wrote.  That's not what he said.

16   Q.   After you had the procedure in August of 2013, you went

17   back to see Dr. Bhanot again; is that right?

18   A.   Yes, ma'am.

19   Q.   And that was, I believe, in September of 2013?

20   A.   Yes, ma'am.

21   Q.   Could you pull up that record as well, please.  That's

22   Exhibit 91.  And this is your first visit with him after that

23   procedure, right, as far as you understand?  "Reason for

24   appointment, follow-up from surgery."  Do you see that?

25   A.   Yes, ma'am.

Wilson - Cross - Weiler

1   Q.   And just below that it says under "General," "Symptoms

2   have improved.  She no longer has suprapubic pain, feels that

3   she empties her bladder much better."  Did I read that

4   correctly?

5   A.   You read that correctly.

6   Q.   Now, it's my understanding --

7   A.   But does it matter that it's not a correct statement?

8   Q.   Did I read the record correctly, ma'am?

9   A.   Yes.  That's what I was asking you.  Was it about just

10  what I read or was it correct?

11  Q.   You answered my question sufficiently.  Thank you.

12  A.   Okay.

13  Q.   You then went -- after that appointment at some point in

14  2014 you went back to see Dr. Jagannath; is that right?

15  A.   Yes.

16  Q.   And would you pull up Exhibit 27 -- sorry, Exhibit 95.

17  Again, Dr. Jagannath is your primary care physician; right?

18  A.   Yes.

19  Q.   So, this is -- you're back to see him on February 4th

20  2014; correct?

21  A.   Yes, the day after I was in the ER.  That's why.

22  Q.   And under the first section there, "HOPI."  The last

23  sentence there, "She used to have urgency of urine and

24  incontinence which has resolved now."  Did I read that

25  correctly?

Wilson - Cross - Weiler

1  A.   Yeah.  That's right under "pain in lower back."

2  Q.   And you then also went to see Dr. Bhanot in February of

3  2014?

4  A.   Yes, ma'am.  That was the last time I saw Dr. Bhanot.

5  Q.   Can you pull up Exhibit 91, please.  And the reason for

6  appointment here on February 18th, 2014, was three months.

7  Did you understand that you went to see him for another

8  follow-up visit after your procedure from August?

9  A.   Yes, ma'am.

10  Q.   And in the "General" section here it says, "Patient

11  symptoms have completely improved regarding urination."  Did I

12  read that correctly?

13  A.   Yes, ma'am.

14  Q.   And just below under "Physical Examination," if you could

15  highlight that, please.  It says, "Pelvic examination, no

16  cystocele, no rectocele, no stress incontinence, tape is not

17  felt.  There is no tenderness of the urethra."  Did I read

18  that correctly?

19  A.   Yes, ma'am.

20  Q.   Is this the visit where you went to see Dr. Bhanot and

21  you said he did a very short examination of you pelvically?

22  A.   Yes, ma'am.

23  Q.   And am I correct that you weren't, you weren't happy with

24  that exam; right?

25  A.   I was very unhappy with my visit with Dr. Bhanot that

Wilson - Cross - Weiler

1   day.

2   Q.   Did you feel he gave you inadequate treatment?

3   A.   I felt that he wanted me to leave his office.

4   Q.   But on that date, his note of, "Patient symptoms have

5   completely improved regarding urination," that's actually

6   consistent with your recollection in February of 2014 --

7   A.   That is correct.

8   Q.   -- with regard to your urinary symptoms; is that right?

9   A.   Yes.  I'm sorry.  Yes.

10  Q.   And as you mentioned, that was the last time you saw him;

11  correct?

12  A.   Correct.

13  Q.   One of the things you mentioned earlier was the polar

14  plunge.

15  A.   Yes, ma'am.

16  Q.   When was the last time you did that?

17  A.   I didn't do it this past year, didn't do it the year

18  before, so I did it the previous year.  I don't know.  I'm

19  trying to think.

20  Q.   So, 2011 perhaps?

21  A.   That could be.

22  Q.   And you said that that's done in February; right?

23  A.   Yes, ma'am.

24  Q.   And any estimate for the temperature of the water around

25  that time?

Wilson - Cross - Weiler

1  A.   It depends.  Actually, we've done it -- I've done it when

2  there's four inches of snow and I've done it when it was

3  70 degrees outside.  So, I don't know what the temperature was

4  that year.

5  Q.   And you've done it preceding years as well?

6  A.   Mark and I did it three years.

7  Q.   And you were diagnosed, or had your surgery for the

8  trigeminal neuralgia in 2004; is that correct?

9  A.   That is correct.

10  Q.   And I believe that you said that your trigeminal

11  neuralgia pain is triggered by changes in temperature just

12  like this past Saturday; is that right?

13  A.   That is correct.

14  Q.   Now, it's my understanding that one of your claims is

15  that you have pelvic or abdominal pain; is that right?

16  A.   Yes, ma'am.

17  Q.   And it's also my understanding that you claim to

18  experience pain during intercourse as well; is that right?

19  A.   I don't think that's one of my claims.

20  Q.   Did you fill out a plaintiff fact sheet in this action?

21  A.   I'm sure I did.

22       MR. MONSOUR:  Your Honor, I'm going to object.  This

23  is cumulative.  We already went over this.

24       THE COURT:  Response, counsel.

25       MS. WEILER:  Actually, we haven't at all.  It has to

Wilson - Cross - Weiler

```
 1   do with the nature of her pain and also continuation of

 2   urinary symptoms, Your Honor.  They're tied together.

 3             THE COURT:  All right.  Anything further, Mr.

 4   Monsour?

 5             MR. MONSOUR:  No, Your Honor.

 6             THE COURT:  I'll overrule the objection.  Go ahead.

 7             MS. WEILER:  Thank you.

 8   BY MS. WEILER:

 9   Q.  And in providing your fact sheet to us, you

10   described your claims to us; is that right?

11   A.  I'm sure I did.

12   Q.  And in connection with that, you described your bodily

13   injuries that you claim resulted from the implantation of a

14   pelvic mesh product.  Do you recall that?

15   A.  I'm sure I did.

16   Q.  And it includes, "My suffering included chronic pelvic

17   and vaginal area pain as well as severe urinary urgency and

18   leakage, bowel problems, inflammation, vaginal bleeding,

19   neuromuscular issues, mesh extrusion, pain during

20   intercourse."  Do you have any reason to dispute that?

21   A.  I don't have any reason to dispute that at the time.

22   Q.  Now, do you still experience pain -- excuse me.  Do you

23   still experience urination during orgasm, ma'am?

24   A.  I wouldn't know right now.

25   Q.  And that's because you're not engaging --
```

Wilson - Cross - Weiler

1   A.   I'm not engaging in sex at this time, no.

2   Q.   And when was the last time you engaged in sexual intimacy

3   of that sort where you would achieve orgasm?

4   A.   It's probably been over a year.

5   Q.   And at that time, did you have urination also with

6   orgasm?

7   A.   I really don't remember.  It wasn't -- I don't remember.

8   Q.   And am I correct that you were able to engage in sexual

9   intimacy following your Obtryx procedure?

10  A.   I would say that I would be able to do just about

11  anything after that.  I was as good as new.

12  Q.   And that was for about a year at least, is that right,

13  after the March, 2010, Obtryx surgery?

14  A.   I would say that's correct.

15  Q.   And are you stating that you haven't engaged in that as a

16  result of the Obtryx?

17  A.   I'm not stating that the Obtryx causes me pain during sex

18  if that's what you're asking me.

19  Q.   And are your complaints of -- do you have current

20  complaints of urination in sex now?

21  A.   Well, I'm not having sex currently, so I don't have a

22  current complaint of sex.

23         MR. MONSOUR:  Your Honor, objection.  I now believe

24  we are cumulative.

25         THE COURT:  Well, it is cumulative.  And, again,

Wilson - Redirect  - Monsour

1  given the responses that you received previously, I'm going to

2  sustain the objection.  Go ahead, please.

3          MS. WEILER:  Thank you, Your Honor.  I'm finished

4  with the witness.

5          THE COURT:  Redirect of this witness?

6  (REDIRECT EXAMINATION OF CHRIS WILSON BY

7  MR. MONSOUR:)

8  Q.  I just have one, one question.  And we were looking

9  at the record from Dr. Bhanot from earlier this year and

10  Ms. Weiler highlighted the section that said, "Patient's

11  symptoms have completely improved regarding urination."

12  Do you remember that?

13  A.  Yes.

14  Q.  Okay.  Let me, let me read you the next line if you'll

15  tell me -- it says, "Patient symptoms have completely improved

16  regarding urination."  And that's what Ms. Weiler pointed out

17  to you; correct?

18  A.  Correct.

19  Q.  Read me the next sentence.

20  A.  "However, she still has spasms in the lower abdomen.  And

21  at the time, she has no sensations in her anal/rectal area."

22          MR. MONSOUR:  That's all I have, Your Honor.

23          THE COURT:  You can step down, Ms. Wilson.

24          THE WITNESS:  Thank you.

25          THE COURT:  Mr. Monsour, who's your next witness?

Colloquy

1          MR. MONSOUR:  Can we approach, Your Honor?

2          THE COURT:  Yes, sir.

3          (The following occurred at sidebar.)

4          MR. MONSOUR:  We're trying to figure out how long you

5    want to go today to determine who we might call.

6          THE COURT:  I wanted to know how long your next

7    witness was so I could determine how long I wanted to go.

8          MR. MONSOUR:  We didn't know the answer because we

9    were going to determine that based upon how long you wanted to

10   go.

11         THE COURT:  All right.  Well, --

12         MR. MONSOUR:  Some of the examples that I can give

13   you, Your Honor, are one of the plaintiffs, but then that

14   would have the plaintiff's direct starting and stopping.

15         THE COURT:  And I don't want to do that.  I assume

16   that you might have another -- I wanted to inquire as to

17   whether you had another witness by deposition that you could

18   designate that would give us some time.  I don't know what

19   your witnesses are.

20         MR. MONSOUR:  I think we have a couple of videos.

21   Let me check with --

22         THE COURT:  I do not want to split up a witness's

23   testimony.

24         MR. MONSOUR:  I didn't think you did, so let me

25   check.  Do we have a couple of short videos?

—— Colloquy ——

1          MR. LOVE:  We do have some videos we could argue.  I

2    think the only videos we have that can be played we need to

3    address the Court on some legal issues, and I'd be happy to do

4    that.

5          THE COURT:  I'm just going to recess for the day.

6          What, Mr. Adams?

7          MR. ADAMS:  I'm concerned that given that we have ten

8    and a half trial days, with the jury here I'd prefer that -- I

9    mean, and I'll defer to the Court, but I don't see a problem

10   starting with the plaintiffs and going --

11         THE COURT:  I'm sure you don't see a problem with

12   that.

13         MR. LOVE:  We're well within our time.

14         THE COURT:  I'm sorry?

15         MR. LOVE:  You're welcome to charge us for the time.

16   I don't think we're going to have a problem finishing up.

17         (Sidebar concluded.)

18         THE COURT:  We're going to recess for the day,

19   gentlemen and ladies.

20         MR. LOVE:  Thank you, Your Honor.

21         THE COURT:  Ms. Weiler, you and I have some exhibit

22   business to attend to.

23         MS. WEILER:  We do, Your Honor.  Would you like to do

24   that now?

25         THE COURT:  In a moment.

─ Colloquy ─

1        Ladies and gentlemen of the jury, I'm going to recess

2   you for the day.  While you're out, do not discuss this case

3   among yourselves or permit anyone to discuss it with you or in

4   your presence.  And you're going to have a long recess.

5        Remember, we're not in court tomorrow and Friday.  I

6   hate that you all look so unhappy about that.

7        But make sure that you do not listen to, view, or

8   read any media coverage that there might be on this trial.

9   And keep my order that you not discuss the case with anyone.

10        Have a good, restful recess, and I will see you all

11   back here Monday morning at 9:00 a.m.  Thank you all.

12        (Jury retired from the courtroom at 4:45 p.m.)

13        THE COURT:  Ms. Weiler, before we begin with the

14   documents that I believe you want to move in, I want to

15   address on the record some exhibits that I believe you will

16   want to withdraw.

17        I want the record to be clear that there was an

18   Exhibit Number 10 in the joint exhibits, some medical records

19   that had to do, I believe, with Ms. Blankenship.  And I think

20   you have advised the clerk that Number 10 had to do with the

21   claimed medical bills that's not being made.  And I want to

22   know whether you want to withdraw that exhibit on the record.

23        MS. WEILER:  Yes, Your Honor, based on your prior

24   ruling.

25        THE COURT:  Joint Exhibit Number 62 is a medical

─── Colloquy ───

1    record relating to Ms. Tyree.

2           MS. WEILER:  It's likewise another set of billing

3    records, Your Honor.  So, based on your ruling, those should

4    also be removed from the record.

5           THE COURT:  Those are medical records, plaintiffs,

6    that you're not pursuing those medical bills.  Is that

7    correct?

8           MS. WAGSTAFF:  That's correct, Your Honor.

9           MR. LOVE:  That is correct, Your Honor.

10          THE COURT:  All right.  Then I am going to grant the

11   motion to withdraw previously admitted Exhibit 10 having to do

12   with the Blankenship medical bills and Joint Exhibit 62, the

13   medical records also relating to Ms. Tyree.

14          MS. WAGSTAFF:  Thank you, Your Honor.

15          THE COURT:  All right.  You have some that you want

16   to move.

17          MS. WEILER:  Yes.  We'd like to move joint exhibit

18   medical records as regards to Ms. Campbell.

19          Exhibit Number 31 are the medical records of Ms.

20   Campbell from Dr. Subhash Bhanot.

21          Exhibit Number 32 are the medical records from CAMC

22   Women and Children's Hospital regarding Ms. Campbell.

23          Exhibit 33 are the records from Kishore Challa

24   regarding Ms. Campbell.

25          Exhibit 34 are the --

─ Colloquy ─

1          THE COURT:  Counsel, I want to be able to hear Ms.

2    Weiler, if you all could take your conversations elsewhere.

3          I'm sorry.  The last one you said, Number 33, was --

4          MS. WEILER:  33 is Kishore Challa.  And I have a list

5    that I can provide to the court reporter of the names.

6          THE COURT:  All right.

7          MS. WEILER:  Number 34 is Charleston Neurology

8    medical records pertinent to Ms. Campbell.

9          Exhibit 35 are the records from Julie DeTemple

10   regarding Ms. Campbell.

11         Exhibit 36, Bernard Greisman records regarding Ms.

12   Campbell.

13         Exhibit 37, records from Bassam Hafar regarding Ms.

14   Campbell.

15         Exhibit 38, records from Samuel Heywood regarding Ms.

16   Campbell.

17         Exhibit 39, records from Jackson & Wood Plastic

18   Surgery regarding Ms. Campbell.

19         Exhibit 40, records from Narender Jogenpally

20   regarding Ms. Campbell.

21         Exhibit 41, records from Vellore Kasturi regarding

22   Ms. Campbell.

23         Exhibit 42, medical records from Paul Kyer regarding

24   Ms. Campbell.

25         Exhibit 43, medical records from Dr. Joshua Lohri

─ Colloquy ─

 1    regarding Ms. Campbell.

 2            Exhibit 44, medical records from Cyrus Mali regarding

 3    Ms. Campbell.

 4            Exhibit 45, records from Dr. Luke Martin regarding

 5    Ms. Campbell.

 6            Exhibit 46, records from Kris Murthy regarding

 7    Ms. Campbell.

 8            Exhibit 47, records from Sawador Portugal regarding

 9    Ms. Campbell.

10            Exhibit 48, records from St. Francis Hospital

11    regarding Ms. Campbell.

12            Exhibit 49, records from Samar Sankari regarding

13    Ms. Campbell.

14            Exhibit 50, records from Asish Sheth regarding Ms.

15    Campbell.

16            Exhibit 51, records from David Soulsby regarding Ms.

17    Campbell.

18            Exhibit 52, records from Thomas Memorial Hospital

19    regarding Ms. Campbell.

20            And, finally, Exhibit 53, pharmacy records from

21    Wal-Mart Pharmacy regarding Ms. Campbell.

22            THE COURT:  Was there a 46 in that list?

23            MS. WEILER:  There was, Kris Murthy.

24            THE COURT:  All right.

25            Mr. Monsour, anything you want to place on the record

─ Colloquy ─

1    in that regard?

2           MR. MONSOUR:  Provided these are being offered

3    pursuant to the Court's motions *in limine* rulings and per

4    agreement with my co-counsel, we do not have an objection at

5    this time.

6           THE COURT:  All right.  I will order that Joint

7    Exhibits 31 through and including 52 will be admitted.

8           MS. WEILER:  53.

9           THE COURT:  53 will be admitted into evidence.

10          (JOINT EXHIBITS 31 THROUGH 53 WERE RECEIVED IN

11   EVIDENCE.)

12          MS. WEILER:  Thank you, Your Honor.

13          MR. LOVE:  Thank you, Your Honor.

14          THE COURT:  You all have a good, restful weekend.

15          (Trial recessed at 4:51 p.m.)

16

17

18

19

20

21

22

23

24

25

*United States District Court*
*Southern District of West Virginia*

1                          **REPORTERS' CERTIFICATE**

2

3        **Carol Farrell, CRR, RMR, CCP, RPR, RSA,** Official Court

4    Reporter of the United States District Court for the Southern

5    District of West Virginia, and **Lisa A. Cook, RPR, RMR, CRR,**

6    **FCRR,** do hereby certify that the foregoing is a true and

7    accurate transcript, to the best of our ability, of the

8    proceedings as taken stenographically by and before us at the

9    time, place, and on the date hereinbefore set forth.

10

11

12   **/S/ Carol Farrell, CRR, RMR, CCP, RPR**        **11/05/14**

13   _____        _____
                **Court Reporter**                      **Date**

14

15   **/S/ Lisa A. Cook, RPR, RMR, CRR, FCRR**        **11/05/14**

16   _____        _____
                **Court Reporter**                      **Date**

17

18

19

20

21

22

23

24

25

**'**

**'10** [1] - 716:13
**'11** [6] - 776:18, 776:20, 783:14, 783:20, 784:2, 784:11
**'12** [1] - 789:15
**'80s** [1] - 622:18
**'90s** [6] - 623:9, 709:6, 710:4, 742:2, 801:25, 828:1
**'Denies** [1] - 785:9
**'Voiding** [1] - 779:7

**/**

**/S** [2] - 859:12, 859:15

**0**

**05** [2] - 606:13, 609:3

**1**

**1** [6] - 701:14, 742:5, 766:17, 824:2, 824:12, 826:10
**1.1** [1] - 673:3
**10** [17] - 617:9, 618:4, 618:5, 618:6, 618:7, 636:13, 636:14, 713:19, 728:21, 737:20, 768:2, 802:12, 808:24, 809:1, 854:18, 854:20, 855:11
**10-18-13** [1] - 792:4
**100-yard** [1] - 673:16
**1004** [3] - 616:18, 629:21, 680:20
**101** [1] - 836:23
**1043** [4] - 631:7, 632:23, 633:8, 633:17
**1053** [1] - 705:4
**1059** [3] - 701:17, 701:22, 701:23
**1076** [4] - 630:15, 630:16, 631:5, 632:5
**1078** [1] - 630:13
**10993** [6] - 701:18, 702:11, 703:2, 703:8, 703:11, 703:15
**10993-1** [1] - 701:13
**10:11** [2] - 659:16, 659:17
**10:30** [3] - 659:13, 659:17, 659:19

**11** [3] - 626:23, 773:8, 773:15
**11/05/14** [2] - 859:12, 859:15
**1110** [5] - 626:15, 626:24, 626:25, 627:2, 627:3
**1131** [4] - 678:8, 678:13, 678:15, 678:17
**11th** [1] - 607:7
**12** [5] - 729:2, 737:20, 780:25, 808:24, 809:1
**126** [3] - 776:5, 776:8, 776:10
**127** [1] - 778:25
**128** [2] - 778:24, 779:3
**129** [1] - 783:17
**12:24** [2] - 751:8, 751:11
**12:30** [1] - 751:2
**12th** [2] - 796:6, 796:13
**13** [4] - 646:21, 714:10, 783:8, 783:11
**131** [1] - 785:7
**14** [3] - 650:13, 785:8, 791:21
**147** [2] - 824:9, 824:16
**148** [1] - 825:22
**14th** [1] - 781:3
**15** [8] - 644:11, 726:13, 743:16, 745:13, 777:15, 779:1, 802:12, 828:14
**1503** [5] - 704:14, 704:16, 705:1, 705:6, 711:24
**152** [1] - 777:23
**15th** [1] - 744:12
**16** [2] - 637:12, 637:23
**1600** [1] - 607:4
**166** [3] - 668:2, 668:7, 668:19
**166/15** [1] - 669:21
**166/24** [1] - 667:23
**17** [1] - 834:16
**17th** [1] - 839:2
**18** [8] - 773:11, 773:16, 776:2, 776:13, 788:23, 788:25, 789:8, 840:13
**18th** [4] - 773:8, 774:25, 846:6
**192** [3] - 614:14, 637:10, 637:23

**193** [1] - 614:14
**1960s** [1] - 657:2
**1988** [1] - 611:21
**1990** [1] - 685:5
**1990s** [2] - 685:10, 827:6
**1997** [3] - 636:5, 636:10, 636:16
**1999** [3] - 607:9, 660:22, 711:8
**19th** [2] - 826:7, 826:15
**1:59** [2] - 751:11, 751:12
**1st** [1] - 746:2

**2**

**2** [6] - 627:16, 627:25, 628:3, 628:4, 768:21, 792:25
**20** [9] - 732:10, 742:3, 776:3, 776:16, 788:13, 802:11, 806:15, 828:14, 833:3
**2000** [2] - 636:2, 661:14
**2000s** [1] - 623:9
**2001** [9] - 611:21, 611:23, 742:4, 742:13, 743:6, 743:17, 744:20, 745:13, 745:21
**2002** [3] - 802:4, 802:17, 803:3
**2004** [14] - 616:21, 680:19, 681:3, 681:7, 682:1, 685:2, 686:11, 687:10, 803:15, 804:13, 804:17, 804:23, 829:1, 848:8
**2006** [3] - 745:24, 746:2, 746:15
**2009** [11] - 693:15, 694:18, 695:1, 695:12, 716:13, 716:17, 717:4, 718:21, 747:2, 820:12, 820:14
**2010** [43] - 693:15, 694:18, 716:17, 717:4, 718:21, 718:25, 728:20, 728:21, 730:22, 732:17, 733:1, 733:15, 733:18, 733:23, 733:24, 734:6, 746:16,

746:21, 747:2, 748:11, 751:23, 755:6, 755:9, 756:8, 757:15, 764:21, 766:17, 769:4, 769:9, 769:23, 770:8, 773:1, 784:23, 805:21, 820:6, 820:13, 820:14, 834:20, 834:22, 836:18, 838:4, 839:2, 850:13
**2011** [23] - 693:15, 773:11, 773:16, 774:25, 776:3, 776:13, 777:16, 779:1, 781:1, 781:2, 781:3, 783:11, 785:5, 786:9, 786:20, 795:19, 796:1, 797:2, 797:17, 839:8, 839:13, 841:19, 847:20
**2012** [10] - 785:22, 786:5, 786:8, 786:19, 786:21, 787:17, 788:14, 788:20, 789:12, 789:22, 790:10, 790:20, 790:24, 791:11, 808:18
**2013** [24] - 634:12, 634:13, 634:15, 726:11, 729:17, 737:23, 773:1, 790:17, 790:20, 791:12, 791:16, 791:17, 791:24, 792:22, 796:6, 796:13, 841:13, 841:20, 842:13, 843:8, 843:12, 844:16, 844:19
**2014** [11] - 606:13, 609:3, 729:19, 800:14, 826:8, 826:15, 845:14, 845:20, 846:3, 846:6, 847:6
**20s** [1] - 802:13
**20th** [2] - 834:20, 838:3
**21** [1] - 791:24
**22** [2] - 711:8, 785:22
**22nd** [1] - 768:7
**23-year-old** [1] - 801:5
**24** [8] - 668:2, 715:11, 715:18, 736:18, 738:17, 738:25,

838:24, 839:22
**24-year-old** [2] - 799:15, 800:8
**24/7** [1] - 818:3
**25** [2] - 675:4, 842:6
**25338-3843** [1] - 607:16
**2555** [1] - 607:19
**25701** [1] - 607:7
**26** [3] - 784:14, 784:20, 785:5
**261** [1] - 644:11
**27** [3] - 784:23, 834:22, 845:16
**27th** [4] - 719:3, 770:8, 836:18, 843:12
**28** [2] - 714:21, 843:8
**287** [1] - 646:20
**28th** [2] - 681:3, 843:11
**29** [3] - 764:21, 786:5, 786:8
**2:00** [2] - 751:3, 751:10
**2:12-cv-08633** [1] - 606:7

**3**

**3** [1] - 769:21
**30** [2] - 660:20, 714:14
**30(b)(6** [1] - 626:16
**304)347-3188** [1] - 606:19
**304)347-3198** [1] - 606:21
**308** [1] - 627:7
**31** [3] - 855:19, 858:7, 858:10
**32** [1] - 855:21
**33** [3] - 855:23, 856:3, 856:4
**34** [3] - 714:20, 855:25, 856:7
**35** [1] - 856:9
**350** [1] - 611:3
**36** [1] - 856:11
**37** [1] - 856:13
**38** [1] - 856:15
**3843** [1] - 607:16
**39** [1] - 856:17
**3:00** [1] - 798:19
**3A** [1] - 769:5
**3rd** [1] - 751:23

**4**

**4** [3] - 636:3, 789:7, 789:8
**40** [1] - 856:19

**404** [1] - 607:12
**41** [1] - 856:21
**4150** [1] - 607:9
**419** [1] - 607:7
**42** [1] - 856:23
**43** [1] - 856:25
**44** [1] - 857:2
**440** [1] - 607:4
**45** [2] - 742:20, 857:4
**45-year-old** [1] - 742:23
**46** [2] - 857:6, 857:22
**47** [2] - 798:25, 857:8
**48** [1] - 857:10
**49** [1] - 857:12
**4.04** [2] - 842:7, 842:8
**4:25** [1] - 842:8
**4:45** [1] - 854:12
**4:51** [1] - 858:15
**4th** [1] - 845:19

**5**

**5** [1] - 769:5
**50** [1] - 857:14
**50-yard** [2] - 673:15, 673:17
**51** [1] - 857:16
**52** [3] - 836:23, 857:18, 858:7
**522** [1] - 688:12
**53** [4] - 857:20, 858:8, 858:9, 858:10
**55-year-old** [1] - 781:9
**55-year-old** [1] - 765:9

**6**

**6** [1] - 779:3
**60** [1] - 756:18
**609** [1] - 608:8
**62** [2] - 854:25, 855:12
**633** [1] - 608:8
**64** [5] - 746:17, 751:21, 752:20, 756:18, 766:13
**64108** [1] - 607:20
**654** [1] - 608:8
**66** [1] - 742:6
**660** [1] - 608:9
**665** [2] - 668:5, 668:8
**696** [1] - 608:9

**7**

**7** [2] - 636:3, 751:20
**70** [3] - 839:20, 839:25, 848:3
**708** [1] - 608:9
**712** [1] - 608:10

**73** [1] - 650:2
**736** [1] - 608:10
**74** [2] - 650:2, 650:13
**75** [3] - 674:12, 675:2
**75601** [1] - 607:12
**759** [2] - 710:15, 710:21
**77002** [1] - 607:5
**793** [1] - 608:10
**798** [1] - 608:11

**8**

**8** [5] - 655:12, 756:8, 757:15, 757:22, 768:8
**80** [1] - 715:14
**80202** [1] - 607:10
**803(4** [1] - 728:2
**819** [1] - 608:11
**851** [1] - 608:11
**853** [1] - 608:3

**9**

**9** [5] - 742:13, 743:11, 764:13, 783:18, 783:20
**91** [3] - 834:16, 844:22, 846:5
**95** [4] - 838:23, 839:17, 840:13, 845:16
**96** [1] - 843:10
**98** [1] - 839:17
**9:00** [3] - 609:4, 609:5, 854:11

**A**

**a.m** [7] - 609:4, 609:5, 659:16, 659:17, 659:19, 854:11
**Abbott's** [1] - 780:1
**abdomen** [6] - 686:1, 742:25, 809:3, 810:21, 815:1, 851:20
**abdominal** [6] - 746:24, 752:9, 763:6, 773:22, 843:1, 848:15
**ability** [4] - 689:5, 828:23, 828:25, 859:7
**able** [30] - 624:18, 651:11, 666:18, 689:22, 690:2, 690:7, 690:18, 706:1, 710:2,

715:14, 721:12, 728:16, 731:3, 761:8, 793:20, 800:2, 802:18, 803:1, 805:2, 806:15, 812:20, 811:5, 812:20, 815:2, 818:5, 819:14, 838:11, 850:8, 850:10, 856:1
**abnormal** [1] - 716:1
**abreast** [1] - 698:10
**abscess** [1] - 743:3
**absolutely** [7] - 620:14, 621:23, 636:10, 637:22, 657:24, 686:16, 776:1
**Absolutely** [1] - 707:25
**abusive** [1] - 653:13
**accept** [1] - 735:20
**acceptable** [1] - 620:21
**acceptance** [5] - 672:21, 672:25, 673:5, 673:7, 673:9
**accepted** [1] - 620:12
**access** [2] - 663:21, 663:25
**accompanied** [2] - 625:22, 627:6
**accompany** [1] - 679:6
**accomplishments** [1] - 800:21
**according** [5] - 628:16, 705:22, 705:25, 706:1, 780:5
**account** [2] - 707:19, 736:13
**accurate** [14] - 630:21, 637:20, 687:10, 700:21, 704:21, 772:11, 773:15, 776:21, 779:14, 779:20, 779:21, 780:4, 785:14, 859:7
**accurately** [1] - 822:20
**achieve** [2] - 708:22, 850:3
**acids** [3] - 627:16, 628:7, 628:8
**acknowledge** [1] - 759:15
**act** [2] - 735:8, 735:20
**action** [1] - 848:20
**ACTION** [1] - 606:6
**activities** [1] - 818:7

**activity** [2] - 720:10, 818:11
**acts** [3] - 822:1, 822:8, 823:13
**actual** [5] - 706:2, 742:19, 745:12, 770:7, 808:17
**acute** [1] - 746:5
**acutely** [1] - 746:7
**ad** [2] - 788:10, 789:10
**ADAMS** [1] - 607:17, 853:7
**Adams** [2] - 718:17, 853:6
**add** [2] - 632:14, 739:1
**added** [5] - 629:5, 629:7, 636:22, 663:23, 699:3
**adding** [1] - 630:3
**addition** [1] - 635:9
**additional** [3] - 737:4, 853:3, 854:15
**address** [2] - 737:4, 853:3, 854:15
**addressed** [1] - 749:3
**adds** [1] - 753:8
**adhesions** [8] - 748:22, 748:24, 753:9, 753:15, 755:8, 763:11, 763:14, 763:17
**admissibility** [2] - 632:24, 667:7
**admissible** [1] - 666:16
**admission** [2] - 678:12, 744:14
**admit** [2] - 633:7, 704:25
**admitted** [12] - 616:18, 626:25, 678:10, 678:15, 680:19, 701:22, 705:5, 742:8, 746:17, 855:11, 858:7, 858:9
**ads** [4] - 788:4, 788:13, 788:18, 791:10
**Advantage** [17] - 661:10, 661:17, 663:15, 665:10, 667:16, 671:1, 671:6, 682:5, 682:21, 687:14, 687:15, 697:4, 704:18, 705:11, 709:4, 711:19, 712:3
**adversely** [1] - 659:22
**advice** [2] - 654:23, 717:10

**advised** [4] - 745:1, 819:1, 844:7, 854:20
**affect** [6] - 674:21, 674:23, 675:5, 806:16, 818:4, 831:6
**affected** [4] - 676:24, 738:1, 828:23, 828:25
**affects** [4] - 675:8, 735:11, 802:5, 830:14
**affirmation** [1] - 712:19
**afield** [1] - 657:17
**afoul** [3] - 623:14, 648:15
**afraid** [2] - 655:19, 830:24
**African** [1] - 781:9
**afternoon** [8] - 712:23, 712:24, 751:3, 798:17, 798:18, 798:20, 819:20, 819:21
**afterwards** [3] - 754:10, 773:7, 790:7
**age** [5] - 715:11, 715:13, 738:21, 739:1, 777:17
**agent** [1] - 619:3
**agents** [10] - 618:25, 619:8, 622:3, 626:7, 628:9, 628:14, 632:12, 686:3, 686:8, 761:2
**aggravated** [1] - 722:23
**agitated** [1] - 804:1
**ago** [19] - 638:10, 683:9, 696:10, 699:23, 726:13, 732:9, 732:10, 732:11, 732:13, 735:11, 739:24, 742:3, 748:20, 761:22, 778:25, 784:6, 791:8, 815:3
**Agrawal** [1] - 831:24
**agree** [11] - 643:12, 647:21, 648:2, 650:25, 653:21, 662:18, 662:21, 662:22, 666:20, 669:13
**agreed** [2] - 691:25, 698:2, 731:15, 731:19, 731:23, 795:12, 819:3
**agreement** [1] - 858:4
**ahead** [25] - 617:25,

620:18, 631:16,
640:19, 645:10,
665:17, 665:24,
669:16, 680:4,
683:10, 694:24,
695:8, 695:19,
710:19, 710:21,
711:2, 738:22,
746:15, 774:15,
794:23, 805:17,
810:8, 812:18,
849:6, 851:2
**AIMEE** [1] - 607:8
**Aimee** [1] - 713:1
**akin** [1] - 680:13
**al** [1] - 606:6
**Alabama** [1] - 611:20
**Albans** [2] - 713:15,
713:18
**alcohol** [1] - 803:9
**Alderson** [1] - 799:23
**alkane** [1] - 621:18
**alkanes** [2] - 621:17,
621:19
**allegations** [1] - 643:9
**allergic** [1] - 758:10
**allergy** [1] - 804:25
**allow** [1] - 680:3
**allowed** [6] - 624:9,
624:10, 690:13,
715:12, 799:21,
812:24
**allows** [1] - 744:5
**almost** [1] - 784:20
**altering** [1] - 730:23
**alternative** [2] - 771:7,
829:7
**alternatives** [3] -
760:24, 760:25,
761:3
**American** [2] - 672:11,
781:9
**amount** [3] - 673:17,
719:19, 823:15
**ample** [1] - 759:25
**anal/rectal** [1] -
851:21
**analogous** [1] -
627:23
**analytical** [3] - 683:21,
700:8, 705:18
**analyze** [1] - 683:21
**analyzed** [1] - 663:22
**analyzes** [1] - 698:5
**analyzing** [1] - 701:5
**anatomy** [1] - 831:14
**ANDRUS** [1] - 607:9
**anesthesia** [5] -
726:17, 729:14,
756:7, 763:4, 834:3

**anesthesiologist** [1] -
834:7
**animals** [2] - 799:19,
799:20
**ANSWER** [6] - 638:5,
638:7, 644:18,
647:1, 824:18, 826:2
**answer** [39] - 645:1,
645:3, 645:6, 645:8,
646:4, 657:6, 657:8,
657:13, 657:14,
658:6, 663:4,
666:11, 666:13,
666:17, 666:22,
667:9, 668:24,
667:5, 673:12,
673:13, 673:21,
677:6, 735:12,
737:5, 741:14,
776:22, 779:9,
779:21, 784:4,
784:5, 785:10,
785:12, 785:15,
785:19, 785:20,
816:16, 825:14,
836:9, 852:8
**answered** [13] -
645:25, 670:8,
760:1, 760:5, 760:8,
761:8, 764:8,
764:11, 771:19,
825:1, 825:2, 825:3,
845:11
**answers** [5] - 637:20,
666:16, 666:17,
667:5, 667:9
**antibiotic** [1] - 744:19
**antioxidant** [10] -
629:16, 629:18,
630:3, 630:6, 630:8,
631:23, 632:14,
635:18, 635:21,
635:25
**antioxidants** [7] -
629:5, 629:7,
629:10, 629:12,
629:13, 629:24,
632:1
**antiseizure** [2] -
802:19, 802:21
**anxieties** [2] - 827:13,
827:16
**anxiety** [3] - 827:19,
827:21, 827:25
**apart** [1] - 645:23
**apologies** [4] - 668:9,
668:19, 673:12,
674:4
**apologize** [4] - 643:4,
672:18, 791:2,

813:14
**appear** [13] - 658:10,
679:15, 679:16,
679:21, 680:2,
687:6, 692:6,
692:11, 692:15,
692:19, 692:23,
693:17, 837:3
**appeared** [1] - 670:12
**appendicitis** [1] -
809:6
**appendix** [1] - 809:9
**Application** [4] -
681:15, 681:19,
698:25, 699:2
**application** [20] -
612:24, 613:3,
613:8, 614:5, 616:4,
616:11, 616:22,
616:24, 628:25,
629:22, 629:23,
629:25, 636:11,
636:22, 637:2,
637:24, 651:15,
684:11, 685:18
**applications** [2] -
610:21, 617:1
**appointment** [5] -
805:21, 816:7,
844:24, 845:13,
846:6
**appointments** [2] -
775:1, 781:12
**appreciate** [1] - 696:2
**appreciation** [1] -
732:23
**approach** [16] -
612:18, 630:18,
633:20, 648:11,
660:11, 666:4,
678:18, 688:1,
696:13, 701:7,
704:6, 721:2, 768:4,
768:16, 823:24,
852:1
**appropriate** [8] -
622:21, 640:16,
649:3, 670:14,
697:11, 727:16,
814:7, 837:23
**approval** [2] - 697:25,
698:1
**approve** [1] - 697:24
**April** [19] - 695:1,
711:8, 746:2,
776:24, 779:19,
783:11, 783:14,
783:20, 784:2,
784:11, 785:19,
786:10, 790:17,

791:16, 791:18,
797:2, 797:17,
834:22, 836:18
**area** [25] - 664:14,
676:5, 676:12,
681:24, 682:3,
713:20, 723:11,
724:11, 724:15,
742:25, 744:17,
748:24, 797:11,
808:16, 809:3,
810:21, 814:12,
814:17, 815:4,
815:7, 817:1,
817:18, 849:17,
851:21
**argue** [3] - 613:24,
615:14, 853:1
**argument** [2] - 624:5,
694:22
**argumentative** [7] -
653:15, 656:16,
656:17, 673:22,
679:22, 683:7,
694:24
**Argumentative** [1] -
683:5
**arose** [2] - 808:21,
808:22
**article** [3] - 642:15,
658:18, 658:19
**articles** [2] - 658:17
**AS** [4] - 609:16, 660:1,
712:21, 798:11
**aside** [1] - 639:2
**Asish** [1] - 857:14
**assess** [1] - 711:4
**assistance** [1] -
609:21
**assistant** [5] - 611:22,
736:20, 736:24,
799:24, 831:10
**associate** [1] - 808:16
**associated** [3] -
693:19, 725:10,
833:25
**Associates** [1] - 781:5
**assume** [8] - 615:14,
645:19, 694:2,
827:7, 840:8,
840:11, 841:14,
852:15
**assumed** [1] - 802:2
**Assuming** [1] - 708:10
**assuming** [1] - 708:12
**assure** [1] - 697:12
**assured** [1] - 699:11
**ASTM** [2] - 672:10,
705:25, 706:1
**AT** [1] - 606:2

791:16, 791:18,
797:2, 797:17,
834:22, 836:18
**Atlanta** [1] - 611:12
**atomic** [1] - 612:9
**attached** [1] - 625:16
**attachment** [1] -
626:15
**attack** [7] - 619:8,
627:17, 628:9,
628:16, 629:19,
746:6, 792:16
**attacked** [1] - 628:8
**attacks** [1] - 802:11,
802:12
**attempt** [7] - 662:3,
670:7, 670:12,
720:16, 720:18,
728:21, 734:15
**attend** [1] - 853:22
**attendant** [2] - 679:12,
680:1
**August** [14] - 641:12,
681:7, 687:10,
743:15, 743:16,
744:12, 745:13,
745:21, 838:19,
839:2, 843:8,
843:12, 844:16,
846:8
**author** [2] - 648:18,
648:22
**authors** [1] - 648:10
**available** [9] - 676:1,
676:22, 677:3,
677:8, 681:6, 691:7,
691:11, 691:24,
825:13
**avoid** [1] - 618:20
**aware** [25] - 622:13,
630:8, 637:6, 651:7,
662:14, 668:20,
676:3, 676:6,
676:13, 677:6,
681:20, 681:22,
699:2, 709:5,
763:17, 766:8,
767:22, 771:17,
793:6, 793:15,
795:12, 814:12,
823:20, 835:21,
840:20
**awhile** [1] - 619:24,
808:10, 810:12
**awoke** [1] - 792:11

### B

**background** [8] -
610:17, 610:23,
660:21, 736:16,
766:23, 799:10,
801:9, 801:10

**BACON** [1] - 607:19
**bad** [4] - 651:13, 789:21, 802:15, 804:25
**BAILEY** [1] - 607:6
**balance** [1] - 827:15
**balanced** [4] - 648:3, 648:20, 648:25, 649:12
**banding** [3] - 692:22, 692:23, 694:8
**barometric** [1] - 804:3
**base** [2] - 623:10, 700:15
**based** [22] - 614:24, 635:13, 646:3, 646:18, 654:1, 665:13, 690:10, 708:7, 760:20, 812:6, 812:13, 812:16, 812:17, 813:5, 813:9, 827:9, 835:9, 844:6, 852:9, 854:23, 855:3
**bases** [1] - 628:7
**basic** [1] - 831:12
**basing** [1] - 634:19
**basis** [11] - 612:24, 613:2, 613:13, 614:4, 615:3, 616:4, 616:11, 631:9, 681:23, 757:10, 818:5
**basketball** [1] - 800:22
**Bassam** [1] - 856:13
**bathroom** [4] - 765:15, 792:9, 805:13, 810:23
**battery** [2] - 700:22, 704:1
**became** [3] - 612:10, 699:2, 804:6
**becomes** [3] - 628:21, 661:25
**becoming** [1] - 810:18
**BEEN** [4] - 609:16, 660:1, 712:20, 798:11
**BEFORE** [1] - 606:14
**began** [6] - 716:11, 797:2, 797:17, 802:23, 808:15, 820:11
**begin** [2] - 670:10, 854:13
**beginning** [3] - 670:20, 820:13, 820:14
**begins** [1] - 681:11

**behave** [2] - 618:14, 672:17
**behavior** [1] - 652:23
**behind** [7] - 664:8, 664:12, 664:18, 664:22, 674:15, 768:21, 774:16
**beings** [1] - 795:6
**belabor** [1] - 799:10
**below** [18] - 758:7, 758:14, 760:21, 774:1, 777:20, 777:21, 778:7, 781:19, 792:2, 837:13, 839:4, 840:23, 842:15, 842:20, 844:4, 845:1, 846:14
**bench** [5] - 707:2, 707:14, 709:10, 812:8, 814:6
**benchmark** [1] - 673:15
**benefit** [1] - 705:8
**benefits** [3] - 730:2, 771:7, 803:19
**Berger** [1] - 609:1
**BERGER** [1] - 606:14
**Bernard** [3] - 769:25, 770:4, 856:11
**beside** [1] - 721:5
**best** [9] - 637:20, 643:4, 662:22, 714:5, 802:25, 804:15, 821:18, 822:18, 859:7
**better** [12] - 653:19, 662:5, 662:7, 663:17, 663:24, 664:1, 697:7, 749:9, 799:6, 810:14, 822:20, 845:3
**between** [9] - 672:15, 730:11, 733:23, 754:4, 755:11, 772:25, 777:20, 788:10, 831:20
**beyond** [4] - 633:4, 640:11, 709:19, 826:18
**Bhanot** [43] - 805:20, 805:21, 806:3, 806:9, 806:22, 807:16, 807:18, 811:8, 811:11, 811:13, 811:22, 813:21, 815:13, 815:14, 815:16, 816:18, 816:22, 817:4, 832:20,

832:22, 833:3, 833:22, 834:23, 835:2, 835:5, 836:1, 836:18, 837:10, 837:18, 838:6, 838:9, 841:7, 841:11, 841:19, 841:22, 842:12, 844:17, 846:2, 846:4, 846:20, 846:25, 851:9, 855:20
**Bhanot's** [2] - 832:15, 837:22
**big** [4] - 619:25, 667:24, 715:22, 796:11
**biggest** [2] - 819:9, 819:15
**bike** [3] - 818:8, 818:9
**bilateral** [3] - 752:12, 752:17, 753:15, 753:16, 809:16
**billing** [2] - 650:10, 855:2
**billion** [1] - 655:12
**bills** [3] - 854:21, 855:6, 855:12
**biocompatibility** [6] - 676:24, 700:16, 700:20, 700:22, 701:3, 702:1
**biofeedback** [1] - 761:1
**Biological** [1] - 701:14
**biological** [2] - 647:18, 703:4
**biomaterials** [1] - 651:15
**biomedical** [1] - 654:18
**bipolar** [3] - 801:22, 827:9, 827:12
**Birmingham** [1] - 611:20
**birth** [2] - 773:13, 777:17
**births** [1] - 715:20
**bit** [27] - 650:21, 697:1, 699:23, 706:17, 714:18, 716:16, 732:6, 736:16, 741:4, 747:20, 748:6, 770:15, 776:16, 781:18, 794:4, 799:9, 801:8, 801:23, 805:12, 805:14, 826:19, 828:8, 830:9,

830:10, 834:25, 843:22, 844:5
**black** [3] - 667:24, 669:13, 742:23
**Bladder** [1] - 781:20
**bladder** [20] - 744:4, 756:3, 758:21, 759:6, 763:6, 771:12, 781:21, 782:2, 792:10, 793:8, 793:9, 796:21, 805:13, 822:4, 823:3, 826:20, 826:23, 833:16, 843:20, 845:3
**blaming** [2] - 740:1, 740:12
**blank** [1] - 730:19
**Blankenship** [3] - 695:11, 854:19, 855:12
**Blankenship's** [1] - 695:1
**bleeding** [4] - 761:12, 771:11, 834:14, 849:18
**bless** [1] - 760:16
**blood** [3] - 758:11, 763:2, 839:22
**blow** [4] - 778:3, 834:17, 836:23, 840:2
**blown-up** [1] - 834:25
**board** [2] - 612:16, 814:2
**bodies** [5] - 647:19, 702:16, 762:3, 762:7
**bodily** [1] - 849:12
**body** [55] - 617:2, 629:16, 630:6, 632:3, 632:6, 632:10, 632:15, 632:18, 643:1, 646:19, 650:22, 651:1, 652:22, 657:3, 662:16, 665:12, 666:1, 667:18, 668:23, 669:4, 671:3, 671:18, 671:21, 674:10, 674:22, 674:24, 675:5, 675:12, 675:20, 675:23, 676:1, 676:21, 677:2, 679:20, 682:13, 686:10, 692:10, 692:14, 692:17, 692:18, 694:14,

700:25, 701:1, 731:10, 731:13, 795:9, 805:3, 819:3, 819:6, 819:10, 832:6, 832:10, 832:11
**bolded** [1] - 618:8
**bomb** [1] - 612:9
**Bonasso** [6] - 736:5, 742:8, 750:16, 751:14, 794:4, 798:1
**BONASSO** [49] - 607:15, 607:15, 723:13, 725:14, 726:4, 726:24, 727:10, 736:2, 742:6, 742:9, 742:10, 746:19, 750:17, 750:19, 751:15, 751:16, 752:6, 752:7, 752:24, 753:2, 755:20, 755:22, 756:17, 756:20, 760:16, 760:18, 762:6, 763:20, 763:24, 766:12, 766:15, 768:4, 768:6, 768:16, 768:18, 769:17, 769:20, 773:10, 783:10, 784:16, 785:25, 786:7, 791:21, 791:23, 793:21, 794:17, 797:21, 798:3, 798:5
**book** [3] - 667:24, 668:8, 668:18
**borderline** [1] - 819:6
**bore** [1] - 655:18
**born** [1] - 713:21
**Boston** [56] - 622:20, 623:8, 624:7, 624:13, 635:19, 635:20, 650:17, 660:21, 660:24, 661:10, 662:14, 662:18, 665:9, 665:10, 665:15, 665:24, 667:16, 668:22, 669:1, 670:1, 670:22, 671:1, 677:7, 681:11, 685:9, 686:12, 688:11, 691:18, 691:23, 692:3, 693:3, 694:18, 695:4, 695:14, 695:25, 696:14, 697:2,

697:17, 698:4,
699:24, 700:16,
701:16, 702:8,
702:20, 703:11,
704:2, 705:22,
707:22, 708:1,
711:3, 711:12,
712:4, 731:20,
732:1, 795:1, 795:5
**BOSTON** [1] - 606:8
**bother** [2] - 804:21,
817:24
**bothering** [1] - 807:8
**bothers** [1] - 797:12
**bottom** [13] - 645:24,
646:15, 702:25,
747:10, 757:5,
757:14, 762:14,
763:20, 817:23,
824:16, 835:3,
836:23, 837:2
**Boulevard** [1] -
607:19
**bowel** [3] - 758:20,
771:11, 849:18
**bowels** [1] - 792:9
**box** [1] - 842:2
**Box** [1] - 607:16
**brain** [4] - 758:12,
802:5, 803:17, 829:1
**break** [4] - 619:5,
620:1, 621:12,
798:20
**breaking** [3] - 619:21,
620:3, 655:21
**breaks** [1] - 632:10
**breath** [1] - 821:4
**brief** [2] - 610:15,
611:19
**briefly** [5] - 610:25,
658:18, 666:4,
706:5, 768:1
**bring** [4] - 710:15,
710:21, 742:4,
768:14
**brittle** [3] - 628:21,
628:22, 629:1
**broad** [3] - 698:1,
711:5, 812:9
**Broaddus** [1] - 799:23
**broadly** [1] - 651:14
**Broadway** [1] - 607:9
**brother** [3] - 799:7,
800:3, 800:5
**brought** [3] - 636:13,
796:4, 824:13
**Bryan** [2] - 742:21,
742:23
**BSC** [1] - 665:23
**budget** [2] - 737:24,

738:2
**build** [1] - 653:22
**building** [1] - 738:18
**built** [1] - 780:18
**bulk** [1] - 672:16
**bulking** [1] - 761:2
**bullet** [2] - 710:22,
711:2
**bump** [1] - 733:4
**bunch** [9] - 620:7,
649:15, 682:17,
683:4, 747:11,
758:13, 773:19,
805:5, 806:23
**burning** [1] - 744:16
**business** [6] - 684:16,
684:19, 686:20,
699:12, 706:12,
853:22
**busy** [2] - 801:6, 801:7
**button** [1] - 836:12
**BY** [104] - 609:25,
610:7, 616:1,
616:20, 618:1,
621:7, 623:6,
623:18, 625:7,
627:5, 630:20,
631:19, 633:22,
638:23, 640:23,
644:2, 649:9,
653:17, 654:7,
655:10, 655:20,
656:20, 657:19,
658:8, 658:15,
660:3, 660:13,
665:22, 667:14,
668:6, 668:17,
670:19, 674:5,
678:20, 680:17,
683:15, 691:3,
694:25, 695:10,
695:23, 696:7,
701:10, 701:24,
704:8, 705:7,
708:18, 709:25,
710:23, 711:25,
712:22, 721:11,
723:19, 724:2,
725:17, 726:7,
726:25, 727:7,
727:21, 728:14,
736:2, 742:10,
746:19, 751:16,
752:7, 753:2,
755:22, 756:20,
760:18, 762:6,
763:24, 766:15,
768:6, 768:18,
769:20, 773:10,
783:10, 784:16,

785:25, 786:7,
791:23, 793:24,
794:24, 796:8,
798:16, 806:1,
808:7, 810:9,
813:20, 814:10,
816:9, 816:19,
819:19, 824:1,
834:19, 835:1,
836:25, 837:6,
837:15, 839:1,
839:19, 840:15,
842:11, 849:8, 851:6

# C

**C/O** [6] - 774:4, 779:8,
779:13, 783:24,
785:1, 785:9
**CAMC** [1] - 855:21
**camera** [1] - 726:20
**Campbell** [24] -
855:18, 855:20,
855:22, 855:24,
856:8, 856:10,
856:12, 856:14,
856:16, 856:18,
856:20, 856:22,
856:24, 857:1,
857:3, 857:5, 857:7,
857:9, 857:11,
857:13, 857:15,
857:17, 857:19,
857:21
**candid** [1] - 741:15
**cannot** [3] - 643:16,
644:3, 793:19
**capful** [5] - 821:7,
821:14, 821:18,
821:22, 822:18
**care** [6] - 721:19,
741:20, 749:25,
800:8, 838:17,
845:17
**career** [2] - 611:2,
611:19
**carefully** [1] - 643:24
**Carol** [3] - 606:18,
859:3, 859:12
**carol_farrell@wvsd.
  uscourts.gov** [1] -
606:19
**carried** [1] - 702:17
**case** [45] - 614:20,
631:12, 634:11,
634:13, 635:10,
635:18, 635:23,
637:15, 638:4,
639:14, 639:19,
640:1, 640:8, 641:9,

641:23, 642:22,
643:9, 646:17,
651:17, 652:1,
652:8, 652:21,
653:8, 653:22,
657:24, 659:11,
661:6, 678:2,
688:25, 689:24,
690:3, 744:7, 744:8,
747:17, 750:24,
754:21, 768:11,
768:24, 774:12,
793:3, 807:10,
842:4, 854:2, 854:9
**cases** [1] - 639:16
**catch** [2] - 657:25,
658:4
**catheter** [1] - 759:5
**catheterization** [1] -
835:18
**causation** [2] -
640:10, 640:11
**caused** [3] - 643:17,
644:4, 716:18
**causes** [3] - 643:19,
827:12, 850:17
**causing** [6] - 618:17,
627:18, 733:9,
733:12, 763:1,
809:18
**caution** [16] - 610:21,
612:24, 613:3,
613:8, 614:5, 616:4,
616:11, 616:23,
616:24, 629:22,
629:23, 629:25,
636:11, 636:22,
637:2, 637:24
**Caution** [4] - 681:15,
681:19, 698:25,
699:2
**CC** [2] - 783:23,
786:18
**CCP** [3] - 606:18,
859:3, 859:12
**cell** [1] - 721:5
**center** [2] - 611:10,
611:14
**centimeter** [2] - 673:3,
673:10
**centimeters** [1] -
672:14
**certain** [12] - 624:11,
686:3, 708:10,
719:19, 738:21,
803:17, 817:6,
822:1, 822:10,
823:13, 825:19
**certainly** [20] - 609:21,
609:23, 613:12,

615:18, 617:19,
636:21, 637:6,
640:2, 642:14,
642:17, 643:12,
647:10, 650:25,
652:13, 653:21,
653:25, 668:16,
670:5, 707:14,
708:21
**CERTIFICATE** [1] -
859:1
**certify** [1] - 859:6
**cetera** [10] - 618:25,
623:15, 747:21,
752:17, 758:22,
761:21, 763:2,
763:7, 763:11,
771:14
**chain** [1] - 628:10
**chair** [1] - 799:6
**Challa** [2] - 855:23,
856:4
**chance** [3] - 625:16,
709:9, 730:12
**change** [22] - 618:15,
618:17, 656:2,
664:4, 664:12,
665:4, 670:23,
676:17, 677:13,
693:21, 790:10,
803:1, 804:3, 804:7,
804:9, 823:21,
824:17, 824:22,
824:24, 824:25,
830:7, 830:18
**changed** [5] - 682:23,
684:17, 699:11,
785:11, 785:12
**changes** [11] - 663:16,
663:19, 664:1,
664:21, 664:25,
666:2, 676:15,
692:4, 818:5, 848:11
**changing** [1] - 699:5
**charge** [2] - 698:14,
853:15
**Charleston** [11] -
607:16, 609:3,
717:22, 717:23,
717:24, 724:11,
724:15, 725:20,
818:12, 819:25,
856:7
**CHARLESTON** [1] -
606:2
**chart** [1] - 665:7
**check** [2] - 852:21,
852:25
**Checkup** [2] - 781:19
**Chem** [2] - 617:19,

636:23
**chemical** [7] - 620:6, 628:6, 647:20, 652:23, 653:3, 683:22, 700:9
**Chemical** [3] - 610:12, 616:25, 627:7
**chemically** [2] - 627:17, 705:16
**chemicals** [1] - 615:21
**chemist** [5] - 613:19, 622:21, 623:7, 646:18, 647:20
**chemistry** [4] - 655:23, 655:24, 656:1
**Chemistry** [3] - 621:16, 621:19, 657:5
**chemists** [1] - 625:11
**cherry** [1] - 639:9
**cherry-pick** [1] - 639:9
**Cheryl** [2] - 756:12, 756:23
**Chevron** [9] - 616:25, 630:2, 683:17, 683:24, 685:7, 685:14, 686:13, 699:5, 699:19
**chicken** [2] - 747:11, 767:8
**chief** [4] - 742:16, 743:19, 751:24, 783:23
**child** [2] - 799:16, 801:5
**children** [4] - 714:16, 714:19, 714:20, 715:22
**Children's** [1] - 855:22
**chlorates** [1] - 618:25
**choice** [1] - 802:25
**cholecystitis** [1] - 746:6
**Cholhan** [1] - 692:21
**choose** [2] - 693:15, 837:25
**chose** [6] - 685:11, 689:4, 689:6, 689:18, 690:22, 717:18
**Chris** [3] - 798:8, 798:25, 826:12
**CHRIS** [5] - 608:11, 798:11, 798:16, 819:19, 851:6
**Christmas** [1] - 719:2
**chronic** [2] - 753:3, 849:16
**Chronic** [1] - 692:17

**Cipro** [2] - 787:23, 790:1
**circled** [5] - 773:20, 773:21, 773:25, 775:18, 784:18
**circles** [1] - 795:19
**circumstances** [2] - 825:16, 825:20
**cite** [5] - 643:16, 644:3, 644:15, 645:14, 683:11
**City** [1] - 607:20
**civil** [2] - 736:25, 737:3
**CIVIL** [1] - 606:6
**claim** [3] - 735:1, 848:17, 849:13
**claimed** [1] - 854:21
**claiming** [1] - 689:23
**claims** [8] - 732:18, 736:25, 737:4, 739:6, 848:14, 848:19, 849:10
**clarification** [1] - 756:17
**clarify** [1] - 824:22
**CLARK** [1] - 607:4
**Clavé** [4] - 644:6, 658:18
**clear** [8] - 613:19, 614:22, 640:5, 645:6, 647:4, 693:20, 816:14, 854:17
**clearance** [4] - 744:14, 751:23, 752:19, 764:19
**CLERK** [2] - 609:14, 609:18
**clerk** [3] - 609:21, 736:20, 854:20
**clients** [1] - 694:1
**clients'** [1] - 694:5
**clinical** [43] - 643:10, 643:13, 644:16, 644:19, 645:15, 645:18, 645:20, 646:3, 652:13, 658:17, 662:24, 663:10, 663:11, 665:13, 671:7, 676:20, 677:1, 677:7, 682:14, 683:12, 684:5, 687:24, 688:23, 691:5, 691:9, 693:5, 693:6, 694:11, 695:16, 696:22, 697:23, 698:6, 698:14, 698:15,

698:16, 707:20, 708:12, 708:13, 711:4, 711:5, 711:12, 840:1, 840:6
**clinician** [4] - 644:18, 646:1, 646:2, 647:7
**close** [3] - 715:4, 715:6, 791:20
**clothes** [4] - 823:21, 824:17, 824:22, 824:25
**clots** [1] - 763:2
**CMG** [1] - 835:8
**co** [4] - 648:10, 648:18, 648:22, 858:4
**CO** [1] - 607:10
**co-author** [2] - 648:18, 648:22
**co-authors** [1] - 648:10
**co-counsel** [1] - 858:4
**coaches** [1] - 800:16
**coffee** [1] - 659:8
**cold** [5] - 802:7, 804:2, 811:4, 830:19
**collage** [1] - 799:19
**collects** [1] - 825:12
**college** [2] - 831:12, 831:21
**College** [2] - 737:17, 799:23
**colonoscopy** [4] - 817:8, 817:10, 817:12, 817:14
**combination** [2] - 707:2, 802:8
**coming** [3] - 657:14, 699:10, 831:4
**comment** [1] - 782:11
**commercialization** [1] - 707:4
**commercialized** [1] - 707:22
**commercializes** [1] - 708:3
**committees** [3] - 702:18, 702:21
**common** [1] - 621:14
**commonly** [1] - 629:7
**communities** [1] - 625:9
**community** [12] - 620:13, 621:21, 621:24, 622:6, 623:20, 623:21, 657:1, 657:11, 657:21, 657:22, 658:10
**company** [17] - 665:5,

681:19, 684:12, 686:16, 687:12, 687:23, 689:3, 689:5, 689:17, 708:23, 709:6, 709:16, 710:3, 710:8, 710:11, 712:9
**Company** [1] - 616:25
**company's** [1] - 693:7
**compare** [1] - 669:17
**compared** [6] - 672:20, 672:21, 673:4, 673:14, 687:3, 704:17
**Competent** [1] - 738:14
**competitive** [1] - 707:19
**complain** [4] - 775:24, 777:5, 777:8, 786:14
**complained** [10] - 776:4, 776:25, 777:1, 778:20, 778:21, 785:21, 786:13, 786:16, 787:17, 789:24
**complaining** [1] - 746:24
**complains** [1] - 843:1
**complaint** [6] - 742:16, 743:19, 751:24, 778:8, 783:23, 850:22
**complaints** [25] - 737:3, 741:13, 746:21, 774:7, 776:2, 776:17, 777:12, 778:19, 779:8, 779:13, 779:15, 779:22, 780:6, 781:16, 783:11, 783:14, 784:3, 785:1, 786:1, 786:2, 786:24, 850:19, 850:20
**complete** [2] - 645:8, 824:23
**completely** [4] - 846:11, 847:5, 851:11, 851:15
**complication** [1] - 759:3
**complications** [19] - 719:12, 725:10, 727:22, 728:15, 758:8, 758:15, 758:17, 758:24, 771:6, 771:10, 771:17, 803:6, 803:21, 806:11,

806:18, 833:25, 834:2, 835:15, 835:16
**complied** [1] - 720:6
**comply** [1] - 719:23
**component** [1] - 617:5
**composes** [1] - 645:22
**composition** [1] - 704:3
**compound** [2] - 700:5, 700:6
**compounded** [1] - 830:8
**compounds** [3] - 619:2, 619:16, 629:14
**computer** [1] - 606:25
**concept** [1] - 706:20
**concern** [2] - 666:14, 667:4
**concerned** [4] - 725:8, 787:4, 825:14, 853:7
**concerns** [1] - 699:14
**concluded** [9] - 615:25, 625:6, 649:8, 667:13, 670:18, 691:2, 709:24, 813:19, 853:17
**conclusions** [1] - 688:19
**condemning** [1] - 651:14
**condition** [9] - 718:22, 743:9, 757:8, 757:9, 802:5, 802:10, 813:2, 817:7, 828:11
**conditions** [2] - 812:21, 840:20
**conduct** [2] - 670:2, 698:8
**conducted** [10] - 642:22, 642:25, 665:9, 665:25, 669:2, 670:23, 671:1, 676:20, 677:1, 693:3
**conducting** [1] - 671:6
**confines** [2] - 633:10, 633:14
**confirmed** [3] - 770:19, 770:21, 770:23
**confused** [2] - 790:25, 795:16
**connected** [1] - 741:2
**connection** [2] - 711:3, 849:12
**Connor** [1] - 698:16

**consent** [28] - 730:7,
730:9, 730:11,
730:13, 730:15,
730:16, 730:19,
755:18, 756:15,
757:1, 757:2,
757:18, 757:20,
760:10, 762:11,
762:12, 762:13,
771:23, 794:4,
794:25, 795:4,
795:8, 795:11,
836:14, 836:16,
836:19
**consents** [12] -
754:17, 754:18,
754:22, 754:25,
755:3, 755:11,
755:12, 760:4,
761:22, 764:15,
794:13, 794:15
**consider** [11] - 639:6,
646:16, 646:24,
669:25, 683:6,
774:21, 781:21,
800:9, 803:4,
820:17, 821:21
**consideration** [2] -
658:5, 674:2
**considered** [9] -
663:8, 663:13,
674:1, 674:13,
738:12, 761:5,
767:13, 767:24,
782:24
**considering** [1] -
693:15
**consistent** [6] - 784:1,
796:25, 797:6,
797:15, 823:5, 847:6
**constant** [1] - 817:24
**consult** [1] - 753:25
**consultation** [1] -
842:17
**contact** [4] - 617:2,
618:20, 618:23,
822:11
**contain** [3] - 619:2,
684:7, 794:25
**contained** [1] - 687:13
**containing** [2] -
619:16, 757:20
**content** [1] - 698:2
**contents** [1] - 615:5
**context** [1] - 673:2
**continuation** [1] -
849:1
**continue** [1] - 804:11
**continued** [3] -
721:19, 803:13

**contributed** [2] -
614:20, 638:8
**control** [9] - 672:1,
740:21, 758:22,
759:2, 761:1, 792:9,
802:23, 804:12,
844:8
**controlled** [8] - 663:8,
686:12, 686:15,
687:5, 691:6,
691:20, 693:3,
804:14
**controlling** [1] -
804:19
**convenient** [1] -
668:15
**conventional** [1] -
687:4
**conversation** [1] -
699:17
**conversations** [4] -
688:11, 688:18,
813:6, 856:2
**convinced** [1] -
620:23
**Cook** [3] - 606:20,
859:5, 859:15
**coping** [1] - 827:2
**copy** [12] - 626:19,
630:21, 631:1,
660:16, 662:3,
665:19, 666:8,
666:9, 666:12,
678:21, 752:5,
768:14
**copying** [1] - 662:9
**corporate** [1] - 626:17
**CORPORATION** [1] -
606:8
**corporation** [1] -
623:8
**Corporation** [1] -
691:23
**Correct** [22] - 662:8,
671:7, 671:15,
683:25, 691:13,
691:15, 692:2,
702:10, 702:23,
712:11, 725:19,
725:24, 726:2,
726:10, 727:19,
750:12, 776:14,
779:9, 779:16,
785:10, 847:12,
851:18
**correct** [235] - 612:4,
612:5, 616:15,
616:16, 618:10,
618:11, 628:14,
628:15, 632:10,

632:11, 632:12,
632:13, 632:16,
634:14, 634:16,
634:17, 634:20,
634:21, 635:3,
635:4, 635:7,
635:14, 635:15,
635:19, 635:25,
636:1, 636:6, 636:7,
636:11, 636:12,
636:17, 636:18,
636:19, 636:20,
636:23, 636:24,
637:5, 637:16,
637:25, 638:1,
638:16, 638:17,
638:19, 639:4,
639:7, 639:8, 639:9,
639:10, 639:12,
639:13, 639:16,
639:17, 639:22,
639:24, 639:25,
640:3, 640:4, 640:8,
641:1, 641:2,
641:10, 641:15,
641:17, 641:23,
641:24, 642:3,
642:4, 642:7, 642:9,
642:15, 642:23,
642:24, 643:2,
643:3, 643:7, 643:8,
643:10, 643:11,
643:18, 644:5,
646:1, 646:2, 646:4,
646:5, 647:9,
647:15, 647:19,
648:6, 648:7, 648:8,
648:9, 649:13,
649:14, 649:20,
649:23, 650:6,
650:9, 650:11,
650:12, 650:19,
650:20, 651:19,
651:20, 652:7,
652:11, 652:15,
652:16, 653:11,
653:24, 654:2,
654:3, 658:1,
660:22, 671:18,
677:9, 677:21,
678:14, 679:1,
679:7, 683:24,
684:4, 686:2, 691:7,
691:11, 691:12,
699:17, 700:17,
708:13, 712:10,
714:12, 718:18,
718:25, 721:20,
723:2, 724:12,
725:18, 725:23,
726:9, 729:14,

732:7, 733:12,
734:21, 738:18,
739:9, 744:9,
745:21, 747:15,
747:23, 753:9,
756:9, 756:24,
757:3, 758:3,
758:17, 759:12,
760:6, 760:12,
760:20, 761:9,
769:10, 770:17,
772:4, 772:19,
773:11, 773:20,
773:21, 773:24,
774:9, 777:3,
777:18, 778:5,
778:15, 779:23,
780:8, 781:13,
782:16, 783:24,
784:21, 785:9,
785:11, 787:10,
790:8, 790:12,
796:2, 797:17,
813:5, 814:13,
814:23, 814:24,
818:24, 820:7,
821:12, 821:25,
822:6, 822:14,
822:17, 825:2,
825:5, 827:7,
827:13, 828:4,
829:10, 829:11,
829:16, 829:25,
831:7, 831:19,
831:23, 831:25,
832:2, 834:20,
836:2, 836:5, 838:4,
840:7, 840:17,
840:21, 840:24,
841:21, 842:25,
845:7, 845:10,
845:20, 846:23,
847:7, 847:11,
848:8, 848:9,
848:13, 850:8,
850:14, 851:17,
855:7, 855:8, 855:9
**correction** [1] - 758:1
**correctly** [39] - 638:9,
638:11, 644:20,
644:21, 644:24,
647:2, 734:11,
744:23, 744:24,
780:5, 796:23,
797:13, 824:19,
826:5, 826:16,
830:11, 835:2,
835:11, 835:19,
835:20, 839:5,
839:23, 839:24,
840:4, 842:21,

842:22, 842:24,
843:2, 843:17,
843:18, 844:2,
844:9, 844:10,
845:4, 845:5, 845:8,
845:25, 846:12,
846:18
**couch** [4] - 792:10,
792:11, 804:18,
828:21
**cough** [3] - 716:22,
805:14, 821:2
**coughed** [2] - 765:25,
805:12
**coughing** [6] - 765:20,
820:18, 823:7,
823:8, 823:9, 823:10
**counsel** [30] - 609:9,
609:19, 610:3,
614:9, 614:13,
617:12, 620:23,
623:12, 632:23,
653:15, 657:17,
658:13, 659:20,
674:1, 694:24,
696:3, 705:2,
723:25, 726:5,
727:20, 728:6,
736:1, 794:21,
794:23, 798:15,
808:2, 828:8, 842:1,
848:24, 858:4
**Counsel** [3] - 679:23,
680:10, 856:1
**County** [2] - 736:21,
800:15
**couple** [9] - 678:23,
743:9, 772:19,
773:6, 784:13,
800:11, 831:16,
852:20, 852:25
**course** [8] - 614:15,
635:8, 661:20,
690:5, 693:10,
717:5, 812:11,
827:24
**courses** [1] - 831:13
**COURT** [199] - 606:1,
609:6, 609:7, 609:9,
609:13, 609:19,
609:24, 610:6,
612:19, 612:21,
613:6, 613:15,
614:2, 614:9,
614:12, 614:17,
614:18, 615:17,
617:11, 617:16,
617:22, 620:16,
620:18, 620:23,
621:1, 621:4, 623:1,

623:4, 623:12,
623:24, 624:1,
624:14, 624:23,
626:20, 626:23,
626:25, 630:19,
631:6, 631:8,
631:13, 631:18,
632:22, 633:1,
633:7, 633:21,
638:22, 640:13,
640:19, 643:23,
645:2, 648:12,
648:21, 649:1,
653:14, 654:6,
655:4, 656:15,
656:17, 657:7,
657:12, 658:3,
658:13, 659:1,
659:4, 659:9,
659:15, 659:20,
659:23, 659:25,
660:12, 666:5,
666:14, 666:23,
667:2, 667:10,
668:11, 669:8,
669:12, 669:16,
669:23, 670:5,
673:23, 678:10,
678:13, 678:15,
678:19, 679:23,
680:3, 680:10,
683:6, 688:2,
688:20, 689:7,
689:19, 690:9,
690:23, 694:20,
694:23, 695:8,
695:19, 696:3,
696:6, 701:8,
701:19, 701:21,
704:7, 705:2, 705:4,
708:17, 709:10,
709:12, 709:18,
709:20, 710:16,
710:19, 711:22,
712:13, 712:15,
712:18, 723:16,
723:18, 723:22,
723:25, 725:15,
726:5, 727:2, 727:5,
727:12, 727:18,
727:20, 728:4,
736:1, 742:7,
746:18, 750:16,
750:18, 750:21,
751:7, 751:9,
751:13, 751:14,
762:5, 768:17,
769:19, 793:23,
794:21, 797:20,
797:22, 798:1,
798:4, 798:9,

798:14, 805:24,
808:2, 810:5, 812:5,
812:8, 812:11,
813:1, 813:14,
813:18, 813:25,
814:5, 814:9,
816:12, 819:18,
823:25, 842:1,
842:9, 848:24,
849:3, 849:6,
850:25, 851:5,
851:23, 851:25,
852:2, 852:6,
852:11, 852:15,
852:22, 853:5,
853:11, 853:14,
853:18, 853:21,
853:25, 854:13,
854:25, 855:5,
855:10, 855:15,
856:1, 856:6,
857:22, 857:24,
858:6, 858:9, 858:14
**court** [11] - 638:18,
715:11, 736:17,
738:17, 738:25,
759:19, 788:19,
789:11, 802:8,
854:5, 856:5
**Court** [12] - 606:18,
609:2, 667:7, 690:1,
728:1, 798:13,
853:3, 853:9, 859:3,
859:4, 859:13,
859:16
**Court's** [1] - 858:3
**courthouse** [2] -
788:17, 791:11
**Courthouse** [1] -
736:21
**courtroom** [9] - 609:5,
659:16, 659:18,
736:6, 751:8,
751:12, 818:24,
842:7, 854:12
**cover** [1] - 728:5
**coverage** [1] - 854:8
**covered** [1] - 788:2
**cowboy** [1] - 801:3
**CP** [2] - 617:19,
636:23
**crack** [1] - 629:2
**cranial** [2] - 802:5,
802:22
**crazy** [2] - 802:14,
827:23
**created** [1] - 696:18
**credibility** [1] - 649:4
**criteria** [5] - 672:21,
672:25, 673:5,

673:7, 673:9
**critical** [1] - 689:12
**criticisms** [1] - 719:14
**cross** [9] - 632:22,
666:13, 696:13,
696:19, 727:15,
801:16, 812:25,
819:18, 823:11
**Cross** [3] - 608:6,
696:3, 736:1
**CROSS** [3] - 633:22,
696:7, 736:2
**Cross-examination**
[1] - 736:1
**cross-examination**
[3] - 632:22, 666:13,
819:18
**cross-functional** [2] -
696:13, 696:19
**crossed** [1] - 831:18
**CROSS-
EXAMINATION** [1] -
819:19
**CRR** [6] - 606:18,
606:20, 859:3,
859:5, 859:12,
859:15
**crumble** [2] - 619:14,
619:18
**culture** [1] - 787:22
**cumulative** [3] -
848:23, 850:24,
850:25
**current** [4] - 611:24,
781:16, 850:19,
850:22
**cut** [2] - 770:12,
829:14
**cutbacks** [1] - 737:24
**cutting** [2] - 829:4,
829:21
**Cyrus** [1] - 857:2
**cyst** [1] - 840:17
**cysto** [1] - 835:8
**cystocele** [6] - 792:25,
793:5, 793:8,
793:15, 843:24,
846:16
**cystoceles** [1] -
793:17
**cystoscopy** [4] -
753:17, 755:24,
755:25, 757:18
**cystourethroscopy**
[1] - 771:3
**cysts** [1] - 809:16
**cytoscopy** [1] -
726:19

## D

**daily** [3] - 721:7,
802:23, 818:5
**damage** [2] - 758:12,
763:1
**damages** [2] - 730:24,
731:1
**dash** [3] - 673:16,
673:18
**Data** [1] - 615:5
**data** [12] - 639:9,
643:12, 665:11,
665:13, 665:14,
667:17, 667:19,
668:23, 669:25,
682:14, 711:4,
711:12
**date** [30] - 693:25,
711:6, 711:7,
745:12, 746:2,
751:23, 756:8,
756:22, 766:17,
769:7, 769:21,
770:8, 773:13,
773:15, 776:12,
777:17, 779:22,
786:1, 788:22,
789:4, 790:6, 790:7,
790:8, 840:23,
841:9, 843:11,
847:4, 859:9
**Date** [2] - 859:13,
859:16
**dated** [11] - 681:3,
742:13, 743:16,
744:13, 757:21,
762:14, 764:21,
767:8, 784:20,
786:8, 834:22
**dates** [5] - 769:1,
790:25, 795:16,
797:1
**Daubert** [3] - 615:10,
615:16, 624:6
**David** [1] - 857:16
**DAY** [1] - 606:12
**days** [9] - 661:20,
716:5, 749:5, 749:7,
803:18, 804:8,
831:3, 838:6, 853:8
**deal** [7] - 698:10,
723:12, 735:15,
735:22, 749:9,
749:13, 823:17
**dealing** [2] - 671:16,
735:4
**dealt** [1] - 677:17
**Dean** [1] - 745:1
**death** [3] - 655:19,

758:13, 819:13
**decade** [1] - 685:12
**decades** [2] - 651:1,
651:4
**December** [19] -
718:25, 719:3,
733:24, 755:6,
764:17, 766:17,
767:8, 768:7, 769:4,
769:9, 769:23,
770:8, 771:21,
772:2, 772:25,
784:13, 784:23,
786:9
**decided** [7] - 725:11,
749:8, 811:5,
825:19, 825:21,
826:2, 832:16
**decision** [7] - 684:16,
684:19, 686:20,
699:13, 709:16,
766:9, 791:15
**decisions** [1] - 767:23
**defendant** [1] - 624:25
**Defendant** [1] - 606:9
**defendant's** [7] -
615:7, 617:24,
625:3, 633:16,
649:5, 709:21,
794:22
**Defendant's** [3] -
701:17, 701:21,
705:4
**DEFENDANT'S** [2] -
701:23, 705:6
**DEFENDANTS** [1] -
607:14
**defense** [1] - 689:22
**Defense** [1] - 705:1
**defer** [1] - 853:9
**defining** [1] - 706:14
**definitely** [1] - 803:20
**definition** [2] - 706:13,
707:7, 707:10,
707:15, 707:16
**deform** [1] - 664:14
**degradation** [21] -
615:12, 615:21,
621:20, 624:10,
627:18, 627:19,
627:21, 627:23,
628:1, 629:8, 630:4,
642:23, 643:6,
643:18, 643:19,
644:5, 644:17,
645:16, 645:21,
658:17, 708:11
**Degradation** [1] -
692:13
**degrade** [11] - 621:22,

621:25, 622:17, 625:10, 626:3, 626:6, 686:10, 692:14, 694:13, 731:13, 795:9
**degraded** [2] - 655:21, 662:15
**degrades** [1] - 621:13
**degrading** [2] - 619:20, 620:4
**degrees** [1] - 848:3
**Delaware** [1] - 611:11
**delays** [1] - 764:15
**deliberations** [1] - 674:3
**deliverables** [1] - 696:17
**deliveries** [1] - 716:2
**demonstrated** [1] - 687:5
**denied** [2] - 779:22, 783:14
**Denies** [3] - 774:4, 783:11, 785:1
**denies** [8] - 774:7, 778:8, 779:7, 779:8, 783:24, 785:1, 786:2, 786:24
**Denver** [1] - 607:10
**deny** [1] - 779:14
**denying** [1] - 778:19
**department** [5] - 661:2, 696:16, 697:17, 698:4
**Department** [2] - 661:3, 661:5
**depended** [1] - 823:2
**deponent** [1] - 625:14
**deposed** [3] - 635:12, 641:25, 678:1
**deposition** [54] - 613:4, 613:13, 614:8, 614:14, 615:18, 625:15, 625:16, 625:17, 625:23, 626:16, 627:7, 633:12, 635:10, 635:17, 635:24, 636:25, 637:8, 637:15, 638:16, 644:9, 645:13, 645:25, 646:4, 646:6, 646:20, 648:19, 648:23, 650:1, 650:4, 668:12, 670:4, 670:8, 676:10, 768:20, 774:12, 776:5, 776:24, 777:2,

777:5, 778:23, 779:6, 779:19, 783:17, 785:7, 788:7, 788:23, 824:4, 824:9, 824:11, 825:22, 826:7, 826:12, 852:17
**depression** [5] - 739:13, 739:15, 739:23, 763:3, 828:5
**DEPUTY** [2] - 609:14, 609:18
**describe** [4] - 705:9, 706:4, 706:6, 822:20
**described** [6] - 770:4, 817:18, 820:16, 828:11, 849:10, 849:12
**design** [9] - 663:19, 663:21, 665:4, 666:2, 670:23, 676:17, 677:13, 682:23, 692:3
**designate** [1] - 852:18
**designated** [2] - 626:17, 640:10
**designed** [2] - 697:5, 706:7
**designing** [2] - 698:12
**desired** [1] - 628:25
**detail** [6] - 621:9, 772:5, 772:13, 835:19, 836:4, 836:7
**details** [1] - 696:1
**detang** [1] - 676:16
**detanged** [5] - 664:5, 664:10, 703:22, 712:5, 712:7
**detangling** [5] - 664:9, 664:22, 677:8, 677:11, 712:9
**DeTemple** [1] - 856:9
**determine** [5] - 662:15, 675:22, 852:5, 852:7, 852:9
**determining** [1] - 701:4
**detract** [1] - 649:4
**develop** [1] - 810:18
**developed** [3] - 696:15, 706:8, 815:6
**developing** [2] - 654:22, 706:21
**development** [2] - 706:4, 706:20
**Development** [3] - 661:3, 661:4, 697:3
**develops** [1] - 696:14
**device** [9] - 622:20,

641:17, 675:14, 682:5, 703:13, 705:24, 706:2, 708:22
**devices** [5] - 641:19, 672:14, 700:6, 701:14, 703:5
**DFU** [33] - 678:2, 678:8, 679:16, 680:2, 680:5, 688:17, 688:25, 689:9, 689:12, 689:21, 690:10, 691:23, 692:11, 692:15, 692:19, 693:14, 693:20, 693:25, 694:1, 694:6, 694:17, 695:2, 695:12, 695:21, 696:1, 696:15, 696:21, 698:1, 698:19, 699:3, 708:7
**DFUs** [2] - 688:15, 693:21
**diagnose** [1] - 802:17
**diagnosed** [9] - 789:17, 789:25, 801:21, 801:22, 802:11, 803:3, 827:8, 827:20, 848:7
**diagnoses** [2] - 752:23, 752:25
**diagnosis** [7] - 728:3, 728:9, 746:5, 753:3, 753:7, 802:4, 802:13
**diagnostic** [1] - 753:14
**difference** [4] - 613:22, 672:15, 688:15, 688:25
**differences** [6] - 689:21, 690:10, 690:24, 703:18, 703:22
**Different** [1] - 671:24
**different** [39] - 617:6, 617:14, 624:20, 624:23, 654:12, 657:20, 662:11, 662:25, 666:21, 666:25, 671:22, 672:6, 685:3, 685:8, 685:19, 686:1, 686:17, 690:15, 696:20, 699:6, 699:10, 700:9, 704:18, 705:12, 706:5, 710:9, 710:10, 727:11,

734:6, 734:23, 741:11, 747:14, 754:17, 785:20, 786:18, 802:6, 813:7
**differently** [1] - 672:17
**difficult** [5] - 720:5, 736:9, 736:11
**difficulty** [5] - 762:19, 773:20, 773:22, 826:20, 843:19
**diminished** [1] - 822:8
**Direct** [1] - 608:6
**direct** [7] - 643:6, 648:16, 651:3, 657:15, 727:17, 769:4, 852:14
**DIRECT** [4] - 609:25, 660:3, 712:22, 798:16
**directing** [1] - 668:9
**direction** [1] - 831:14
**Directions** [19] - 677:15, 677:17, 677:21, 678:25, 679:4, 679:17, 679:21, 686:25, 687:1, 687:6, 688:9, 691:14, 691:18, 692:6, 692:24, 693:18, 696:11, 697:14
**directly** [2] - 655:4, 689:12
**disability** [2] - 827:6, 827:9
**disagree** [2] - 709:20, 729:18
**disappear** [1] - 802:16
**disappointed** [1] - 818:17
**discharge** [1] - 746:23
**disclose** [1] - 613:23
**disclosed** [2] - 613:17, 639:24
**discomfort** [2] - 759:8, 797:9
**discuss** [11] - 659:11, 659:12, 741:4, 750:23, 750:24, 836:7, 842:4, 854:2, 854:3, 854:9
**discussed** [7] - 615:1, 749:8, 750:4, 771:8, 771:11, 772:2, 835:18
**discussion** [7] - 671:6, 701:25, 730:1, 748:8, 771:21, 772:1, 787:3
**discussions** [4] -

748:5, 760:20, 766:8, 767:23
**disfiguring** [1] - 758:11
**dishes** [2] - 792:8
**disorder** [2] - 827:9, 827:12
**disproven** [1] - 812:25
**dispute** [4] - 754:9, 754:11, 849:20, 849:21
**dissertations** [1] - 654:20
**Distinguished** [3] - 610:13, 612:2, 612:3
**distinguished** [2] - 620:10, 620:11
**DISTRICT** [3] - 606:1, 606:2, 606:15
**District** [2] - 609:2, 859:4, 859:5
**diverticulum** [4] - 743:20, 744:1, 745:1, 745:17
**dizzy** [1] - 792:9
**doctor** [66] - 647:5, 651:18, 653:4, 653:6, 653:9, 653:18, 653:25, 679:10, 691:17, 693:14, 695:1, 695:12, 708:6, 717:10, 717:17, 717:19, 720:6, 723:1, 723:14, 724:5, 724:11, 725:20, 727:1, 728:4, 728:6, 728:7, 741:18, 741:23, 747:18, 747:23, 748:1, 748:6, 748:8, 755:12, 760:14, 760:20, 761:8, 764:6, 766:8, 766:23, 767:13, 772:21, 775:20, 782:24, 790:11, 803:16, 805:24, 808:4, 808:18, 809:21, 811:9, 812:12, 812:16, 813:4, 813:6, 813:8, 814:12, 815:16, 815:18, 817:11, 831:21, 831:22, 831:24, 833:13, 840:6
**Doctor** [16] - 634:1, 635:22, 637:8, 638:24, 641:16,

643:5, 643:24,
644:3, 644:9, 645:2,
645:24, 646:20,
647:4, 649:10,
650:1, 653:18
**doctor's** [9] - 728:10,
747:15, 770:21,
772:10, 774:24,
777:15, 795:23,
831:15, 831:21
**doctors** [35] - 651:7,
651:24, 652:2,
652:6, 652:14,
652:22, 652:25,
654:23, 656:7,
656:14, 657:25,
658:4, 694:5,
695:17, 708:13,
724:9, 724:15,
725:9, 740:22,
741:8, 741:10,
741:13, 747:25,
777:12, 783:2,
783:5, 802:17,
803:5, 803:14,
803:19, 812:14,
815:23, 827:18,
827:24, 831:19
**document** [54] -
616:19, 626:9,
627:4, 627:6,
627:15, 631:14,
633:3, 633:5, 633:9,
633:12, 666:15,
666:19, 666:23,
667:6, 672:24,
673:2, 680:24,
685:16, 696:19,
697:25, 701:11,
703:3, 710:17,
710:18, 711:22,
711:23, 744:13,
745:12, 747:6,
751:21, 752:19,
752:21, 757:19,
757:21, 759:14,
764:21, 766:14,
768:3, 771:25,
773:9, 775:15,
783:9, 783:22,
783:23, 784:15,
785:24, 786:6,
791:22, 796:7,
834:18, 836:24,
838:25, 839:18,
840:14
**Document** [1] - 742:5
**documentation** [2] -
701:6, 722:5
**documented** [1] -

797:16
**documents** [13] -
609:20, 624:24,
625:15, 625:17,
625:22, 631:11,
650:5, 650:8,
696:17, 737:8,
759:20, 794:18,
854:14
**done** [42] - 642:6,
642:9, 642:10,
652:11, 652:12,
653:10, 654:24,
662:14, 676:4,
676:11, 677:12,
683:14, 684:6,
695:4, 695:14,
697:12, 700:20,
701:4, 701:5,
706:23, 707:15,
709:14, 711:15,
712:8, 726:19,
755:2, 755:25,
771:24, 799:20,
814:6, 819:3,
833:21, 835:8,
843:16, 847:22,
848:1, 848:2, 848:5
**door** [2] - 688:18,
690:20
**DOREEN** [5] - 608:9,
660:1, 660:3, 696:7,
708:18
**Doreen** [2] - 659:6,
659:22
**dossier** [1] - 663:21
**double** [3] - 799:24,
818:7, 818:9
**doubt** [1] - 620:11
**DOUGLAS** [1] -
607:11
**down** [61] - 614:18,
616:22, 618:8,
619:5, 619:21,
620:3, 621:12,
627:13, 629:8,
630:5, 632:10,
652:9, 653:7, 659:1,
674:18, 703:7,
712:13, 745:12,
745:15, 758:7,
758:9, 763:20,
764:14, 766:21,
769:3, 769:21,
774:1, 775:10,
775:11, 775:12,
775:22, 776:16,
777:12, 777:20,
777:21, 778:7,
779:1, 780:4,

781:18, 781:19,
786:12, 787:9,
787:10, 792:2,
797:20, 797:23,
799:19, 808:8,
810:24, 825:11,
837:1, 837:13,
839:4, 839:21,
840:1, 842:20,
843:22, 844:4,
851:23
**Downs** [1] - 799:16
**Dr** [166] - 609:12,
610:15, 612:23,
613:1, 613:12,
615:9, 615:11,
624:8, 627:20,
633:23, 640:9,
648:8, 648:16,
648:19, 648:22,
648:23, 700:21,
701:25, 717:14,
717:16, 717:19,
718:3, 719:4,
719:14, 721:19,
722:1, 722:9, 723:4,
723:9, 723:20,
724:3, 724:5, 724:7,
724:8, 724:11,
724:14, 724:18,
724:20, 724:22,
724:24, 725:1,
725:4, 725:5, 725:7,
725:11, 725:12,
725:13, 725:18,
725:22, 725:25,
726:8, 729:25,
730:21, 733:2,
741:9, 744:12,
744:25, 746:16,
746:20, 751:22,
752:11, 752:20,
753:25, 756:18,
766:13, 766:18,
769:25, 770:4,
770:9, 771:21,
772:1, 780:1, 780:3,
780:9, 780:20,
780:22, 781:3,
782:19, 783:1,
783:3, 787:16,
787:24, 789:15,
790:11, 790:14,
790:15, 790:17,
790:19, 791:4,
791:12, 791:25,
792:21, 792:22,
793:2, 793:11,
793:12, 805:16,
805:20, 805:21,
806:3, 806:9,

806:22, 807:16,
807:18, 809:24,
809:25, 811:8,
811:11, 811:13,
811:22, 813:21,
815:13, 815:14,
815:16, 816:4,
816:6, 816:18,
816:22, 817:4,
826:3, 831:23,
831:24, 831:25,
832:15, 832:19,
832:20, 832:22,
833:3, 833:22,
834:23, 835:5,
836:1, 836:18,
837:10, 837:18,
837:22, 838:6,
838:9, 838:16,
840:10, 840:16,
840:24, 841:7,
841:11, 841:18,
841:19, 841:22,
842:12, 844:17,
845:14, 845:17,
846:2, 846:4,
846:20, 846:25,
851:9, 855:20,
856:25, 857:4
**drafting** [1] - 697:22
**drain** [1] - 759:5
**dramatically** [1] -
830:20
**drawn** [1] - 624:21
**dribble** [1] - 826:23
**dribbling** [1] - 773:23
**drink** [2] - 804:1,
804:2
**dropped** [1] - 830:20
**drops** [2] - 793:8,
793:9
**drug** [1] - 802:25
**drugs** [3] - 763:4,
764:2, 834:9
**due** [1] - 645:15
**Duke** [1] - 803:16
**DULY** [4] - 609:16,
660:1, 712:20,
798:11
**dumbed** [1] - 674:18
**Dunbar** [1] - 781:4
**During** [1] - 709:13
**during** [15] - 633:12,
643:6, 651:3, 690:5,
718:14, 719:12,
730:5, 765:15,
787:4, 821:25,
822:11, 848:18,
849:19, 849:23,
850:17

**duties** [1] - 611:11
**dyspareunia** [7] -
692:22, 771:14,
782:3, 794:16,
796:20, 797:2,
797:16

**E**

**ear** [1] - 830:14
**early** [8] - 623:9,
697:3, 700:11,
707:7, 707:9,
791:12, 828:1
**easier** [1] - 804:11
**easy** [3] - 660:16,
795:16, 807:6
**edge** [1] - 703:22
**edges** [2] - 664:10,
712:6
**educate** [1] - 693:18
**education** [2] -
611:17, 611:19
**educational** [1] -
622:13
**effect** [8] - 628:9,
628:13, 643:17,
644:4, 644:16,
645:15, 764:5
**effective** [4] - 691:20,
692:6, 694:11,
697:13
**effectiveness** [2] -
686:24, 687:3
**effects** [5] - 666:1,
669:3, 671:2,
676:21, 677:1
**efficacy** [2] - 689:13,
689:16
**effort** [1] - 751:2
**eight** [2] - 743:17,
794:18
**Either** [1] - 666:22
**either** [11] - 613:12,
673:19, 680:9,
680:12, 683:7,
687:25, 688:24,
691:25, 699:5,
749:4, 754:11
**elaborate** [1] - 696:16
**electronic** [1] - 697:25
**eleven** [1] - 737:21
**Eleven** [1] - 737:22
**ELMO** [1] - 796:5
**elongate** [1] - 664:14
**elongation** [8] -
671:10, 671:13,
672:19, 673:1,
675:8, 705:19,
705:23, 708:1

elsewhere [1] - 856:2
embrittlement [3] -
628:10, 628:19,
628:20
Emergency [3] -
839:8, 839:13, 840:9
emotional [1] - 774:20
empathize [1] -
774:19
employed [1] - 660:24
employee [3] -
738:12, 738:14
empties [1] - 845:3
emptying [3] - 805:12,
826:20, 843:19
enabling [1] - 703:3
end [14] - 611:21,
611:23, 612:23,
634:13, 634:15,
666:23, 714:21,
717:16, 725:18,
726:8, 786:20,
815:25, 819:11,
820:14
ended [1] - 708:5
ends [1] - 815:5
endures [1] - 675:11
engage [4] - 720:10,
720:12, 721:16,
850:8
engaged [2] - 850:2,
850:15
engaging [8] - 720:1,
728:19, 733:25,
822:7, 822:10,
823:13, 849:25,
850:1
engineer [2] - 660:22,
697:3
engineering [1] -
665:2
engineers [2] -
625:12, 654:18
English [1] - 831:12
enjoyed [1] - 818:20
enlarge [1] - 767:3
enlarged [1] - 840:3
ensure [6] - 665:5,
665:9, 685:1, 690:2,
692:5
entered [2] - 609:5,
751:12
enterolysis [1] -
753:15
entire [2] - 713:4,
799:3
entirely [2] - 758:20,
772:10
entitled [1] - 618:18
episode [1] - 792:12

episodes [3] - 765:14,
792:4, 792:13
equal [1] - 690:17
equaled [1] - 715:14
equipment [1] - 700:8
equivalence [3] -
690:14, 690:16,
690:17
ER [4] - 809:6, 809:8,
809:11, 845:21
erode [1] - 619:18
erosion [2] - 761:25,
771:13
ESQUIRE [8] - 607:3,
607:6, 607:8,
607:11, 607:15,
607:17, 607:18,
607:18
essentially [1] - 624:7
establish [2] - 662:22,
663:5
established [10] -
620:20, 620:24,
621:21, 621:24,
681:23, 682:2,
682:12, 689:8,
691:19, 694:10
estimate [2] - 650:16,
847:24
estrogen [3] - 840:24,
841:1, 841:3
et [11] - 606:6, 618:25,
623:15, 747:21,
752:17, 758:21,
761:21, 763:2,
763:7, 763:11,
771:14
Ethicon [3] - 662:3,
663:18, 703:18
Eva [1] - 819:22
EVA [1] - 607:18
evaluate [4] - 706:11,
707:2, 793:12, 817:7
evaluated [1] - 673:5
evaluating [1] -
671:25
evaluation [6] -
701:14, 703:4,
706:16, 707:3,
749:10
Evan [3] - 616:22,
627:13, 628:3
event [2] - 739:20,
739:24, 743:13,
746:10, 805:1
eventual [2] - 628:10,
802:22
eventually [8] -
619:12, 619:13,
619:16, 629:18,

725:18, 726:8,
802:3, 822:14
evidence [18] - 624:7,
626:14, 627:1,
631:5, 643:12,
663:13, 674:2,
678:11, 678:16,
680:19, 688:6,
701:18, 701:22,
705:5, 710:13,
710:17, 818:23,
858:9
Evidence [1] - 728:2
EVIDENCE [6] - 627:2,
633:17, 678:17,
701:23, 705:6,
858:11
evolution [1] - 707:17
exact [7] - 630:13,
667:21, 676:9,
684:6, 710:1,
788:22, 830:15
exactly [4] - 683:22,
686:21, 699:12,
814:6
exam [4] - 724:3,
724:24, 725:22,
846:24
Examination [1] -
846:14
EXAMINATION [11] -
609:25, 633:22,
654:7, 660:3, 696:7,
708:18, 712:22,
736:2, 793:24,
798:16, 851:6
examination [14] -
632:22, 643:6,
666:13, 709:13,
736:1, 770:19,
813:23, 815:25,
816:23, 816:25,
819:18, 843:23,
846:15, 846:21
examine [3] - 685:1,
793:12, 815:23
examined [3] - 723:9,
793:5, 809:14
example [2] - 619:19,
619:22
examples [1] - 852:12
exceeded [1] - 821:14
excellent [2] - 838:9,
838:11
except [2] - 727:24,
799:20
exception [13] - 615:7,
617:24, 625:3,
633:16, 649:6,
672:25, 690:25,

709:22, 728:1,
728:5, 728:10,
728:12, 794:22
excised [1] - 745:2
excision [1] - 745:16
excuse [3] - 745:15,
814:1, 849:22
exercises [1] - 761:1
Exhibit [58] - 626:15,
626:25, 629:21,
632:23, 633:7,
678:8, 678:15,
680:20, 701:17,
701:21, 705:1,
705:4, 710:15,
710:21, 711:23,
742:6, 746:17,
751:21, 756:18,
766:13, 834:16,
836:22, 838:23,
839:17, 840:13,
841:25, 843:10,
844:22, 845:16,
846:5, 854:18,
854:25, 855:11,
855:12, 855:19,
855:21, 855:23,
855:25, 856:9,
856:11, 856:13,
856:15, 856:17,
856:19, 856:21,
856:23, 856:25,
857:2, 857:4, 857:6,
857:8, 857:10,
857:12, 857:14,
857:16, 857:18,
857:20
exhibit [10] - 609:22,
616:17, 631:6,
752:20, 757:19,
783:19, 839:25,
853:21, 854:22,
855:17
EXHIBIT [5] - 627:2,
633:17, 678:17,
701:23, 705:6
Exhibits [1] - 858:7
exhibits [2] - 854:15,
854:18
EXHIBITS [2] - 608:3,
858:10
exist [1] - 735:8
existed [1] - 641:17
existing [2] - 762:3,
762:8
expand [1] - 844:5
expect [2] - 672:22,
831:6
expecting [1] - 673:16
experience [21] -

624:17, 646:7,
646:10, 646:13,
646:16, 646:24,
652:14, 653:22,
654:2, 654:8,
656:23, 685:12,
717:7, 773:18,
806:18, 821:16,
829:25, 848:18,
849:22, 849:23
experienced [3] -
716:8, 729:1, 809:2
experiencing [2] -
734:23, 825:8
expert [16] - 620:22,
624:14, 634:16,
634:18, 634:22,
638:24, 639:1,
640:10, 646:25,
647:10, 647:18,
648:5, 648:6,
648:23, 649:10,
649:11
experts [4] - 635:21,
655:9, 685:1, 702:21
explain [7] - 619:7,
676:7, 696:13,
700:4, 723:21,
732:22, 801:15
explained [3] -
759:16, 760:1,
771:22
explaining [2] -
625:10, 657:8
explains [1] - 617:5
explanation [6] -
645:3, 645:7,
684:22, 709:20,
804:15
explanted [4] - 644:7,
645:18, 658:21,
658:22
exploratory [1] -
752:16
explore [2] - 689:22,
709:15
exposed [1] - 626:6
exposure [1] - 621:25
express [1] - 699:14
extensive [1] - 753:9
extent [5] - 615:13,
660:15, 667:8,
688:16, 710:2
extrapolate [1] -
685:18
extreme [2] - 827:12,
830:18
extremely [1] - 825:14
extrusion [2] - 761:24,
849:19

**eye** [2] - 694:16, 830:14

# F

**face** [4] - 803:7, 803:8, 830:14, 830:16
**facilitate** [1] - 674:16
**facility** [2] - 611:12, 612:10
**fact** [27] - 620:22, 629:7, 629:24, 636:25, 637:4, 638:13, 639:23, 642:21, 647:13, 650:22, 652:6, 657:1, 688:13, 688:22, 690:22, 703:21, 704:2, 730:5, 730:9, 765:24, 768:11, 768:12, 768:20, 769:12, 771:25, 848:20, 849:9
**factor** [1] - 804:14
**factually** [1] - 687:9
**fail** [7] - 672:20, 673:3, 673:13, 673:20, 707:16, 808:12
**failed** [7] - 672:3, 672:19, 673:6, 673:8, 673:13, 673:14, 673:20
**faint** [1] - 792:10
**fainting** [1] - 792:7
**Fair** [18] - 661:21, 662:11, 662:16, 662:17, 663:25, 664:2, 664:15, 664:23, 668:14, 676:18, 677:15, 679:12, 680:16, 681:12, 693:13, 693:19, 695:25, 711:16
**fair** [44] - 615:4, 646:23, 647:1, 647:25, 648:3, 648:20, 648:25, 649:11, 653:25, 655:7, 655:24, 655:25, 661:3, 661:12, 661:17, 662:4, 662:13, 662:24, 663:3, 663:15, 663:20, 664:6, 665:3, 671:9, 676:4, 677:20, 680:8, 681:8, 684:7, 687:9, 689:20,

693:1, 693:4, 704:21, 716:13, 721:24, 728:13, 735:18, 741:24, 795:22, 795:24, 801:4, 827:3
**fairly** [1] - 689:22
**fairness** [1] - 664:20
**fall** [2] - 796:1, 804:25
**falling** [2] - 645:23, 704:10
**falls** [3] - 615:13, 615:14, 728:12
**familiar** [12] - 631:20, 631:22, 641:19, 663:14, 674:6, 678:22, 683:13, 693:11, 695:17, 710:3, 710:6, 716:13
**familiarize** [1] - 679:11
**family** [3] - 782:5, 782:7, 805:18
**far** [11] - 624:15, 689:10, 725:8, 735:22, 781:24, 782:13, 799:13, 800:7, 806:18, 834:8, 844:23
**Farrell** [3] - 606:18, 859:3, 859:12
**FARRELL** [2] - 607:6, 607:6
**fashion** [5] - 645:9, 647:8, 649:12, 666:19, 804:19
**fast** [1] - 791:1
**fatal** [1] - 762:20
**father** [1] - 800:1
**favorite** [1] - 818:7
**FCRR** [3] - 606:20, 859:6, 859:15
**FDA** [1] - 688:10, 688:12, 688:13, 689:12, 689:25, 690:11, 690:15, 690:19, 690:21
**FDA's** [1] - 688:18
**fear** [4] - 819:9, 819:11, 819:15
**features** [1] - 663:23
**February** [18] - 746:20, 748:11, 754:4, 777:15, 779:1, 781:1, 785:22, 786:10, 796:1, 803:15, 818:12, 833:4, 845:19, 846:2, 846:6, 847:6, 847:22

**Federal** [1] - 728:2
**federation** [1] - 702:15
**feelings** [2] - 721:6, 721:17
**feet** [1] - 763:2
**fellow** [1] - 648:8
**felt** [13] - 663:24, 720:15, 721:12, 792:10, 803:11, 805:12, 810:21, 811:15, 815:4, 817:8, 826:21, 846:17, 847:3
**female** [5] - 666:1, 742:23, 765:9, 770:13, 781:9
**female's** [2] - 669:3, 671:3
**few** [25] - 612:14, 634:3, 686:23, 705:17, 708:19, 716:5, 741:6, 748:18, 748:20, 762:10, 772:21, 791:8, 794:2, 794:3, 800:7, 801:17, 806:5, 810:23, 815:6, 819:25, 820:1, 820:3, 824:5, 831:13, 843:17
**fibers** [2] - 611:9, 611:12
**fibroid** [1] - 840:17
**fibroids** [1] - 809:17
**field** [1] - 800:22
**fields** [1] - 624:15
**fifth** [1] - 802:5
**figure** [11] - 650:11, 673:19, 673:20, 686:23, 696:24, 697:6, 707:11, 735:21, 802:1, 827:21, 852:4
**figured** [2] - 638:14, 749:21
**figuring** [1] - 707:17
**file** [2] - 737:3, 791:15
**filed** [2] - 737:5, 737:9
**fill** [2] - 822:15, 848:20
**filled** [1] - 768:23
**filling** [3] - 701:6, 768:11, 768:12
**film** [1] - 833:21
**films** [1] - 611:10
**Finally** [1] - 764:4
**finally** [1] - 857:20
**financially** [1] - 800:2
**fine** [2] - 678:11, 793:19
**finger** [2] - 822:22,

822:23
**fingerprint** [1] - 700:9
**fingers** [2] - 817:2, 822:24
**finish** [3] - 645:1, 800:4, 826:23
**finished** [2] - 791:20, 851:3
**finishing** [1] - 853:16
**FIRM** [1] - 607:11
**first** [49] - 612:9, 612:15, 616:22, 618:12, 619:25, 629:21, 639:4, 661:2, 661:20, 665:23, 679:19, 681:14, 681:18, 693:2, 695:2, 703:1, 727:5, 742:20, 744:1, 747:18, 748:1, 749:10, 749:11, 750:6, 750:10, 753:8, 755:17, 755:18, 773:5, 773:6, 774:16, 781:7, 791:16, 802:10, 808:22, 811:13, 814:21, 821:1, 821:6, 827:5, 827:8, 831:11, 832:8, 841:15, 844:22, 845:22
**First** [1] - 741:8
**fishing** [5] - 619:22, 619:23, 619:25, 655:21
**fistula** [1] - 758:21
**fits** [1] - 696:25
**Fitzwater** [9] - 724:8, 724:14, 724:22, 724:24, 725:1, 725:5, 741:9, 790:13, 792:22
**five** [5] - 611:6, 706:8, 721:23, 753:13, 838:6
**five-phase** [1] - 706:8
**fix** [1] - 718:11
**fixture** [1] - 801:2
**FLAHERTY** [1] - 607:15
**flake** [2] - 629:2, 629:3
**flank** [3] - 839:15, 839:22, 840:3
**flare** [3] - 804:11, 804:23, 805:2
**flare-ups** [2] - 804:23, 805:2
**flip** [1] - 611:4

**floor** [1] - 792:11
**fluid** [1] - 825:12
**fluids** [1] - 617:2
**fly** [1] - 803:17
**follow** [16] - 663:1, 683:8, 693:5, 693:6, 698:7, 722:10, 727:14, 772:22, 789:7, 789:10, 794:2, 809:11, 811:7, 815:10, 844:24, 846:8
**follow-up** [5] - 683:8, 722:10, 794:2, 844:24, 846:8
**follow-ups** [1] - 772:22
**followed** [3] - 788:18, 838:6, 840:9
**following** [20] - 612:20, 623:25, 648:13, 666:6, 669:15, 687:2, 688:3, 697:11, 709:11, 749:5, 749:7, 713:18, 803:13, 807:14, 807:20, 809:11, 812:10, 814:25, 850:9, 852:3
**follows** [1] - 609:4
**FOLLOWS** [4] - 609:16, 660:2, 712:21, 798:11
**follow-up** [5] - 773:5, 773:6, 781:10, 781:12, 841:17
**footprint** [1] - 683:22
**FOR** [4] - 606:2, 607:2, 607:14, 608:6
**force** [1] - 671:14
**forces** [3] - 671:20, 674:25, 675:1
**foregoing** [1] - 859:6
**foreign** [6] - 647:19, 692:17, 692:18, 762:3, 762:7, 832:10
**forever** [2] - 735:16
**form** [23] - 614:23, 620:17, 620:21, 622:24, 648:2, 653:13, 654:1, 694:19, 694:21, 730:7, 755:18, 756:6, 759:15, 759:16, 765:5, 777:16, 783:12, 786:17, 836:14, 836:16, 836:19, 837:17

**format** [1] - 696:25
**formation** [2] - 758:21, 763:11
**formed** [10] - 634:11, 635:6, 635:16, 639:14, 640:1, 641:22, 646:17, 647:24, 651:17, 652:1
**forming** [1] - 631:11
**forms** [13] - 730:9, 730:11, 730:13, 730:15, 730:16, 730:19, 759:17, 771:23, 794:4, 794:25, 795:4, 795:8, 795:11
**formulated** [1] - 635:22
**formulating** [1] - 635:9
**formulation** [1] - 684:17
**formulations** [1] - 699:11
**forth** [1] - 859:9
**Forward** [1] - 702:11
**forward** [8] - 609:19, 624:7, 656:23, 706:12, 706:18, 706:21, 816:16, 832:16
**fostering** [1] - 799:19
**foundation** [15] - 617:10, 617:12, 620:17, 620:21, 620:24, 631:10, 633:18, 655:3, 657:6, 657:11, 658:2, 694:19, 694:22, 695:6, 726:24
**foundational** [1] - 621:8
**four** [11] - 640:25, 649:22, 650:18, 652:15, 753:13, 764:23, 776:8, 794:7, 807:9, 821:17, 848:2
**FOUR** [1] - 606:12
**Fourier** [1] - 700:7
**frame** [4] - 747:2, 788:21, 791:15, 801:24
**Francis** [2] - 835:9, 857:10
**Frank** [1] - 626:16
**frank** [1] - 613:17
**free** [4] - 621:13,

671:19, 674:25, 675:14
**free-radical-type** [1] - 621:13
**freeze** [5] - 656:6, 656:8, 656:11, 656:21, 656:24
**freezer** [4] - 656:5, 656:9, 656:21, 656:24
**freezing** [1] - 657:15
**frequency** [3] - 771:14, 796:22, 842:18
**frequent** [2] - 744:17, 746:22
**frequently** [1] - 720:3
**Friday** [2] - 743:4, 854:5
**friend** [3] - 714:5, 791:11, 818:17
**friends** [2] - 788:17, 788:19
**front** [11] - 637:8, 644:9, 713:2, 774:16, 810:16, 810:18, 810:19, 810:21, 815:1, 817:22, 826:10
**FTIR** [6] - 683:21, 700:1, 700:7, 700:11, 700:12, 705:13
**full** [5] - 611:23, 689:21, 700:22, 771:16, 772:12
**fully** [2] - 731:7, 805:13
**function** [5] - 674:21, 674:23, 675:5, 758:12, 818:5
**functional** [2] - 696:13, 696:19
**functioning** [1] - 830:11
**functions** [1] - 803:8
**future** [3] - 709:16, 710:11, 711:3

## G

**gain** [1] - 618:2
**gallbladder** [5] - 745:24, 746:6, 746:7, 746:8, 746:12
**gather** [3] - 711:4, 711:12, 736:14
**geared** [1] - 677:10
**general** [16] - 623:20, 640:10, 640:11,

641:18, 726:17, 729:13, 755:18, 756:7, 758:10, 758:13, 766:22, 775:7, 780:11, 805:15, 806:25
**General** [2] - 845:1, 846:10
**generalized** [1] - 797:11
**generally** [9] - 620:12, 621:11, 624:2, 624:18, 625:8, 647:21, 780:23, 813:1, 822:4
**generated** [1] - 630:3
**generates** [1] - 629:17
**generating** [1] - 629:17
**gentlemen** [14] - 610:11, 645:5, 658:5, 659:10, 660:4, 673:25, 712:25, 713:1, 716:15, 728:25, 750:22, 842:3, 853:19, 854:1
**Georgia** [1] - 611:13
**Gido** [4] - 648:8, 648:19, 648:22, 648:23
**Gido's** [1] - 648:16
**gist** [1] - 806:25
**given** [18] - 625:1, 629:25, 642:17, 663:3, 663:4, 671:14, 719:17, 754:25, 755:3, 759:25, 765:5, 771:23, 782:19, 806:23, 807:18, 837:20, 851:1, 853:7
**Given** [1] - 709:20
**glasses** [1] - 824:13
**goal** [5] - 662:2, 662:12, 703:8, 708:21, 708:22
**God** [1] - 760:16
**gold** [1] - 663:9
**gonna** [2] - 656:9, 656:11
**Goodwin** [2] - 615:11, 624:9
**grade** [1] - 685:11
**Grade** [1] - 792:25
**graduate** [1] - 611:6
**Grand** [1] - 607:19
**grant** [1] - 855:10
**great** [2] - 661:2, 813:25

**greater** [2] - 675:3, 675:4
**Green** [3] - 607:12, 793:11, 793:12
**GREENE** [1] - 607:6
**Greisman** [1] - 856:11
**groin** [1] - 744:16
**group** [11] - 696:22, 696:23, 696:24, 698:6, 698:9, 698:14, 698:15, 701:3, 752:22, 762:10
**growth** [3] - 674:14, 674:16, 676:24
**guarantee** [2] - 664:25, 757:7
**guardian** [1] - 799:15
**guess** [7] - 660:21, 662:2, 710:24, 735:23, 767:9, 772:18, 775:17
**guidance** [2] - 703:3, 812:9
**guy** [1] - 674:19
**guys** [3] - 666:21, 666:25, 677:13
**gynecological** [1] - 809:10
**gynecologist** [3] - 809:12, 809:15, 840:11

## H

**Hafar** [1] - 856:13
**half** [15] - 672:14, 673:10, 715:25, 737:21, 737:22, 743:4, 743:10, 778:4, 796:19, 799:18, 799:25, 804:10, 806:21, 808:20, 853:8
**halfway** [1] - 616:3
**hall** [1] - 810:24
**Halo** [1] - 678:8
**halogens** [2] - 627:16, 628:8
**hand** [6] - 609:15, 626:9, 678:21, 704:9, 767:7, 794:7
**handed** [2] - 701:12, 704:15
**handle** [3] - 735:23, 821:5, 825:20
**handled** [1] - 737:5
**handwriting** [3] - 643:4, 747:14, 839:4
**hang** [1] - 630:24

**Hannah** [2] - 744:12, 744:25
**happy** [2] - 846:23, 853:3
**hard** [1] - 802:16
**HARDY** [1] - 607:19
**hate** [1] - 854:6
**HAVING** [4] - 609:16, 660:1, 712:20, 798:11
**Hawaii** [1] - 715:1
**head** [8] - 802:2, 802:3, 802:15, 803:24, 827:22, 829:5, 829:15, 829:21
**headache** [3] - 792:12, 792:18, 802:21
**headaches** [1] - 792:13
**health** [1] - 698:17
**hear** [7] - 631:13, 693:11, 718:19, 774:19, 805:6, 839:9, 856:1
**heard** [14] - 627:19, 661:19, 664:5, 673:6, 679:3, 692:9, 692:13, 692:21, 710:8, 713:7, 716:4, 717:17, 718:17, 732:1
**hearing** [2] - 633:2, 751:1
**hearsay** [14] - 723:14, 725:14, 727:11, 727:18, 728:2, 728:9, 805:23, 808:1, 812:7, 812:14, 812:17, 813:5, 813:10, 816:8
**heat** [1] - 712:4
**heat-melted** [1] - 712:4
**heavy** [1] - 807:24
**help** [13] - 609:20, 611:13, 611:15, 628:23, 663:1, 729:10, 729:23, 789:2, 789:4, 789:13, 799:22, 800:2, 825:25
**helped** [1] - 737:6
**Hercules** [3] - 611:7, 611:12
**hereby** [1] - 859:6
**hereinbefore** [1] - 859:9
**hernia** [2] - 665:15,

685:9
**hernias** [1] - 685:13
**hesitancy** [1] - 842:18
**Heywood** [1] - 856:15
**high** [1] - 714:12
**highlight** [3] - 837:13, 842:15, 846:15
**highlighted** [5] - 669:18, 759:24, 792:3, 842:16, 851:10
**himself** [1] - 679:11
**hire** [2] - 684:25, 685:3
**hired** [13] - 622:21, 623:7, 623:19, 641:4, 641:5, 641:8, 641:16, 642:10, 642:14, 642:20, 642:21, 643:2, 656:1
**historical** [1] - 685:17
**History** [2] - 765:1, 781:7
**history** [19] - 728:7, 740:5, 741:5, 741:6, 742:19, 742:24, 743:16, 743:19, 747:20, 751:22, 751:24, 752:1, 765:2, 765:5, 765:6, 765:10, 827:3, 827:4, 843:12
**hit** [2] - 742:11, 746:13
**hold** [3] - 741:18, 812:1
**hole** [1] - 829:4
**home** [5] - 772:18, 800:1, 801:2, 806:16, 828:21
**homeopathic** [1] - 841:3
**honest** [2] - 735:12, 741:15
**honestly** [1] - 693:5
**Honor** [95] - 609:8, 609:10, 609:11, 609:23, 610:5, 612:17, 614:17, 615:23, 623:3, 625:4, 625:5, 626:13, 626:21, 630:18, 631:4, 632:21, 632:25, 633:4, 633:20, 640:9, 644:25, 648:11, 649:7, 653:12, 658:25, 659:5, 659:21, 659:24, 660:11, 667:11, 667:12,

668:3, 670:16, 670:17, 674:4, 678:7, 678:18, 680:16, 688:21, 689:17, 691:1, 696:5, 701:7, 701:16, 701:20, 704:6, 704:25, 705:3, 708:16, 712:16, 723:13, 725:14, 726:4, 726:24, 727:4, 727:10, 727:25, 742:6, 746:17, 751:5, 751:15, 756:17, 768:16, 769:18, 794:17, 797:21, 798:7, 798:13, 805:23, 808:1, 808:6, 810:4, 812:4, 812:20, 814:1, 816:8, 823:24, 842:10, 848:22, 849:2, 849:5, 850:23, 851:3, 851:22, 852:1, 852:13, 853:20, 853:23, 854:23, 855:3, 855:8, 855:9, 855:14, 858:12, 858:13
**HONORABLE** [1] - 606:14
**Honorable** [1] - 609:1
**hook** [4] - 833:11, 833:14, 833:15, 833:19
**hope** [2] - 662:6, 708:22
**hoped** [1] - 665:1
**hopefully** [1] - 664:10
**hopes** [1] - 664:1
**HOPI** [1] - 845:22
**hoping** [2] - 662:10, 663:17
**horse** [2] - 799:19, 801:1
**Hospital** [4] - 835:9, 855:22, 857:10, 857:18
**hospital** [3] - 717:24, 717:25, 809:8
**hospitals** [1] - 679:6
**hour** [1] - 842:6
**hours** [10] - 649:22, 649:24, 649:25, 650:17, 650:18, 819:25, 824:3, 824:5, 839:22, 842:2

**house** [1] - 828:25
**Houston** [1] - 607:5
**hum** [5] - 761:17, 774:3, 790:4, 795:21, 824:12
**human** [31] - 617:1, 629:16, 632:3, 632:6, 632:15, 632:18, 662:16, 662:23, 662:24, 671:3, 671:18, 674:10, 674:22, 675:12, 675:20, 675:25, 676:21, 677:2, 679:20, 682:13, 685:2, 687:23, 688:23, 691:9, 692:14, 694:11, 709:17, 710:12, 712:8, 795:5, 819:2
**Human** [1] - 709:2
**humans** [19] - 663:6, 664:23, 676:2, 676:22, 677:3, 677:9, 681:7, 687:25, 689:2, 691:11, 691:24, 692:5, 702:2, 703:8, 708:20, 708:25, 709:15, 731:17, 731:21
**hundred** [3] - 644:6, 655:14, 658:21
**Huntington** [1] - 607:7
**hurt** [1] - 734:12
**hurting** [1] - 781:23
**husband** [2] - 713:23, 719:25, 720:13, 722:17, 722:25, 731:4, 733:25, 781:23, 782:13
**HUTSON** [1] - 607:4
**hygiene** [1] - 717:5
**hypermobile** [1] - 770:17
**hypertechnical** [1] - 613:24
**hysterectomy** [4] - 732:7, 732:15, 741:10, 742:1

## I

**ice** [1] - 818:11
**idea** [24] - 610:16, 632:18, 636:21, 639:15, 647:16, 648:14, 651:13, 655:11, 662:6,

664:8, 664:11, 664:13, 664:17, 664:18, 664:22, 671:24, 674:15, 706:9, 706:16, 706:17, 706:20, 799:12, 801:18, 832:11
**identical** [2] - 669:10
**identify** [4] - 679:25, 684:4, 701:11, 704:15
**illness** [1] - 742:19
**Illness** [2] - 765:1, 781:8
**immediate** [1] - 842:24
**immediately** [1] - 723:10
**impact** [2] - 717:3, 717:8
**impeach** [4] - 649:3, 670:7, 670:12, 670:15
**impeachment** [2] - 669:6, 670:11
**implant** [2] - 645:23, 719:6, 719:25, 732:3, 819:2
**implantation** [10] - 617:1, 632:17, 662:23, 681:24, 682:3, 682:13, 685:2, 719:15, 770:5, 849:13
**implanted** [18] - 632:15, 662:15, 675:11, 675:23, 679:20, 694:2, 695:11, 701:1, 718:18, 718:24, 719:4, 730:1, 733:24, 739:18, 755:5, 760:12, 835:5, 838:3
**implanting** [1] - 651:7, 674:10, 685:4
**implants** [1] - 652:25
**implication** [2] - 624:21, 657:16
**importance** [2] - 689:20, 759:21
**important** [8] - 615:19, 639:6, 639:11, 647:25, 652:17, 674:9, 674:11, 775:5
**impossible** [2] - 731:7, 764:4, 819:6
**impression** [3] -

825:10, 840:1, 840:6
**improper** [2] - 669:6, 794:20
**improve** [2] - 665:1, 757:8
**improved** [8] - 662:11, 801:20, 804:16, 845:2, 846:11, 847:5, 851:11, 851:15
**improvement** [1] - 759:1
**IN** [7] - 606:1, 627:2, 633:17, 678:17, 701:23, 705:6, 858:10
**in-growth** [3] - 674:14, 674:16, 676:24
**inadequate** [1] - 847:2
**inappropriate** [1] - 684:8
**inch** [6] - 672:12, 672:16, 672:22, 673:4, 673:7, 673:11
**inches** [1] - 848:2
**incision** [2] - 833:11, 833:14
**include** [5] - 758:15, 763:10, 771:11, 794:15, 795:4
**included** [3] - 689:1, 728:8, 849:16
**includes** [2] - 834:6, 849:16
**including** [2] - 650:18, 858:7
**Incompatibility** [2] - 618:9, 618:18
**inconsistency** [1] - 670:14
**inconsistent** [1] - 670:13
**incontinence** [53] - 642:2, 647:11, 647:14, 650:18, 687:4, 713:8, 716:5, 716:9, 716:17, 716:18, 717:4, 717:11, 718:4, 718:19, 718:22, 729:4, 729:7, 729:9, 729:23, 749:6, 749:13, 750:9, 754:1, 754:4, 758:1, 758:3, 761:13, 761:14, 763:25, 765:3, 765:11, 765:19, 770:16, 770:24, 771:3, 771:12, 771:13,

773:2, 775:2,
801:11, 805:5,
805:9, 806:23,
807:7, 808:9, 820:9,
821:10, 825:4,
838:13, 843:25,
844:12, 845:24,
846:16
**incorrect** [15] -
770:13, 772:9,
772:15, 772:16,
774:9, 774:10,
775:24, 776:1,
776:23, 778:11,
784:11, 785:17,
786:3, 835:24,
842:22
**increased** [3] - 729:9,
810:3, 810:16
**indicate** [1] - 689:19
**indicated** [10] - 613:9,
613:10, 613:11,
614:24, 615:11,
615:20, 641:25,
779:19, 810:6,
840:17
**indicates** [4] - 614:15,
614:21, 615:17,
797:16
**Indicating** [3] - 613:5,
791:20, 830:17
**indication** [1] - 635:20
**Indications** [1] -
745:15
**indications** [1] -
770:10
**indistinguishable** [1] -
700:14
**industry** [7] - 611:5,
611:16, 622:11,
622:14, 624:19,
625:9, 702:7
**inert** [1] - 657:3
**infected** [1] - 771:13
**infection** [9] - 734:21,
758:10, 761:12,
762:2, 762:4, 762:8,
771:11, 787:18,
789:17
**infections** [6] -
734:17, 740:5,
740:9, 740:12,
744:18, 746:23
**inflamed** [1] - 746:7
**inflammation** [1] -
849:18
**information** [23] -
622:19, 634:19,
636:19, 639:7,
640:2, 652:23,

680:1, 684:10,
684:21, 684:23,
690:9, 766:23,
766:24, 768:10,
769:2, 769:8, 769:9,
769:22, 769:23,
770:3, 782:6, 813:6,
837:16
**informed** [8] - 639:11,
652:24, 756:15,
757:2, 811:1,
811:22, 812:13,
815:13
**Infrared** [1] - 700:7
**inherently** [1] - 688:10
**initiated** [1] - 684:13
**injection** [3] - 729:10,
829:8, 829:11
**injuries** [2] - 739:6,
849:13
**injury** [4] - 758:20,
763:5, 771:11
**input** [1] - 698:11
**inquire** [2] - 690:7,
852:16
**insert** [1] - 761:2
**inserted** [3] - 671:17,
671:19, 671:20
**inside** [19] - 630:6,
652:22, 657:3,
692:10, 694:13,
721:6, 726:20,
726:22, 727:9,
727:16, 731:10,
731:13, 731:16,
731:19, 731:21,
731:24, 755:9,
819:5, 827:22
**instance** [3] - 624:24,
661:25, 696:21
**instances** [1] - 810:23
**instead** [1] - 841:3
**instruct** [1] - 680:10
**instructed** [1] - 673:25
**instructing** [2] -
680:11, 680:14
**instruction** [1] - 769:8
**instructions** [4] -
769:2, 769:3, 769:8,
807:18
**integrate** [1] - 661:24
**intend** [1] - 769:17
**intended** [2] - 679:19,
703:2
**intent** [2] - 623:15,
624:12
**intercourse** [16] -
719:20, 720:1,
720:13, 721:16,
728:19, 733:5,

733:22, 733:25,
734:10, 734:12,
752:10, 759:8,
787:5, 787:17,
848:18, 849:20
**interested** [3] - 646:9,
646:12, 803:18
**interfere** [1] - 829:13
**intermittent** [4] -
752:1, 792:13,
817:25, 835:17
**internal** [1] - 617:2
**internally** [2] - 698:8,
709:16
**international** [5] -
655:8, 702:4, 702:6,
702:7, 702:17
**interpret** [2] - 613:22,
617:20
**interrupting** [1] -
672:18
**intimacy** [3] - 822:11,
850:2, 850:9
**intimate** [1] - 822:7
**introduce** [6] - 610:10,
712:25, 713:2,
713:11, 713:12,
798:23
**Introduction** [2] -
702:24, 703:1
**invited** [1] - 654:20
**involve** [1] - 833:10
**involved** [9] - 615:19,
642:1, 678:2,
696:20, 697:22,
737:8, 829:4,
829:18, 829:23
**involving** [2] - 617:1,
643:1
**IRENE** [1] - 606:14
**Irene** [1] - 609:1
**Irganox** [6] - 630:12,
630:22, 631:5,
631:20, 631:22,
632:5
**iron** [2] - 619:11,
619:12
**irrelevant** [1] - 688:21
**ISO** [20] - 700:23,
701:13, 701:17,
702:3, 702:4,
702:11, 702:12,
702:15, 702:16,
702:18, 703:2,
703:8, 703:11,
703:15, 708:19,
708:21, 709:14,
709:17, 710:25
**issue** [7] - 689:2,
723:25, 775:5,

783:3, 809:10,
812:25, 816:3
**issues** [14] - 630:5,
630:7, 651:4,
688:19, 689:13,
717:5, 735:15,
748:19, 757:20,
805:4, 813:22,
827:19, 849:19,
853:3
**itching** [1] - 746:23
**items** [1] - 836:5
**iterative** [1] - 706:15
**itself** [5] - 618:17,
630:6, 642:8,
685:20, 830:15
**IV** [1] - 702:12

**J**

**Jackie** [1] - 713:13
**Jackson** [1] - 856:17
**JACQUELYN** [6] -
606:6, 608:10,
712:20, 712:22,
736:2, 793:24
**Jacquelyn** [3] -
712:17, 766:17,
796:13
**Jagannath** [18] -
805:16, 809:24,
809:25, 816:4,
816:6, 817:11,
831:23, 831:25,
832:19, 838:16,
840:10, 840:16,
840:24, 841:18,
841:22, 845:14,
845:17
**Jamika** [3] - 714:21,
714:25, 715:24
**Janice** [1] - 698:16
**January** [25] - 681:3,
686:11, 729:19,
742:13, 743:6,
743:11, 746:2,
773:7, 773:8,
773:11, 773:15,
773:16, 774:24,
774:25, 776:2,
776:13, 776:18,
776:20, 781:2,
786:9, 790:18,
790:20, 795:19,
796:1
**jaw** [1] - 802:15
**Jen** [9] - 752:24,
755:20, 763:23,
773:8, 834:17,
834:24, 837:5,

837:14, 844:5
**JIMMY** [5] - 608:8,
609:16, 609:25,
633:22, 654:7
**Jimmy** [2] - 609:12,
610:12
**job** [9] - 697:2, 697:5,
697:8, 698:6, 698:9,
736:23, 737:15,
738:7, 800:4
**Joey** [3] - 714:20,
714:22, 715:24
**Jogenpally** [1] -
856:19
**John** [1] - 744:12
**Johnson** [2] - 668:24,
668:25
**joined** [2] - 660:21,
661:10
**joint** [2] - 854:18,
855:17
**JOINT** [1] - 858:10
**Joint** [3] - 854:25,
855:12, 858:6
**Jon** [2] - 634:3, 708:20
**JON** [1] - 607:18
**Joshua** [1] - 856:25
**JR** [1] - 607:6
**judge** [1] - 798:19
**Judge** [5] - 609:2,
615:10, 624:9,
750:19, 798:3
**JUDGE** [1] - 606:15
**judgment** [2] - 665:2,
832:15
**Julie** [1] - 856:9
**July** [7] - 715:3,
726:11, 756:8,
757:14, 757:21,
764:15, 773:1
**jump** [2] - 746:15,
818:11
**jumping** [1] - 818:18
**jumps** [1] - 818:14
**jurisdictions** [1] -
639:23
**JUROR** [2] - 760:15,
760:17
**jurors** [1] - 810:20
**jury** [59] - 610:11,
610:16, 616:19,
627:4, 653:2, 655:1,
659:13, 659:18,
660:4, 660:21,
666:15, 666:19,
666:24, 667:5,
668:15, 673:19,
679:15, 680:1,
680:12, 680:14,
684:4, 689:21,

692:21, 693:2,
694:16, 697:1,
706:4, 706:6, 711:2,
713:10, 713:12,
714:18, 716:16,
718:17, 723:8,
728:25, 733:21,
750:22, 751:3,
766:14, 768:3,
773:9, 783:9,
784:15, 785:24,
786:6, 786:15,
791:22, 796:7,
798:24, 801:23,
834:18, 836:24,
838:25, 839:18,
840:14, 842:2,
853:8, 854:1
**Jury** [6] - 609:5,
659:16, 751:8,
751:12, 842:7,
854:12
**jury's** [7] - 640:16,
661:19, 664:5,
668:20, 679:3,
692:13, 705:8

## K

**Kanawha** [2] - 736:21,
800:15
**Kansas** [1] - 607:20
**Kasturi** [1] - 856:21
**keep** [7] - 680:11,
680:14, 693:7,
698:10, 808:8,
816:7, 854:9
**keeps** [3] - 629:17,
801:6, 801:7
**Kegel** [1] - 761:1
**kept** [1] - 699:5
**KETCHUM** [1] - 607:6
**key** [3] - 697:24,
710:14, 711:14
**kicks** [1] - 831:4
**kidneys** [1] - 825:12
**kids** [3] - 657:5, 715:4,
715:19
**kill** [2] - 803:9, 829:11
**kind** [21] - 650:5,
663:1, 670:21,
675:22, 679:5,
693:13, 717:19,
735:6, 735:7,
741:23, 747:19,
760:3, 776:8,
778:24, 786:19,
788:25, 799:13,
801:18, 823:10,
826:23, 831:12

**kinds** [1] - 747:14
**Kishore** [2] - 855:23,
856:4
**knit** [3] - 672:9, 704:4
**knowable** [1] - 624:11
**knowing** [1] - 686:21
**knowledge** [8] -
618:3, 623:10,
623:15, 623:20,
624:2, 624:12,
633:8, 633:13
**known** [15] - 612:10,
619:15, 622:20,
624:3, 624:8,
624:11, 624:13,
624:18, 625:8,
651:4, 695:3,
714:11, 714:14,
731:23, 819:5
**knows** [2] - 681:2,
816:13
**Knoxville** [1] - 611:25
**Kris** [2] - 857:6,
857:23
**Kyer** [1] - 856:23

## L

**labeling** [1] - 696:24
**laboratory** [1] -
612:12
**Laboratory** [5] -
610:14, 611:25,
612:4, 612:6, 612:11
**lacerations** [1] -
761:20
**ladies** [9] - 610:10,
658:4, 659:10,
660:4, 712:25,
716:15, 728:25,
842:3, 853:19
**Ladies** [3] - 673:25,
750:22, 854:1
**language** [5] - 613:10,
688:7, 689:9, 760:3,
761:24
**laparoscopic** [5] -
752:12, 753:14,
753:15, 753:16
**laparoscopy** [2] -
752:12, 753:14
**large** [5] - 621:18,
622:20, 623:8,
624:16, 674:16
**largest** [2] - 611:8,
622:15
**last** [35] - 629:6,
641:11, 658:16,
678:22, 692:3,
707:4, 708:5,

710:22, 711:18,
715:3, 716:5,
722:25, 723:4,
728:18, 737:23,
759:8, 769:15,
781:1, 790:5, 790:6,
791:5, 791:6,
798:20, 802:12,
804:20, 806:20,
818:16, 841:17,
843:17, 845:22,
846:4, 847:10,
847:16, 850:2, 856:3
**late** [11] - 641:11,
709:6, 710:4,
788:20, 789:12,
790:10, 790:23,
791:4, 791:11, 827:6
**laughed** [1] - 765:25
**laughing** [1] - 765:19
**Laughter** [1] - 655:17
**launch** [1] - 711:17
**launched** [1] - 677:12
**law** [2] - 768:23, 793:2
**LAW** [1] - 607:11
**laws** [1] - 656:1
**lawsuit** [1] - 791:15
**lawyer** [7] - 732:2,
741:5, 747:2, 788:1,
788:9, 788:17,
812:22
**lawyers** [4] - 641:13,
642:10, 642:22,
816:13
**lay** [1] - 825:11
**leader** [1] - 697:8
**leading** [1] - 656:16
**leakage** [7] - 746:25,
747:3, 749:3, 749:4,
766:2, 773:23,
778:8, 778:17,
779:7, 820:11,
823:17, 849:18
**leaked** [1] - 823:22
**leaking** [11] - 716:20,
716:22, 718:12,
718:13, 722:14,
722:16, 722:21,
722:22, 778:13,
781:24, 781:25
**learned** [2] - 719:7,
832:9
**least** [5] - 761:3,
761:4, 791:4,
812:24, 850:12
**leave** [3] - 751:5,
790:11, 847:3
**lectured** [1] - 654:17
**left** [17] - 611:16,
615:11, 619:24,

659:3, 659:16,
705:11, 742:16,
752:8, 797:25,
809:4, 809:8,
811:14, 813:4,
816:2, 839:16,
842:7, 843:24
**legal** [4] - 638:14,
737:8, 799:15, 853:3
**legs** [9] - 763:2,
806:19, 823:11,
825:12, 833:11,
833:15, 833:19,
834:11
**less** [2] - 721:23,
823:11
**letting** [1] - 645:1
**level** [2] - 617:6,
728:25
**liability** [1] - 686:19
**libido** [1] - 763:3
**life** [15] - 713:20,
716:8, 717:4, 717:8,
730:23, 731:16,
799:17, 801:20,
804:6, 804:16,
804:19, 806:17,
819:13, 827:24,
831:7
**life-altering** [1] -
730:23
**lift** [1] - 821:3
**lifted** [1] - 765:25
**lifting** [5] - 719:20,
720:9, 765:20,
807:24, 820:23
**light** [3] - 620:21,
716:20, 716:22
**likewise** [1] - 855:2
**limine** [1] - 858:3
**limited** [2] - 758:16
**limiting** [1] - 803:21
**line** [15] - 619:22,
619:23, 620:1,
645:24, 646:15,
655:21, 668:2,
669:20, 679:5,
758:5, 763:1,
763:22, 781:15,
837:21, 851:14
**Line** [11] - 637:12,
637:23, 644:11,
646:20, 650:13,
776:16, 779:2,
783:18, 783:20,
785:8, 789:8
**liner** [4] - 716:21,
716:25, 805:15,
821:8
**liners** [1] - 821:4

**Lisa** [3] - 606:20,
859:5, 859:15
**lisa_cook@wvsd.
uscourts.gov** [1] -
606:21
**list** [7] - 649:15, 758:7,
758:13, 758:14,
764:4, 856:4, 857:22
**listed** [4] - 649:19,
746:22, 753:14,
756:22
**Listen** [1] - 690:18
**listen** [2] - 643:24,
854:7
**listing** [1] - 627:25
**lists** [7] - 627:16,
753:8, 758:17,
760:22, 760:23,
762:25, 773:17
**literally** [2] - 802:3,
817:23
**literature** [22] -
615:13, 620:4,
620:5, 620:6, 622:6,
622:10, 624:11,
643:16, 644:3,
644:15, 644:19,
645:14, 646:3,
682:2, 682:16,
682:17, 693:6,
698:4, 698:5,
698:10, 708:12,
708:13
**litigation** [7] - 641:4,
641:5, 641:16,
642:1, 642:5, 642:9,
647:15
**live** [4] - 713:14,
714:25, 804:18,
804:19
**lived** [2] - 713:18,
713:19
**Lohri** [9] - 724:14,
725:4, 725:7,
725:11, 725:18,
725:22, 725:25,
726:8, 856:25
**Lohri's** [1] - 724:8
**long-term** [8] -
665:11, 665:25,
667:17, 668:22,
669:2, 669:25,
671:2, 692:18
**Longview** [1] - 607:12
**look** [24] - 613:23,
618:2, 618:6, 618:8,
629:24, 645:21,
669:14, 669:17,
670:5, 673:3,
694:16, 702:3,

702:11, 706:14, 707:18, 711:6, 747:6, 747:10, 752:22, 768:1, 812:23, 826:10, 839:21, 854:6
**looked** [6] - 613:23, 644:6, 650:13, 748:7, 754:22, 756:2
**looking** [21] - 614:13, 650:17, 658:19, 658:20, 677:11, 682:25, 691:17, 693:14, 694:6, 695:2, 695:12, 704:22, 704:23, 705:9, 707:20, 708:7, 740:4, 775:16, 791:3, 839:20, 851:8
**looks** [12] - 610:24, 673:14, 681:3, 683:22, 721:22, 747:10, 756:23, 757:15, 777:16, 783:12, 784:17, 786:17
**lose** [3] - 620:1, 803:7, 803:11
**loss** [6] - 758:11, 758:22, 763:3, 824:17, 825:1
**lost** [3] - 735:1, 792:9, 828:7
**Louisiana** [1] - 607:4
**lounge** [2] - 659:13, 751:3
**LOVE** [63] - 607:3, 607:4, 659:5, 659:21, 659:24, 660:3, 660:11, 660:13, 665:20, 665:22, 666:10, 666:21, 666:25, 667:8, 667:11, 667:14, 668:6, 668:14, 668:17, 669:10, 669:17, 669:21, 670:1, 670:16, 670:19, 674:4, 674:5, 678:7, 678:12, 678:14, 678:18, 678:20, 679:25, 680:16, 680:17, 683:15, 688:21, 689:15, 690:8, 690:13, 691:1, 691:3, 694:25, 695:10, 695:23, 701:20,

705:3, 708:18, 709:8, 709:13, 709:23, 709:25, 710:14, 710:21, 710:23, 711:23, 711:25, 853:1, 853:13, 853:15, 853:20, 855:9, 858:13
**love** [1] - 659:10
**Love** [11] - 660:8, 667:3, 688:16, 690:4, 696:11, 698:21, 701:19, 703:17, 708:5, 708:17, 709:12
**Love's** [3] - 674:2, 688:7, 708:10
**low** [1] - 752:10
**low-back** [1] - 752:10
**lower** [9] - 627:14, 742:24, 752:9, 776:16, 781:18, 809:3, 815:3, 846:1, 851:20
**LP** [1] - 616:25
**Luby** [30] - 717:14, 717:16, 717:19, 718:3, 719:4, 721:19, 722:1, 722:9, 723:4, 729:25, 730:21, 733:2, 746:16, 746:20, 752:11, 753:25, 770:1, 770:4, 770:9, 771:21, 772:1, 783:3, 787:16, 787:24, 789:15, 790:11, 790:23, 791:4
**Luby's** [8] - 719:14, 751:22, 752:20, 756:18, 766:13, 766:18, 780:1, 780:3
**luck** [1] - 685:22
**lucky** [1] - 804:2
**Luke** [1] - 857:4
**luncheon** [2] - 750:23, 751:11
**lysis** [2] - 753:14, 753:18

## M

**M.D** [2] - 781:4, 835:2
**ma'am** [91] - 669:5, 672:3, 678:12, 678:14, 680:21, 710:25, 712:13,

750:17, 753:20, 757:14, 812:5, 819:24, 820:5, 820:20, 823:23, 823:25, 824:20, 825:21, 826:6, 826:17, 827:11, 827:17, 827:23, 828:1, 828:3, 828:6, 828:10, 828:13, 828:19, 828:22, 829:3, 829:6, 829:9, 829:19, 829:22, 829:24, 830:2, 830:5, 832:4, 832:14, 832:17, 832:21, 832:24, 833:9, 833:12, 834:5, 834:7, 834:15, 834:21, 835:4, 835:7, 835:12, 835:14, 835:25, 836:3, 836:21, 837:3, 837:8, 837:24, 838:2, 838:5, 838:8, 838:15, 838:18, 839:3, 839:6, 839:14, 840:5, 840:18, 840:22, 840:25, 841:12, 841:24, 842:14, 843:3, 843:9, 843:14, 844:1, 844:18, 844:20, 844:25, 845:8, 846:4, 846:9, 846:13, 846:19, 846:22, 847:15, 847:23, 848:16, 849:23
**machine** [1] - 606:24
**magistrate** [6] - 715:11, 736:17, 736:24, 737:12, 738:17, 738:25
**magnification** [1] - 704:22
**magnifications** [2] - 704:18, 705:12
**maiden** [1] - 742:21
**maintained** [1] - 612:9
**major** [3] - 804:13, 804:14, 805:1
**Mali** [1] - 857:2
**man** [3] - 736:11, 800:8
**management** [1] - 771:7
**Manhattan** [1] - 612:7

**Mani** [1] - 744:25
**manner** [2] - 671:19, 760:2
**manners** [1] - 672:7
**manufacturer** [5] - 622:20, 624:16, 627:11, 628:17, 672:13
**march** [1] - 706:21
**March** [11] - 714:10, 781:3, 796:6, 796:13, 797:2, 797:17, 839:7, 839:12, 841:19, 850:13
**Margolis** [1] - 793:2
**Mark** [6] - 799:16, 800:20, 801:1, 801:2, 818:18, 848:6
**Mark's** [2] - 799:22, 818:7
**marked** [2] - 626:15, 704:16
**MARKED** [1] - 608:3
**market** [5] - 641:22, 665:14, 667:20, 685:10, 697:13
**marketing** [1] - 706:10
**Marlex** [29] - 616:5, 616:12, 616:14, 616:21, 618:21, 618:22, 625:25, 626:2, 626:5, 627:8, 627:17, 628:6, 629:9, 630:9, 632:17, 635:19, 635:25, 642:8, 683:16, 683:23, 685:1, 685:4, 685:7, 685:11, 685:14, 685:17, 685:20, 700:13, 712:1
**married** [2] - 714:9, 715:1
**Marshall** [1] - 714:22
**Mart** [1] - 857:21
**Martin** [1] - 857:4
**material** [24] - 616:25, 618:14, 628:21, 630:4, 643:19, 645:21, 646:18, 665:16, 671:13, 672:10, 682:21, 682:22, 682:25, 683:1, 686:17, 686:21, 700:10, 700:12, 700:14, 700:15, 700:17, 710:9, 711:9
**Material** [1] - 615:5

**materially** [2] - 614:19, 638:8
**materials** [20] - 612:12, 618:9, 618:21, 618:22, 625:12, 633:23, 645:17, 645:21, 649:15, 649:19, 654:19, 684:17, 699:9, 699:10, 703:5, 709:17, 710:12, 711:3, 751:6
**Materials** [2] - 618:19, 672:11
**math** [1] - 831:12
**matter** [6] - 688:22, 690:19, 693:10, 751:1, 817:2, 845:7
**Matthew** [1] - 781:4
**MAYS** [5] - 608:8, 609:16, 609:25, 633:22, 654:7
**Mays** [12] - 609:12, 610:12, 610:15, 612:23, 613:1, 613:12, 615:9, 615:11, 617:18, 624:8, 633:23, 640:9
**mean** [17] - 618:19, 639:1, 642:8, 664:17, 685:19, 697:9, 720:17, 750:4, 767:17, 775:13, 787:12, 790:21, 810:19, 810:20, 818:2, 821:17, 853:9
**meaning** [2] - 700:14, 761:13
**means** [9] - 614:1, 731:1, 752:13, 765:14, 774:2, 783:23, 792:5, 793:9, 798:20
**meant** [5] - 671:19, 697:9, 718:11, 779:13, 782:15
**measured** [2] - 676:5, 676:11
**mechanical** [2] - 628:23, 707:14
**mechanism** [2] - 621:14, 622:17
**med** [1] - 778:7
**medals** [1] - 800:23
**media** [1] - 854:8
**Medical** [8] - 616:24, 654:21, 681:15, 681:19, 697:23, 698:25, 699:2, 781:5

**medical** [87] - 610:20, 612:24, 613:2, 613:8, 614:5, 616:4, 616:11, 616:22, 616:25, 620:4, 620:5, 622:20, 629:22, 629:23, 629:25, 636:11, 636:22, 637:1, 637:24, 647:5, 651:18, 651:23, 652:2, 652:10, 652:25, 653:9, 653:18, 657:1, 657:11, 657:14, 657:22, 658:10, 684:11, 696:23, 697:21, 698:3, 698:5, 698:9, 699:13, 701:14, 703:5, 708:22, 721:22, 722:6, 722:7, 727:8, 728:3, 728:7, 728:8, 732:17, 732:20, 740:4, 742:7, 774:6, 777:8, 779:13, 784:10, 795:15, 795:18, 796:4, 796:5, 797:16, 801:9, 805:6, 812:21, 813:2, 825:16, 825:25, 827:3, 827:4, 832:15, 834:22, 837:22, 854:18, 854:21, 854:25, 855:5, 855:6, 855:12, 855:13, 855:18, 855:19, 855:21, 856:8, 856:23, 856:25, 857:2
**medicals** [1] - 812:23
**medicate** [2] - 804:12, 805:3
**medication** [14] - 740:21, 761:2, 789:17, 802:18, 802:19, 802:20, 802:21, 803:2, 803:13, 804:6, 810:2, 827:15, 837:21
**medications** [1] - 739:9
**medicine** [8] - 739:15, 739:17, 739:23, 740:17, 799:25, 804:8, 830:21, 831:4

**medicines** [1] - 747:21
**meet** [14] - 673:7, 707:23, 708:2, 713:10, 747:23, 748:2, 766:24, 774:12, 780:21, 780:22, 806:3, 806:6, 806:8, 807:14
**meetings** [2] - 671:6, 677:17
**meets** [2] - 706:25, 707:1
**melted** [1] - 712:4
**member** [1] - 702:16
**memo** [1] - 710:14
**Memorex** [1] - 836:11
**Memorial** [2] - 744:11, 857:18
**memorized** [2] - 680:7, 682:16
**memory** [4] - 670:3, 776:18, 784:1, 796:25
**mention** [6] - 697:22, 782:20, 805:15, 807:22, 807:24, 808:3
**mentioned** [11] - 658:18, 699:23, 700:19, 715:19, 747:3, 752:9, 759:12, 824:3, 830:3, 847:10, 847:13
**mentioning** [2] - 690:14, 690:19
**merits** [1] - 690:2
**Mesh** [1] - 674:6
**mesh** [88] - 642:2, 642:15, 642:16, 642:18, 642:19, 642:23, 643:1, 643:10, 643:13, 645:22, 651:8, 651:12, 651:13, 651:19, 652:4, 652:7, 652:14, 654:9, 654:12, 658:20, 661:17, 661:19, 661:23, 662:15, 664:9, 665:15, 671:11, 671:17, 672:2, 672:9, 672:12, 672:13, 672:16, 673:10, 674:10, 674:11, 675:11, 675:20, 675:22, 675:25, 676:5,

676:12, 682:8, 685:4, 685:6, 685:9, 687:15, 697:5, 697:6, 699:21, 700:20, 703:13, 704:1, 704:3, 704:17, 704:18, 704:22, 704:23, 705:11, 705:13, 705:23, 725:25, 726:3, 726:9, 726:22, 727:9, 727:16, 739:21, 761:25, 762:3, 762:7, 770:4, 771:13, 773:1, 788:5, 819:5, 819:9, 829:15, 829:23, 832:5, 832:7, 832:8, 832:10, 849:14, 849:19
**meshes** [2] - 644:7
**met** [17] - 634:6, 660:7, 672:25, 673:8, 707:5, 736:6, 747:22, 755:12, 766:22, 766:23, 775:9, 775:19, 775:20, 806:4, 819:23, 837:17
**methods** [1] - 621:20
**MICHAEL** [1] - 607:15
**microns** [4] - 674:12, 675:2, 675:4
**mid** [3] - 757:3, 762:13, 771:2
**mid-urethral** [3] - 757:3, 762:13, 771:2
**middle** [10] - 627:14, 664:5, 757:5, 763:21, 777:21, 779:2, 779:6, 817:21, 818:12, 843:2
**might** [21] - 619:19, 629:5, 668:15, 684:8, 696:20, 698:8, 706:10, 706:15, 738:1, 759:20, 789:2, 789:4, 791:18, 798:20, 809:5, 810:20, 821:9, 844:12, 852:5, 852:16, 854:8
**migraine** [2] - 792:16, 792:18
**migraines** [4] - 740:18, 740:19, 741:1, 792:20

**Mike** [1] - 736:5
**mild** [1] - 807:10
**military** [1] - 715:1
**mind** [3] - 617:21, 790:10, 818:18
**mine** [3] - 621:2, 802:6, 818:17
**mineral** [3] - 627:16, 628:7, 628:8
**minimal** [1] - 674:13
**minor** [1] - 762:20
**minute** [5] - 760:24, 761:22, 774:17, 778:25, 818:3
**minutes** [9] - 660:20, 686:23, 748:20, 791:8, 794:3, 802:12, 806:15, 842:6
**misheard** [1] - 782:17
**misstates** [3] - 710:13, 710:17
**Misstates** [1] - 710:18
**mistaken** [1] - 790:18
**misunderstood** [2] - 782:9, 813:14
**MO** [1] - 607:20
**models** [1] - 671:24
**moderate** [1] - 807:10
**modify** [1] - 706:16
**molecules** [1] - 621:17
**mom** [3] - 714:3, 800:2, 801:6
**moment** [8] - 614:9, 638:10, 683:9, 696:10, 713:12, 768:14, 769:18, 853:25
**Monday** [2] - 718:15, 854:11
**money** [2] - 738:9, 818:13
**monies** [1] - 715:8
**monitor** [2] - 665:8, 742:14
**Monsour** [10] - 612:22, 613:15, 614:3, 636:13, 638:18, 812:18, 813:25, 849:4, 851:25, 857:25
**MONSOUR** [93] - 607:11, 607:11, 609:10, 609:23, 609:25, 610:3, 610:5, 610:7, 613:16, 614:4, 615:8, 615:23, 616:1, 616:20,

617:13, 618:1, 620:20, 620:25, 621:3, 621:6, 621:7, 623:3, 623:6, 623:16, 623:18, 624:4, 625:5, 625:7, 626:13, 626:22, 626:24, 627:3, 627:5, 630:18, 630:20, 631:3, 631:7, 631:16, 631:19, 632:20, 632:25, 638:20, 640:9, 640:18, 644:25, 648:11, 648:14, 649:7, 653:12, 653:16, 654:7, 655:10, 655:20, 656:14, 656:19, 656:20, 657:8, 657:18, 657:19, 658:7, 658:15, 658:24, 798:7, 798:13, 798:15, 798:16, 806:1, 808:6, 808:7, 810:9, 812:19, 813:20, 814:3, 814:8, 814:10, 816:9, 816:17, 816:19, 819:16, 848:22, 849:5, 850:23, 851:7, 851:22, 852:1, 852:4, 852:8, 852:12, 852:20, 852:24, 858:2
**month** [4] - 714:21, 764:23, 795:18, 840:16
**months** [17] - 678:23, 681:10, 726:13, 743:17, 784:6, 784:20, 784:21, 791:16, 807:8, 807:9, 808:25, 809:1, 815:6, 821:17, 838:19, 843:17, 846:6
**Morgantown** [2] - 803:5, 803:17
**morning** [15] - 609:7, 609:8, 610:8, 610:9, 659:8, 660:4, 660:5, 660:6, 696:8, 718:15, 736:3, 736:4, 736:12, 754:23, 854:11
**Most** [1] - 762:18

**most** [9] - 611:11, 628:7, 698:16, 742:11, 762:18, 797:12, 800:14, 812:14, 838:1
**mother** [1] - 800:3
**motion** [2] - 632:24, 855:11
**motions** [1] - 858:3
**motive** [1] - 623:15
**mouth** [1] - 767:20
**move** [17] - 701:17, 704:25, 706:12, 706:18, 706:19, 746:16, 764:14, 766:16, 769:17, 799:11, 805:4, 808:6, 814:1, 816:16, 854:14, 855:16, 855:17
**moved** [5] - 611:23, 715:2, 715:3, 753:24, 755:1
**moving** [2] - 678:11, 678:12
**MR** [283] - 609:10, 609:23, 609:25, 610:3, 610:4, 610:5, 610:7, 612:17, 612:22, 613:7, 613:16, 614:4, 614:6, 614:10, 615:8, 615:9, 615:23, 615:24, 616:1, 616:20, 617:8, 617:10, 617:13, 617:17, 618:1, 620:15, 620:17, 620:20, 620:25, 621:3, 621:6, 621:7, 622:22, 622:24, 623:3, 623:6, 623:11, 623:16, 623:18, 623:23, 624:4, 624:5, 625:5, 625:7, 626:13, 626:19, 626:21, 626:22, 626:24, 627:3, 627:5, 630:18, 630:20, 631:1, 631:3, 631:7, 631:9, 631:16, 631:19, 632:20, 632:25, 633:4, 633:18, 633:22, 638:20, 638:23, 640:9, 640:18, 640:23,

643:22, 644:2, 644:25, 648:11, 648:14, 648:18, 648:22, 649:7, 649:9, 653:12, 653:16, 653:17, 654:4, 654:7, 655:3, 655:7, 655:10, 655:20, 656:13, 656:14, 656:16, 656:19, 656:20, 657:6, 657:8, 657:10, 657:18, 657:19, 658:2, 658:7, 658:8, 658:12, 658:14, 658:15, 658:24, 659:5, 659:21, 659:24, 660:3, 660:11, 660:13, 665:19, 665:20, 665:22, 666:4, 666:7, 666:10, 666:20, 666:21, 666:25, 667:8, 667:11, 667:12, 667:14, 668:3, 668:6, 668:14, 668:17, 669:6, 669:9, 669:10, 669:17, 669:20, 669:21, 669:22, 669:24, 670:1, 670:3, 670:16, 670:17, 670:19, 673:22, 674:4, 674:5, 678:7, 678:9, 678:12, 678:14, 678:18, 678:20, 679:22, 679:25, 680:16, 680:17, 683:5, 683:15, 688:1, 688:4, 688:21, 689:8, 689:15, 690:8, 690:13, 691:1, 691:3, 694:19, 694:21, 694:25, 695:6, 695:10, 695:16, 695:23, 696:4, 696:7, 701:7, 701:10, 701:16, 701:20, 701:24, 704:6, 704:8, 704:25, 705:3, 705:7, 708:15, 708:18, 709:7, 709:8, 709:13, 709:19, 709:23, 709:25, 710:13, 710:14, 710:18,

710:21, 710:23, 711:23, 711:25, 723:13, 725:14, 726:4, 726:24, 727:10, 736:2, 742:6, 742:9, 742:10, 746:19, 750:17, 750:19, 751:15, 751:16, 752:6, 752:7, 752:24, 753:2, 755:20, 755:22, 756:17, 756:20, 760:16, 760:18, 762:6, 763:20, 763:24, 766:12, 766:15, 768:4, 768:6, 768:16, 768:18, 769:17, 769:20, 773:10, 783:10, 784:16, 785:25, 786:7, 791:21, 791:23, 793:21, 794:17, 797:21, 798:3, 798:5, 798:7, 798:13, 798:15, 798:16, 806:1, 808:6, 808:7, 810:9, 812:19, 813:20, 814:3, 814:8, 814:10, 816:9, 816:17, 816:19, 819:16, 848:22, 849:5, 850:23, 851:7, 851:22, 852:1, 852:4, 852:8, 852:12, 852:20, 852:24, 853:1, 853:7, 853:13, 853:15, 853:20, 855:9, 858:2, 858:13
**MS** [75] - 712:16, 712:22, 721:2, 721:11, 723:17, 723:19, 723:23, 724:2, 725:16, 725:17, 726:6, 726:7, 726:25, 727:4, 727:7, 727:14, 727:19, 727:21, 727:25, 728:13, 728:14, 735:25, 751:5, 752:5, 793:24, 794:24, 796:8, 797:19, 805:23, 808:1, 810:4, 812:4, 812:6, 813:13, 813:17, 814:1, 814:4, 816:8,

819:19, 823:24, 824:1, 834:16, 834:19, 834:24, 835:1, 836:22, 836:25, 837:4, 837:6, 837:13, 837:15, 838:23, 839:1, 839:17, 839:19, 840:13, 840:15, 841:25, 842:10, 842:11, 848:25, 849:7, 849:8, 851:3, 853:23, 854:23, 855:2, 855:8, 855:14, 855:17, 856:4, 856:7, 857:23, 858:8, 858:12
**MSDS** [37] - 610:20, 612:25, 613:18, 613:21, 613:22, 614:5, 616:5, 616:12, 616:15, 616:21, 617:4, 617:14, 617:15, 617:18, 617:20, 618:3, 629:20, 629:25, 630:21, 631:5, 631:20, 632:5, 634:8, 636:3, 636:5, 636:10, 636:16, 680:19, 681:1, 681:3, 681:20, 683:1, 684:13, 684:23, 685:20, 698:22, 819:1
**MSDSs** [1] - 684:7
**Murthy** [2] - 857:6, 857:23
**must** [3] - 715:17, 730:2, 787:2
**myth** [2] - 657:2, 657:13
**myths** [1] - 657:10

**N**

**nail** [4] - 619:11, 619:12, 619:13, 629:3
**name** [23] - 610:12, 634:3, 634:22, 639:21, 641:19, 648:8, 660:7, 686:12, 713:1, 736:5, 742:21, 756:11, 758:5, 760:22, 766:17, 773:11, 777:17,

798:25, 799:16, 801:2, 809:23, 837:21
**names** [4] - 639:15, 639:18, 639:20, 856:5
**Narender** [1] - 856:19
**narrow** [1] - 673:9
**national** [1] - 702:16
**National** [5] - 610:14, 611:25, 612:4, 612:6, 612:10
**nature** [3] - 797:11, 809:19, 849:1
**nausea** [1] - 763:10
**near** [3] - 611:12, 611:25, 830:16
**necessarily** [5] - 613:21, 662:25, 663:21, 665:20, 799:10
**necessary** [3] - 637:7, 749:12, 749:24
**need** [25] - 633:24, 657:17, 660:14, 660:15, 663:2, 669:13, 670:8, 688:14, 696:18, 697:24, 700:24, 701:4, 709:17, 736:14, 737:4, 741:20, 741:21, 749:11, 758:19, 759:5, 764:1, 817:8, 819:11, 835:17, 853:2
**needed** [10] - 613:11, 638:7, 718:18, 759:20, 794:9, 794:12, 806:5, 806:10, 817:15, 826:3
**needle** [1] - 803:9
**needs** [5] - 670:7, 707:1, 707:18, 801:5, 816:14
**negative** [3] - 717:3, 717:7, 717:8
**neighborhood** [1] - 801:7
**nerve** [6] - 763:1, 802:5, 803:9, 803:25, 829:11, 829:13
**nerves** [2] - 761:21, 802:22
**nervous** [3] - 713:16, 736:12, 799:5
**neuralgia** [9] - 801:13, 801:19, 801:22,

804:21, 828:9,
830:1, 831:6, 848:8,
848:11
**Neurology** [1] - 856:7
**neuromuscular** [1] -
849:19
**Never** [1] - 731:5
**never** [31] - 613:1,
634:6, 642:1,
642:10, 642:14,
642:17, 642:22,
651:17, 652:1,
652:9, 652:11,
653:7, 653:8,
653:10, 691:23,
692:4, 694:10,
722:23, 731:2,
731:3, 731:5, 731:8,
731:17, 782:7,
782:8, 786:11,
819:14, 821:14
**New** [1] - 746:3
**new** [11] - 636:19,
654:22, 699:9,
803:16, 806:17,
807:3, 807:4,
808:24, 809:1,
832:14, 850:11
**news** [1] - 762:9
**next** [46] - 609:9,
611:4, 612:1, 628:3,
659:4, 659:5,
659:20, 673:13,
679:5, 691:22,
712:15, 712:16,
724:22, 745:5,
748:18, 752:19,
756:15, 757:1,
757:18, 757:24,
759:23, 760:10,
764:3, 770:7,
771:16, 773:17,
776:20, 777:15,
779:2, 779:25,
783:8, 784:14,
785:11, 786:5,
792:11, 797:24,
815:6, 841:19,
842:12, 842:16,
851:14, 851:19,
851:25, 852:6
**Next** [1] - 686:24
**nice** [1] - 802:8
**night** [5] - 746:13,
765:15, 825:7,
825:14, 825:15
**nightly** [1] - 765:14
**nighttime** [1] - 825:10
**nine** [9] - 715:24,
730:9, 730:11,

754:17, 794:15,
794:18, 794:25,
795:4, 795:8
**nitrates** [1] - 618:25
**NO** [1] - 606:6
**no-foundation** [1] -
633:18
**nocturia** [4] - 765:13,
765:14, 825:5, 825:6
**none** [4] - 645:19,
693:16, 711:15
**nonresponsive** [1] -
643:22
**normal** [2] - 804:6,
804:19
**normally** [1] - 702:17
**nos** [2] - 778:5, 784:18
**note** [6] - 612:2,
632:5, 689:23,
747:15, 792:4, 847:4
**notebook** [2] - 768:19,
774:16
**noted** [2] - 838:9,
838:11
**notes** [2] - 747:7,
748:7
**nothing** [5] - 613:3,
686:17, 689:16,
785:11, 785:12
**notice** [3] - 689:3,
689:17, 820:24
**noticed** [3] - 699:3,
798:1, 805:11
**noticing** [1] - 808:23
**November** [3] - 609:3,
764:14, 764:21
**NOVEMBER** [1] -
606:13
**nowadays** [1] - 612:12
**nowhere** [1] - 614:7
**nuisance** [2] - 807:11,
823:19
**number** [11] - 609:20,
626:23, 630:12,
630:13, 669:18,
704:12, 711:22,
738:22, 740:19,
773:17, 822:7
**Number** [19] - 711:24,
742:5, 751:20,
752:20, 764:13,
768:2, 769:5,
769:21, 773:8,
780:25, 783:8,
791:21, 854:18,
854:20, 854:25,
855:19, 855:21,
856:3, 856:7
**numbered** [1] - 631:6
**numbers** [1] - 609:22

**numbness** [1] - 763:1
**nurse** [3] - 748:4,
778:8, 780:22

# O

**Oak** [5] - 610:14,
612:4, 612:6, 612:8,
612:10
**oath** [4] - 637:16,
712:19, 785:19,
824:6
**OB/GYN** [1] - 717:21
**object** [7] - 631:9,
653:12, 668:3,
723:13, 794:17,
813:15, 848:22
**objecting** [1] - 653:14
**Objection** [10] - 669:6,
673:22, 679:22,
688:1, 694:19,
694:21, 695:16,
709:7, 710:13,
726:24
**objection** [91] -
612:17, 613:17,
614:12, 615:6,
615:7, 617:8,
617:10, 617:11,
617:24, 621:2,
622:22, 622:24,
623:13, 623:23,
625:2, 625:3,
626:20, 626:21,
627:1, 631:8, 633:3,
633:16, 633:19,
638:20, 638:22,
640:9, 640:19,
643:22, 644:25,
648:11, 649:2,
649:5, 653:15,
655:3, 656:13,
656:17, 657:6,
657:12, 658:2,
658:3, 658:12,
666:18, 667:2,
667:5, 668:11,
669:23, 673:23,
674:3, 678:9,
678:16, 679:24,
680:4, 683:6, 688:4,
690:25, 695:6,
695:19, 701:19,
701:20, 701:22,
705:2, 705:3, 705:5,
709:21, 709:22,
723:16, 724:1,
725:15, 726:4,
726:5, 727:10,
727:11, 727:20,

794:21, 794:22,
805:23, 805:24,
808:1, 808:5, 810:4,
810:5, 810:7, 812:6,
813:9, 816:8,
816:15, 849:6,
850:23, 851:2, 858:4
**objections** [2] - 645:5,
812:12
**objects** [1] - 807:24
**obligation** [5] - 648:3,
648:20, 648:24,
662:19
**observation** [1] -
761:1
**Obtryx** [101] - 630:9,
641:17, 641:20,
641:21, 642:7,
642:12, 646:16,
646:24, 661:7,
661:16, 661:25,
676:17, 676:22,
677:2, 677:20,
677:22, 678:2,
678:8, 678:25,
679:21, 681:6,
681:11, 682:6,
682:18, 682:19,
687:3, 687:7,
687:21, 688:9,
688:17, 688:23,
689:4, 689:6, 689:9,
691:6, 691:10,
691:12, 691:24,
692:5, 692:7,
692:19, 692:24,
693:14, 693:16,
694:17, 697:15,
700:5, 700:20,
703:13, 704:22,
705:23, 711:9,
711:15, 713:8,
718:8, 718:10,
718:24, 719:7,
719:8, 719:15,
730:1, 730:3,
730:17, 731:7,
731:10, 731:13,
731:15, 731:17,
731:19, 731:24,
733:24, 740:2,
740:7, 740:10,
740:13, 755:5,
794:9, 794:13,
795:1, 795:5, 795:8,
820:6, 821:20,
822:6, 824:21,
825:8, 827:2, 828:2,
828:5, 832:2, 833:6,
833:24, 835:5,

835:22, 838:3,
839:7, 839:12,
850:9, 850:13,
850:16, 850:17
**obvious** [1] - 733:21
**obviously** [6] - 614:6,
677:20, 681:15,
688:5, 696:23,
705:12
**occasion** [3] - 748:11,
787:9, 823:4
**occasional** [1] -
796:22
**occasionally** [1] -
805:14
**occasions** [3] -
772:21, 787:10,
823:21
**occur** [5] - 746:10,
746:12, 761:25,
763:5, 764:1
**occurred** [9] - 612:20,
623:25, 648:13,
666:6, 669:15,
688:3, 709:11,
812:10, 852:3
**occurs** [2] - 752:8,
765:19
**October** [5] - 784:14,
784:20, 785:5,
786:10, 791:24
**odor** [1] - 746:23
**OF** [14] - 606:2, 606:3,
609:25, 633:22,
654:7, 660:3, 696:7,
708:18, 712:22,
736:2, 793:24,
798:16, 819:19,
851:6
**offer** [7] - 626:14,
631:5, 637:20,
641:14, 657:11,
723:1, 723:15
**offered** [9] - 613:1,
613:12, 624:9,
635:17, 803:3,
807:1, 807:2, 829:7,
858:2
**offering** [3] - 640:5,
640:7, 640:24
**office** [12] - 718:2,
724:8, 724:10,
774:24, 780:1,
780:3, 780:9,
831:15, 831:21,
831:23, 842:23,
847:3
**OFFICER** [3] - 609:6,
659:15, 751:13
**offices** [1] - 774:6

**Official** [1] - 859:3
**officially** [1] - 660:7
**often** [3] - 804:23, 817:24, 817:25
**old** [3] - 798:25, 799:16, 813:15
**oldest** [1] - 714:20
**Olympian** [1] - 818:14
**Olympics** [4] - 799:22, 800:15, 800:16, 818:13
**Once** [2] - 706:23, 733:14
**once** [10] - 662:15, 674:21, 692:10, 692:14, 694:13, 715:13, 720:4, 749:21, 802:17, 811:1
**One** [3] - 685:10, 711:18, 847:13
**one** [107] - 611:7, 611:11, 612:15, 614:9, 619:22, 620:1, 621:14, 622:15, 635:20, 640:8, 645:20, 647:23, 653:8, 655:8, 655:11, 663:7, 663:13, 665:23, 667:3, 667:15, 667:24, 668:7, 668:10, 669:2, 669:19, 671:1, 671:11, 672:14, 673:10, 679:10, 690:13, 691:13, 693:25, 700:3, 709:5, 709:6, 711:14, 713:10, 715:25, 716:21, 722:17, 725:2, 725:5, 728:24, 747:18, 748:24, 752:1, 755:17, 755:18, 756:15, 756:21, 757:1, 757:2, 757:18, 757:24, 758:2, 758:23, 759:8, 759:11, 761:12, 761:22, 762:9, 767:7, 767:8, 772:24, 773:19, 773:22, 773:23, 775:15, 777:9, 779:1, 780:11, 781:1, 781:2, 781:11, 783:12, 785:22, 786:8,

787:13, 788:16, 788:19, 791:19, 792:17, 796:4, 797:11, 797:21, 800:16, 800:24, 803:6, 808:24, 814:21, 814:22, 818:7, 821:9, 827:21, 830:13, 831:19, 832:19, 842:23, 848:14, 848:19, 851:8, 852:13, 856:3
**one-and-a-half-centimeter** [1] - 673:10
**ones** [1] - 758:14
**oophorectomy** [3] - 752:13, 752:17, 753:17
**op** [1] - 842:24
**open** [6] - 679:9, 736:11, 741:15, 741:23, 776:5, 834:24
**opened** [1] - 690:20
**opening** [6] - 625:13, 625:14, 688:18, 718:14, 730:6, 732:1
**operated** [2] - 745:6, 814:18
**operating** [1] - 697:11
**operation** [10] - 745:17, 745:20, 750:10, 750:20, 753:8, 764:16, 765:7, 772:3, 784:21, 829:12
**operative** [3] - 745:11, 752:21, 770:7
**operatively** [1] - 842:21
**opine** [1] - 652:20
**opinion** [19] - 613:1, 613:9, 613:12, 613:13, 614:6, 615:4, 615:13, 622:25, 623:2, 633:6, 633:10, 635:23, 638:5, 638:8, 723:6, 832:25, 833:2, 833:5, 837:22
**opinions** [40] - 610:18, 610:19, 614:20, 614:23, 614:24, 615:2, 615:10, 615:11, 631:11, 633:14, 634:11, 634:19, 635:6,

635:10, 635:13, 635:17, 637:7, 638:4, 639:14, 639:24, 640:1, 640:6, 640:7, 640:11, 640:14, 640:17, 640:24, 641:14, 641:23, 643:14, 646:17, 646:18, 646:25, 647:24, 648:3, 651:17, 652:1, 653:22, 654:1, 656:25
**opportunity** [8] - 667:7, 759:25, 760:4, 760:8, 764:6, 774:11, 782:19, 819:22
**opposed** [1] - 673:10
**opted** [1] - 829:10
**optimal** [1] - 674:13
**option** [1] - 838:1
**options** [1] - 806:23
**order** [9] - 615:10, 615:16, 624:6, 689:20, 690:1, 810:7, 817:6, 854:9, 858:6
**orders** [2] - 688:12, 795:23
**organ** [2] - 688:6, 688:13
**Organic** [3] - 621:16, 621:19, 657:5
**organic** [1] - 621:17
**organization** [2] - 683:12, 702:6
**organs** [1] - 758:1
**orgasm** [6] - 822:2, 822:11, 823:14, 849:23, 850:3, 850:6
**orient** [1] - 679:5
**originally** [2] - 801:21, 831:1
**ORNL** [1] - 612:7
**otherwise** [1] - 691:10
**ounces** [2] - 715:24, 715:25
**outcomes** [1] - 682:14
**outdoor** [1] - 614:8
**outfit** [1] - 824:23
**outline** [1] - 669:19
**outpatient** [1] - 835:9
**outside** [7] - 615:15, 619:11, 622:24, 623:2, 642:9, 709:7, 848:3
**outweighed** [1] - 803:20

**ovarian** [1] - 840:17
**ovaries** [11] - 732:15, 733:3, 733:6, 733:11, 733:14, 749:1, 749:11, 751:20, 752:13, 755:8, 809:17
**ovary** [5] - 748:19, 748:22, 749:10, 749:25, 753:4
**overall** [1] - 703:3
**overlaid** [1] - 700:13
**overrule** [12] - 614:13, 615:6, 617:23, 625:2, 633:15, 640:19, 680:4, 695:8, 695:19, 709:21, 794:21, 849:6
**overruled** [1] - 683:6
**own** [6] - 653:22, 663:20, 693:7, 707:23, 718:2, 801:15
**ownership** [1] - 699:6
**oxidants** [2] - 636:17
**oxidation** [3] - 627:23, 629:15, 651:4
**oxidative** [2] - 621:20, 622:17
**oxidized** [1] - 628:22
**oxidizers** [1] - 686:9
**oxidizing** [11] - 618:24, 619:3, 619:8, 619:20, 622:3, 626:6, 628:9, 628:13, 632:12, 686:3, 686:8
**oxygen** [6] - 618:24, 619:2, 619:13, 619:16, 627:17, 628:8
**oxygen-containing** [1] - 619:16

**P**

**p.m** [8] - 751:8, 751:11, 751:12, 842:7, 842:8, 854:12, 858:15
**P.O** [1] - 607:16
**PA** [2] - 748:4, 780:22
**package** [1] - 679:9
**page** [18] - 628:3, 668:1, 674:20, 693:1, 696:25, 702:24, 747:7, 759:14, 769:15, 776:7, 776:8, 778:4,

779:1, 779:2, 784:14, 788:24, 825:23, 826:10
**PAGE** [1] - 608:2
**Page** [32] - 637:10, 637:23, 644:11, 650:2, 650:13, 667:23, 668:5, 668:7, 668:8, 668:19, 702:12, 769:4, 776:5, 776:9, 778:24, 778:25, 779:3, 783:17, 785:7, 788:23, 789:7, 789:8, 824:9, 824:16, 825:22, 834:16, 836:23, 838:24, 839:20, 839:25
**Pages** [1] - 614:14
**pages** [6] - 649:20, 649:21, 649:23, 702:25, 776:9, 788:2
**paid** [2] - 638:24, 639:1
**pain** [1] - 643:21, 720:22, 720:24, 723:1, 724:17, 724:20, 728:25, 732:2, 732:18, 732:25, 733:9, 733:12, 734:5, 734:6, 734:23, 740:21, 742:16, 742:24, 746:12, 749:10, 751:25, 752:1, 752:8, 752:10, 753:4, 763:1, 763:11, 773:23, 775:6, 775:7, 776:17, 781:22, 782:3, 782:4, 785:5, 787:4, 789:16, 789:24, 793:18, 793:20, 795:20, 796:21, 797:10, 797:17, 802:14, 802:19, 803:10, 806:18, 808:15, 809:2, 810:1, 810:2, 810:10, 810:14, 810:16, 810:17, 811:2, 811:4, 814:25, 815:1, 815:2, 815:6, 815:11, 815:20, 817:17, 819:12, 828:14, 828:17, 828:20, 829:25,

830:24, 839:15,
839:22, 840:3,
840:20, 842:17,
843:1, 845:2, 846:1,
848:11, 848:15,
848:18, 849:1,
849:17, 849:19,
849:22, 850:17
**painful** [12] - 720:18,
728:22, 733:17,
734:3, 734:15,
734:20, 782:3,
787:17, 795:24,
797:4, 810:18,
828:11
**pains** [6] - 720:25,
722:1, 722:3,
746:24, 806:20
**panty** [5] - 716:21,
716:25, 805:15,
821:4, 821:8
**paper** [2] - 787:12,
815:15
**papers** [2] - 611:2,
611:3
**paragraph** [14] -
616:22, 629:21,
703:1, 742:20,
757:5, 757:6,
759:23, 762:17,
762:24, 763:21,
764:3, 770:10,
843:15
**paragraphs** [1] -
703:7
**paralysis** [1] - 758:12
**parameters** [2] -
640:17, 707:11
**paraplegia** [1] -
758:12
**parcel** [1] - 615:20
**Pardon** [3] - 740:8,
745:8, 746:11
**parents** [1] - 828:7
**Park** [1] - 818:13
**Part** [2] - 701:14,
707:10
**part** [31] - 615:20,
627:13, 629:2,
631:11, 653:21,
680:14, 700:25,
707:15, 707:17,
719:17, 735:7,
742:6, 742:7,
746:17, 751:21,
752:19, 752:21,
756:3, 756:18,
757:19, 766:9,
766:12, 770:17,
778:14, 778:17,

778:19, 785:8,
790:1, 793:2, 840:2
**participate** [1] -
818:19
**particular** [17] - 620:6,
620:24, 624:19,
624:25, 633:9,
633:11, 640:2,
640:15, 641:9,
677:25, 680:6,
680:24, 681:1,
684:11, 685:11,
691:17, 728:12
**partner** [1] - 648:6
**pass** [5] - 632:20,
703:13, 707:16,
735:25, 819:16
**passed** [5] - 701:2,
737:12, 792:10,
800:1, 800:4
**passing** [2] - 677:24,
792:7
**past** [5] - 734:18,
796:18, 801:12,
847:17, 848:12
**path** [1] - 808:8
**Patient** [8] - 771:1,
781:8, 786:24,
787:4, 843:19,
846:10, 847:4,
851:15
**patient** [24] - 643:17,
644:4, 644:16,
646:6, 646:7,
646:10, 646:16,
646:24, 728:6,
728:11, 744:15,
752:12, 765:6,
770:8, 771:8,
771:16, 792:4,
796:18, 812:20,
812:22, 835:8,
835:18, 843:24,
844:6
**Patient's** [1] - 851:10
**patient's** [1] - 646:12
**patients** [11] - 647:7,
651:8, 651:12,
652:7, 652:10,
653:1, 654:1,
658:21, 658:23,
762:18
**Patton** [14] - 723:9,
723:20, 724:3,
724:5, 724:7,
724:11, 724:18,
724:20, 725:12,
790:14, 790:15,
790:17, 790:19,
791:12

**patton** [1] - 790:14
**Paul** [1] - 856:23
**PAUL** [1] - 607:6
**Pause** [1] - 614:11
**pay** [1] - 738:9
**PC** [1] - 607:9
**peaks** [2] - 700:9,
700:14
**pee** [7] - 810:22,
810:24, 811:5,
815:2, 825:14,
825:15
**peer** [1] - 611:3
**peer-reviewed** [1] -
611:3
**pelvic** [29] - 644:7,
650:18, 681:24,
682:3, 685:25,
686:3, 688:5,
688:13, 724:3,
724:24, 725:22,
742:16, 743:7,
748:24, 749:10,
752:1, 753:4, 753:9,
758:1, 763:6,
773:23, 809:3,
810:21, 815:4,
843:23, 848:15,
849:14, 849:16
**Pelvic** [2] - 751:24,
846:15
**pelvically** [1] - 846:21
**penalty** [1] - 634:25
**Pence** [2] - 700:21,
701:25
**penetration** [1] -
734:16
**people** [30] - 623:19,
630:2, 653:10,
654:20, 655:1,
655:12, 683:12,
684:5, 696:20,
697:10, 697:24,
706:10, 737:3,
738:3, 738:9,
741:11, 744:8,
747:19, 779:25,
780:1, 780:3,
780:20, 780:21,
788:2, 794:19,
800:13, 802:6,
804:1, 825:13
**per** [2] - 828:15, 858:3
**Perfect** [7] - 661:6,
667:11, 671:12,
675:7, 710:10,
711:18, 712:8
**perfect** [5] - 711:18,
712:8, 802:9, 830:3,
830:6

**perform** [5] - 724:3,
724:24, 745:18,
816:1, 816:22
**performance** [4] -
643:10, 643:13,
711:5, 738:7
**performed** [10] -
665:4, 677:7,
725:22, 745:20,
806:7, 806:8,
814:20, 814:21,
832:22, 833:1
**perhaps** [5] - 752:16,
752:22, 754:21,
756:23, 847:20
**perineal** [1] - 742:25
**period** [7] - 721:20,
733:23, 772:18,
776:18, 795:22,
796:2, 828:6
**periods** [1] - 828:4
**periurethral** [4] -
692:22, 692:23,
694:8, 743:3
**perjury** [1] - 634:25
**permanent** [15] -
617:1, 617:2,
632:17, 645:23,
662:23, 681:24,
682:3, 682:12,
692:18, 730:25,
735:16, 794:16,
801:2, 819:2, 832:13
**permanently** [4] -
630:4, 674:10,
679:20, 685:14
**permissible** [2] -
622:25, 623:2
**permit** [8] - 645:4,
655:6, 659:12,
670:10, 690:11,
750:24, 842:4, 854:3
**peroxide** [5] - 619:3,
619:8, 619:16,
628:14, 629:17
**peroxides** [6] -
618:25, 619:1,
619:2, 621:14,
622:1, 629:19
**persistent** [1] - 761:12
**person** [10] - 623:9,
663:10, 663:11,
697:21, 737:11,
756:23, 757:15,
765:6, 769:25
**personally** [2] -
698:24, 699:17
**perspective** [1] -
655:1
**pertinent** [1] - 856:8

**Ph.D** [1] - 610:24
**pharmacy** [1] - 857:20
**Pharmacy** [1] - 857:21
**phase** [11] - 706:8,
706:9, 706:13,
706:15, 706:20,
706:24, 707:4,
707:5, 707:7,
707:10, 707:15
**phases** [1] - 706:5
**Phillips** [14] - 616:25,
625:14, 626:17,
626:18, 627:10,
630:2, 683:17,
683:24, 685:7,
685:14, 686:14,
699:5, 699:14,
699:19
**phone** [3] - 651:18,
652:2, 721:5
**photos** [2] - 705:11,
705:12
**phrasing** [1] - 625:1
**physical** [5] - 743:16,
751:22, 770:19,
843:12, 843:23
**Physical** [1] - 846:14
**physician** [7] -
698:11, 799:24,
807:14, 807:15,
817:16, 838:17,
845:17
**physician's** [1] - 831:9
**physicians** [8] -
651:11, 652:19,
653:8, 656:23,
675:21, 694:17,
698:11, 815:11
**physiology** [1] -
831:14
**pick** [1] - 639:9
**picked** [3] - 651:18,
652:2, 794:7
**picture** [10] - 704:19,
704:21, 705:13,
711:19, 712:6,
800:12, 800:19,
800:24, 800:25,
817:19
**pictures** [4] - 704:17,
800:7, 800:12,
800:21
**piece** [4] - 672:9,
672:12, 672:16,
833:18
**pill** [1] - 804:10
**pills** [2] - 810:10,
810:14
**Pinnacle** [9] - 661:11,
687:16, 687:19,

687:24, 688:5, 688:9, 688:17, 689:1, 689:12

place [8] - 694:1, 736:12, 750:20, 803:8, 813:11, 814:13, 857:25, 859:9

placed [14] - 667:6, 668:12, 731:16, 731:19, 731:21, 731:24, 744:7, 811:23, 814:16, 820:6, 829:15, 832:2, 832:6, 832:13

placement [1] - 829:23

plaintiff [8] - 640:3, 640:15, 712:17, 768:12, 768:20, 769:12, 798:8, 848:20

plaintiff's [1] - 852:14

Plaintiffs [1] - 606:7

plaintiffs [10] - 639:15, 639:18, 640:8, 640:25, 652:15, 652:19, 713:11, 852:13, 853:10, 855:5

PLAINTIFFS [3] - 607:2, 608:7, 627:2

Plaintiffs' [5] - 626:25, 632:23, 633:7, 678:15, 701:21

PLAINTIFFS' [2] - 633:17, 678:17

plaintiffs' [3] - 641:13, 642:21, 690:25

plan [2] - 749:20, 750:2, 844:4

planet [1] - 655:12

Plastic [1] - 856:17

plastics [1] - 611:1

played [1] - 853:2

players [1] - 697:24

pleases [1] - 798:13

PLLC [1] - 607:15

plunge [1] - 847:14

Plunge [1] - 818:10

plus [2] - 714:16, 800:2

point [43] - 609:11, 613:6, 614:25, 624:12, 626:13, 631:4, 635:20, 637:12, 646:3, 646:8, 664:20, 679:15, 679:17, 680:18, 706:19,

710:22, 710:24, 711:2, 716:8, 720:12, 722:19, 722:23, 723:9, 725:9, 747:13, 750:18, 753:24, 767:2, 775:13, 788:4, 803:22, 808:12, 808:24, 809:20, 812:22, 813:8, 817:8, 823:2, 825:19, 831:1, 831:2, 831:14, 845:13

pointed [4] - 636:13, 645:12, 703:22, 851:16

points [5] - 641:3, 710:14, 711:14, 739:2, 799:11

Polar [1] - 818:10

polar [1] - 847:13

polymer [7] - 610:24, 610:25, 613:18, 622:21, 623:7, 625:11, 628:10

polymeric [1] - 654:19

polymers [6] - 611:1, 654:22, 654:23, 655:9, 655:13, 655:16

polyolefins [1] - 628:7

Polypropylene [1] - 679:19

polypropylene [125] - 610:19, 611:8, 611:9, 615:12, 615:19, 615:22, 618:17, 618:21, 618:23, 619:5, 619:8, 619:14, 619:15, 619:17, 619:20, 619:23, 620:3, 620:13, 621:10, 621:12, 621:13, 621:17, 621:22, 621:25, 622:15, 623:22, 624:16, 625:25, 627:8, 627:17, 627:21, 628:6, 628:16, 628:24, 629:1, 629:6, 629:8, 629:19, 631:24, 632:10, 642:6, 642:11, 642:15, 642:16, 642:18, 642:19, 642:23, 643:1, 643:7, 643:10, 643:13,

643:18, 643:20, 644:4, 644:17, 645:15, 646:10, 646:19, 650:22, 650:25, 651:8, 651:12, 651:13, 651:14, 651:16, 651:19, 652:7, 652:14, 652:21, 652:23, 653:3, 653:6, 653:10, 653:19, 654:9, 654:12, 654:13, 654:17, 654:19, 654:24, 655:2, 657:2, 657:23, 661:19, 665:11, 666:1, 667:17, 668:23, 669:3, 671:2, 671:17, 681:20, 681:23, 682:2, 682:9, 682:12, 682:20, 682:21, 682:22, 683:17, 683:20, 684:2, 684:25, 685:1, 685:7, 685:14, 686:10, 687:13, 687:17, 687:19, 687:20, 688:22, 690:6, 692:13, 699:20, 699:24, 700:1, 700:5, 700:6, 700:17, 703:19, 712:1, 712:2, 712:4, 819:2

polypropylene's [1] - 622:16

polypropylenes [1] - 625:10

poor [1] - 652:22

POP [1] - 689:14

pore [14] - 673:21, 674:6, 674:9, 674:13, 674:15, 674:21, 675:1, 675:4, 675:8, 676:5, 676:12, 704:3

Pore [2] - 674:6, 674:23

pores [3] - 674:7, 674:9, 674:12

Pores [1] - 674:11

portion [10] - 614:22, 617:4, 617:14, 618:8, 657:13, 658:5, 664:6, 810:5, 816:15, 834:25

portions [1] - 617:17

Portugal [1] - 857:8

position [1] - 611:24

possibility [1] - 836:9

possible [4] - 752:16, 764:4, 820:25, 834:2

possibly [1] - 677:22

post [5] - 774:2, 784:23, 842:21, 842:24, 844:6

post-op [1] - 842:24

post-operatively [1] - 842:21

post-void [1] - 844:6

postoperative [1] - 753:7

postoperatively [1] - 838:14

potential [5] - 693:18, 694:15, 707:12, 771:17, 834:13

Potential [1] - 771:10

potentially [1] - 693:24

potentiate [2] - 762:3, 762:7

pounds [2] - 715:24

Power [1] - 818:12

PowerPoint [1] - 610:16

practice [3] - 831:19, 831:25, 832:1

practices [1] - 652:18

practicing [1] - 817:15

practitioner [3] - 805:16, 805:19, 811:1

Pratt [1] - 799:1

pre [1] - 744:14

pre-admission [1] - 744:14

preadmission [3] - 751:25, 765:2, 765:10

preceding [1] - 848:5

precise [1] - 642:6

preclude [2] - 633:13, 690:3

precluded [1] - 690:1

prefer [1] - 853:8

preferentially [1] - 629:14

preop [1] - 837:21

preoperative [2] - 752:25, 753:3

prepare [2] - 696:18, 823:10

prepared [1] - 810:25

preparing [3] - 649:25, 666:2, 702:17

prescribe [1] - 810:10

prescribed [3] - 810:2, 840:24, 841:5

prescription [4] - 787:22, 787:23, 790:1, 841:4

presence [4] - 659:12, 750:25, 842:5, 854:4

Present [2] - 765:1, 781:7

present [2] - 629:18, 765:2

presentation [1] - 642:17

presented [2] - 744:11, 832:18

presenting [1] - 765:10

presents [4] - 742:24, 751:25, 770:16, 781:9

preserve [3] - 649:5, 690:24, 709:21

preserving [5] - 615:6, 617:23, 625:2, 633:16, 794:22

pressed [1] - 684:16

pressure [6] - 676:6, 676:7, 676:12, 742:25, 743:7, 744:16, 804:3, 822:2

presume [1] - 761:7

presurgery [3] - 751:23, 752:18, 764:19

pretty [12] - 715:4, 735:8, 742:12, 747:25, 765:24, 766:1, 774:20, 801:6, 801:7, 804:18, 806:14, 828:23

prevent [1] - 630:4

previous [6] - 623:14, 671:12, 673:12, 684:14, 777:23, 847:18

previously [7] - 626:14, 661:11, 677:16, 678:10, 742:8, 851:1, 855:11

primary [5] - 676:17, 703:8, 708:21, 838:17, 845:17

primary-care [1] - 838:17

principles [2] - 623:21, 639:2

privileged [1] - 799:17

problem [9] - 645:18,

735:16, 811:15, 813:1, 818:1, 853:9, 853:11, 853:16
**problems** [27] - 611:13, 611:14, 645:20, 658:23, 693:18, 722:15, 722:19, 722:22, 727:24, 733:22, 743:7, 748:12, 762:19, 775:2, 775:3, 785:4, 785:5, 805:8, 805:9, 808:21, 808:22, 809:18, 811:12, 826:4, 842:20, 849:18
**procedure** [36] - 745:12, 752:23, 753:13, 755:24, 756:4, 756:22, 757:8, 757:11, 764:16, 766:9, 768:10, 770:5, 771:2, 803:20, 806:15, 808:9, 817:6, 819:3, 819:7, 829:17, 832:3, 832:16, 833:22, 834:1, 835:15, 837:9, 837:19, 837:23, 843:4, 843:11, 844:11, 844:16, 844:23, 846:8, 850:9
**Procedure** [1] - 745:16
**procedures** [8] - 688:12, 697:11, 753:18, 756:5, 770:21, 771:6, 772:2, 816:1
**proceed** [7] - 634:1, 645:8, 659:24, 696:4, 771:1, 771:4, 771:18
**PROCEEDINGS** [3] - 606:3, 608:2, 609:1
**proceedings** [1] - 859:8
**Proceedings** [1] - 606:24
**process** [13] - 619:10, 619:17, 629:8, 632:14, 635:6, 688:10, 706:5, 706:8, 707:8, 737:2, 737:6, 756:13
**processed** [1] - 737:5
**processes** [2] -

647:21, 707:23
**produced** [1] - 606:25
**producers** [2] - 611:8, 622:16
**product** [68] - 642:2, 661:16, 662:5, 662:7, 662:9, 662:10, 662:11, 662:22, 663:5, 663:17, 663:18, 663:19, 663:22, 663:24, 665:1, 665:4, 665:10, 665:13, 671:7, 674:24, 675:5, 676:1, 676:15, 677:8, 679:6, 679:11, 679:12, 680:2, 682:4, 682:17, 684:8, 687:16, 687:20, 688:5, 688:22, 688:24, 689:17, 691:7, 691:19, 692:10, 693:19, 693:21, 694:2, 694:10, 694:13, 695:11, 695:13, 695:15, 699:7, 699:12, 699:25, 700:24, 706:4, 706:7, 706:14, 706:21, 706:25, 707:6, 707:12, 707:18, 707:19, 707:22, 709:5, 710:11, 711:4, 711:9, 849:14
**product's** [2] - 674:21, 674:23
**productive** [1] - 738:14
**products** [18] - 647:14, 647:16, 647:17, 654:1, 661:24, 662:19, 665:15, 687:13, 687:24, 688:14, 689:14, 696:15, 696:18, 697:13, 698:12, 698:13, 707:20
**profession** [2] - 653:23, 657:14
**Professor** [2] - 610:12, 612:2
**professor** [3] - 611:22, 611:23, 620:10
**proffer** [1] - 648:15

**program** [2] - 800:1, 831:11
**project** [13] - 661:11, 662:2, 662:13, 663:16, 667:16, 671:1, 677:23, 677:25, 697:4, 697:5, 697:19, 706:12
**Project** [1] - 612:7
**prolapse** [2] - 650:19, 688:6, 688:13
**prolapsed** [1] - 743:4
**Prolene** [2] - 762:3, 762:7
**prolonged** [1] - 759:5
**prompted** [3] - 699:7, 825:16, 825:25
**pronounce** [1] - 837:12
**proper** [2] - 701:6, 802:18
**properly** [2] - 689:4, 737:9
**properties** [2] - 628:23, 653:3
**proposal** [1] - 706:9
**proposed** [1] - 700:12
**protect** [3] - 708:25, 709:15, 803:25
**protection** [3] - 702:2, 703:8, 708:20
**ProteGen** [2] - 709:5, 710:3
**proven** [1] - 795:1
**provide** [2] - 769:1, 856:5
**Provide** [1] - 769:7
**Provided** [1] - 858:2
**provided** [3] - 625:17, 683:17, 683:23
**provider** [2] - 727:8, 781:4
**providing** [1] - 849:9
**Prozac** [1] - 827:17
**public** [1] - 738:19
**publish** [1] - 678:8
**published** [22] - 611:3, 616:19, 627:4, 642:15, 654:11, 654:13, 678:16, 698:2, 766:14, 768:3, 773:9, 783:9, 784:15, 785:24, 786:6, 791:22, 796:7, 834:18, 836:24, 838:25, 839:18, 840:14
**publishing** [1] - 769:18

**pull** [14] - 616:17, 618:5, 627:3, 629:21, 680:18, 691:14, 836:22, 838:23, 840:13, 841:25, 843:10, 844:21, 845:16, 846:5
**pulling** [1] - 719:21
**punctures** [1] - 761:20
**purchase** [1] - 661:23
**purely** [1] - 684:16
**purified** [1] - 612:8
**purports** [1] - 645:14
**purpose** [2] - 728:5, 728:9
**purposes** [5] - 638:3, 670:11, 694:3, 751:9, 827:9
**pursuant** [1] - 858:3
**pursuing** [1] - 855:6
**push** [1] - 836:12
**pushing** [2] - 719:21, 811:24, 811:25
**put** [46] - 617:19, 619:11, 624:7, 634:15, 634:18, 638:14, 645:22, 645:24, 652:10, 655:15, 656:4, 656:9, 656:21, 656:24, 665:17, 666:8, 666:17, 667:9, 673:2, 674:24, 676:5, 676:12, 684:13, 684:15, 689:5, 690:15, 699:7, 715:14, 721:4, 726:19, 728:20, 755:15, 756:2, 767:20, 773:1, 777:12, 780:25, 791:21, 796:5, 804:7, 811:9, 834:8, 834:16, 839:17
**Put** [1] - 676:7
**puts** [1] - 767:15
**putting** [4] - 666:11, 668:3, 677:17, 769:3

## Q

**quadrant** [1] - 742:24
**quadrants** [1] - 752:9
**quadriplegia** [1] - 758:12
**qualify** [1] - 739:2
**quality** [4] - 672:1, 696:22, 697:21,

697:23
**quantity** [4] - 821:2, 823:4, 823:12, 823:22
**quarter** [1] - 791:16
**QUESTION** [3] - 638:3, 638:6, 646:23
**questioned** [1] - 640:12
**questioning** [2] - 679:5, 680:15
**questionnaire** [2] - 768:11, 768:23
**questions** [54] - 612:14, 631:13, 631:17, 633:2, 633:9, 634:4, 634:8, 636:2, 637:21, 647:24, 650:4, 654:4, 654:8, 666:10, 667:4, 696:10, 698:3, 698:18, 698:21, 703:17, 705:19, 708:6, 708:15, 708:19, 728:1, 736:13, 741:5, 741:7, 741:15, 754:16, 759:25, 760:1, 760:5, 760:8, 761:7, 761:9, 764:7, 764:11, 764:12, 771:19, 773:17, 778:4, 784:5, 785:23, 788:10, 794:2, 794:8, 797:19, 801:17, 818:22, 820:3, 837:18
**quick** [6] - 745:11, 797:21, 806:14, 807:6, 812:1
**quickly** [3] - 742:12, 746:1, 755:18
**quite** [3] - 613:17, 820:1, 824:5

## R

**rabbit** [1] - 676:23
**radical** [1] - 621:13
**raise** [2] - 609:14, 799:17
**raised** [1] - 713:21
**raises** [1] - 818:13
**raising** [1] - 801:5
**randomized** [9] - 663:8, 686:12, 686:15, 687:5, 691:4, 691:5,

691:10, 691:20,
693:3
**ranging** [1] - 762:20
**ranks** [1] - 611:23
**RAO** [5] - 608:9,
660:1, 660:3, 696:7,
708:18
**Rao** [9] - 659:6,
659:22, 665:18,
696:8, 697:14,
698:3, 701:11,
704:9, 704:15
**rates** [3] - 835:16,
835:21
**rather** [1] - 735:7
**reach** [2] - 637:7,
738:21
**reached** [1] - 717:13
**reaching** [1] - 646:25
**react** [7] - 618:16,
618:24, 619:15,
629:15, 665:12,
667:18, 668:23
**reacting** [2] - 619:13,
629:14
**reaction** [5] - 636:17,
692:17, 692:18,
758:11, 802:24
**reactions** [1] - 763:4
**reactive** [1] - 619:2
**reactivity** [3] - 618:7,
618:13, 618:16
**Read** [1] - 851:19
**read** [70] - 616:23,
618:22, 627:15,
628:4, 637:6, 638:9,
638:11, 644:19,
644:20, 644:21,
644:24, 647:2,
668:15, 668:20,
669:5, 676:10,
699:1, 708:13,
708:20, 711:2,
743:1, 744:23,
744:24, 747:13,
757:12, 758:19,
758:20, 759:15,
759:16, 759:17,
760:25, 761:6,
765:22, 770:11,
771:25, 775:22,
777:21, 778:9,
796:23, 797:13,
824:19, 826:5,
826:15, 835:2,
835:10, 835:19,
835:20, 839:5,
839:22, 839:24,
840:4, 842:21,
842:22, 842:24,

843:2, 843:17,
843:18, 844:2,
844:9, 844:10,
845:3, 845:5, 845:8,
845:10, 845:24,
846:12, 846:17,
851:14, 854:8
**readily** [1] - 825:13
**reading** [5] - 745:9,
762:25, 779:5,
792:8, 839:9
**ready** [6] - 610:1,
634:1, 707:6, 751:2,
751:17, 754:21
**real** [5] - 619:20,
745:11, 774:19,
812:1
**reality** [1] - 643:16
**realize** [1] - 798:5
**realized** [2] - 686:16,
832:8
**really** [37] - 612:7,
612:12, 613:16,
614:1, 615:4,
619:10, 638:8,
646:8, 647:13,
647:18, 652:20,
666:15, 666:19,
677:23, 716:12,
717:20, 723:11,
736:10, 747:13,
750:10, 750:13,
755:20, 756:5,
788:25, 789:25,
796:11, 801:10,
802:14, 804:13,
804:25, 810:22,
819:13, 823:19,
830:11, 833:20,
850:7
**Reason** [2] - 839:21,
844:23
**reason** [17] - 621:1,
625:1, 644:8, 657:3,
658:22, 684:15,
689:11, 689:24,
722:6, 742:19,
764:14, 785:13,
785:15, 785:16,
846:5, 849:20,
849:21
**reasons** [5] - 615:6,
633:15, 638:14,
685:10, 686:19
**recalled** [1] - 710:11
**received** [7] - 731:20,
768:10, 769:1,
769:3, 769:7,
769:21, 851:1
**RECEIVED** [6] - 627:2,

633:17, 678:17,
701:23, 705:6,
858:10
**receiving** [2] - 686:13,
715:8
**recent** [1] - 800:14
**recently** [2] - 715:2,
812:15
**recess** [15] - 659:10,
659:14, 659:17,
750:23, 751:4,
751:9, 751:11,
842:2, 842:5, 842:8,
853:5, 853:18,
854:1, 854:4, 854:10
**recessed** [1] - 858:15
**recognize** [1] - 658:11
**recognized** [1] -
700:23
**recollection** [6] -
789:13, 797:7,
797:15, 821:18,
822:18, 847:6
**recommend** [5] -
672:11, 718:3,
725:25, 730:3,
813:22
**recommendation** [1] -
788:18
**recommendations** [1]
- 844:4
**recommended** [3] -
718:5, 752:11,
835:10
**record** [53] - 609:21,
614:22, 615:9,
615:15, 670:11,
729:18, 732:17,
732:20, 742:13,
746:16, 766:18,
768:1, 772:7, 772:9,
772:10, 775:15,
776:20, 777:8,
777:9, 777:16,
779:20, 781:1,
784:8, 784:10,
784:17, 785:14,
785:17, 791:3,
791:19, 791:24,
796:4, 796:5,
797:16, 810:7,
813:11, 813:16,
816:13, 816:14,
834:23, 835:24,
838:21, 841:10,
843:12, 844:21,
845:8, 851:9,
854:15, 854:17,
854:22, 855:1,
855:4, 857:25

**recorded** [1] - 606:24
**records** [49] - 650:10,
721:22, 722:6,
722:7, 728:8, 740:4,
742:7, 751:22,
752:20, 756:19,
766:13, 779:13,
780:5, 780:7,
783:15, 786:11,
786:15, 789:20,
795:15, 795:18,
805:6, 854:18,
855:3, 855:5,
855:13, 855:18,
855:19, 855:21,
855:23, 856:8,
856:9, 856:11,
856:13, 856:15,
856:17, 856:19,
856:21, 856:23,
856:25, 857:2,
857:4, 857:6, 857:8,
857:10, 857:12,
857:14, 857:16,
857:18, 857:20
**recovery** [2] - 719:18,
772:18
**Recross** [1] - 608:6
**rectocele** [2] - 843:25,
846:16
**recurrence** [2] -
763:22, 771:12
**redirect** [3] - 654:6,
793:23, 797:22
**Redirect** [3] - 608:6,
708:17, 851:5
**REDIRECT** [4] - 654:7,
708:18, 793:24,
851:6
**reel** [1] - 619:24
**reevaluate** [1] -
749:12
**refer** [10] - 609:20,
633:11, 724:5,
724:7, 783:2, 783:3,
783:5, 815:14,
815:17, 815:18
**reference** [2] - 660:16,
660:17
**references** [1] -
649:24
**referral** [1] - 843:6
**referred** [9] - 723:12,
805:20, 815:15,
815:19, 817:4,
817:9, 832:12,
832:19, 840:12
**referring** [4] - 682:15,
771:20, 822:19,
835:13

**refers** [6] - 755:23,
758:20, 776:12,
784:23, 816:16
**refresh** [1] - 789:13
**refresher** [1] - 788:25
**refuse** [1] - 686:18
**regard** [22] - 613:1,
617:17, 623:22,
641:21, 649:10,
657:23, 688:7,
689:14, 696:14,
698:14, 698:25,
703:25, 705:23,
707:7, 708:1,
779:14, 779:22,
782:15, 819:9,
829:7, 847:8, 858:1
**regarded** [1] - 688:12
**regarding** [39] -
617:11, 623:14,
633:13, 665:25,
669:3, 671:2, 675:8,
675:10, 677:7,
680:1, 688:12,
689:13, 770:5,
837:18, 846:11,
847:5, 851:11,
851:16, 855:22,
855:24, 856:10,
856:11, 856:13,
856:15, 856:18,
856:20, 856:21,
856:23, 857:1,
857:2, 857:4, 857:6,
857:8, 857:11,
857:12, 857:14,
857:16, 857:19,
857:21
**regards** [1] - 855:18
**region** [3] - 685:25,
686:1, 686:3
**regular** [9] - 693:10,
780:9, 809:21,
811:1, 815:16,
815:18, 833:25,
834:2
**regularly** [1] - 644:18
**regulatory** [2] -
697:21, 697:23
**rehighlight** [1] - 837:5
**relate** [1] - 643:10
**related** [4] - 730:16,
739:20, 809:7
**relates** [2] - 744:1,
770:12
**relating** [2] - 855:1,
855:13
**relations** [4] - 731:4,
781:22, 797:9,
797:10

**relationship** [4] - 615:1, 780:18, 782:13, 818:4
**relatively** [1] - 652:22
**relaxation** [2] - 757:25
**relevance** [2] - 617:18, 707:21
**relevant** [7] - 639:7, 643:13, 643:15, 652:20, 689:3, 690:21, 703:4
**reliable** [4] - 684:10, 684:11, 684:21, 684:23
**relied** [3] - 613:20, 832:15, 837:25
**relieve** [1] - 810:15
**relieves** [1] - 830:15
**rely** [5] - 613:21, 613:25, 638:3, 638:5, 638:6
**relying** [4] - 613:8, 635:13, 637:1, 637:4
**remained** [1] - 815:5
**remains** [1] - 819:10
**Remember** [1] - 854:5
**remember** [42] - 630:13, 636:14, 637:2, 641:8, 646:7, 646:8, 698:19, 700:2, 703:23, 705:20, 708:7, 710:1, 715:23, 716:11, 732:4, 732:18, 743:6, 745:9, 753:4, 754:5, 754:6, 754:7, 754:8, 754:12, 754:23, 764:17, 781:2, 783:7, 787:25, 788:7, 788:15, 788:22, 789:1, 789:3, 789:19, 789:25, 794:5, 836:8, 850:7, 851:12
**remembers** [1] - 735:10
**remind** [1] - 609:20
**removal** [4] - 676:21, 676:23, 677:1, 746:1
**remove** [1] - 731:7
**removed** [11] - 644:8, 726:1, 726:3, 726:9, 732:15, 733:7, 733:14, 746:7, 751:21, 773:2, 855:4
**Rene** [1] - 826:13
**reoccur** [1] - 744:19
**Reoccurrence** [1] - 758:22

**reoccurrence** [2] - 763:22, 763:25
**reorganize** [1] - 670:21
**repair** [3] - 687:4, 757:24, 757:25
**repeat** [4] - 625:8, 640:21, 643:23, 695:9
**rephrase** [3] - 623:3, 623:17, 658:9
**report** [31] - 613:4, 613:13, 613:18, 613:19, 614:8, 633:5, 633:6, 633:12, 634:16, 634:18, 634:22, 635:5, 635:9, 635:16, 635:23, 646:25, 648:5, 648:6, 648:19, 648:23, 649:10, 649:11, 649:15, 649:19, 649:25, 650:21, 745:11, 747:14, 752:21, 770:7, 792:3
**reported** [2] - 765:13, 765:17
**Reporter** [3] - 859:4, 859:13, 859:16
**reporter** [1] - 856:5
**REPORTER** [2] - 614:17, 762:5
**Reporters** [1] - 606:18
**REPORTERS'** [1] - 859:1
**reports** [1] - 701:5
**representation** [1] - 704:21
**representations** [1] - 708:10
**representative** [1] - 626:17
**Request** [1] - 757:25
**request** [5] - 659:7, 756:15, 757:10, 757:24, 837:16
**require** [2] - 696:21, 707:23
**required** [5] - 645:8, 689:25, 690:11, 708:2, 829:20
**requirements** [1] - 707:5
**rescue** [1] - 801:1
**research** [10] - 611:10, 611:14, 612:12, 642:6, 642:11, 642:23,

642:25, 654:24, 832:3, 833:20
**Research** [3] - 661:3, 661:4, 697:3
**residual** [2] - 753:4, 844:6
**resin** [11] - 625:25, 626:2, 627:18, 628:11, 628:19, 635:19, 635:25, 683:1, 685:16, 685:17, 699:3
**resistance** [2] - 627:7, 628:6
**resolve** [1] - 733:17
**resolved** [1] - 845:24
**respect** [8] - 631:14, 652:25, 682:6, 689:4, 698:15, 711:15, 718:4, 719:15
**respond** [3] - 620:18, 631:15, 643:25
**responded** [2] - 654:11, 744:18
**response** [13] - 613:15, 617:11, 623:1, 647:19, 655:5, 657:7, 679:23, 683:9, 727:12, 777:14, 784:12, 810:6, 813:7
**RESPONSE** [1] - 609:8
**Response** [2] - 723:16, 848:24
**responses** [2] - 703:4, 851:1
**responsible** [4] - 697:14, 697:18, 697:20, 701:4
**rest** [5] - 655:18, 731:16, 756:6, 819:12, 831:7
**restful** [2] - 854:10, 858:14
**restriction** [2] - 719:23, 720:6
**restrictions** [2] - 719:17, 720:9, 807:19
**result** [11] - 621:25, 626:6, 632:12, 657:15, 764:1, 813:23, 824:17, 825:1, 830:1, 844:12, 850:16
**resulted** [1] - 849:13
**resulting** [2] - 628:10, 628:19

**results** [3] - 806:12, 838:9, 838:11
**retention** [2] - 835:17, 835:21
**retire** [2] - 715:12, 715:14
**retired** [3] - 715:6, 751:8, 854:12
**retirement** [4] - 715:8, 738:17, 738:22, 739:2
**return** [6] - 729:4, 744:12, 800:2, 808:17, 809:20, 816:2
**returned** [3] - 659:18, 811:13, 811:22
**review** [12] - 613:17, 615:12, 624:24, 625:17, 636:8, 640:2, 679:10, 730:12, 730:15, 756:6, 759:20, 766:24
**reviewed** [11] - 611:3, 614:15, 615:1, 615:18, 617:14, 626:10, 631:11, 631:20, 649:16, 650:5, 721:22
**reviewing** [3] - 649:22, 650:8, 732:20
**rid** [1] - 825:13
**ride** [1] - 818:8
**Ridge** [5] - 610:14, 612:4, 612:6, 612:8, 612:10
**riding** [1] - 818:7
**rise** [3] - 609:6, 659:15, 751:13
**risk** [13] - 699:20, 730:23, 731:3, 731:6, 731:9, 731:12, 759:2, 759:6, 803:22, 829:18, 829:20, 834:6, 834:10
**risks** [25] - 679:11, 680:1, 684:19, 695:3, 730:1, 756:7, 757:21, 758:7, 758:10, 758:13, 758:15, 758:23, 759:11, 760:23, 761:11, 763:10, 771:6, 771:17, 772:2, 772:6, 795:12, 803:20, 834:3

**RMR** [6] - 606:18, 606:20, 859:3, 859:5, 859:12, 859:15
**robe** [1] - 614:18
**ROBERT** [1] - 607:17
**Robert** [4] - 714:9, 720:1, 722:20, 735:10
**Rocky** [1] - 801:2
**rod** [1] - 619:24
**room** [2] - 655:15, 697:10
**Room** [3] - 839:8, 839:13, 840:9
**rose** [1] - 611:22
**Rosenzweig** [1] - 627:20
**Ross** [1] - 693:4
**rough** [3] - 721:9, 823:17
**roughly** [3] - 716:11, 729:16, 732:9
**rounds** [1] - 656:7
**routine** [4] - 671:11, 781:9, 783:24, 786:21
**routinely** [1] - 698:11
**row** [1] - 818:15
**RPR** [6] - 606:18, 606:20, 859:3, 859:5, 859:12, 859:15
**RSA** [1] - 859:3
**Rule** [1] - 728:2
**rule** [6] - 631:15, 666:18, 667:3, 667:7, 728:2, 798:5
**ruled** [1] - 615:10
**ruling** [6] - 623:14, 632:24, 690:25, 812:9, 854:24, 855:3
**rulings** [1] - 858:3
**run** [7] - 673:16, 703:25, 749:20, 811:15, 811:17, 811:19, 815:23
**running** [4] - 648:15, 650:2, 673:15
**runs** [1] - 623:14
**rush** [1] - 813:15
**rushed** [2] - 722:12, 746:13
**rust** [3] - 619:12, 619:17, 629:3
**rust-like** [1] - 619:17
**rusting** [1] - 619:10, 627:24
**rusty** [2] - 619:13, 629:3

# S

**S.C** [1] - 835:2
**safe** [16] - 646:15, 646:23, 662:19, 662:23, 663:6, 665:6, 681:23, 682:3, 682:12, 685:2, 689:2, 691:19, 692:5, 694:11, 697:13, 795:1
**safer** [2] - 664:15, 664:18
**Safety** [1] - 615:7
**safety** [8] - 665:9, 684:18, 686:24, 687:2, 689:13, 690:17, 699:14, 703:4
**Saint** [1] - 835:9
**sale** [8] - 676:1, 676:22, 677:3, 677:8, 681:7, 691:7, 691:11, 691:25
**salpingo** [3] - 752:13, 752:17, 753:17
**salpingo-oophorectomy** [3] - 752:13, 752:17, 753:17
**Samar** [1] - 857:12
**sample** [2] - 673:4, 706:2
**Samuel** [1] - 856:15
**Sankari** [1] - 857:12
**sat** [1] - 677:16
**satisfactorily** [1] - 771:19
**satisfactory** [1] - 760:2
**satisfied** [1] - 707:5
**Saturday** [6] - 802:8, 804:10, 830:4, 830:11, 830:19, 848:12
**saw** [24] - 664:11, 677:22, 724:9, 725:2, 725:5, 730:6, 760:25, 761:3, 761:22, 781:1, 788:4, 788:10, 788:13, 791:10, 805:21, 838:16, 838:19, 840:7, 840:11, 840:16, 841:19, 846:4, 847:10
**Sawador** [1] - 857:8
**scale** [1] - 728:24

**scar** [2] - 758:11, 803:24
**scares** [1] - 819:13
**scarring** [1] - 771:13
**scheduled** [2] - 743:11, 751:1
**school** [5] - 611:6, 652:10, 714:12, 799:13, 799:23
**School** [1] - 654:21
**science** [3] - 610:24, 610:25, 620:12
**sciences** [2] - 696:23, 698:9
**Scientific** [54] - 622:21, 623:8, 624:7, 624:13, 635:19, 635:21, 650:17, 660:22, 660:24, 661:10, 662:14, 662:19, 665:9, 665:11, 665:15, 665:24, 667:17, 668:22, 669:2, 670:2, 670:22, 671:1, 677:7, 681:11, 685:9, 686:13, 688:11, 691:19, 691:23, 692:3, 693:4, 694:18, 695:4, 695:14, 695:25, 696:14, 697:2, 697:17, 698:5, 699:24, 700:16, 701:17, 702:8, 702:20, 703:11, 704:2, 705:22, 708:2, 711:4, 711:12, 712:4, 731:20, 795:2, 795:5
**scientific** [23] - 610:20, 612:16, 612:21, 612:24, 613:2, 614:4, 615:3, 616:4, 616:11, 618:3, 620:13, 621:21, 621:24, 622:5, 623:20, 625:9, 625:15, 625:22, 639:2, 657:21, 657:22, 681:22, 682:2
**SCIENTIFIC** [1] - 606:8
**Scientific's** [2] - 707:23, 732:2
**scientist** [5] - 620:11, 639:4, 639:6,

639:11, 649:12
**Scientist** [2] - 610:14, 612:3
**scientists** [1] - 625:11
**scope** [7] - 614:8, 622:25, 623:2, 624:6, 633:5, 709:7, 709:19
**SCOTT** [1] - 607:3
**Scott** [1] - 660:7
**scratch** [2] - 747:11, 767:9
**scratched** [1] - 786:25
**screen** [5] - 666:9, 668:4, 668:12, 670:6, 777:10
**season** [1] - 804:25
**seat** [1] - 818:8
**second** [19] - 628:12, 656:15, 709:5, 723:6, 729:3, 748:8, 750:7, 758:2, 759:14, 762:17, 814:21, 814:22, 814:25, 816:12, 829:12, 832:9, 832:25, 833:2, 833:5
**seconds** [1] - 817:3
**Section** [7] - 617:9, 618:4, 618:5, 618:6, 618:7, 636:13, 636:14
**section** [10] - 618:2, 618:18, 676:16, 763:9, 773:17, 842:16, 843:23, 845:22, 846:10, 851:10
**See** [1] - 792:4
**see** [137] - 611:13, 611:15, 619:19, 624:19, 624:23, 627:8, 627:10, 632:23, 638:8, 644:11, 645:17, 645:21, 650:2, 650:13, 665:18, 667:15, 668:9, 669:12, 672:22, 673:2, 675:13, 675:22, 676:10, 676:23, 681:3, 691:22, 702:13, 702:18, 705:9, 709:10, 717:18, 742:17, 743:4, 743:19, 743:21, 745:3, 745:4, 745:7, 745:9, 745:18, 746:25, 747:1,

747:6, 747:11, 749:5, 749:10, 749:23, 753:11, 757:2, 758:23, 759:2, 759:6, 759:9, 759:24, 762:1, 763:7, 763:12, 763:16, 765:3, 765:14, 766:18, 767:4, 767:5, 767:10, 767:11, 767:14, 767:16, 769:5, 769:10, 769:21, 771:8, 771:14, 774:4, 774:5, 774:7, 774:8, 775:12, 775:18, 777:22, 778:3, 779:3, 779:10, 779:17, 779:20, 779:23, 780:6, 781:3, 781:16, 782:1, 783:20, 786:21, 786:25, 787:5, 788:19, 789:18, 790:5, 790:17, 791:25, 792:14, 792:22, 793:2, 793:11, 793:12, 796:9, 805:10, 805:17, 806:2, 806:22, 811:17, 813:21, 814:2, 826:13, 831:3, 835:3, 837:7, 839:2, 840:23, 841:7, 841:11, 841:16, 841:22, 842:12, 842:17, 842:18, 843:13, 843:25, 844:17, 844:24, 845:14, 845:19, 846:2, 846:7, 846:20, 853:9, 853:11, 854:10
**seeing** [3] - 674:25, 789:10, 841:18
**seek** [5] - 717:10, 723:6, 825:16, 825:25, 832:25
**seem** [4] - 722:12, 726:21, 733:20, 772:4
**selection** [1] - 703:3
**self** [2] - 805:3, 835:18
**self-catheterization** [1] - 835:18
**self-medicate** [1] - 805:3

**sell** [5] - 662:23, 681:11, 686:19, 686:21, 706:22
**selling** [3] - 687:24, 690:21, 707:6
**send** [2] - 693:21, 816:6
**sending** [1] - 701:5
**senior** [2] - 660:22, 714:22
**SENSABAUGH** [1] - 607:15
**sensations** [1] - 851:21
**sense** [2] - 671:16, 706:12
**sent** [1] - 841:22
**sentence** [4] - 628:12, 771:16, 845:23, 851:19
**separating** [1] - 753:19
**September** [10] - 786:5, 786:8, 786:19, 787:16, 789:15, 789:18, 789:22, 790:24, 791:4, 844:19
**series** [1] - 739:20
**serious** [1] - 762:21
**seriously** [3] - 635:5, 635:6, 637:18
**served** [1] - 654:20
**service** [1] - 715:13
**SERVICES** [3] - 609:6, 659:15, 751:13
**set** [5] - 639:2, 707:1, 708:2, 855:2, 859:9
**sets** [1] - 702:12
**seven** [4] - 681:10, 715:24, 743:17, 828:17
**Several** [1] - 730:10
**several** [7] - 627:16, 627:25, 754:19, 760:3, 765:3, 765:11, 778:5
**severe** [25] - 716:17, 718:18, 718:22, 718:23, 733:9, 733:12, 746:23, 758:11, 766:5, 766:10, 767:5, 767:10, 767:13, 767:15, 767:17, 767:24, 794:16, 805:10, 807:10, 827:21, 828:6, 828:20, 849:17
**Severe** [1] - 792:13

**sex** [24] - 721:9, 721:13, 728:16, 729:1, 732:18, 733:1, 733:4, 733:12, 733:17, 734:5, 775:6, 782:4, 793:18, 793:19, 793:20, 795:23, 795:24, 797:4, 807:22, 850:1, 850:17, 850:20, 850:21, 850:22
**sexual** [17] - 720:1, 720:10, 720:12, 721:16, 728:19, 731:4, 733:25, 773:19, 773:22, 785:5, 797:9, 797:10, 822:1, 822:10, 823:13, 850:2, 850:8
**sexually** [1] - 822:7
**sharp** [1] - 720:25
**Sheet** [1] - 615:5
**sheet** [35] - 610:20, 613:18, 613:21, 613:22, 614:5, 616:5, 616:12, 616:15, 616:21, 617:4, 617:14, 617:15, 617:18, 617:20, 618:3, 629:20, 630:1, 630:3, 630:21, 631:5, 631:21, 632:5, 634:9, 636:3, 636:5, 636:10, 636:16, 768:11, 768:12, 768:20, 769:12, 772:1, 819:1, 848:20, 849:9
**shell** [5] - 735:6, 782:5, 782:8, 782:12, 782:15
**Sheth** [1] - 857:14
**shipped** [1] - 679:6
**SHOOK** [1] - 607:19
**shoot** [2] - 721:1, 803:9
**shooting** [2] - 720:25, 811:3
**short** [2] - 846:21, 852:25
**shortening** [1] - 763:3
**shorthand** [1] - 774:6
**shot** [1] - 809:3
**show** [11] - 658:17, 688:8, 705:14, 710:14, 710:19, 745:11, 766:12,

767:7, 789:20, 800:12, 811:21
**showed** [4] - 700:4, 711:19, 730:6
**showing** [3] - 682:14, 700:10, 811:16
**shows** [2] - 656:23, 700:9
**shrink** [4] - 692:10, 731:10, 795:9, 819:5
**shrinkage** [3] - 692:9, 694:6, 708:11
**shrinking** [1] - 738:3
**shrunk** [1] - 811:24
**sic** [1] - 705:4
**side** [8] - 733:11, 735:19, 803:7, 803:8, 809:4, 830:13, 830:16, 843:24
**Sidebar** [9] - 615:25, 625:6, 649:8, 667:13, 670:18, 691:2, 709:24, 813:19, 853:17
**sidebar** [9] - 612:20, 623:25, 648:13, 666:6, 669:15, 688:3, 709:11, 812:10, 852:3
**sign** [4] - 788:1, 794:12, 836:16, 837:17
**signature** [4] - 756:9, 769:14, 837:1, 837:14
**signed** [22] - 634:22, 730:5, 730:6, 730:9, 730:11, 754:17, 754:19, 755:13, 756:11, 756:21, 756:23, 756:24, 757:14, 757:15, 757:21, 762:14, 769:12, 769:14, 771:23, 794:15, 836:14, 836:19
**significant** [3] - 809:19, 827:3, 827:4
**significantly** [1] - 801:16
**signing** [1] - 759:15
**similar** [8] - 619:10, 663:23, 697:7, 704:2, 711:20, 761:21, 784:17, 785:23
**similarities** [2] - 703:18, 703:21
**simple** [1] - 710:25

**simplest** [1] - 621:17
**simply** [5] - 609:19, 633:11, 672:18, 679:25, 684:20
**single** [1] - 653:9
**sit** [3] - 729:6, 818:8, 826:22
**sitting** [1] - 636:21
**situation** [2] - 749:25, 774:18
**situations** [1] - 711:5
**six** [7] - 681:10, 715:24, 719:21, 720:6, 721:16, 784:6
**six-week** [1] - 720:6
**size** [20] - 673:21, 674:6, 674:9, 674:11, 674:13, 674:15, 674:21, 674:23, 675:1, 675:4, 675:8, 676:5, 676:12, 704:3, 821:4, 822:15, 822:19, 823:1, 823:5
**sizes** [1] - 671:22
**skipped** [1] - 773:6
**slide** [5] - 612:1, 665:19, 665:21, 730:6, 732:4
**sling** [64] - 661:11, 661:16, 661:25, 676:18, 677:23, 679:1, 679:21, 681:6, 681:11, 682:18, 682:19, 687:3, 687:7, 687:21, 690:7, 691:6, 691:10, 691:24, 692:4, 692:5, 692:7, 692:19, 692:24, 693:15, 693:16, 709:5, 710:3, 710:12, 711:3, 711:9, 711:16, 713:8, 718:5, 718:6, 718:18, 719:7, 725:10, 730:17, 731:7, 731:10, 731:13, 731:16, 731:17, 731:19, 731:24, 739:18, 744:7, 757:3, 760:11, 760:19, 762:13, 770:4, 770:5, 771:2, 781:20, 781:21, 781:24, 782:2, 787:4, 808:9, 811:9
**Sling** [3] - 630:9,

794:10, 794:13
**sling's** [1] - 682:20
**slings** [2] - 661:7, 725:8
**slow** [4] - 616:2, 629:8, 630:5, 632:14
**slower** [1] - 658:11
**small** [7] - 736:25, 737:4, 762:20, 776:8, 803:24, 833:10, 833:14
**smaller** [1] - 668:18
**smart** [1] - 674:19
**smarter** [1] - 652:24
**smoother** [2] - 664:11, 664:13
**Smoother** [1] - 664:15
**smoothing** [1] - 664:18
**snakes** [1] - 799:21
**sneeze** [2] - 716:22, 821:2
**sneezed** [1] - 766:1
**sneezes** [1] - 760:15
**sneezing** [4] - 820:21, 823:9
**snow** [1] - 848:2
**social** [1] - 827:13
**Society** [1] - 672:11
**sold** [1] - 665:15
**solely** [1] - 701:3
**someone** [7] - 696:22, 696:23, 696:24, 756:11, 756:12, 766:22, 789:11
**sometime** [7] - 641:11, 641:12, 742:2, 788:10, 788:13, 788:20, 790:10
**sometimes** [5] - 737:3, 746:24, 791:1, 802:13, 826:24
**somewhat** [2] - 737:8, 772:9
**somewhere** [3] - 657:16, 723:6, 815:18
**son** [5] - 800:9, 800:19, 801:1, 818:4, 818:18
**Sophomore** [2] - 621:16, 657:4
**sore** [2] - 721:9, 834:11
**sorry** [35] - 614:17, 640:22, 648:21, 650:17, 663:14, 667:25, 668:7,

668:9, 669:8, 676:7, 681:25, 682:9, 694:20, 711:23, 727:2, 746:2, 752:6, 762:5, 770:25, 780:2, 782:17, 784:14, 789:8, 791:1, 796:11, 798:3, 798:6, 814:3, 822:24, 839:9, 839:10, 845:16, 847:9, 853:14, 856:3
**sort** [9] - 657:2, 683:21, 699:20, 729:10, 747:22, 777:22, 781:12, 794:7, 850:3
**sorts** [1] - 708:12
**sought** [2] - 833:2, 833:4
**Soulsby** [1] - 857:16
**sound** [7] - 685:21, 716:13, 718:25, 729:19, 776:13, 777:23, 788:14
**sounds** [1] - 779:6
**Sounds** [1] - 681:9
**source** [2] - 643:20, 652:22
**sources** [1] - 804:1
**South** [2] - 717:23, 717:24
**SOUTHERN** [1] - 606:2
**Southern** [2] - 609:2, 859:4
**SoyCares** [1] - 841:2
**SP** [1] - 774:1
**spasms** [1] - 851:20
**speaking** [1] - 621:11
**spear** [5] - 811:3, 815:4, 817:19, 817:23
**special** [1] - 801:5
**Special** [5] - 799:22, 800:15, 800:16, 818:13, 818:14
**special-needs** [1] - 801:5
**specialist** [2] - 783:2, 815:19
**specialized** [1] - 725:7
**specific** [15] - 614:6, 617:16, 640:15, 642:11, 647:17, 678:2, 683:1, 683:11, 684:3, 685:18, 702:20, 759:11, 797:1, 797:11

**specifically** [19] - 613:4, 613:7, 614:21, 636:25, 640:7, 640:24, 641:21, 648:18, 650:7, 675:9, 677:10, 685:20, 697:2, 698:21, 698:24, 702:25, 703:7, 744:21, 836:12

**specifications** [2] - 706:25, 707:21

**specs** [1] - 707:11

**spectrum** [1] - 711:5

**spend** [1] - 722:9

**spent** [8] - 611:6, 649:22, 649:24, 650:8, 650:16, 819:25, 824:3, 828:21

**spiders** [1] - 799:21

**spine** [2] - 815:19, 843:2

**split** [1] - 852:22

**spoken** [3] - 654:11, 654:17, 725:13

**sports** [1] - 799:24

**spot** [1] - 814:15

**spray** [2] - 805:11, 821:4

**sprayed** [1] - 823:2

**spraying** [9] - 805:14, 820:16, 820:18, 821:2, 821:25, 822:8, 822:11, 822:15, 823:4

**spreads** [17] - 830:13

**spring** [1] - 804:25

**spritz** [3] - 820:17, 821:9, 821:22

**spritzing** [1] - 821:17

**squirt** [1] - 823:3

**St** [3] - 713:15, 713:18, 857:10

**stabbed** [1] - 811:3

**stability** [3] - 618:7, 618:13, 618:14

**stabilize** [1] - 664:14

**stable** [1] - 618:15

**staff** [4] - 747:18, 755:12, 775:9, 775:19

**stage** [2] - 707:24, 708:3

**stand** [11] - 609:12, 609:18, 633:3, 659:3, 659:14, 751:4, 751:9, 797:25, 798:8,

798:10, 842:5

**standard** [9] - 631:23, 663:9, 672:1, 701:13, 702:7, 702:8, 705:25, 706:1, 707:23

**standardization** [1] - 702:6

**standards** [9] - 662:25, 672:10, 700:23, 702:4, 702:16, 702:17, 705:22, 708:2

**standpoint** [2] - 622:13, 622:14

**Stands** [1] - 620:15

**stands** [2] - 623:11, 702:4

**start** [11] - 610:17, 670:20, 706:14, 706:15, 707:6, 736:8, 755:17, 789:21, 804:8, 805:8, 808:12

**started** [20] - 611:22, 612:7, 634:13, 645:2, 661:9, 706:8, 744:15, 747:3, 754:12, 795:18, 808:22, 808:23, 810:17, 812:18, 815:3, 820:11, 821:1, 821:6, 830:7

**starting** [3] - 805:11, 852:14, 853:10

**starts** [6] - 668:5, 668:8, 757:6, 763:21, 830:12, 830:13

**state** [3] - 645:15, 695:21, 795:8

**State** [2] - 737:17, 737:18

**statement** [31] - 612:25, 613:3, 613:9, 613:14, 617:18, 636:11, 636:22, 637:25, 638:3, 655:24, 673:23, 674:3, 679:19, 683:8, 686:24, 687:2, 687:6, 687:9, 691:22, 692:3, 718:14, 728:3, 728:11, 732:1, 760:7, 794:16, 795:1, 795:4, 797:6, 801:4, 845:7

**statements** [11] -

674:1, 679:16, 680:11, 690:4, 691:13, 728:4, 728:5, 728:8, 757:10, 757:20, 794:18

**States** [2] - 609:2, 859:4

**STATES** [2] - 606:1, 606:15

**states** [12] - 643:17, 644:3, 644:15, 703:1, 703:2, 744:15, 752:4, 752:8, 783:22, 796:18, 797:8

**stating** [2] - 850:15, 850:17

**status** [2] - 774:2, 784:23

**stay** [2] - 699:13, 735:6

**stenographically** [1] - 859:8

**stenography** [1] - 606:24

**step** [5] - 659:1, 712:13, 797:20, 797:23, 851:23

**steps** [1] - 697:12

**stick** [1] - 805:14

**sticker** [1] - 704:13

**sticker's** [1] - 704:9

**sticking** [1] - 748:23

**stiffen** [1] - 643:19

**stiffening** [1] - 643:20

**stiffer** [1] - 628:21

**still** [17] - 629:25, 652:9, 653:6, 656:9, 660:24, 724:17, 726:22, 727:9, 761:13, 815:11, 818:18, 823:15, 829:25, 839:9, 849:22, 849:23, 851:20

**stock** [1] - 656:25

**stop** [5] - 645:5, 652:3, 718:12, 823:10

**stopped** [1] - 822:10

**stopping** [3] - 750:18, 797:22, 852:14

**storm** [3] - 802:9, 830:3, 830:6

**story** [1] - 805:7

**straight** [2] - 790:23, 811:4

**strap** [1] - 833:18

**Street** [2] - 607:7,

607:12

**stress** [41] - 642:2, 647:10, 647:14, 687:4, 713:8, 716:5, 716:9, 716:16, 716:18, 716:23, 717:4, 717:11, 718:4, 718:18, 718:21, 729:3, 729:6, 729:9, 729:23, 749:12, 750:9, 754:1, 754:4, 770:16, 770:24, 771:3, 771:12, 773:2, 775:2, 801:11, 802:7, 804:4, 805:4, 805:8, 807:7, 808:8, 820:8, 830:9, 830:10, 843:25, 846:16

**stresses** [1] - 804:2

**stressful** [1] - 805:1

**stretch** [1] - 671:13

**stretching** [1] - 716:23

**stricken** [1] - 810:7

**strike** [3] - 640:6, 816:15, 833:22

**strip** [8] - 672:17, 672:21, 672:23, 673:4, 673:8, 673:9, 673:10, 673:11

**strong** [11] - 618:24, 619:3, 619:7, 622:3, 626:6, 627:16, 628:8, 628:9, 628:13, 632:12, 686:9

**Strongman** [18] - 614:25, 617:16, 623:5, 624:21, 626:20, 631:8, 632:22, 633:2, 634:3, 643:24, 655:4, 656:7, 668:11, 680:4, 683:7, 696:3, 709:13, 710:16

**STRONGMAN** [84] - 607:18, 610:4, 612:17, 612:22, 613:7, 614:6, 614:10, 615:9, 615:24, 617:8, 617:10, 617:17, 620:15, 620:17, 622:22, 622:24, 623:11, 623:23, 624:5, 624:22, 625:4, 626:19, 626:21, 631:1,

631:9, 633:4, 633:18, 633:22, 638:23, 640:23, 643:22, 644:2, 648:18, 648:22, 649:9, 653:17, 654:4, 655:3, 655:7, 656:13, 656:16, 657:6, 657:10, 658:2, 658:12, 665:19, 666:4, 666:7, 666:20, 667:12, 668:3, 669:6, 669:9, 669:20, 669:22, 669:24, 670:3, 670:17, 673:22, 678:9, 679:22, 683:5, 688:1, 688:4, 689:8, 694:19, 694:21, 695:6, 695:16, 696:4, 696:7, 701:7, 701:10, 701:16, 701:24, 704:6, 704:8, 704:25, 705:7, 708:15, 709:7, 709:19, 710:13, 710:18

**struck** [2] - 648:16, 787:3

**structurally** [2] - 705:14, 705:15

**structures** [1] - 763:6

**stuck** [5] - 733:3, 733:11, 749:1, 815:8, 817:2

**students** [1] - 621:18

**studied** [2] - 689:1, 831:9

**studies** [20] - 620:8, 665:3, 665:25, 669:2, 670:22, 671:2, 676:4, 676:11, 676:20, 677:1, 682:11, 683:13, 684:6, 688:14, 689:16, 693:6, 693:7, 698:7, 698:8

**Studies** [1] - 665:8

**study** [11] - 611:1, 675:19, 675:24, 676:23, 682:7, 682:15, 683:3, 683:11, 684:3, 692:22, 693:4

**stuff** [7] - 621:8, 687:13, 716:19, 741:18, 777:22,

780:13, 788:3
**Subhash** [1] - 855:20
**subject** [1] - 736:9
**submit** [1] - 727:25
**subsequently** [1] - 843:7
**substance** [2] - 624:19, 683:8
**substances** [1] - 618:16
**substantial** [3] - 690:14, 690:16, 690:17
**success** [1] - 835:16
**successful** [3] - 682:4, 804:5
**sudden** [1] - 830:7
**suddenly** [1] - 684:13
**suffer** [4] - 729:6, 827:18, 827:25, 831:3
**suffered** [1] - 828:17
**suffering** [7] - 724:17, 732:3, 796:19, 820:8, 827:21, 849:16
**sufficiently** [1] - 845:11
**suggest** [1] - 797:1
**suggested** [1] - 779:12
**SUI** [7] - 688:14, 689:14, 755:1, 766:5, 767:5, 767:10, 767:12
**suitable** [1] - 838:1
**Suite** [2] - 607:4, 607:9
**Sumika** [5] - 625:14, 626:17, 626:18, 627:11, 699:5
**summers** [1] - 831:20
**supplier** [2] - 661:24, 685:8
**suppliers** [2] - 684:18, 699:10
**support** [3] - 714:7, 723:1, 833:15
**supported** [6] - 620:4, 620:5, 620:6, 622:5, 622:8, 622:10
**supposed** [3] - 632:15, 674:24, 806:20
**suprapubic** [2] - 842:17, 845:2
**surface** [3] - 664:13, 664:15, 774:22
**surgeon** [1] - 770:9
**surgeries** [1] - 788:11

**Surgery** [1] - 856:18
**surgery** [118] - 647:11, 653:1, 695:2, 719:10, 719:12, 721:15, 721:20, 726:15, 729:3, 729:13, 729:16, 729:25, 730:21, 730:23, 731:3, 731:6, 731:9, 731:12, 743:11, 745:5, 745:23, 746:8, 749:14, 749:24, 750:14, 751:19, 751:20, 754:25, 755:1, 755:5, 755:8, 755:19, 756:16, 758:10, 760:23, 761:11, 762:19, 763:15, 763:18, 764:2, 764:5, 764:14, 764:20, 764:24, 768:1, 768:2, 768:7, 771:7, 771:18, 771:22, 771:24, 772:8, 772:13, 772:17, 773:1, 774:2, 786:9, 792:22, 795:13, 795:19, 801:12, 803:4, 803:13, 803:16, 803:17, 803:23, 804:16, 806:10, 806:12, 807:2, 807:12, 807:14, 807:20, 808:9, 808:19, 813:23, 814:11, 814:13, 814:20, 814:21, 814:25, 819:11, 821:13, 821:15, 821:16, 822:16, 823:23, 824:23, 828:2, 828:5, 828:15, 829:1, 829:14, 829:18, 832:9, 832:22, 832:25, 833:6, 833:7, 834:11, 834:14, 834:20, 836:15, 836:16, 836:19, 838:7, 838:20, 839:7, 841:16, 841:17, 843:7, 844:9, 844:24, 848:7, 850:13
**surgical** [5] - 687:4, 770:5, 833:25, 834:2, 843:4

**surprised** [1] - 837:21
**suspect** [2] - 722:6, 801:15
**sustain** [12] - 621:1, 623:12, 649:2, 653:15, 657:12, 658:3, 694:23, 727:20, 808:4, 810:6, 816:15, 851:2
**sustained** [11] - 638:22, 656:18, 668:13, 673:24, 674:3, 724:1, 725:15, 726:5, 805:25, 808:2, 812:12
**swim** [3] - 800:14, 800:16
**swimmer** [1] - 799:23
**swimming** [1] - 800:22
**SWORN** [4] - 609:16, 660:1, 712:20, 798:11
**symptoms** [15] - 744:16, 763:25, 808:17, 810:15, 826:18, 826:19, 827:1, 832:19, 844:7, 846:11, 847:4, 847:8, 849:2, 851:11, 851:15
**Symptoms** [1] - 845:1
**syncope** [2] - 792:4, 792:5
**syndrome** [1] - 753:4
**Syndrome** [1] - 799:16
**synopsis** [1] - 611:19
**synthetic** [3] - 760:10, 760:11, 760:19
**system** [18] - 678:8, 687:3, 691:24, 692:4, 692:5, 697:25, 701:6, 714:7, 736:18, 737:6, 738:19, 738:25, 759:19, 788:20, 789:11, 802:25, 804:8, 830:8

---

**T**

**tab** [1] - 774:17
**Tab** [4] - 768:21, 824:2, 824:12, 826:10
**Table** [4] - 627:16, 627:25, 628:3, 628:4
**talks** [6] - 613:18,

627:25, 636:16, 692:22, 761:11, 763:4
**tall** [3] - 822:22, 822:23, 823:1
**tallied** [1] - 649:18
**tampon** [1] - 815:8
**tangs** [3] - 676:21, 676:24, 677:2
**tape** [14] - 811:23, 814:15, 814:18, 814:22, 832:9, 832:10, 832:13, 833:18, 835:10, 835:13, 837:7, 837:12, 846:16
**tat** [1] - 690:20
**taught** [1] - 654:18
**teach** [3] - 621:16, 621:18, 657:4
**teacher** [1] - 620:10
**teaches** [2] - 620:10, 621:19
**teaching** [1] - 624:17
**team** [8] - 671:6, 675:7, 675:10, 697:8, 697:19, 800:14, 800:15, 800:17
**teams** [1] - 696:19
**tech** [1] - 778:7
**technical** [3] - 697:5, 702:18, 780:21
**technician** [2] - 748:4, 780:21
**technique** [1] - 700:8
**Tegretol** [2] - 802:24, 830:8
**television** [1] - 788:4
**temperature** [4] - 830:20, 847:24, 848:3, 848:11
**ten** [6] - 721:23, 728:24, 729:1, 784:20, 784:21, 853:7
**tendency** [1] - 622:17
**tenderness** [2] - 843:24, 846:17
**tends** [2] - 706:15, 825:11
**Tennessee** [10] - 610:13, 611:24, 612:3, 612:8, 651:21, 651:23, 652:3, 652:7, 653:7, 654:21
**tension** [9] - 671:19, 671:25, 674:25, 675:11, 675:13,

675:14, 675:19, 675:22, 675:25
**tension-free** [3] - 671:19, 674:25, 675:14
**term** [9] - 613:24, 665:11, 665:25, 667:17, 668:22, 669:2, 669:25, 671:2, 692:18
**terminated** [1] - 738:2
**terminology** [1] - 663:14
**terms** [5] - 653:3, 704:3, 716:17, 801:15, 811:25
**test** [10] - 671:24, 672:1, 683:21, 700:4, 700:24, 706:1, 707:24, 822:15, 822:19, 822:21
**tested** [10] - 664:22, 672:6, 672:21, 691:23, 692:4, 731:17, 750:9, 753:25, 754:3, 795:5
**TESTIFIED** [4] - 609:16, 660:1, 712:20, 798:11
**testified** [12] - 617:13, 624:15, 624:17, 677:16, 678:1, 678:22, 680:23, 686:7, 709:14, 748:19, 812:13, 812:15
**testifies** [1] - 812:11
**testify** [2] - 624:18, 812:21
**testifying** [6] - 620:12, 624:24, 624:25, 680:13, 813:2, 813:3
**testimony** [30] - 614:14, 620:2, 621:5, 633:13, 633:14, 635:2, 648:16, 649:4, 651:3, 660:15, 663:3, 667:22, 668:12, 669:1, 670:14, 671:12, 690:5, 713:7, 716:4, 723:14, 723:15, 754:23, 776:23, 812:6, 821:19, 824:6, 824:10, 824:11, 835:24, 852:23
**testing** [54] - 662:14,

663:1, 671:10,
671:13, 672:3,
672:15, 672:19,
672:25, 673:1,
675:7, 675:10,
675:17, 675:21,
690:5, 690:24,
699:23, 700:1,
700:16, 700:20,
700:22, 700:23,
701:15, 702:1,
703:11, 703:15,
705:22, 705:25,
706:16, 706:24,
707:3, 707:14,
708:1, 708:19,
708:25, 709:2,
709:14, 709:17,
710:12, 710:25,
712:8, 748:14,
748:18, 749:4,
749:24, 751:25,
754:5, 754:6, 754:7,
765:2, 765:10,
770:20, 813:23,
815:25

**Testing** [1] - 672:11

**tests** [22] - 671:11,
700:3, 701:2, 701:4,
703:3, 704:1,
705:16, 705:18,
749:20, 750:12,
754:13, 754:15,
806:5, 806:6, 806:7,
806:8, 811:15,
811:17, 811:19,
811:21, 815:23

**textbook** [1] - 621:19

**textbooks** [1] - 622:8

**thankful** [1] - 802:7

**THE** [225] - 606:1,
606:2, 606:14,
607:2, 607:11,
607:14, 608:7,
609:7, 609:9,
609:13, 609:14,
609:17, 609:18,
609:19, 609:24,
610:6, 612:19,
612:21, 613:6,
613:15, 614:2,
614:9, 614:12,
614:17, 614:18,
615:17, 617:9,
617:11, 617:16,
617:22, 620:16,
620:18, 620:23,
621:1, 621:4,
622:23, 623:1,
623:4, 623:12,

623:24, 624:1,
624:14, 624:23,
626:20, 626:23,
626:25, 630:19,
631:2, 631:6, 631:8,
631:13, 631:18,
632:22, 633:1,
633:7, 633:21,
638:22, 640:13,
640:19, 640:21,
643:23, 644:1,
645:2, 645:11,
648:12, 648:21,
649:1, 653:14,
654:6, 655:4, 655:8,
655:18, 656:15,
656:17, 657:7,
657:12, 658:3,
658:13, 659:1,
659:2, 659:4, 659:9,
659:20, 659:23,
659:25, 660:12,
666:5, 666:14,
666:23, 667:2,
667:10, 668:5,
668:11, 669:8,
669:12, 669:16,
669:23, 670:5,
673:23, 678:10,
678:13, 678:15,
678:19, 679:23,
680:3, 680:5,
680:10, 683:6,
683:11, 688:2,
688:20, 689:7,
689:19, 690:9,
690:23, 694:20,
694:23, 695:8,
695:9, 695:19,
695:21, 696:3,
696:6, 701:8, 701:9,
701:19, 701:21,
704:7, 705:2, 705:4,
708:17, 709:10,
709:12, 709:18,
709:20, 710:16,
710:19, 711:22,
712:13, 712:14,
712:15, 712:18,
721:4, 723:16,
723:18, 723:22,
723:25, 725:15,
726:5, 727:2, 727:5,
727:12, 727:18,
727:20, 728:4,
736:1, 742:7,
746:18, 750:16,
750:18, 750:21,
751:7, 751:9,
751:14, 762:5,
768:17, 769:19,

793:23, 794:21,
797:20, 797:22,
798:1, 798:4, 798:9,
798:12, 798:14,
805:24, 808:2,
810:5, 812:5, 812:8,
812:11, 813:1,
813:14, 813:18,
813:25, 814:5,
814:9, 816:12,
816:18, 819:18,
823:25, 842:1,
842:9, 848:24,
849:3, 849:6,
850:25, 851:5,
851:23, 851:24,
851:25, 852:2,
852:6, 852:11,
852:15, 852:22,
853:5, 853:11,
853:14, 853:18,
853:21, 853:25,
854:13, 854:25,
855:5, 855:10,
855:15, 856:1,
856:6, 857:22,
857:24, 858:6,
858:9, 858:14

**themselves** [2] -
672:14, 794:19

**theories** [1] - 620:2

**theory** [1] - 664:21

**therapy** [1] - 744:19

**thereabouts** [2] -
681:7, 682:1

**therefore** [1] - 615:2

**they've** [1] - 842:2

**thighs** [1] - 763:2

**thin** [2] - 672:21,
716:25

**think's** [1] - 756:11

**thinking** [2] - 617:19,
641:11

**third** [3] - 618:8,
762:25, 781:15

**Thomas** [2] - 744:11,
857:18

**THOMAS** [1] - 607:6

**thoroughly** [1] - 771:8

**thousand** [1] - 833:3

**thousands** [4] -
649:19, 649:20,
649:22, 649:23

**three** [22] - 650:17,
660:19, 661:20,
702:25, 752:25,
765:14, 791:16,
794:7, 800:3, 804:8,
804:24, 805:2,
807:9, 817:3,

817:25, 818:15,
821:16, 838:19,
842:21, 843:16,
846:6, 848:6

**THROUGH** [1] -
858:10

**thumb** [4] - 822:21,
822:23, 822:25,
823:5

**tie** [2] - 709:8, 745:12

**tied** [2] - 689:12, 849:2

**tier** [1] - 663:13

**tight** [1] - 811:24

**timeline** [1] - 790:23

**tissue** [4] - 674:13,
674:16, 676:24,
753:19

**tissues** [1] - 617:3

**tit** [1] - 690:20

**titanium** [1] - 829:15

**title** [1] - 618:12

**today** [41] - 610:19,
612:14, 616:6,
620:3, 620:8,
620:12, 623:21,
635:2, 636:21,
638:18, 638:24,
639:18, 640:6,
640:7, 640:24,
651:7, 652:18,
660:8, 660:19,
660:25, 661:7,
661:17, 670:13,
713:2, 713:23,
714:3, 727:23,
728:16, 729:6,
730:12, 732:3,
734:6, 734:14,
734:24, 735:4,
740:1, 748:8,
785:16, 785:20,
820:3, 852:5

**together** [6] - 617:20,
634:15, 677:18,
818:10, 819:25,
824:3, 830:10, 849:2

**toilet** [1] - 826:22

**tomorrow** [1] - 854:5

**tone** [1] - 683:8

**took** [15] - 635:6,
635:17, 637:18,
700:11, 704:19,
722:17, 779:6,
798:10, 804:6,
814:13, 831:25,
832:1, 841:2

**top** [17] - 627:10,
628:4, 642:25,
655:8, 655:11,
700:13, 702:12,

711:6, 746:22,
747:7, 763:9,
766:18, 774:21,
776:12, 778:4,
837:4, 843:15

**Topamax** [2] - 740:15,
740:24

**topic** [2] - 643:5,
736:9

**topics** [1] - 660:19

**TOT** [6] - 755:23,
757:3, 774:1, 774:2,
784:23, 786:2

**total** [1] - 747:6

**touch** [2] - 658:16,
691:4

**touched** [1] - 794:4

**touches** [1] - 817:20

**tough** [1] - 738:10

**toward** [2] - 677:11,
755:1

**towards** [4] - 706:21,
809:4, 810:17,
820:14

**toxic** [2] - 632:1, 632:3

**toxicity** [1] - 630:6

**track** [1] - 800:22

**tract** [9] - 734:17,
734:21, 740:5,
740:9, 740:12,
744:18, 746:22,
787:18, 789:17

**trans** [1] - 757:1

**TRANSCRIPT** [1] -
606:3

**transcript** [4] -
606:24, 667:23,
668:4, 859:7

**Transform** [1] - 700:7

**Transobturator** [1] -
837:7

**transobturator** [5] -
757:3, 762:12,
762:13, 771:2,
835:10

**transvaginal** [1] -
699:21

**transvaginally** [1] -
685:15

**treat** [6] - 642:2,
647:7, 647:14,
717:11, 749:12,
780:14

**treated** [1] - 790:15

**treater** [1] - 780:9

**treating** [1] - 652:19

**treatment** [15] -
719:14, 721:19,
728:3, 749:25,
764:1, 771:3, 783:6,

801:19, 801:20,
814:22, 815:14,
825:17, 835:16,
835:17, 847:2
**treats** [1] - 653:25
**Trelex** [4] - 685:4,
685:6, 685:9, 687:15
**Trial** [1] - 858:10
**trial** [13] - 629:5,
661:21, 667:1,
686:12, 686:15,
687:5, 693:3, 713:4,
713:7, 754:21,
799:3, 853:8, 854:8
**TRIAL** [1] - 606:12
**trials** [12] - 662:24,
663:8, 671:7, 677:7,
677:10, 677:12,
687:24, 688:23,
691:6, 691:9,
691:20, 694:11
**tried** [6] - 637:20,
720:20, 721:17,
728:18, 729:1
**trigeminal** [9] -
801:13, 801:19,
801:21, 804:20,
828:9, 830:1, 831:6,
848:8, 848:10
**triggered** [1] - 848:11
**triggers** [1] - 802:6
**trophies** [1] - 800:20
**true** [14] - 619:14,
630:21, 635:16,
641:18, 649:24,
657:23, 694:5,
708:11, 760:7,
774:20, 826:22,
827:14, 828:16,
859:6
**True** [10] - 660:25,
691:20, 691:21,
694:6, 694:7, 694:8,
694:9, 694:11,
694:12, 694:14
**truly** [2] - 833:17,
834:12
**trusted** [2] - 782:24,
837:22
**truth** [4] - 694:17,
695:3, 695:13,
695:24
**try** [17] - 629:8, 649:3,
650:10, 675:21,
720:12, 729:10,
735:8, 735:20,
735:23, 736:13,
740:21, 741:15,
742:11, 799:11,
799:24, 803:25,

813:15
**trying** [9] - 613:24,
624:6, 674:19,
707:10, 710:24,
767:20, 790:22,
847:19, 852:4
**TSM** [1] - 627:7
**tube** [5] - 744:4,
756:2, 822:15,
822:19, 822:21
**tubes** [1] - 752:14
**turn** [9] - 637:10,
644:11, 646:20,
650:2, 702:24,
769:4, 824:2, 824:9,
825:22
**turning** [1] - 788:2
**TV** [5] - 665:8, 709:4,
788:18, 791:10,
811:16
**TVT** [28] - 662:3,
662:7, 662:9,
663:18, 663:19,
663:22, 664:1,
664:21, 665:13,
666:2, 666:3,
667:19, 670:24,
676:15, 682:4,
682:17, 682:24,
683:16, 692:4,
693:16, 697:6,
700:11, 703:18,
704:3, 704:17,
704:23, 705:13,
712:1
**TVTs** [1] - 663:25
**TWEEL** [1] - 607:6
**Twenty** [1] - 732:13
**twisted** [2] - 815:8,
815:9
**twisting** [1] - 815:7
**two** [31] - 641:3,
660:19, 661:20,
672:12, 672:16,
672:22, 673:4,
673:7, 673:11,
703:7, 705:11,
714:20, 715:19,
724:9, 747:14,
753:8, 765:13,
788:10, 792:12,
792:14, 796:19,
799:18, 799:25,
802:12, 805:2,
830:10, 831:3,
831:11, 833:3,
841:18, 842:2
**two-and-a-half** [2] -
799:18, 799:25
**two-inch** [6] - 672:12,

672:16, 672:22,
673:4, 673:7, 673:11
**two-sided** [1] - 776:9
**TX** [1] - 607:5, 607:12
**Tylenol** [3] - 802:20,
802:22, 831:5
**type** [8] - 621:13,
622:19, 687:17,
716:18, 725:7,
737:1, 817:6, 828:17
**types** [3] - 641:18,
652:25, 822:10
**typical** [1] - 802:18
**typically** [2] - 673:17,
798:19
**TYREE** [6] - 606:6,
608:10, 712:20,
712:22, 736:2,
793:24
**Tyree** [18] - 712:17,
712:18, 712:23,
713:4, 713:13,
723:20, 736:3,
751:17, 751:25,
766:18, 768:19,
774:11, 782:15,
793:21, 796:14,
818:22, 855:1,
855:13

---

# U

**ultimately** [5] -
686:21, 706:22,
717:10, 829:1,
832:22
**Ultimately** [1] - 687:16
**ultrasound** [1] -
840:19
**um-hum** [5] - 761:17,
774:3, 790:4,
795:21, 824:12
**uncertain** [1] - 811:25
**uncomfortable** [1] -
834:11
**unconcerned** [1] -
722:15
**under** [39] - 634:25,
637:16, 671:13,
675:20, 675:25,
676:6, 676:7,
676:12, 676:16,
703:1, 712:6,
726:17, 728:2,
728:12, 729:13,
744:7, 745:16,
765:1, 770:10,
781:7, 781:19,
785:8, 785:19,
802:23, 804:12,

824:6, 825:10,
830:9, 833:19,
834:8, 839:21,
840:1, 843:23,
844:4, 845:1,
845:22, 846:1,
846:14
**undergo** [4] - 619:17,
621:19, 729:10,
844:12
**undergoing** [1] -
836:14
**underline** [1] - 628:12
**underneath** [3] -
664:6, 664:9, 842:16
**understated** [1] -
834:12
**understood** [21] -
657:21, 664:4,
753:18, 755:24,
758:2, 760:11,
761:4, 761:16,
762:21, 763:14,
812:20, 812:21,
829:18, 829:20,
833:7, 833:10,
833:17, 837:9,
837:11, 844:11
**underwear** [1] -
824:24
**underwent** [2] -
730:21, 829:1
**undesirable** [1] -
764:5
**unforeseen** [1] - 756:7
**unfortunately** [1] -
655:5
**unhappy** [2] - 846:25,
854:6
**Unintended** [1] -
763:5
**union** [1] - 759:2
**UNITED** [2] - 606:1,
606:15
**United** [2] - 609:2,
859:4
**University** [12] -
610:13, 611:20,
611:24, 612:3,
651:21, 651:23,
652:3, 652:6, 653:7,
654:21, 714:22,
737:18
**unless** [1] - 631:15
**unrealistic** [1] -
645:19
**unrelated** [1] - 751:1
**up** [110] - 612:15,
616:17, 618:5,
623:24, 627:3,

629:5, 629:16,
629:19, 629:21,
636:13, 644:23,
649:18, 651:18,
652:2, 656:7, 665:7,
665:17, 666:8,
666:11, 666:17,
666:23, 667:4,
667:6, 667:9, 668:4,
668:12, 670:5,
680:19, 683:8,
688:10, 691:4,
691:5, 691:15,
693:7, 693:14,
693:25, 702:4,
702:8, 706:9,
710:15, 710:22,
712:18, 717:16,
721:1, 722:10,
725:18, 726:8,
727:14, 736:5,
738:18, 741:23,
742:5, 745:16,
752:24, 755:15,
756:2, 756:3,
762:17, 765:15,
774:17, 777:9,
778:3, 779:1,
780:18, 780:25,
788:18, 789:7,
789:10, 791:21,
794:2, 799:5, 803:1,
803:14, 803:16,
804:11, 804:13,
809:11, 811:7,
811:16, 811:24,
811:25, 815:10,
819:5, 819:11,
825:7, 825:15,
834:6, 834:9,
834:16, 834:17,
834:24, 836:22,
836:23, 837:4,
838:6, 838:23,
839:17, 840:2,
840:9, 840:13,
841:25, 843:10,
843:15, 844:21,
844:24, 845:16,
846:5, 846:8,
852:22, 853:16
**up-to-date** [1] -
693:25
**upper** [1] - 743:16
**ups** [3] - 772:22,
804:23, 805:2
**Upton** [6] - 741:9,
780:22, 781:4,
782:19, 783:1,
791:25

**Upton's** [2] - 780:9, 780:20
**upwards** [1] - 802:11
**uranium** [1] - 612:8
**ureter** [2] - 758:21, 763:6
**ureterolysis** [1] - 753:16
**urethra** [15] - 664:6, 664:10, 664:11, 676:17, 712:6, 726:20, 744:1, 744:2, 744:4, 744:8, 745:6, 756:3, 770:17, 833:19, 846:17
**urethral** [7] - 743:20, 743:25, 745:1, 745:17, 757:3, 762:13, 771:2
**urethrolysis** [1] - 844:7
**urge** [2] - 771:12, 825:4
**urgency** [4] - 765:13, 796:22, 845:23, 849:17
**urinalysis** [1] - 787:19
**urinary** [60] - 642:2, 647:10, 647:14, 650:18, 687:4, 713:8, 716:5, 716:9, 716:16, 716:18, 717:4, 717:11, 718:4, 718:19, 718:22, 729:4, 729:6, 729:9, 729:23, 734:17, 734:20, 740:5, 740:9, 740:12, 744:16, 744:18, 746:22, 749:12, 750:9, 758:1, 758:3, 761:1, 761:12, 761:13, 763:25, 765:2, 770:16, 771:12, 771:14, 773:2, 787:18, 789:17, 801:11, 805:4, 805:9, 807:7, 808:9, 808:16, 808:17, 811:2, 820:8, 820:11, 826:18, 827:1, 832:19, 842:18, 847:8, 849:2, 849:17
**urinate** [4] - 744:5, 825:7, 825:11, 838:12
**urinating** [1] - 826:24

**urination** [8] - 765:13, 846:11, 847:5, 849:23, 850:5, 850:20, 851:11, 851:16
**urine** [16] - 758:23, 759:2, 820:18, 821:25, 822:4, 822:15, 823:2, 823:4, 823:12, 823:22, 824:17, 825:1, 826:4, 839:22, 844:8, 845:23
**urodynamic** [1] - 770:20
**urologist** [4] - 805:17, 805:18, 811:6, 811:7
**urology** [2] - 698:15, 698:17
**user** [2] - 707:1, 707:3
**users** [1] - 707:2
**uses** [1] - 621:14
**uterus** [3] - 809:17, 840:3, 840:17
**UTI** [2] - 787:23, 789:25
**utilizes** [1] - 661:17

## V

**vagina** [6] - 733:3, 748:23, 749:2, 763:3, 814:17, 833:8
**vaginal** [12] - 651:13, 654:9, 658:20, 715:20, 746:23, 771:13, 809:3, 815:7, 816:25, 817:18, 849:17, 849:18
**Vaguely** [2] - 710:5, 710:6
**validation** [2] - 706:24, 707:24
**validity** [1] - 610:20
**valleys** [1] - 700:10
**value** [1] - 672:22
**various** [1] - 688:12
**Vellore** [1] - 856:21
**vendor** [1] - 699:4
**verbal** [8] - 666:10, 769:2, 769:3, 769:8, 769:9, 769:22, 772:1
**verification** [3] - 706:23, 707:24, 708:3
**versions** [1] - 684:14
**versus** [2] - 689:14, 693:16

**vessels** [1] - 761:21
**vibrates** [1] - 721:5
**video** [1] - 826:12
**videos** [4] - 852:20, 852:25, 853:1, 853:2
**view** [5] - 666:15, 666:19, 666:24, 689:21, 854:7
**violent** [2] - 823:8, 823:9
**Virginia** [8] - 609:3, 713:15, 713:21, 737:17, 737:18, 799:1, 859:5
**VIRGINIA** [1] - 606:2
**visit** [19] - 611:12, 722:25, 723:4, 724:22, 725:1, 773:6, 777:15, 779:1, 786:21, 787:24, 809:11, 833:2, 839:21, 840:9, 843:10, 844:22, 846:8, 846:20, 846:25
**visiting** [1] - 724:18
**visits** [2] - 722:10, 792:21
**void** [2] - 744:17, 844:6
**Voiding** [1] - 778:8
**voiding** [1] - 778:14
**voids** [1] - 796:21
**volunteer** [1] - 799:22
**volunteering** [1] - 799:18
**vomited** [1] - 792:9
**vomiting** [1] - 763:10

## W

**wages** [1] - 735:1
**WAGSTAFF** [32] - 607:8, 607:9, 712:16, 712:22, 721:2, 721:11, 723:17, 723:19, 723:23, 724:2, 725:16, 725:17, 726:6, 726:7, 726:25, 727:4, 727:7, 727:14, 727:19, 727:21, 727:25, 728:13, 728:14, 735:25, 751:5, 752:5, 793:24, 794:24, 796:8, 797:19, 855:8, 855:14
**Wagstaff** [5] - 713:1,

727:3, 727:13, 754:16, 818:22
**wait** [2] - 719:19, 760:23
**waited** [1] - 721:15
**wake** [1] - 834:9
**waking** [1] - 834:6
**Wal** [1] - 857:21
**Wal-Mart** [1] - 857:21
**walk** [1] - 794:7
**walked** [3] - 652:9, 652:18, 653:7
**WALKER** [1] - 607:6
**walking** [1] - 817:22
**walks** [1] - 765:6
**wall** [2] - 733:12, 800:21
**walls** [2] - 733:3, 749:1
**wants** [2] - 771:1, 771:18
**war** [1] - 612:9
**warn** [4] - 689:4, 689:18, 690:19, 690:22
**warning** [8] - 680:6, 684:12, 689:1, 692:10, 692:19, 692:23, 699:7, 731:21
**warnings** [2] - 684:7, 690:23
**warrants** [2] - 736:25, 737:2
**warring** [1] - 692:14
**WAS** [5] - 627:2, 633:17, 678:17, 701:23, 705:6
**washing** [1] - 792:8
**watching** [2] - 799:3, 818:23
**water** [11] - 656:4, 656:8, 656:9, 656:21, 656:24, 721:3, 804:2, 818:11, 847:24
**water's** [1] - 656:8
**waves** [1] - 828:14
**weakness** [1] - 763:1
**weapons** [1] - 612:13
**wear** [3] - 716:21, 716:25
**weather** [6] - 802:7, 804:7, 804:9, 804:24, 830:7, 830:18
**Wednesday** [2] - 798:19, 804:10
**week** [11] - 720:4, 720:6, 744:13,

745:5, 787:21, 798:21, 799:11, 803:18, 804:20, 806:21
**weekend** [1] - 858:14
**weeks** [7] - 719:22, 721:16, 748:18, 764:23, 772:19, 792:12, 792:14
**weigh** [1] - 747:21
**weight** [3] - 777:22, 777:23, 777:24
**WEILER** [46] - 607:18, 805:23, 808:1, 810:4, 812:4, 812:6, 813:13, 813:17, 814:1, 814:4, 816:8, 819:19, 823:24, 824:1, 834:16, 834:19, 834:24, 835:1, 836:22, 836:25, 837:4, 837:6, 837:13, 837:15, 838:23, 839:1, 839:17, 839:19, 840:13, 840:15, 841:25, 842:10, 842:11, 848:25, 849:7, 849:8, 851:3, 853:23, 854:23, 855:2, 855:17, 856:4, 856:7, 857:23, 858:8, 858:12
**Weiler** [11] - 813:5, 813:12, 814:5, 819:18, 819:23, 842:9, 851:10, 851:16, 853:21, 854:13, 856:2
**weird** [1] - 815:7
**welcome** [1] - 853:15
**Wellbutrin** [2] - 739:11, 740:2
**WERE** [1] - 858:10
**WEST** [1] - 606:2
**West** [8] - 609:2, 609:3, 713:15, 713:21, 737:17, 737:18, 799:1, 859:5
**white** [3] - 667:24, 770:13
**whole** [12] - 620:7, 667:1, 677:23, 683:4, 694:17, 695:3, 695:13, 695:24, 697:19, 758:8, 762:24, 834:17

**wide** [11] - 672:9, 672:12, 672:14, 672:16, 672:22, 673:4, 673:8, 673:11, 706:3, 822:21, 822:23
**willing** [1] - 803:22
**Wilmington** [1] - 611:10
**WILSON** [5] - 608:11, 798:11, 798:16, 819:19, 851:6
**Wilson** [13] - 756:12, 756:24, 757:22, 798:8, 798:25, 799:2, 816:13, 819:20, 822:12, 826:13, 835:22, 837:1, 851:23
**withdraw** [4] - 723:17, 854:16, 854:22, 855:11
**withdrawing** [1] - 727:3
**withdrawn** [4] - 623:5, 723:18, 727:6, 735:7
**witness** [40] - 609:9, 620:22, 624:14, 625:18, 631:10, 631:14, 632:20, 633:8, 633:20, 645:6, 649:3, 649:5, 654:5, 659:3, 659:4, 659:5, 659:20, 660:11, 670:7, 678:18, 679:25, 683:9, 695:7, 695:17, 712:15, 712:16, 735:25, 756:12, 793:23, 797:24, 797:25, 798:10, 798:20, 814:2, 819:16, 851:4, 851:5, 851:25, 852:7, 852:17
**WITNESS** [21] - 609:17, 617:9, 622:23, 631:2, 640:21, 644:1, 645:11, 655:8, 655:18, 659:2, 668:5, 680:5, 683:11, 695:9, 695:21, 701:9, 712:14, 721:4, 798:12, 816:18, 851:24
**witness's** [2] - 670:13, 852:22

**witnessed** [2] - 757:15, 757:22
**WITNESSES** [1] - 608:6
**witnesses** [2] - 798:2, 852:19
**woman** [3] - 682:3, 685:15, 736:11
**woman's** [4] - 665:12, 667:18, 668:23, 685:25
**Women** [2] - 671:22, 855:22
**women** [5] - 643:21, 644:8, 645:20, 662:19, 685:20
**women's** [1] - 698:17
**won** [1] - 800:20
**Wood** [1] - 856:17
**word** [6] - 648:24, 755:16, 790:22, 793:9, 826:11, 837:12
**words** [8] - 664:16, 692:9, 692:20, 728:7, 767:9, 767:20, 770:12, 794:19
**works** [6] - 738:19, 747:24, 747:25, 802:20, 802:22, 831:4
**world** [6] - 611:8, 619:20, 622:16, 653:6, 655:9, 792:18
**worldwide** [2] - 702:15, 702:21
**worse** [3] - 729:8, 757:9, 821:10
**worsen** [2] - 821:12, 821:19
**worsened** [1] - 727:24
**worsening** [1] - 821:21
**wrap** [2] - 693:13, 829:12
**wrapped** [2] - 688:10, 803:25
**write** [7] - 612:15, 616:2, 767:14, 775:10, 775:12, 780:4, 787:10
**writing** [9] - 635:9, 648:6, 666:21, 666:22, 667:1, 775:22, 777:20, 779:7, 783:22
**written** [8] - 611:2, 767:16, 769:2, 769:7, 769:22,

778:11, 780:6, 785:8
**wrote** [12] - 635:23, 648:5, 649:11, 649:12, 775:11, 775:25, 778:8, 786:11, 787:2, 787:4, 787:9, 844:15
**WV** [2] - 607:7, 607:16

**Y**

**yard** [1] - 799:20
**year** [28] - 621:16, 641:11, 657:5, 737:23, 743:3, 743:10, 743:15, 750:14, 752:1, 776:24, 796:19, 799:16, 800:14, 804:24, 808:20, 817:25, 818:16, 818:17, 833:4, 839:7, 839:12, 847:17, 847:18, 848:4, 850:4, 850:12, 851:9
**Year's** [1] - 746:3
**year-old** [1] - 799:16
**years** [48] - 611:7, 619:15, 631:25, 665:14, 685:21, 699:4, 713:19, 714:10, 714:16, 715:11, 715:13, 715:14, 715:18, 732:9, 732:10, 732:13, 736:18, 736:21, 737:20, 738:17, 738:18, 738:22, 738:25, 739:24, 740:5, 740:19, 741:10, 742:3, 765:3, 765:11, 780:15, 780:18, 782:22, 796:19, 798:25, 799:25, 800:3, 803:1, 818:15, 828:18, 831:11, 831:16, 841:18, 842:21, 843:16, 848:5, 848:6
**yellow** [1] - 669:18
**yesterday** [2] - 620:7, 627:19
**young** [1] - 800:8
**yourself** [6] - 610:10, 704:19, 713:12, 736:14, 738:12, 798:23

**yourselves** [3] - 659:11, 842:4, 854:3

**Z**

**Zakrzewski** [4] - 625:19, 625:23, 626:16, 627:6
**zoom** [1] - 842:15